IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| JOE ALEXANDER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. ___3:19-cv-688___ |
| | ) | |
| | ) | **TRIAL BY JURY** |
| DIET MADISON AVENUE | ) | **IS DEMANDED** |
| DMA DOE DEFENDANTS 1-17 | ) | |
| ADWEEK, LLC | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| PATRICK COFFEE | ) | |
| | ) | |
| Defendants. | ) | |

# **COMPLAINT**

Plaintiff, Joe Alexander, by counsel, files the following Complaint against Defendants, Diet Madison Avenue ("DMA"), DMA Doe Defendants 1-17, Adweek, LLC ("Adweek") and Patrick Coffee ("Coffee"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$25,350,000.00**, (b) plus prejudgment interest on the principal sum awarded by the Jury from November 21, 2017 to the date of Judgment, and (c) court costs and expenses – arising out of the Defendants' tortious interference with contract, tortious interference with prospective economic advantage, common law conspiracy, defamation and intentional infliction of emotional distress.

# I.  INTRODUCTION



[https://www.ispot.tv/ad/AgQ3/geico-the-wisconsin ("**Fifteen minutes could save you 15% or more on car insurance**").  The GEICO Gecko has become a force to be reckoned with in the advertising world and was voted America's favorite advertising icon in 2005.  GEICO's small green friend has traveled the country spreading the good news about GEICO and has captivated audiences of all ages.  The idea for the Gecko grew from a creative session at GEICO's ad agency, The Martin Agency in Richmond, Virginia.  The name "GEICO" was often mispronounced "Gecko".  As the brainstorming began, a quick doodle of a gecko appeared.  The Gecko came to life and made his debut during the 1999-2000 television season.  https://www.geico.com/about/corporate/word-from-sponsor/].  In 2009, Forbes cited the Martin Agency's GEICO ads as part of the 100 things that makes America great.  [https://www.interpublic.com/our-agencies/recent-work/post?id=39&casename=GEICO].  Over the past two decades, GEICO's advertising campaigns – featuring the Gecko, the Caveman, the Humpday Camel, Maxwell the Pig,

Ice Cube and Little Richard – have been among the most creative, most awarded, and most successful in history. [https://martinagency.com/news/us-most-creative-partnerships-geico-the-martin-agency].

1.      Joe Alexander ("Joe") was the Chief Creative Officer ("CCO") at The Martin Agency.  He led the team of creatives responsible for the great success of the GEICO account and many others.  Under Joe's leadership, GEICO became the No. 2 car insurance brand; OREO's global sales rose 12%; Ping became the No. 1 driver in golf; and Donate Life's donor base increased 600%.  Joe's creative leadership produced acclaimed work for clients and brands in almost every category and medium. [https://joealexander.net/about-me-1].  In 2017, The Martin Agency won a Grand Clio[1] award for the powerful short film *Donate Life – The World's Biggest Asshole*. [https://clios.com/awards/winner/film/donate-life/the-world-s-biggest-asshole-17052].  In 2015, GEICO's *Unskippable* pre-roll campaign[2] was Adweek's Campaign of the Year and took home 12 Cannes Lions,[3] including the Grand Prix in Film:

---

[1]      The Clios is an  esteemed international awards competition for the creative business.  Founded in 1959 to celebrate high achievement in advertising, the Clios annually and throughout the year recognize the work, the agencies and the talent that push boundaries and establish new precedent.  The "Grand Clio" is the highest honor bestowed by the Clios. [https://clios.com/awards].

[2]      https://www.youtube.com/watch?v=g0zJNjGM5Dw ("You can't skip this GEICO ad because its already over");  https://www.youtube.com/watch?v=4ELn-NTKo44 (Geico – Unskippable Elevator);  https://www.youtube.com/watch?v=8JomU-0WHLk (Geico – Unskippable High Five); https://www.youtube.com/watch?v=cshPQ3ZbESs (Geico – Unskippable Hungry Dog).

[3]      The Cannes Lions are the most established and coveted awards for the creative and marketing communications industry.  Winning at the Cannes Lions International Festival of Creativity Festival puts you among the world's elite.  Cannes Lions trophies are recognized globally as the ultimate achievement in creativity. [https://www.canneslions.com/our-awards].



In 2013, *Clouds Over Cuba*, a striking interactive documentary produced for the JFK Presidential Library and Museum, won an Emmy Award.  It was the first time an advertising agency had ever won an Emmy in the News and Documentary category:



[https://martinagency.com/news/the_martin_agency_wins_emmy_for_clouds_over_cuba]

Well before Joe became CCO of The Martin Agency, he was the creative star of the Agency.  His writing for The JFK Presidential Library won international acclaim.  His writing for Healthtex captured the hearts of parents everywhere:



He helped win millions of dollars in new business for The Martin Agency, including Mercedes-Benz, Olympus, PING, Kindercare, Remy Martin, Careerbuilder, Pizza Hut, UPS, and more.  From 2010 to 2012, he led the Walmart account:



Under Joe, the Walmart account grew to be the largest in Agency history with over $45,000,000.00 in revenue.  When Joe was promoted to CCO in 2012, the late Mike

Hughes, former Martin Agency President, stated that "Joe's passion for the work, his unbridled drive to push hard for brilliant creative and his ability to mentor creative talent across all disciplines combine to make him the right guy for this critically important job." By May 2016, The Martin Agency was recognized at The One Show[4] as 2016 Agency of the Year. The Agency and GEICO also received the inaugural Penta Pencil, an award given to an agency-brand team who, together, have created stellar work for five or more continuous    years. [https://martinagency.com/news/the-one-show-names-martin-agency-2016-agency-of-the-year]. Joe was named one of the fifty (50) Most Creative People in the World by *Ad Age* magazine and the 7th most Creative in the World by Adweek. [https://adage.com/article/special-report-creativity-50-2015/creativity-50-2015-joe-alexander/301720; https://www.adweek.com/brand-marketing/10-chief-creative-officers-who-are-inspiring-breakthrough-work-us-agencies-165896/]. In 2017, just a few months before his termination, the One Club ranked Joe # 1 Chief Creative Officer in the world:



---

[4]      The One Show is one of the most prestigious awards competitions in advertising, design, interactive and branded entertainment. Judged every year by top industry professionals, a Gold Pencil is the ultimate symbol of creative excellence. [https://www.oneclub.org/awards/theoneshow/].

Joe was near the top of his career in advertising.

2. Everything Joe had worked for his entire life was destroyed in an instant by false and defamatory accusations of sexual harassment and other misconduct gratuitously published by DMA and the DMA Doe Defendants via anonymous direct messages transmitted to Joe's employer in Virginia, The Martin Agency. DMA and the DMA Doe Defendants threatened to expose The Martin Agency as an enabler of sexual harassment. DMA and its agents and co-conspirators caused The Martin Agency to summarily terminate Joe's employment without any due process or opportunity to be heard. In December 2017, after Joe's termination, DMA and the DMA Doe Defendants bragged publicly about what they had done to Joe and what they threatened to do (and later did) to others:



3.      In this case, Joe seeks money damages for the extreme insult, pain, embarrassment, humiliation, mental suffering, destruction of his career, destruction of his good name, destruction of his personal and professional reputations, and the enormous financial loss caused by the Defendants' tortious interference with contract, common law conspiracy, defamation, and intentional infliction of emotional distress.  The misconduct at issue in this case is egregious, intolerable and of an unprecedented type and scale.  While concealing their identities, the Defendants went out of their way to target and wreck the life of a hugely successful and incredibly popular Virginia creative.  The Defendants should be punished for their unlawful actions and a very strong message needs to be sent to prevent others of similar ilk from ever acting in a similar way.

## II.  **PARTIES**

4.      Joe lives in Richmond, Virginia.  He is 59-years old.  Joe grew up in a huge family with three sisters and five brothers.  Joe's father "Ace" was a man of honor, always aware of right and wrong.  He had very defined moral guidelines.  He was respectful and open to differing points of view and new ideas.  He passed those same traits on to Joe. [http://consciencenow.blogspot.com/].  Joe is married.  He helped raise three (3) smart, confident, compassionate, successful daughters, with whom he is very close.  In addition to GEICO, Joe led the creative effort that helped transform UPS from the world's leading shipping company to the world's leading supply chain and logistics provider by asking, "What can Brown do for you?".  As a result of Joe's creative leadership, The Martin Agency won Effie Awards[5] between 2012 and 2017 for multiple

---

[5]      The Effie Awards recognize all forms of marketing that contribute to a brand's success.  For over 50 years, winning an Effie has become a global symbol of achievement. [https://www.effie.org/worldwide/about].

campaigns on behalf of multiple different clients, including GEICO and Walmart. [https://effie.org/case_database/case/3051 (GEICO – Happier Than II, featuring the Hump Day Camel) (https://www.youtube.com/watch?v=WMsXhG9S2LU); https://www.effie.org/case_database/case/NA_2012_6637 (Walmart)]. The Martin Agency was named to the *Ad Age* Creative Innovators List four (4) times. [https://adage.com/article/special-report-agency-alist-2016/creativity-innovators-martin-agency/302296; https://martinagency.com/news/ad-ages-first-ever-campaign-of-the-year-award]. The creative genius of The Martin Agency was a major reason parent company Interpublic Group of Companies, Inc. ("IPG") was named the Most Effective Holding Company of the Year in 2017. [https://interpublicgroup.gcs-web.com/news-releases/news-release-details/ipg-named-most-effective-holding-company-2017-north-american].

5.      Joe sat on the distinguished board of The One Club, was Cannes Lions Film Jury President in 2016, and was a regular guest speaker in the advertising industry and on campuses, including the renowned VCU Brandcenter. It took a life-time for Joe to establish his name, good will and to build his personal and professional reputations. Until he was attacked and smeared by the Defendants beginning in November, Joe enjoyed an untarnished reputation in the advertising industry.

6.      Defendant, DMA, is a partnership, joint venture or unincorporated association of individuals, none of whom, upon information and belief, is a citizen of Virginia. DMA was formed in October 2017 by advertising executives and others for the sole purpose of anonymously doxxing, smearing and shaming alleged sexual harassers in the advertising industry. [https://adage.com/article/agency-news/diet-madison-avenue-

anonymous-instagram/312213 (DMA "is run by a 'collective' of 17 men and women who all have various day jobs in advertising, with additional assistance from 42 people on content creation, copy-writing design strategy and website and community management, according to the account.  It now [as of February 2, 2018] has 7,500 followers and counting, they say");  https://qz.com/1201495/metoo-and-diet-madison-avenue-sexual-harassment-allegations-at-publicis-wieden-kennedy-martin-agency/ (DMA "is managed by 17 men and women, and is aimed at 'exposing sexual harassment & discrimination in ad agencies since Oct 2017, cuz HR won't.'");  https://www.refinery29.com/en-us/2018/03/192252/diet-madison-avenue-instagram-account-sexual-harassment-advertising ("Diet Madison Avenue has so far named a number of alleged serial predators publicly, and there has indeed been a string of high-level firings")].   On or around January 29, 2018, DMA and the DMA Doe Defendants posted the following message on the *dietmadisonave* Instagram account:

> "We are growing, adding new people to our collective from agencies all over … so we are going to be everywhere.  This will just help us improve what we are doing, bring new people into the discussion, and help us figure out what we want to do as a collective.  As it remains, only the original select group of individuals will have access to private messages & emails".

 DMA's mission was to get white male chief creative officers fired.  DMA was not out to clean up the advertising industry or to change anything.  For DMA and the DMA Doe Defendants, it was personal and premeditated.  On February 2, 2018, DMA and the DMA Doe Defendants confirmed that it had targeted seven (7) advertising agencies:  "over the past few months we have held the following agencies accountable in a similar fashion: @martinagency @grey @tbwa @cpbgroup Next up: @mccann_ww & @180la."  DMA was aggressive, unabashed and publicly unapologetic:



The Martin Agency was ground zero in DMA's campaign of intimidation and character assassination.  DMA began operations in or about October 2017 after the group heard stories about how harassment complaints were allegedly handled at The Martin Agency in Richmond, Virginia.  [https://www.nytimes.com/2018/03/07/business/media/diet-madison-avenue-instagram.html].  DMA solicited stories from women, including former employees of The Martin Agency.  DMA compiled a "master" hit list of intended targets, which it posted online.  Joe was DMA's first victim.  DMA operated an Instagram account, "dietmadisonave". [https://www.instagram.com/dietmadisonave/].[6]  DMA used Instagram and its direct messenger ("DM") service to target Joe and others for

---

[6]      Instagram is a Instagram is a free photo and video sharing app available on Apple iOS, Android and Windows Phone. People can upload photos or videos to our service and share them with their followers or with a select group of friends. They can also view, comment and like posts shared by their friends on Instagram. Anyone 13 and older can create an account by registering an email address and selecting a username. [https://help.instagram.com/424737657584573].  Instagram is owned by Facebook, Inc. ("Facebook").  Facebook's is authorized to transact business in Virginia.  Its registered office and registered agent are located in the City of Richmond, Virginia.  According to Instagram's "Terms of Use," a user "**can't do anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose**," and "**can't post private or confidential information or do anything that violates someone else's rights**".  Further, Instagram's "Community Guidelines" state that it is unacceptable to post "content that targets private individuals to degrade or shame them" or "personal information meant to blackmail or harass someone".  [https://help.instagram.com/581066165581870 ("terms of Service); https://help.instagram.com/477434105621119 (Community Guidelines)].

termination.  DMA communicated anonymously with The Martin Agency and former employees of The Martin Agency in Virginia for the express purpose of interfering with and ending Joe's employment.  In addition to its Instagram account. DMA set up three (3) email accounts, dietmadisonavenue@gmail.com, dietmadisonave@gmail.com and Madisonaveabuse@gmail.com, that it used to communicate false and defamatory statements concerning its targets.[7]  Between October 2017 and the present, DMA and its agents published unverified, scandalous, and salacious statements about Joe, and acted as judge, jury and executioner to "call out" Joe for termination.  DMA acted without due process, without affording Joe or any other target an opportunity to be heard, without evidence or verification.  DMA blindly accepted stories from the women it solicited and, based on those stories, many of which were decades old and unverifiable, sentenced their targets to professional death.  DMA represented everything that was wrong about the nascent #MeToo movement.  It's statements and visual content graphically symbolized hatred, intolerance and rabid misandry.  DMA was determined to hold white male chief creative officers "accountable" no matter what the personal, professional and societal costs:[8]

---

[7]       In addition to Instagram and Gmail, DMA and the DMA Defendants were collectively responsible for publishing written and visual content on other social media platforms, including Facebook, Twitter, Snapchat, GoFundMe, and a WordPress website. DMA and the DMA Doe Defendants have since deleted, deactivated or discontinued many of these accounts.

[8]       An advocate of violent activism has taken credit for one visual image employed by DMA.  [https://twitter.com/ShannonDowney/status/959581597128445959 ("@dietmadisonave hey.  I'm in full support of outing the ad world perves.  The boys will be boys piece is mine.  Wanted you to know.  My insta is @badasscrossstitch so you can credit it")].



7.     Defendant, DMA Doe Defendants 1-17 (the "DMA Doe Defendants"), are identifiable partners, associates and/or individual members of DMA, who acted as a "collective" to destroy the careers of white male chief creative officers, including Joe. The DMA Doe Defendants have concealed their identities and have resisted every effort to unmask them.  Upon information and belief, the DMA Doe Defendants include current or former employees of Crispin-Porter-Bogusky [https://www.cpbgroup.com/], 180LA [https://www.180la.com/], and Droga5 [https://droga5.com/].  In 2017, DMA published a post stating that the group was comprised of people in the advertising industry, Ph.D students, professors, and 2 lawyers.  Ralph M. Watson ("Watson"), another victim of

DMA's smear and intimidation campaign, received private messages (Instagram DMs) between DMA and an individual at the Droga5 advertising agency ("Droga5"). These DMs confirmed that the DMA Instagram account was operated in part by people who worked in advertising, with at least two working at Droga5. Each of the DMA Doe Defendants participated in a conspiracy together and with one or more former employees of The Martin Agency to tortiously interfere with and to terminate Joe's employment with The Martin Agency. At all times material to this action, DMA and the DMA Doe Defendants directed highly defamatory communications and images (visual content) towards Virginia with the specific intent to cause injury to Joe in Virginia.

8.      Sissy Estes ("Estes") is a citizen of Virginia. She lives and works in Richmond. [http://www.sissyestes.com/]. Estes is a former employee of The Martin Agency. [https://www.linkedin.com/in/sissy-estes/]. She was an art director that Joe recruited and brought to the Agency in the mid-2000s. Estes worked primarily on the Walmart account. In or about 2011, after The Martin Agency lost a big portion of the Walmart business, Estes was part of a layoff. Estes held a grudge against Joe and was very vocal about her layoff. Estes conspired with the Defendants to tortiously interfere with Joe's employment. Like DMA, Estes publicly bragged about taking Joe down. On November 30, 2017, for instance, she posted the following message to Facebook:



In August 2018, long after Joe was terminated, Joe's wife Sarah saw Estes in a jewelry store in Richmond. Estes again falsely accused Joe of "sexual harassing" Estes. Estes

hissed, "**I hope he never works another day in his life … thousands of women have thanked me**".   Between October 2017 and the present, Estes published false and defamatory statements about Joe to the Defendants, to persons in the advertising industry, to newspapers, including the *Richmond-Times Dispatch*, and to trade magazines, all in furtherance of the conspiracy to tortiously interfere with Joe's employment as CCO of The Martin Agency and to ensure that Joe never works another day in his life.   Among the articles that contain Estes' false and defamatory statements are the following:

https://www.wsj.com/articles/ousting-an-accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001;[9]

https://www.richmond.com/business/local/amid-new-allegations-of-misconduct-former-employees-discuss-the-culture/article_b0930ee2-c672-55d6-8aca-ef14836999d9.html.[10]

---

[9]     The *Wall Street Journal* reported that "[s]everal other former employees and another person with knowledge of Mr. Alexander's alleged conduct told The Wall Street Journal about allegations of harassment and assault by the executive, including previously unreported details."   **Estes was one of the unnamed "former employees" who spoke with the *Journal*.**

[10]     The *Richmond Times-Dispatch* reported that "Sissy Estes, who worked at The Martin Agency from 2007 to 2012, said that when she was first hired, a creative director gave her a warning about Alexander with no explanation: 'He said, 'Stay away from Joe.  Just try to avoid Joe.'  One day, Estes heard Alexander comment on another woman in his department: 'Why would we hire someone who looks like that? … Another time, Estes said she heard Alexander tell a woman she looked great and dared the woman to go to HR about it … He earned the moniker 'HR Joe,' Estes said … 'I know Joe loves his wife and his family, but he's saying things that could be construed as a sexual invite or a coming on or sexually inappropriate things that he should not be saying.  There were so many women coming to me crying,' Estes said.  'A lot of us tried to change things, and we were brushed off.'  About a month later, Estes was laid off, along with others at the company".   **Estes' statements to the *Richmond Times-Dispatch* were completely fabricated as part of the conspiracy to defame and tortiously interfere with Joe's employment.  None of these events ever occurred**.

As a veteran in the advertising industry, Estes knew that her false and defamatory statements to DMA and to the media would be republished over and over and over to Joe's detriment. [*E.g.*, https://twitter.com/patrickmwilson/status/94207722064598220 9].

9.      Estes is very good friends with Robin Bidwell ("Bidwell"), another former employee of The Martin Agency.  In 2011, Bidwell made a claim against The Martin Agency and Joe.  She alleged (falsely) that she had been sexually harassed.  Joe emphatically denied any wrongdoing.  The matter was settled in 2013 with Bidwell, The Martin Agency and Joe executing a confidential settlement agreement.[11]  In spite of the confidential settlement agreement, Bidwell leaked the terms of the confidential settlement to Estes who in turn leaked the terms to the Defendants between October 2017 and November 21, 2017.  Those leaked confidences and other improper methods were used to interfere with and cause the termination of Joe's employment with The Martin Agency.

10.      Adweek is a Delaware limited liability company.  Adweek is owned by Canadian private equity firm, Beringer Capital.  [https://www.beringercapital.com/; https://www.adweek.com/digital/adweek-acquired-private-equity-firm-beringer-capital-172542/; https://twitter.com/tonyrobbins/status/756490412693479424?lang=en   ("My partners and I purchased @Adweek – one of the leading trade publications")].  None of Adweek's members is a citizen of Virginia.  Adweek launched in 1978 and now attracts more than 6.5 million monthly unique visitors online, counts 1.9 million social media followers, and has a weekly print circulation of around 40,000. [https://www.youtube.com/channel/UCKhCJRTHHLuW2iW7XQtcfyQ ("we reach more than 6,000,000 marketing wizards, ad innovators, tech titans, media mavens and brand

---

[11]      Incredibly, IPG claimed that it first learned about the 2013 settlement in the week of November 20, 2017.

geniuses … three times our nearest competitor")].  Adweek regularly transacts substantial business in Richmond, Virginia, where it has a large social media following and a subscriber base, including The Martin Agency.  Since 1978, Adweek and its employees have written hundreds, perhaps thousands, of articles on matters relating to Virginia's advertising industry.  At all times relevant to this action, Adweek acted as a partner, associate, or member of DMA or as an agent of DMA and the DMA Doe Defendants to publish and republish false and defamatory statements about Joe on the Internet and via social media, with the intended goal that Joe would never work again.

11.    Defendant, Coffee, is a blogger, writer, and former senior editor employed by Adweek. [https://www.adweek.com/contributor/patrick-coffee/].  At all times relevant to this action, Coffee acted as an partner, associate or member of DMA or as an agent of DMA and the DMA Doe Defendants to publish and republish false and defamatory statements about Joe on the internet and via social media.  In 2018 and 2019, Adweek and Coffee published and republished the following defamatory articles about Joe to subscribers and advertising executives in Virginia:

https://www.adweek.com/agencies/the-martin-agency-promotes-karen-costello-to-cco-in-the-wake-of-joe-alexanders-scandalous-departure/
("The Martin Agency Promotes Karen Costello to CCO in the Wake of Joe Alexander's Scandalous Departure");[12]

---

[12]    Coffee published his articles to multiple new target audiences, including his followers on Twitter, to Adweek's 600,000+ followers on Twitter, to the 81.500 Twitter followers of Adweek's "AgencySpy", and Adweek's 600,000+ followers on Facebook. [*See, e.g.*, https://twitter.com/AgencySpy/status/1039533742249992192; https://www.facebook.com/Adweek/posts/joe-alexander-departed-last-december-amid-an-investigation-into-claims-of-sexual/10155436232142075/].

https://www.adweek.com/agencies/when-metoo-came-to-madison-avenue/4/
("When #MeToo Came to Madison Avenue … staffers at The Martin Agency say their complaints to HR about CCO Joe Alexander were repeatedly ignored or dismissed for years before he was ousted last December over multiple sexual harassment allegations");

https://www.adweek.com/agencyspy/the-martin-agency-turns-joe-alexanders-old-office-into-a-meeting-room-and-dog-house/148911/
("It's been 10 months since The Martin Agency parted with CCO **Joe Alexander** after 26 years amid an investigation into multiple claims of sexual harassment made over nearly two decades") (emphasis in original);

https://twitter.com/PatrickCoffee/status/1075407319943524352
("The Martin Agency one year after the Joe Alexander sexual harassment scandal blew up the ad industry");

https://www.adweek.com/agencies/the-5-most-important-ad-industry-stories-of-2018/
("Misogyny and advertising have an unfortunate and well-documented history … This year, the conversation unquestionably changed; whether that change was dramatic enough to permanently impact the industry for the better remains a matter for debate.  #MeToo officially hit the business in December 2017, when The Martin Agency fired CCO Joe Alexander");

https://www.adweek.com/agencyspy/the-20-biggest-agencyspy-posts-of-2018/152124/
("However you may now feel about Diet Madison Avenue, the group exerted a huge influence over the calendar year.  After the departure of The Martin Agency chief creative Joe Alexander last December, 2018 became the year #MeToo finally arrived as the industry maybe, finally began to grapple with endemic abuses of power").

Virtually every article published by Coffee for Adweek between December 2017 and July 2019 contains provably false and defamatory statements about Joe.  Coffee's articles have been republished millions of times in the last year in Virginia by third-parties, including Refinery 29, The Martin Agency, McCann, Marsha Wright, and many others. [*See, e.g.*, https://www.refinery29.com/en-us/2018/12/217506/the-martin-agency-women-executives-times-up;   https://martinagency.com/news/then-and-now-refinery29-profiles-

the-martin-agency; https://twitter.com/McCannMexico/status/1082802531305177088; https://twitter.com/marshawright/status/1078298314406313984].

### III.  JURISDICTION AND VENUE

12.     The United States District Court for the Eastern District of Virginia has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

13.     The Defendants are subject to personal jurisdiction in Virginia pursuant to Virginia's long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) and § 8.01-328.1(B) of the Code, as well as the Due Process Clause of the United States Constitution.  The Defendants and their agents and co-conspirators in Virginia transmitted and published false and defamatory statements in Virginia for the sole purpose of injuring Joe and interfering with his employment at The Martin Agency.  The Defendants are subject to specific personal jurisdiction.  They have minimum contacts with Virginia such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

14.     Venue is proper in the Richmond Division of the United States District Court for the Eastern District of Virginia.  A substantial part of the events giving rise to the claims stated in this action occurred in Richmond, Virginia.

## COUNT I – __TORTIOUS INTERFERENCE WITH CONTRACT__

15.     The Martin Agency is a wholly-owned subsidiary of IPG.  It is part of IPG's "McCann Worldgroup" network [https://www.mccannworldgroup.com/], one of the world's largest advertising agency networks.

16.     Joe had a valid written contract with The Martin Agency that was not terminable at will.  In 2016, Joe earned gross wages of $1,071,856.83.  His performance in 2016 was nothing less than spectacular.  In March 2017, Joe received a 2017-2018 Long Term Incentive (LTI) Award from McCann.   Joe's creative product in 2017 exceeded all expectations.

17.     Between   2013   and   2017,   The   Martin   Agency   underperformed financially.[13]  The major cause was the CEO, Matt Williams ("Williams").  Williams' underperformance as CEO was well-known inside the Agency.  He faltered in all major areas:   financial – declining revenue, margin and profit; new business – no CMO recruited and put in place for years and a stunning lack of wins; strategy and communications – failure to appoint a new CSO and a lack of cohesive strategic vision for 4 years and a failure to update the Agency's company vision and communication strategy.  Most importantly, Williams failed to inspire and connect with The Martin Agency staff.  He was often described by others as "not understanding how the agency actually works."  Concerns about Williams simmered into the fall of 2017.

18.     Williams' underperformance did not go unnoticed at McCann.  Concerns filtered down from McCann to The Martin Agency's former CEO and chairman emeritus, John Adams ("Adams").  Adams emailed both Joe and Martin Agency President, Beth

---

[13]     The Martin Agency's creative product kept it from sinking.

Rilee-Kelley ("Rilee-Kelley"), that the Agency had a real problem and needed to make an action plan.  Adams laid out an elaborate plan pursuant to which Williams would step down as CEO and become chairman (and retain a new business role as head of strategy), and Rilee-Kelley would take over as CEO.  Behind the scenes, Rilee-Kelley made sure Williams did not know he was being pushed out as CEO and replaced.  She also made sure that she and Joe were the leadership team moving forward.  When the action plan was complete, Rilee-Kelley texted Joe as follows:



Throughout the entire process of reorganizing management, Rilee-Kelley never once suggested to anyone that Joe's behavior had ever been an issue.  Rather, as evidenced by her text message, Rilee-Kelley thought that the path to improvement of The Martin Agency's financial picture was "you and me, kid".  Rilee-Kelley would not have hitched her wagon to Joe if there had been any complaints made about Joe.

19.    On September 22, 2017, Joe picked his favorite ads of all time for Adweek. [https://twitter.com/InterpublicIPG/status/911304184217075714].

20.     On September 27, 2017, Joe was honored by the 4A's Foundation[14] as one of the "100" who made advertising great.  The award was a recognition of Joe's strong belief in and practice of diversity in the workplace.[15]

21.     On October 2, 2017, the *Richmond Times-Dispatch* published a lengthy piece in the Metro Business section, entitled "**An honor for Martin's Agency's Alexander**".   [https://twitter.com/Advertising24x7/status/914696959381737479   ("**Joe Alexander of The Martin Agency - making advertising great**")].   Joe and many members of his creative team were on the cover:



---

[14]     The 4A's is the national trade association representing the advertising agency business in the United States.  Established in 1997, the 4A's Foundation was created to galvanize the industry around improving the level of diversity within advertising and media agencies. [http://foundation.aaaa.org/about].

[15]     After Joe was terminated by The Martin Agency, the 4A's Foundation summarily rescinded the award.  https://www.thedrum.com/news/2017/12/08/4as-rescinds-joe-alexander-s-organizational-honor].  Coffee was the first to report the award being rescinded. [https://www.adweek.com/agencyspy/a-martin-agency-account-director-offers-her-perspective-with-notmymartin-post/140968/].

All seemed well.  No one informed Joe of any complaints about his behavior or issues of any kind.  Joe had the solid backing of the entire Martin Agency.

22.     In October 2017, Joe and Rilee-Kelley traveled to New York for a forward planning meeting with McCann.  At the meeting, they laid out the action plan.  McCann Worldgroup North America President, Chris MacDonald ("Macdonald"), was very impressed with the financial and creative plan outlined by The Martin Agency for 2018. He emailed Joe:



During the meetings, Joe had the full and unfledging support of Rilee-Kelley and McCann.  Joe's creative work and leadership were complimented.  No questions of any kind were raised by anyone.  While in New York, Joe went to a Yankee's game with the Global Creative Chairman of McCann Worldgroup, Rob Reilly ("Reilly"):



Again there was no mention from anybody, either inside The Martin Agency or at McCann, of any complaints about Joe or any issues of any kind.  In fact, Joe's creative campaigns were universally praised and commended.

23.    On November 7, 2017, Macdonald met with Joe and others at The Martin Agency in Richmond, Virginia, for follow-up planning sessions.  Once again, Joe's work was complimented.  After the meeting, Macdonald emailed Joe:



As of November 7, 2017, there was not a single mention of any complaint or issue of any kind involving Joe. No one who attended the planning meeting, including Rilee-Kelley and Williams, mentioned anything.

**A.**      ***DIET MADISON AVENUE INTERFERES WITH JOE'S CONTRACT***

24.      In or about October 2017, Cindy Gallop ("Gallop")[16] issued a public call to action on Facebook for advertising professionals to speak up about "sexual harassers" in the industry. Gallop claimed that her Facebook post came "in response to the outpouring of sexual harassment stories allegedly committed by Hollywood producer Harvey Weinstein". [https://adage.com/article/agency-news/cindy-gallop-asks-advertising-expose-harvey-weinsteins/310976]. Gallop urged woman to "name the names of their harassers". [https://www.campaignlive.co.uk/article/sexual-harassment-adland-cindy-gallop-wants-names/1447809]. Gallop claimed to have been contacted by at least 160 women who reported sexual harassment of some kind. Based on the unverified reports she received, the outspoken Gallop compiled "Cindy's List" of alleged "sexual      harassers".      https://www.mumbrella.asia/2017/11/cindy-gallop-asia-treated-

---

[16]      Gallop claims that she likes to "blow shit up. I am the Michael Bay of business". [https://twitter.com/cindygallop?lang=en].

dumping-ground-sexual-predators ("What a load of absolute fucking bollocks.  A man in the industry recently said to me that men are scared of appearing on 'Cindy's List' and that anyone could find themselves on it.  I  bit his head off because the sheer scale of human misery I'm looking at in my inbox from all around the world, and not a false accusation in them – quite the opposite.  How dare these men pronounce on it; they have no idea what women have been going through for decades.  This is why we need to break these stories: these men, these names and companies and client brands attached, so the men understand the problem is them").

25.    Upon information and belief, Gallop supplied "Cindy's List" to DMA or the DMA Doe Defendants, and instigated, aided, abetted, enticed and/or assisted DMA in its smear and intimidation campaign.  Joe's name was on "Cindy's List".

26.    On October 30, 2017, IPG's chairman, Michael Roth ("Roth"), anticipating attacks by Gallop and #MeToo, circulated an internal note/memo all 50,000-plus IPG employees around the world, including everyone at The Martin Agency, under the subject line "A Workplace Free from Harassment" (the "Roth Memorandum").  The Roth Memorandum "outlined a 'zero-tolerance' policy for all types of harassment". [https://www.adweek.com/agencies/ipg-ceo-issues-memo-promising-zero-tolerance-for-sexual-harassment/;  https://www.thedrum.com/news/2017/10/30/ipg-chief-michael-roth-details-firm-s-zero-tolerance-policy-sexual-harassment-memo].

27.    Roth shamelessly pandered to Gallop and #MeToo in order to insulate IPG and its agencies from the devastating negative publicity and adverse financial effects incident to the witch hunts that started in the fall of 2017.

28.     Because of Roth's irresponsible Memorandum, Joe was at the mercy of every disgruntled employee or ex-employee of The Martin Agency with an axe to grind.

29.     DMA, the DMA Doe Defendants, Adweek and Coffee each knew that Joe was employed as CCO of the Martin Agency from their review of public records and information, and/or from discussions with ex-employees of The Martin Agency with whom the Defendants were in private communications.

30.     Beginning on or about November 7, 2017, DMA and the DMA Doe Defendants published numerous false and defamatory statements to The Martin Agency about Joe via Instagram instant messenger.   They wrongly accused Joe of sexual harassment.   The labeled him a predator.[17]   Estes or another former employee of The Martin Agency falsely stated to DMA that in "Joe Alexander's case, there was a slush fund created just for him internally at Martin" to deal with Joe's "crap":

> Yeah EPLs for sure. But in Martin and Joe Alexander's case there was a slush fund created just for him internally at Martin. Money was drummed up just for his crap and Michael Roth and IPG were not even told about it.

---

[17]     Upon information and belief, the Defendants engaged in other written and oral defamation of Joe between December 2017 and the present that Joe has not discovered because he does not have access to the DMA Instagram account or the DMA Gmail accounts or the emails and text messages of the individual DMA Doe Defendants. Joe believes that additional false and defamatory statements will be revealed through discovery.

31.     The Defendants intentionally interfered with Joe's employment, property rights and business expectancies by, *inter alia*, engaging in repeated acts of defamation and insulting words   Through defamation, threats, intimidation and extortion, they induced IPG and The Martin Agency to terminate Joe's contract.

## B.     *THE MARTIN AGENCY TERMINATES JOE*

32.     IPG claims that it "first learned of Mr. Alexander's alleged misconduct in mid-November" 2017. [https://www.wsj.com/articles/ousting-an-accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001].  As soon as IPG was made aware of the false statements being made about Joe by DMA and the DMA Doe Defendants, IPG ordered The Martin Agency to terminate Joe.

33.     IPG decided to appease DMA and terminate Joe in the hopes that DMA would not look further into the cover-up of sexual harassment by the "C-suite" and/or the handling of sexual harassment claims by IPG/Martin.  IPG wanted to get the spotlight off itself and The Martin Agency before DMA negatively publicized the salacious stories it threatened to leak.  IPG sacrificed its very top creative at The Martin Agency because of DMA and the DMA Doe Defendants' defamation and threats.

34.     Although IPG and The Martin Agency represented to trade magazines, including, but not limited to, *Ad Age*, that Joe's termination followed an "internal investigation into an allegation of sexual harassment by the chief creative officer" [https://adage.com/article/agency-news/exit-martin-agency-cco-joe-alexander-internal-investigation/311550; https://twitter.com/adage/status/938523336858054656  (emphasis added)], in truth, there was no investigation and, even more to the point, there was no "allegation of sexual harassment" that prompted Joe's termination.  Joe was summarily

terminated without any due process in response to the false and defamatory statements made by DMA and the DMA Doe Defendants.

35.     IPG instructed The Martin Agency to concoct a sexual harassment complaint so as to conceal the fact that IPG had decided to give up Joe to toxic DMA and #MeToo.  The Martin Agency complied with IPG's order.

36.     On November 21, 2017, at 3:30 pm, Joe met with Rilee-Kelley and Williams.  Joe thought it was a routine weekly meeting.  Rilee-Kelley had one sheet of paper.  She told Joe that "someone"[18] had filed a sexual harassment complaint against Joe.  Joe was floored.  Rilee-Kelley refused to give any details.  She misrepresented to Joe that it looked "bad".  Rilee-Kelley said that Joe had two options: (1) resign and it "goes away", or (2) "you can fight it and probably lose which would result in your termination.  As your friend, you should take number 1".  Rilee-Kelley refused to disclose what the complaint was or who made it.  She told Joe, "we must protect the confidentiality of the accuser."  Rilee-Kelley and Williams informed Joe that if he resigned, they would work with him on an acceptable statement to be made to The Martin Agency staff.

37.     The meeting lasted a total of seven (7) minutes.

38.     Joe left dumfounded, confused and deeply hurt.

39.     He retrieved his belongings.  Around 4:19 p.m., he quickly sent a text to his team, including Katie, stating that something "personal" had happened and that he would need to take the rest of the year off.

---

[18]     Joe would later find out that the alleged "someone" was a woman who Joe had worked with for years, Katie Pinkard Fallen ("Katie"), who had never before complained to anyone about Joe.

40.     At 5:44 p.m. on November 21, 2017, Katie responded to Joe's text.  Katie

stated:



When Joe explained to Katie that it was "bad", Katie replied:



On November 23, 2017 (Thanksgiving), Katie texted Joe again:



41.    Katie was a colleague and friend.  Prior to November 21, 2017, Katie never expressed any complaints, concerns, or fears of any kind to Joe.  She made no complaints of sexual harassment.[19]   In fact, throughout the many years they worked together, Katie always expressed how much she respected Joe and enjoyed working with him.  In 2016, for instance, to celebrate Joe's 25th anniversary with The Martin Agency, dozens of Joe's Martin Agency co-workers gave Joe a book full of beautiful, heart-felt tributes.  Katie wrote these kind words about Joe:



---

[19]    Katie's text messages demonstrate that she did not level a complaint of sexual harassment before Thanksgiving 2017, and that Rilee-Kelley was lying.  If Katie had made a complaint of sexual harassment against Joe, she would **not** have said, "[h]ope you and your family are ok".  Katie would **not** have said, "[w]hatever this is, you will get through it".  She would **not** have wished a sexual harasser "Happy Thanksgiving".  Katie's texts demonstrate that she did not even know about any claim of sexual harassment on November 21, 2017 when Rilee-Kelley misrepresented that "someone" had made such a complaint.

"**I'd follow you anywhere**".  These are not the words of a woman who has **EVER** been sexually harassed by her boss.

42.    Joe's style was inclusive, collaborative, nurturing, encouraging, mentoring, advocating.  He treated all colleagues with respect.  He shared opportunity with all, as evidenced by the thanks he routinely received:



43.    In truth, Rilee-Kelley, acting upon direction from IPG, manufactured the false claim that Joe had sexually harassed Katie.  Rilee-Kelley betrayed Joe and acted out of mechanical loyalty to IPG and Roth.  Rilee-Kelley was a good lieutenant who valued the security of her job more than loyalty to her partner of two decades.  She backed IPG and terminated Joe's employment to avoid exposure of purported HR complacency at The Martin Agency.  [*See*  https://www.nytimes.com/2018/03/07/business/media/diet-

madison-avenue-instagram.html (DMA was "formed after its members learned of how harassment complaints were handled at the Martin Agency")].

44.     The day after Thanksgiving, Riley-Kelley texted Joe.  She told Joe that he could not reach out, talk to, or "confront" anyone at The Martin Agency, McCann or IPG. She warned Joe about trying to figure out who had lodged the complaint: "Pls don't try to figure out who lodged the complaint because it can be viewed as retaliation which would result in immediate dismissal."  In truth, Rilee-Kelley was afraid that Joe would discover that the complaint of sexual harassment was a lie.

45.     By Monday, November 27, 2017, Joe still had not heard anything from Rilee-Kelley about the next steps.  On Tuesday, November 28, 2017, Joe received a text from Rilee-Kelley at 6:19 pm: "Just tried to call you.  You are my partner and I get it.  I am trying to get you as much as I can so you can make the right decision so you can be thoughtful and make the right decision for you going forward.  And it's taken more time than I hoped.  Working hard to get you something tomorrow."  This was more lies.  In truth, Rilee-Kelley was desperately trying to solicit more complaints against Joe.

46.     On Thursday, November 30, 2017, Joe met with Rilee-Kelley and Williams at the Willow Oaks Country Club.  Rilee-Kelley slid a single sheet of paper across the table.  There were 10 lines on the paper, each describing in very general terms an alleged complaint.  No dates, times, places, or names.  Joe asked for the name of the woman – the "someone" – who had filed the complaint.  Rilee-Kelley refused to say.  Joe asked if any complaint was in writing.  Rilee-Kelley stated that "they" had one email, the rest were "verbal" complaints.  Rilee-Kelley did not identify when the so-called verbal complaints had been made.  Rilee-Kelley again said that it "doesn't look good and as

your friend, I advise you to resign because if you investigate and the complaints are true, you will be fired with cause and lose everything." This was Rilee-Kelley's third threat along these lines. Joe looked Rilee-Kelley in the eye and said, "after 26 years of partnership and all that I've done, you couldn't come to me and say this is bad. You have 6 months. Let's figure out an exit that's good for all of us." No response. Rilee-Kelley then looked at Joe and stated, "you should be grateful we are offering you the option to resign. You think Matt Lauer got that? You think Garrison Keiller got that? We are doing you a favor." Then, Williams dropped the final bombshell. He told Joe "You have until 5 pm tomorrow, Friday December 1, to take option 1 or 2. Because people are already wondering where you are, what's going on, and we have to tell our clients. We can't have this speculation."

47. Joe was so upset he left after 25 minutes.

48. Shortly after the meeting on November 30, 2017, Williams texted Joe:

> I know you're upset. I'm sorry. But I need to be really clear: if you don't communicate your decision about option 1 vs option 2 by end of day Friday, option 1 will come off the table. I don't want that to happen.

49.     On December 1, 2017, Joe attended a pretextual Human Resource inquisition at the Richmond Marriott Downtown.   Meg Garner and Alice Albright (Martin Agency HR) were at the meeting in person.   Dana Mansfield (HR McCann) participated by phone.   Garner reminded Joe about the IPG Code of Conduct and then revealed to Joe that the sexual harassment claim had been filed by Katie.

50.     Joe could not believe it.   There was no one in The Martin Agency that Joe was professionally or personally closer to than Katie.   Katie was Joe's assistant right out of college.   They shared everything: work, home, kids, play, laughs, sadness, trust, everything.   Both Joe and Katie engaged in typical office banter: You look great.   Those jeans are awesome.   That's a great haircut.   Joe was Katie's biggest champion.   In fact, Joe hand-selected Katie to be The Martin Agency's first creative recruiter.   Katie was awesome, just as Joe had predicted.   She took time off and had a baby.   She came back into a new role – creative department manager. Katie was not as confidant in the new role, but, again, Joe propped her up and made sure everyone knew she was nailing the job.   Joe and Katie were as close as could be.   In fact, Joe would always confide in her the most important secrets in the Agency and in the department.   Katie called it, "The Vault."   "Don't worry," she would say.   "It's in the vault."   Anything Joe said to Katie he knew was safe, as safe as it would be with anyone.

51.     Garner gave Joe a 4-year old email from 2013.   The subject matter was the Cobblestone Awards, an award Katie and Joe organized every year for the top creative contributors in The Martin Agency.   In a line buried in the email, Joe and Katie bantered back and forth (as always) about a dream that Joe had had.   Joe did not even remember the email.   No one ever complained about the email.   Rather, Garner and/or Rilee-Kelley

searched the server for things to use against Joe, and found one old email. Joe was not even given a copy of the email. Garner went on to mention other verbal "incidents": a young woman wonders why Joe pays attention to her; another woman says Joe makes her feel "creepy"; another person says Joe called other women "hot"; Joe texts emojis to a women; another person asks why Joe wanted to meet her in his office.[20]

52.     It was a preposterous witch hunt. Joe asked, "how are any of these incidents sexual harassment?" Joe asked for times, places and dates. Garner admitted that she did not have _any_ times, places or dates. Garner said that in her claim Katie said she changed her clothes and appearance to stop the "harassment". This was not true. Katie was not shy about her clothes, her body and making sure everyone knew she looked great. She often said in front of Joe and others that she was proud of her body by saying, "There's no shame in my game." She was completely comfortable around Joe and others no matter what she was wearing. In fact, one of the last times she and Joe worked together in his office, Katie wore a very short skirt and moved her chair right next to Joe's. And, that same week, she sat working on Joe's sofa wearing tight jeans, her legs spread-eagled.

53.     The meeting was pointless. Garner, Albright and Mansfield showed "zero tolerance" and showed a reckless disregard for due process. They had already made a decision on who/what to believe and who/what not to. It was a sham.

---

[20]     Joe's office was glass-walled, right in the middle of the busiest part of The Martin Agency, hardly a place where any "sexual harassment" would have ever occurred.

54.     About 25 minutes into the inquisition, Joe handed Garner a forced resignation letter.  He stood up and said, "I would rather walk out with my dignity than go through this inquisition any longer."  Joe left.

55.     After the HR inquisition on December 1, 2017, Joe prepared a draft statement to be released to The Martin Agency.  He sent it to Rilee-Kelley and Williams because they had promised that if Joe resigned they would release a joint statement together concerning Joe's departure from The Martin Agency.  At 5:00 p.m., much to Joe's chagrin, Williams texted Joe the following message:



56.     By 5:00 p.m. on December 1, 2017, Joe's entire history and presence on The Martin Agency website and social media – articles, bio, awards, photos – had been scrubbed.  It was planned and premeditated.

57.     At 6:00 p.m., Adweek and Coffee published the "breaking" news of Joe's termination to Adweek's millions of online subscribers and its 600,000 Twitter followers. [https://www.adweek.com/agencies/the-martin-agencys-chief-creative-officer-joe-alexander-is-out-after-26-years/;

https://twitter.com/Adweek/status/956919170561691650].

## C.     *THE MEDIA SLAUGHTER*

58.     Because of Joe's sudden departure and the vagueness of Williams' internal announcement to The Martin Agency, speculation about Joe's termination spread like a wildfire in Southern California.  Former co-workers and peers texted and emailed Joe relentlessly.  They expressed bewilderment, sadness and thanks for Joe's leadership. Katie – the woman who allegedly complained about sexual harassment – texted the following message to Joe:



Joe could not believe what was happening.  The woman who The Martin Agency and IPG represented Joe had "sexually harassed" was "here for" him.  Obviously preposterous lies from IPG and The Martin Agency.

59.     Joe tried to maintain his dignity and self-respect.  He posted a statement on Facebook:

> "What a great run.  But it's time for a new challenge.  I couldn't be prouder of the work we accomplished together.  More important, it has been a blessing of a lifetime to do work I love with people I love.  The Martin creative bar will continue to be high because of the deepest bench in the business.  I wish them nothing but the best.  And I look forward to the next adventure.  Shedding a tear tonight through an eye toward the future.  Cheers."

60.     On December 5, 2017, Joe gave an official statement to Lindsay Stein ("Stein") at *Ad Age*:

> "The Martin Agency is my family.  Rather than a drawn-out, hurtful investigation, resigning was the proper thing to do to protect my family and all the people I've worked so closely together with in my 26 wonderful years.  I will always love that place and the people who make it so special.  Please respect my privacy during this very, very sad time."

61.     On December 6, 2017, Coffee texted Joe to advise that *Adweek* was "preparing to run a story indicating that you were fired from The Martin Agency after multiple female employees filed sexual harassment complaints against you.  The story also notes that a case brought against you in 2012 was settled out of court for an undisclosed total.  Please let me know if you would like to comment."  Coffee had already written the story.  He had been working on it all week.  He did not care if Joe commented or not.  In furtherance of the conspiracy, Coffee intended to publish a scandalous story that would ensure Joe never worked again.

62.     On December 7, 2017, Adweek and Coffee, acting in concert with or on behalf of DMA and the DMA Doe Defendants, published a damning indictment of Joe, citing unnamed "sources", anonymous "women", an unidentified "former executive", and unidentified "former employees" and "former co-workers".  As planned, Adweek and Coffee gave a national public voice to and amplified the tortious conduct of DMA and

the DMA Doe Defendants. [https://www.adweek.com/agencies/the-martin-agency-chief-creative-officer-joe-alexander-exits-after-multiple-sexual-harassment-complaints-sources-say/ ("**The Martin Agency Chief Creative Officer Joe Alexander Exited After Multiple Sexual Harassment Complaints, Sources Say**") (the "Adweek Hit Piece")].[21]

63.     To increase the breadth of publication and exacerbate the injury to Joe's reputation, Adweek and Coffee republished the Adweek Hit Piece to Adweek's 600,000+ followers on Twitter. [https://twitter.com/Adweek/status/938813662390882304]. Defendants' intent was to broadly interfere with and eliminate Joe's ability to find any prospective employment.

64.     The Adweek Hit Piece was an intentionally gross fabrication and distortion of the truth.  It contained multiple false and defamatory statements of and concerning Joe, including:

- Joe left The Martin Agency "after several sexual harassment claims[22] about him were made with the agency";

---

[21]     The coordinated effort between DMA and Adweek/Coffee is evidenced by the timing of publication of Coffee's various stories.  Coffee was always first to report the terminations.  He clearly had inside information from DMA that no one else had.  For instance, on the same day Watson was fired by CBP, Adweek/Coffee simultaneously published an article titled "**CP+B Fires Chief Creative Officer Ralph Watson**". [https://www.adweek.com/agencies/cpb-fires-chief-creative-officer-ralph-watson/].  That article, and the "hit list" published by DMA shortly thereafter, linked Watson to other high-profile advertising executives' terminations that were allegedly because of sexual harassment.

[22]     The only "sexual harassment claim" ever made prior to December 1, 2017 was the one reported to Joe by Garner.  In truth, however, Katie never made the claim prior to December 1, 2017.  IPG and The Martin Agency induced Katie to make the claim, which IPG and The Martin Agency then supplied to trade magazines as the reason for Joe's termination.  IPG and The Martin Agency concealed the truth, which is that they terminated Joe in response to DMA's threat to publicly expose and shame IPG and The Martin Agency for how they handled sexual harassment claims.

40

- Several women "reported concerns about his behavior to the agency, citing incidents as far back as the 1990s";

- Joe's "nickname among some staff" in the 2000s was "HR Joe";

- In 2012, Estes told Mike Hughes that Joe "could not continue hitting on women";[23]

- Daniela Montanez ("Montanez") "approached human resources in 2012 to let them know that she was uncomfortable working with Alexander";

- "Alexander made improper sexual advances" towards two "additional women";

- Alexander passed "a former executive" "his hotel key and invited her to his room to have sex during a business trip.  They were both married at the time";

- This was "Alexander's way of 'testing the waters' with women he found attractive";

- A "former worker" said "Alexander joked about threesomes and at one point propositioned her";

- "Three other former employees said Alexander regularly belittled co-workers, telling multiple women that they needed to lose weight and commenting on the size of their breasts in front of male colleagues. They allege that he once described a black female employee as "chocolate thunder" and frequently told Mormon staff members that no one wanted to spend time with them because they wouldn't drink alcohol";

- Estes said, "[t]his has been happening for decades."

65.    Adweek and Coffee concealed the fact that none of the so-called "complaints" were reported to Martin Agency Human Resources or to any manager of The Martin Agency or IPG.  Adweek and Coffee confirmed that "one former employee … and several of her colleagues" did not file complaints until "Thursday", December 7, 2017, the same day Adweek and Coffee publish the Adweek Hit Piece.

---

[23]    Estes' false statements about Joe were immediately retweeted by Gallop. [https://twitter.com/cindygallop/status/938816561502093312].

66.     Adweek and Coffee also disclosed confidential information that they obtained from Estes, Bidwell and/or Tara Hanley, counsel for Bidwell ("Hanley") regarding a 2013 settlement of disputed claims that had been levelled by Bidwell against The Martin Agency and Joe.   Adweek and Coffee stated that "nine sources with knowledge of the story" stated that "a woman in the creative department [Bidwell] accused Alexander of sexually harassing her and then firing her after she repeatedly rejected his advances."   Estes, Bidwell and/or Hanley also disclosed to Adweek and Coffee that "the settlement forbid the woman [Bidwell] from working for the larger Interpublic Group again in any capacity."[24]

---

[24]     On or before December 13, 2017, the terms of the confidential settlement were also leaked to the *Wall Street Journal*. [https://www.wsj.com/articles/ousting-an-accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001 ("In 2011, Mr. Alexander made several unwanted advances toward a female copywriter at the agency, harassing her on multiple occasions, according to people familiar with the woman's account.  That year, on assignment in Los Angeles to shoot a commercial for Wal-Mart, Mr. Alexander touched her inappropriately and tried to kiss her, but she rejected his advances, according to the people familiar with her account.  Days later, he invited her to his hotel room to discuss business. After a short conversation, he got naked, got into bed and said, 'You decide what you want to do,' according to the people familiar with her account.  The two had a sexual encounter.  The people familiar with her account say that after enduring his alleged harassment and criticism, she felt she had no choice. The alleged harassment continued for months afterward, the people said.  The woman involved in the 2011 incident was let go by the Martin Agency in 2013 and received a settlement of $275,000, including a provision barring her from working for Interpublic Group agencies, the people familiar with the matter say.  A spokesman for Interpublic said the parent company first learned about the 2013 settlement in the week of Nov. 20, 2017, and received a copy of the document on Dec. 6")]; *see* https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency]. Bidwell told *Digiday* that she spent the net proceeds of the settlement after payment of taxes and lawyers on "Diamond earrings … They were quarter carats, if that tells you anything". [https://digiday.com/marketing/agencies-use-ndas-hide-sexual-harassment-claims/].

67.    The Adweek Hit Piece was republished millions of times between 2017 and the present. [*See, e.g.*, https://www.refinery29.com/en-us/2018/12/217506/the-martin-agency-women-executives-times-up ("The piece included two former employees who spoke on the record, saying they went to managers about Alexander at various points to no avail. Most damning though was a 2013 settlement between the agency and an unnamed woman"); https://qz.com/1201495/metoo-and-diet-madison-avenue-sexual-harassment-allegations-at-publicis-wieden-kennedy-martin-agency/ ("According to a lengthy report published by Adweek in December, Alexander was the subject of several harassment complaints about repeated incidents through his career, dating as early as the 1990s"); https://twitter.com/cindygallop/status/938821321181618176 ("I'm disgusted @martinagency fired @joealex12 without publicizing the (many, years-long) reasons why")].

68.    On December 7, 2017, Joe received a text from Stein stating that The Martin Agency had released an "internal memo" to the press.  Prior to release, The Martin Agency did not provide a copy of the "internal" memo to Joe or even advise Joe that it intended to release the memo.  The "internal" memo, published at the direction of IPG, was egregiously defamatory.  Among other things, the memo falsely stated that the "behavior that Martin's former CCO, Joe Alexander, is accused of is inexcusable.  That's why the only alternative was for him to leave The Martin Agency.  That decision was ours."  The Martin Agency further misrepresented that "people in our company felt unsafe and unheard".  The Martin Agency falsely stated that it was "deeply sorry that any of you ever felt unsafe or unheard." [https://www.adweek.com/agencies/the-martin-agency-releases-internal-memo-promising-to-get-better-in-wake-of-harassment-scandal/].

**D.**     ***DIET MADISON AVENUE TAKES FULL CREDIT***

69.     DMA and the DMA Doe Defendants took full credit for getting Joe fired. Afterwards, they marked Joe off their "master" hit list.  They crossed out Joe's name in red to signify that he had been terminated:



70.     In addition to publishing the "master" hit list, and as further evidence of their actual malice, spite and ill-will towards Joe, DMA and the DMA Doe Defendants published a picture of Joe wearing a pig nose with emojis vomiting out of Joe's eyes:



71.     The Defendants' actions and practices were and are illegal, independently actionable, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, immoral and sharp.

72.     Over ten years ago, Joe wrote a small book about The Martin Agency's culture.  He called it "Good and Tough": good to each other, tough on the work; good place to work, tough place to leave.  The Martin Agency embraced this motto.  It was a large part of the Agency's identity.  Joe was never the person described by the

Defendants as "preying on females", a man who it was "unsafe" to be around. Joe was not "guilty" of actions "that are inexcusable." The fact is, Joe had been, was then, and will always be a staunch advocate of equality and diversity in and out of the workplace. At The Martin Agency, Joe hired dozens of women, including the top three (3) female creatives in the Agency's history: Karen Costello, Nancy Hannon and Deb Hagan. Joe's last hire before his termination was Ashley Bozeman, the first African American female creative in the history of The Martin Agency. Joe sent people to the 3% Conference[25] every year since it began. He sent Katie to the Conference in 2017. Joe was one of the very first supporters of Free the Bid, a non-profit initiative advocating on behalf of women directors for equal opportunities to bid on commercial jobs in the global advertising industry. [https://www.freethebid.com/]. Joe discovered female talent in other departments and brought them into creative, including copywriters Lassiter Stone, Miranda Morgan and Katie Lynn Moncure. He mentored countless women throughout The Martin Agency. Being inclusive was a tenet of his leadership style.

73. Joe has been surrounded his whole life by smart, confident, strong, courageous, compassionate women. He was raised by the strongest most beautiful person in his life: his Mother Jan. He grew up with three sisters who blazed trails and always had Joe's undying support and admiration. He raised three incredible daughters. He has

---

[25]   Founded by Kat Gordon in 2011, the 3% Conference is part of a movement to increase the number of female creatives in the advertising industry. [https://www.3percentmovement.com/movement ("Until we came along, only 3% of Creative Directors were women. And very few were people of color. We're changing the ratio because the more varied the people who come up with ideas, the better the ideas will be … Until women make up 50% of creative directors, we've got a crew who'll keep working their butts off, all led by founder Kat Gordon")]. Because of the hard work of the 3% movement, women now comprise up 29% of the total creatives in the industry. [https://www.3percentmovement.com/].

an amazing wife.   It would have been impossible to have women in his life like this if Joe was the person described by the Defendants in this case.   It is physically and emotionally unattainable.  The most telling proof of Joe's character *is* the women in his life. [http://consciencenow.blogspot.com/].

74.    DMA, the DMA Doe Defendants, Adweek and Coffee engaged in actions and published statements that destroyed Joe's reputation and ended his stellar career in advertising.  It is now virtually impossible for Joe to obtain work.  As an example:  Joe was hired to do freelance, but when a vendor was told Joe was working on the job, they said he couldn't be seen in their office or be on phone calls.  Joe lost the freelance job. Joe has lost much more than money, however.  His family suffered untold pain.  His marriage is forever changed.  He constantly fears what his former colleagues, clients and others in the industry may think of him.  The personal injuries Joe suffered – the disgrace, insult, humiliation, embarrassment, pain and mental anguish and suffering – are permanent.

75.    As a direct and proximate cause of the Defendants' tortious interference with contract and Joe's reasonable business expectations, Joe suffered damage and incurred loss, including, but not limited to, actual damages, loss of business and income, diminished earning capacity, injury to his reputation, court costs, and other out-of-pocket expenses and damages in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

**COUNT II – <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS</u>**

76.    After he was terminated by The Martin Agency, Joe attempted to pursue work as a freelancer. [https://www.linkedin.com/in/joealex12/].

77.     Based upon his long career in advertising, Joe had a reasonable expectation of obtaining future employment and business.

78.     From a review of publicly available information including Joe's *LinkedIn* page, website and blogspot, the Defendants each knew about Joe's business expectations and attempts to find work.

79.     After December 1, 2017, Joe had a handful of opportunities to work on freelance campaigns.

80.     As alleged above, after Joe's termination from The Martin Agency, DMA, the DMA Doe Defendants, Adweek and Coffee intentionally interfered with Joe prospective business relationships and opportunities by continuing to publish and by enticing others to publish and republish false and defamatory statements and images (visual content) about Joe. [*See, e.g.*, https://www.adweek.com/agencyspy/the-martin-agency-turns-joe-alexanders-old-office-into-a-meeting-room-and-dog-house/148911/ ("Meanwhile, the former CCO is reportedly testing a return to the ad business.  Several parties tell us that he has reached out specifically seeking work or looking to re-establish connections with industry influencers.  On his personal blog, he recently congratulated Costello, wrote a post in which he discussed volunteer work and indirectly addressed the events preceding his exit, and shared a spec ad for the National Suicide Prevention Hotline following the death of Kate Spade. (The organization said it had no knowledge of that effort.)")].  The Defendants intended that their continuing false statements would interfere with Joe's ability to obtain future employment in the advertising industry.  They knew that the false statements were substantially likely to deprive Joe of any ability to find work.

81.    As a proximate result of the Defendants' statements and improper actions, Joe has largely been unable to secure any substantial work in the advertising industry since his termination.  Prospective employers who google his name fear retaliation by the Defendants and their supporters and/or the reputational risk of being "seen" with Joe. Absent the Defendants' misconduct, it was reasonably certain that Joe would have obtained work, including the freelance business he sought, and/or kept the freelance work he did obtain.

82.    The Defendants' actions constitute tortious interference with prospective economic advantage.

83.    As a direct result of the Defendants' tortious interference with prospective economic advantage, Joe suffered damage and loss, including, but not limited to, Joe suffered damage and incurred loss, including, but not limited to, actual damages, loss of business and income, diminished earning capacity, injury to his reputation, court costs, and other out-of-pocket expenses and damages in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

## COUNT III – <u>COMMON LAW CONSPIRACY</u>

84.    Beginning in October 2017, DMA, the DMA Doe Defendants, Adweek and Coffee combined, associated, agreed or acted in concert together and with others, including Estes, Bidwell, and Hanley, for the express purpose of injuring Joe in his business and reputation through the publication and republication of false and defamatory statements and tortiously interfering with Joe's employment as CCO of The Martin Agency.  In furtherance of the conspiracy and preconceived joint plan, the Defendants and their confederates orchestrated a scheme the unlawful purpose of which was to cause

Joe's termination.  Acting in concert, with specific knowledge of IPG's "zero-tolerance" policy, the Defendants published, republished and spread false and defamatory statements about Joe with knowledge that IPG would order Joe's termination without due process.

85.    The Defendants acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were injuring Joe.

86.    The Defendants' actions constitute a common law conspiracy to tortiously interfere with contract and reasonable business expectations.

87.    As a direct result of the Defendants' conspiracy, Joe suffered damage and loss, including, but not limited to, presumed damages, actual damages, including, loss of employment, business and income, diminished future earnings capacity, insult, pain and mental suffering, humiliation, embarrassment, injury to reputation, court costs, and other damages in the amount of $25,000,000.00 or such greater amount as is determined by the Jury.

### COUNT IV – **DEFAMATION *PER SE***

88.    The Defendants each made and published to third-parties, including IPG and The Martin Agency, numerous false factual statements, which are detailed verbatim above, of or concerning Joe.  The Defendants' false and defamatory statements at issue in this action were published and republished within the past year.

89.    By intentionally publishing statements on the Internet, to newspapers, such as the *Richmond Times-Dispatch*, to trade magazines and via social media, the Defendants knew or should have known that their false and defamatory statements would be published and republished over and over by third-parties, including other industry publications, subscribers and social media followers of those publications, and others,

millions of times to Joe's detriment and injury.  Republication was the natural and probable consequence of the Defendants' actions and was actually and/or presumptively authorized by the Defendants.  The Defendants are liable for the republication of the false and defamatory statements within the year prior to the filing of this action under the doctrine announced by the Supreme Court of Virginia in *Weaver v. Home Beneficial Co.*, 199 Va. 196, 200, 98 S.E.2d 687 (1957) ("where the words declared on are slanderous per se their repetition by others is the natural and probable result of the original slander.").

90.     The Defendants' false statements constitute defamation *per se*.  The statements accuse and impute to Joe (1) the commission of felonies and crimes involving moral turpitude and for which Joe may be punished and imprisoned in a state or federal institution, (b)  an unfitness to perform the duties of an office or employment for profit, including the job of a CCO, or the want of integrity in the discharge of the duties of such office or employment.  The Defendants' statements also severely prejudice Joe in his profession or trade.

91.     The Defendants' false statements caused Joe substantial harm, presumed damages and actual damages.

92.     The Defendants made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false. The Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

    a.      The Defendants pursued a predetermined agenda, which was to interfere with Joe's employment and get him fired.

b.      The Defendants knew about IPG's "zero-tolerance" #MeToo policy and intentionally published false and scandalous statements about Joe, knowing that IPG would immediately terminate Joe without any investigation or Due Process.

c.      The Defendants knew their statements were false and acted out of a desire to hurt Joe and to permanently stigmatize him.  The words and images that they used were vile, contemptuous, any disproportionate to any occasion. There were no sources for any of the defamation because they made up the statements out of whole cloth.

d.      They revealed confidential information with the intent to hurt Joe.

e.      The Defendants knew that the false and defamatory statements would be republished and repeated over and over, destroying Joe's reputation globally and rendering him unemployable.

93.     The Defendants lacked reasonable grounds for any belief in the truth of their statements, and, at the very least, acted negligently in failing to determine the true facts.

94.     As a direct and proximate result of the Defendants' defamation, Joe suffered substantial damage and loss, including, but not limited to, presumed damages, actual damages, loss of business and income, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, damage and injury to his reputation, costs, and other out-of-pocket expenses in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

95.    The Defendants' conduct, detailed above, was intentional and reckless. The Defendants engaged in a series acts that, taken together, constitute extreme and outrageous behavior.   The Defendants deliberately created an anonymous Instagram account and Gmail account.   They acted on unverified complaints of wrongdoing from sources they did not know.   They purposefully initiated a campaign to smear top male creatives in the advertising industry and to get them fired.   They doxxed and defamed top creatives like Joe without any due process.   They engaged in a malicious scheme of harassment, intimidation and mental torture.   The Defendants knew about the Roth Memorandum.   They knew that their incendiary allegations would cause swift, immediate and severe emotional injury and financial loss.   They knew that top creatives at any IPG company were peculiarly susceptible to summary termination.   They knew that IPG would afford Joe no due process.   In spite of their knowledge, the Defendants proceeded with their plan to cause Joe's termination (and the terminations of many others on the "master" hit list).   Defendants' conduct was vulgar, flagrant, insulting and heartless. After Joe's termination, DMA and the DMA Doe Defendants callously scratched Joe's name off the list, as if Joe had been assassinated, published a picture of Joe wearing a pig nose, and Adweek and Coffee then published the Adweek Hit Piece to cap off the calumny.

96.    The Defendants' actions offend against generally accepted standards of decency and morality and are atrocious and utterly intolerable.

97.    Their outrageous conduct caused Joe to suffer severe emotional distress, extreme fear and panic.

98.     The Defendants' misconduct constitutes intentional infliction of emotional distress.

99.     As a direct result of the Defendants' misconduct, Joe suffered damage and incurred loss, including, without limitation, pain and suffering, physical injury, severe emotional trauma, insult, embarrassment, humiliation, public ridicule, anguish, stress and anxiety, injury to reputation, special damages, medical expenses, attorney's fees, costs and out-of-pocket expenses in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

Joe alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.  He believes that substantial additional evidentiary support, which is in the exclusive possession of the Defendants, their clients, agents, surrogates, alter egos, and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Joe reserves the right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## <u>CONCLUSION AND REQUEST FOR RELIEF</u>

WHEREFORE, Joe Alexander respectfully request the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A.     Compensatory damages in the sum of $25,000,000.00 or such greater amount as is determined by the Jury;

B.      Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C.      Prejudgment interest at the rate of 6% per year on the Principal Sum awarded by the Jury from November 21, 2017 to the date of Judgment;

D.      Postjudgment interest at the rate of six percent (6%) per annum until paid;

E.      Such other relief as is just and proper.


**TRIAL BY JURY IS DEMANDED**


DATED:      September 19, 2019


JOE ALEXANDER


By:___*/s/ Steven S. Biss*_____
        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:     (804) 501-8272
        Facsimile:     (202) 318-4098
        Email:         **stevenbiss@earthlink.net**

        *Counsel for the Plaintiff*