VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF RICHMOND
John Marshall Courts Building

| | | |
|---|---|---|
| JOE ALEXANDER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-5438-4 |
| | ) | |
| | ) | **TRIAL BY JURY** |
| THE MARTIN AGENCY, INC. | ) | **IS DEMANDED** |
| KRISTEN CAVALLO | ) | |
| SISSY ESTES | ) | |
| TARA E. HANLEY | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| THE INTERPUBLIC GROUP | ) | |
| OF COMPANIES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# COMPLAINT

Plaintiff, Joe Alexander, by counsel, files the following Complaint against Defendants, The Martin Agency, Inc. ("Martin"), Kristen Cavallo ("Cavallo"), Sissy Estes ("Estes"), Tara E. Hanley ("Hanley"), and The Interpublic Group of Companies, Inc. ("IPG"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$50,350,000.00**, (b) plus prejudgment interest on the principal sum awarded by the Jury from November 21, 2017 to the date of Judgment, and (c) court costs and expenses – arising out of the Defendants' defamation, insulting words, breach of fiduciary duty,

breach of contract, gross negligence, tortious interference, common law conspiracy, intentional infliction of emotional distress, and fraud in the inducement.

## I. **INTRODUCTION**



1.      Et tu, Martin?

2.      This is a case about extreme betrayal, deception and disloyalty.

3.      Joe Alexander ("Joe") was the Chief Creative Officer ("CCO") at Martin in Richmond, Virginia.  He led the team of creatives responsible for the great success of the GEICO account and many others.  Under Joe's leadership, GEICO became the No. 2 car insurance brand; OREO's global sales rose 12%; PING became the No. 1 driver in golf; and Donate Life's donor base increased 600%.  Joe's creative leadership produced acclaimed work for clients and brands in almost every category and medium.

[https://joealexander.net/about-me-1].  In 2017, Martin won a Grand Clio[1] award for the

powerful   short   film   entitled,   *Donate   Life   –   The   World's   Biggest   Asshole.*

[https://clios.com/awards/winner/film/donate-life/the-world-s-biggest-asshole-17052].   In

2015, GEICO's *Unskippable* pre-roll campaign[2] was Adweek's Campaign of the Year

and took home 12 Cannes Lions[3] awards, including the Grand Prix in Film:



---

[1]        The Clios is an esteemed international awards competition for the creative
business.  Founded in 1959 to celebrate high achievement in advertising, the Clios
annually and throughout the year recognize the work, the agencies and the talent that
push boundaries and establish new precedent.  The "Grand Clio" is the highest honor
bestowed by the Clios. [https://clios.com/awards].

[2]        https://www.youtube.com/watch?v=g0zJNjGM5Dw ("You can't skip this
GEICO ad because its already over");  https://www.youtube.com/watch?v=4ELn-
NTKo44 (Geico – Unskippable Elevator);  https://www.youtube.com/watch?v=8JomU-
0WHLk (Geico – Unskippable High Five);
https://www.youtube.com/watch?v=cshPQ3ZbESs (Geico – Unskippable Hungry Dog).

[3]        The Cannes Lions are the most established and coveted awards for the
creative and marketing communications industry.   Winning at the Cannes Lions
International Festival of Creativity Festival puts you among the world's elite.  Cannes
Lions trophies are recognized globally as the ultimate achievement in creativity.
[https://www.canneslions.com/our-awards].

In 2013, *Clouds Over Cuba*, a striking interactive documentary produced for the JFK Presidential Library and Museum, won an Emmy Award. It was the first time an advertising agency had ever won an Emmy in the News and Documentary category:



[https://martinagency.com/news/the_martin_agency_wins_emmy_for_clouds_over_cuba]

Well before Joe became CCO of The Martin Agency, he was the creative star of the Agency. His writing for The JFK Presidential Library won international acclaim. His writing for Healthtex captured the hearts of parents everywhere. He helped win millions of dollars in new business for Martin, including Mercedes-Benz, Olympus, PING, Kindercare, Remy Martin, Careerbuilder, Pizza Hut, UPS, and more. From 2010 to 2012, he led the Walmart account. Under Joe, the Walmart account grew to be the largest in Agency history with over $45,000,000.00 in revenue. When Joe was promoted to CCO in 2012, the late Mike Hughes, former Martin Agency President, stated that "Joe's passion for the work, his unbridled drive to push hard for brilliant creative and his ability to mentor creative talent across all disciplines combine to make him the right guy for this

critically important job." By May 2016, Martin was recognized at The One Show[4] as 2016 Agency of the Year. The Agency and GEICO also received the inaugural Penta Pencil, an award given to an agency-brand team who, together, have created stellar work for five or more continuous years. [https://martinagency.com/news/the-one-show-names-martin-agency-2016-agency-of-the-year]. Joe was named one of the fifty (50) Most Creative People in the World by trade magazine *Ad Age* and the 7th most Creative in the World by trade magazine *Adweek*. [https://adage.com/article/special-report-creativity-50-2015/creativity-50-2015-joe-alexander/301720; https://www.adweek.com/brand-marketing/10-chief-creative-officers-who-are-inspiring-breakthrough-work-us-agencies-165896/]. In 2017, the One Club ranked Joe # 1 Chief Creative Officer in the world:



Joe was at the top of his profession.

---

[4]     The One Show is one of the most prestigious awards competitions in advertising, design, interactive and branded entertainment. Judged every year by top industry professionals, a Gold Pencil is the ultimate symbol of creative excellence. [https://www.oneclub.org/awards/theoneshow/].

4.      Beginning in November 2017 and continuing thereafter, the Defendants robbed Joe of his entire life's work, destroyed his name and reputation, and permanently impaired his ability to find employment in the advertising industry.   Martin did the unthinkable.  Martin secretly leaked the terms of a confidential settlement agreement that Martin and Joe had entered into in 2013 to resolve a disputed accusation and disclosed the contents of confidential human resources (HR) files to an anonymous **#MeToo** Instagram account called, "Diet Madison Avenue" ("DMA"), knowing that DMA intended to republish the confidential information as part of a **#MeToo** crusade against white, male, chief creative officers at prominent advertising agencies.  Martin represented to DMA that Joe had sexually harassed Martin employees.   The allegations were completely false.  Significantly, Martin concealed its involvement with DMA and its vicious, despicable, premeditated misconduct and betrayal from Joe.  In order to cover up Martin's involvement with DMA and Martin's flagrant breaches, gross negligence and wrongdoing, IPG and Martin concocted a "sexual harassment" claim and used the false claim as a pretext to terminate Joe.  When Joe requested severance and his IPG bonus plans, IPG and Martin prepared and induced Joe to sign a "confidential separation agreement and general release".   IPG and Martin fraudulently concealed Martin's treacherous involvement and communications with DMA.  Martin, Estes and Hanley continued to breach fiduciary duties, continued to leak privileged and confidential information, and published false and defamatory statements about Joe (a) to trade tabloid, *Adweek*, who hungrily republished the lies to millions in the advertising industry in a hit piece entitled, **"The Martin Agency Chief Creative Officer Joe Alexander Exited After Multiple Sexual Harassment Complaints, Sources Say"**, and (b) to multiple

6

newspapers including the *Richmond Times-Dispatch*, the *New York Times* and the *Wall Street Journal*. In 2018 and 2019, long after Joe was terminated, IPG, Martin and Cavallo continued to defame Joe out of spite and ill-will by, *inter alia*, republishing false and defamatory statements on Martin's website, https://martinagency.com/, for the whole world to see. IPG, Martin and Cavallo openly disparaged Joe and used his demise -- orchestrated by Martin and DMA – to further their own self-interest.

5.      In this case, Joe seeks to recover presumed damages and actual damages caused by the Defendants' egregious misconduct. IPG, Martin and their agents are dirty, immoral and unethical. They went out of their way to wreck the life of a hugely successful and incredibly popular Virginia creative, and, then, to conceal and compound their crimes with fraud and more defamation. They intentionally betrayed and hurt a human being at the top of his career, solely to cover-up Martin's horrific wrongdoing and pander to **#McToo** and DMA. The Defendants should be punished for their unlawful actions and a very strong message needs to be sent to prevent others who choose to lie and defame from ever acting in a similar way.

## II.  PARTIES

6.      Joe lives in Richmond, Virginia. He is 59-years old. Joe grew up in a huge family with three sisters and five brothers. Joe's father "Ace" was a man of honor, always aware of right and wrong. He had very defined moral guidelines. He was respectful and open to differing points of view and new ideas. He passed those same traits on to Joe. [http://consciencenow.blogspot.com/]. Joe is married. He helped raise three (3) smart, confident, compassionate, successful daughters, with whom he is very close. Joe often brought his daughters to work and on the road with him. They loved

seeing their father do work he loved.  During this time, Joe was a major part of Martin's success, including transforming UPS from the world's leading shipping company to the world's leading supply chain and logistics provider by asking, "What can Brown do for you?".  As a result of Joe's creative leadership, Martin won Effie Awards[5] between 2012 and 2017 for multiple campaigns on behalf of multiple different clients, including GEICO and Walmart. [https://effie.org/case_database/case/3051 (GEICO – Happier Than II – featuring Hump Day Camel) (https://www.youtube.com/watch?v=WMsXhG9S2LU); https://www.effie.org/case_database/case/NA_2012_6637 (Walmart)].     The Martin Agency was named to the *Ad Age* Creative Innovators List four (4) times. [https://adage.com/article/special-report-agency-alist-2016/creativity-innovators-martin-agency/302296;  https://martinagency.com/news/ad-ages-first-ever-campaign-of-the-year-award].  The creative genius of The Martin Agency was a major reason parent company IPG was named the Most Effective Holding Company of the Year in 2017. [https://interpublicgroup.gcs-web.com/news-releases/news-release-details/ipg-named-most-effective-holding-company-2017-north-american].

7.    Joe sat on the distinguished board of The One Club, was Cannes Lions Film Jury President in 2016, and was a regular guest speaker in the advertising industry and on campuses, including the renowned VCU Brandcenter.  It took a life-time for Joe to establish his name, goodwill and to build his personal and professional reputations.  Until he was betrayed, attacked and smeared by the Defendants beginning in November 2017, Joe enjoyed an untarnished reputation in the advertising industry.

---

[5]    The Effie Awards recognize all forms of marketing that contribute to a brand's success.  For over 50 years, winning an Effie has become a global symbol of achievement. [https://www.effie.org/worldwide/about].

8.      Defendant, Martin, is a Virginia corporation, headquartered in Richmond, Virginia. Martin is a full-service agency with unified capabilities in advertising, strategic planning, direct response, digital, media services, data analytics, design and branded content. Martin owns and operates a website, https://martinagency.com/, and a Twitter account, https://twitter.com/martinagency.

9.      Defendant, Cavallo, is a citizen of Virginia. Cavallo is Chief Executive Officer of Martin. [https://martinagency.com/about; https://www.linkedin.com/in/kristen-cavallo-1044633/]. She operates a Twitter account, https://twitter.com/Cavallokristen, where she shares her ideological, political and idiosyncratic views. Cavallo was appointed to the position of CEO by IPG on December 12, 2017. Between 2011 and 2017, Cavallo worked for IPG subsidiary, MullenLowe ("Mullen"). Before joining Mullen, Cavallo spent thirteen (13) years at Martin, rising from strategic planning director to the role of Senior Vice President, business development. Cavallo spent her formative years at Martin. She knew how special a place it was. She never experienced any misogyny while at Martin and never heard any complaints about Joe from anyone. Cavallo was Martin's first female CEO. When IPG and its leadership "hit refresh" in December 2017 and appointed Cavallo as CEO, they instructed her to "re-write the ending of this chapter" of the history of Martin. Cavallo stated that "[o]bviously, there is a need for a new direction, and the culture has to evolve. [https://interpublicgroup.gcs-web.com/news-releases/news-release-details/interpublic-names-kristen-cavallo-ceo-martin-agency]. Cavallo did not disappoint IPG. Shortly after taking control of Martin for IPG and continuing through the present, Cavallo has taken every opportunity to throw Joe – who she once called a "friend" – under the bus.

10.     Defendant, Estes, is a citizen of Virginia.  She lives and works in Richmond, Virginia. [http://www.sissyestes.com/].  Estes is a former employee of Martin. [https://www.linkedin.com/in/sissy-estes/].  She was an art director that Joe recruited and brought to the agency in the mid-2000s.  Estes worked primarily on the Walmart account. In or about 2011, after Martin lost a big portion of the Walmart business, Estes was part of a layoff involving a large part of the staff.  Estes held a grudge against Joe and was very vocal about her layoff.  In November and December 2017, Estes conspired with Martin, DMA and others to tortiously interfere with Joe's employment and to defame Joe.  Like DMA, Estes publicly bragged about taking Joe down.  On November 30, 2017, Martin breached fiduciary duties and shared confidential, non-public information with Estes that Joe was going to be terminated the very next day.  Estes celebrated Joe's termination.  She posted the following message to Facebook:



Sissy Estes
November 30 at 4:53pm · 𝕝𝕝

Today, sexual harassment justice has been served. My father told me it
would happen, and I didn't believe him. (My father is an honorable, kind
and wise man). One more step in the right direction for those who just want
to work in a safe environment and make a life for themselves.

In August 2018, long after Joe was terminated, Joe's wife, Sarah, saw Estes in a jewelry store in Richmond.  Estes again falsely accused Joe of "sexual harassing" Estes.  Estes hissed, **"I hope he never works another day in his life … thousands of women have thanked me"**.  Between October 2017 and the present, Estes exhibited a true messianic desire to hurt Joe.  She intentionally breached a non-disclosure agreement and intentionally disclosed confidential settlement information to DMA.  She published false and defamatory statements about Joe to DMA, to Martin and IPG, to Hanley, to "thousands of women" and other professionals in the advertising industry, to newspapers,

including the *Wall Street Journal* and the *Richmond-Times Dispatch*, and to trade magazines, such as *Adweek*, all in furtherance of a conspiracy to tortiously interfere with Joe's employment as CCO of Martin and to ensure that Joe never works another day in his life.  Among the articles that contain Estes' false and defamatory statements are the following:

> https://www.wsj.com/articles/ousting-an-accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001;[6]

> https://www.richmond.com/business/local/amid-new-allegations-of-misconduct-former-employees-discuss-the-culture/article_b0930ee2-c672-55d6-8aca-ef14836999d9.html.[7]

As a veteran in the advertising industry, Estes knew that her false and defamatory statements to DMA and to the media would be republished over and over and over to Joe's detriment.  [*E.g.*, https://twitter.com/patrickmwilson/status/942077220645982209].  In fact, Estes was counting on a massive republication in order to kill Joe's reputation.

---

[6]     On December 13, 2017, the *Wall Street Journal* reported that "[s]everal other former employees and another person with knowledge of Mr. Alexander's alleged conduct told The Wall Street Journal about allegations of harassment and assault by the executive, including previously unreported details."  **Estes was one of the unnamed "former employees" who spoke with the *Journal*.**

[7]     On December 15, 2017, the *Richmond Times-Dispatch* reported that "Sissy Estes, who worked at The Martin Agency from 2007 to 2012, said that when she was first hired, a creative director gave her a warning about Alexander with no explanation: 'He said, 'Stay away from Joe. Just try to avoid Joe.'  One day, Estes heard Alexander comment on another woman in his department: 'Why would we hire someone who looks like that? ... Another time, Estes said she heard Alexander tell a woman she looked great and dared the woman to go to HR about it ... He earned the moniker 'HR Joe,' Estes said ... 'I know Joe loves his wife and his family, but he's saying things that could be construed as a sexual invite or a coming on or sexually inappropriate things that he should not be saying.  There were so many women coming to me crying,' Estes said. 'A lot of us tried to change things, and we were brushed off.'  About a month later, Estes was laid off, along with others at the company".  **Estes' statements to the *Richmond Times-Dispatch* were completely fabricated as part of the conspiracy to defame and tortiously interfere with Joe's employment. None of these events ever occurred.**

11.    Defendant, Hanley, is a citizen of Texas.    She holds herself out professionally as a products liability litigation defense lawyer licensed in Texas. [https://www.linkedin.com/in/tara-hanley-b712448/].    In 2011, Hanley represented a Martin employee, Robin Bidwell ("Bidwell"). Bidwell made a claim against Martin and Joe.  Bidwell hired Hanley because of Hanley's relationship by marriage to former Martin CCO, John Norman ("Norman").   Hanley's sister was married to Norman at the time.  Norman is close personal friends with Bidwell and Estes.  Both Bidwell and Estes worked for Norman when he was Martin CCO.   In her complaint, Bidwell alleged (falsely) that she had been sexually harassed.  Joe emphatically denied any wrongdoing. The matter was settled in 2013 without any admission of liability pursuant to the terms of a confidential settlement agreement.[8]  In spite of the confidential settlement agreement, Bidwell disclosed the terms of the confidential settlement to Estes, who in turn leaked the terms to DMA, *Adweek*, the *Wall Street Journal* and the *Richmond Times-Dispatch* between October 2017 and December 2017.  For her part, Hanley also breached the terms of the confidential settlement agreement when she spoke with *Adweek* in December 2017. https://www.adweek.com/agencies/the-martin-agency-chief-creative-officer-joe-alexander-exits-after-multiple-sexual-harassment-complaints-sources-say/ ("At least one employee's complaint to the company was settled in 2013 for an undisclosed sum. Attorney Tara Hanley, partner at the Dallas law firm Markland Hanley LLP, confirmed that one of her former clients 'did have a matter' involving The Martin Agency and Alexander that year").   The leaked confidences and other improper methods were

---

[8]      Incredibly, IPG claims that it first learned about the 2013 settlement sometime during the week of November 20, 2017.

12

intentionally used by Hanley and Estes to interfere with and cause the termination of Joe's employment with Martin and smear his reputation.

12.     Defendant, IPG, is a public company whose shares trade on the New York Stock Exchange (NYSE:IPG).  IPG is one of the world's largest global advertising and marketing services companies, with over $15,620 Billion Dollars in assets.  IPG sets company-wide corporate strategy, establishes operational controls, and guides personnel policies for its many companies and advertising agencies, including Martin.  In 2018, IPG's gross revenues from operations exceeded $9.714 Billion Dollars.  [https://investors.interpublic.com/static-files/4b38a7c5-9950-4d48-aca5-355da9e8425f (IPG 02/26/2018 Annual Report on Form 10-K, pp. 2, 16)].  IPG is at home in Virginia.

13.     DMA, is a partnership, joint venture, unincorporated association or "collective" of individuals.  DMA confirmed in a post that:

> **3) There are 12 of us in this collective. We all have day jobs. We work at various agencies (2 of us work at the same one). We are mainly in NY, SF, LA, and Chicago. We decided on those locations on purpose. Other members of the team are 2 lawyers, and 4 phd students + 2 professors who are working on some long term projects with us.**

DMA was formed in October 2017 for the sole purpose of anonymously doxxing, smearing and shaming alleged sexual harassers in the advertising industry. DMA falsely claimed that it had a duty to expose "sexual harassment/abuse" "cuz HR won't". DMA's mission was (and is) to get white, male, chief creative officers fired. DMA was not out to clean up the advertising industry or to change anything. For DMA and the anonymous persons behind the Instagram curtain, it was personal and premeditated:



4) We collect and corroborate stories and expose those we see fit after a lot of information & multiple stories are collected. We started out with just wanting to expose Joe Alexander. We were successful and decided to keep going. FYI, @martinagency still hasn't come fully clean about their coverup that went on for years.

Although DMA started with Joe, it decided to continue its defamation campaign and go after other chief creative officers and directors:



On February 2, 2018, DMA confirmed that it had targeted seven (7) advertising agencies: "over the past few months we have held the following agencies accountable in a similar fashion: @martinagency @grey @tbwa @cpbgroup [and @droga5] Next up: @mccann_ww & @180la." DMA was aggressive, unabashed and publicly unapologetic:



14.     DMA solicited defamatory and unverified stories from women and compiled a "master" hit list of intended targets, which it posted online. Joe was DMA's first victim. Martin was ground zero in DMA's campaign of intimidation and character assassination. DMA began operations as a direct result of the stories it heard about Joe from Martin and how harassment complaints were supposedly handled at Martin. [https://www.nytimes.com/2018/03/07/business/media/diet-madison-avenue-instagram.html (a lengthy document about DMA's mission shared with the *New York Times* "noted that the group [DMA] was formed after its members learned of how harassment complaints were handled at the Martin Agency")]. Martin became ground zero because it was the first advertising agency to leak confidential information to DMA. DMA confirmed that it had copies of the confidential Martin HR reports and NDAs:

> We ask for evidence of those reports. NDAs have also been turned over to us. We consider that to be corroborating evidence. We attach those items to a specific name in our database. Obviously that makes a particular case a bit more solid and provides us with info about who else is involved and complicit. That was/is the situation at Martin and we also suspect it to be the case at Crispin.

> # FYI - HR has all the reports. The things stated aren't rumors. They literally have every single report. We can't say the word literally enough to stress this point
>
> # In other words, they are lying.
>
> # We get it, @martinagency did the same thing for 9 months.

15.    DMA created and operated an Instagram account, "dietmadisonave".

[https://www.instagram.com/dietmadisonave/].[9]   DMA used Instagram and its direct

_____

[9]    Instagram is a free photo and video sharing app available on Apple iOS, Android and Windows Phone. People can upload photos or videos to our service and share them with their followers or with a select group of friends. They can also view, comment and like posts shared by their friends on Instagram. Anyone 13 and older can create an account by registering an email address and selecting a username. [https://help.instagram.com/424737657584573]. Instagram is owned by Facebook, Inc. ("Facebook"). Facebook's is authorized to transact business in Virginia. Its registered office and registered agent are located in the City of Richmond, Virginia. According to Instagram's "Terms of Use," a user **can't do anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose,**" and **can't post private or confidential information or do anything that violates someone else's rights**". Further, Instagram's "Community Guidelines" state that it is unacceptable to post "content that targets private individuals to degrade or shame them" or "personal information meant to blackmail or harass someone". [https://help.instagram.com/581066165581870 ("terms of Service); https://help.instagram.com/477434105621119 (Community Guidelines)].

messenger ("DM") service to target Joe and others for termination.  Facebook aided and abetted DMA's defamation campaign.  DMA communicated anonymously with Martin and former employees of Martin in Virginia for the express purpose of interfering with and ending Joe's employment.

16.   In addition to its Instagram account. DMA set up three (3) Google gmail accounts, dietmadisonavenue@gmail.com, dietmadisonave@gmail.com and Madisonaveabuse@gmail.com, that it used as a repository of false and defamatory statements concerning its targets.[10]  Between October 2017 and the present, DMA and its agents published unverified, scandalous, and salacious statements about Joe – statements that were received from Martin – and acted as judge, jury and executioner to "call out" Joe for termination.  DMA represented everything that was wrong about the nascent **#McToo** movement.  It's statements and visual content graphically symbolized hatred, intolerance, and rabid misandry.  DMA was determined to hold white, male, chief creative officers "accountable" no matter what the personal, professional, moral, ethical and societal costs:[11]

---

[10]   In addition to Instagram and Gmail, DMA and the DMA Partners published written and visual content via Telegram and Signal encrypted messaging services and on other social media platforms, including Facebook, Twitter, Snapchat, GoFundMe, and a WordPress website.  DMA and its principals have since deleted, deactivated or discontinued many of these accounts.

[11]   An advocate of violent activism has taken credit for one visual image employed by DMA. [https://twitter.com/ShannonDowney/status/959581597128445959 ("@dietmadisonave hey.  I'm in full support of outing the ad world perves.  The boys will be boys piece is mine.  Wanted you to know.  My insta is @badasscrossstitch so you can credit it")].



17.   DMA is operated by identifiable partners, associates and/or individual members, who acted as a "collective" to destroy the careers of white, male, chief creative officers, including Joe.  DMA's partners (the "DMA Partners") have concealed their identities and have resisted every effort to unmask them.  Upon information and belief, the DMA Partners include current or former employees of three (3) advertising agencies: Crispin-Porter-Bogusky [https://www.cpbgroup.com/], 180LA [https://www.180la.com/], and Droga5 [https://droga5.com/].  In 2017, DMA published a post stating that the group was comprised of people in the advertising industry, Ph.D students, professors, and 2 lawyers.  Ralph M. Watson ("Watson"), another victim of DMA's smear and intimidation

campaign, received private messages (Instagram DMs) between DMA and an individual at the Droga5 advertising agency ("Droga5"). These DMs confirmed that the DMA Instagram account was operated in part by people who worked in advertising, with at least two working at Droga5. One or more of the DMA Partners participated in a conspiracy with Martin, Estes and other former employees of Martin to tortiously interfere with and to terminate Joe's employment with Martin.

18.    Patrick Coffee ("Coffee") is a blogger, writer, and former senior editor employed by *Adweek*. [https://www.adweek.com/contributor/patrick-coffee/]. Adweek employed Coffee until August 16, 2019. Coffee is now at *Business Insider*. At all times relevant to this action, Coffee acted as an partner, associate or member of DMA or as an agent of DMA and the DMA Partners to publish and republish false and defamatory statements about Joe on the internet and via social media. In 2018 and 2019, *Adweek* published and republished the following defamatory articles written by Coffee about Joe to subscribers and advertising executives in Virginia:

> https://www.adweek.com/agencies/the-martin-agency-promotes-karen-costello-to-cco-in-the-wake-of-joe-alexanders-scandalous-departure/
> ("The Martin Agency Promotes Karen Costello to CCO in the Wake of Joe Alexander's Scandalous Departure");[12]
>
> https://www.adweek.com/agencies/when-metoo-came-to-madison-avenue/4/
> ("When #MeToo Came to Madison Avenue ... staffers at The Martin Agency say their complaints to HR about CCO Joe Alexander were repeatedly ignored or dismissed for years before he was ousted last December over multiple sexual harassment allegations");

---

[12]    Coffee published his articles to multiple new target audiences, including his followers on Twitter, to Adweek's 600,000+ followers on Twitter, to the 81.500 Twitter followers of Adweek's "AgencySpy", and Adweek's 600,000+ followers on Facebook. [*See, e.g.,* https://twitter.com/AgencySpy/status/1039533742249992192; https://www.facebook.com/Adweek/posts/joe-alexander-departed-last-december-amid-an-investigation-into-claims-of-sexual/10155436232142075/].

https://www.adweek.com/agencyspy/the-martin-agency-turns-joe-alexanders-old-office-into-a-meeting-room-and-dog-house/148911/
("It's been 10 months since The Martin Agency parted with CCO **Joe Alexander** after 26 years amid an investigation into multiple claims of sexual harassment made over nearly two decades") (emphasis in original);

https://twitter.com/PatrickCoffee/status/1075407319943524352
("The Martin Agency one year after the Joe Alexander sexual harassment scandal blew up the ad industry");

https://www.adweek.com/agencies/the-5-most-important-ad-industry-stories-of-2018/
("Misogyny and advertising have an unfortunate and well-documented history ... This year, the conversation unquestionably changed; whether that change was dramatic enough to permanently impact the industry for the better remains a matter for debate. #MeToo officially hit the business in December 2017, when The Martin Agency fired CCO Joe Alexander");

https://www.adweek.com/agencyspy/the-20-biggest-agencyspy-posts-of-2018/152124/
("However you may now feel about Diet Madison Avenue, the group exerted a huge influence over the calendar year. After the departure of The Martin Agency chief creative Joe Alexander last December, 2018 became the year #MeToo finally arrived as the industry maybe, finally began to grapple with endemic abuses of power").

Virtually every article published by Coffee for *Adweek* between December 2017 and July 2019 contains provably false and defamatory statements about Joe. Coffee's articles have been republished millions of times in the last year in Virginia, including by Martin. [*See, e.g.*, https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency].

### III.   <u>JURISDICTION AND VENUE</u>

19.     The Richmond Circuit Court has jurisdiction of this matter pursuant to § 17.1-513 of the Virginia Code (1950), as amended (the "Code").

20.     Venue is proper in the Richmond Circuit Court pursuant to §§ 8.01-262(1), (2), (3), and (4), and 8.01-263(2) of the Code.

21.     The Defendants are each subject to personal jurisdiction in Virginia pursuant to Virginia's long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) and § 8.01-328.1(B) of the Code, as well as the Due Process Clause of the United States Constitution.   The Defendants and their agents and co-conspirators in Virginia took action and transmitted and published false and defamatory statements in Virginia for the sole purpose of injuring Joe, breaching fiduciary duties, and interfering with Joe's employment at Martin.   Martin, Cavallo, Estes and IPG are subject to general personal jurisdiction in Virginia.   Martin, Cavallo, Estes, Hanley and IPG are subject to specific personal jurisdiction.   They each have minimum contacts with Virginia such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

## IV.  **STATEMENT OF MATERIAL FACTS**

22.     Martin is a wholly-owned subsidiary of IPG.  It is part of IPG's "McCann Worldgroup" network, one of the world's largest advertising agency networks. [https://www.interpublic.com/our-companies/the-martin-agency/].

23.     Joe had a valid written contract with Martin that was not terminable at will.  In 2016, Joe earned gross wages of $1,071,856.83.  His performance in 2016 was nothing less than spectacular.  In March 2017, Joe received the maximum 2016-2017 Long Term Incentive (LTI) Award from McCann and the maximum Performance Bonus from Martin.  Joe's creative product in 2017 exceeded all expectations.

24.     Between 2013 and 2017, Martin underperformed financially.[13] The major cause was the CEO, Matt Williams ("Williams"). Williams' underperformance as CEO was well-known inside the Agency. He faltered in all major areas: financial – declining revenue, margin and profit; new business – no CMO recruited and put in place for years and a stunning lack of wins; strategy and communications – failure to appoint a new CSO and a lack of cohesive strategic vision for 4 years and a failure to update the Agency's company vision and communication strategy. Most importantly, Williams failed to inspire and connect with Martin staff. He was often described by others as "not understanding how the agency actually works." Concerns about Williams simmered into the fall of 2017.

25.     Williams' underperformance did not go unnoticed at McCann. Concerns filtered down from McCann to Martin's former CEO and chairman emeritus, John Adams ("Adams"). Adams emailed both Joe and Martin President, Beth Rilee-Kelley ("Rilee-Kelley"), that the Agency had a real problem and needed to make an action plan. Adams laid out an elaborate plan pursuant to which Williams would step down as CEO and become chairman (retaining a new role as "head of strategy"), and Rilee-Kelley would take over as CEO. Behind the scenes in September 2017, Rilee-Kelley made sure Williams did not know he was being pushed out as CEO and replaced. Her stated goal was to get Williams to "take this escape hatch and continue to work closely with us. We've got too much riding on him in the hopper right now." Rilee-Kelley also made sure that she and Joe were the leadership team moving forward. When the action plan was complete, Rilee-Kelley texted Joe as follows:

---

[13]     Martin's creative product kept it from sinking.

23

> ### Fri, Sep 15, 7:41 PM
>
> # It's you and me, kid.

Throughout the entire process of reorganizing management, Rilee-Kelley never once suggested to anyone that Joe's behavior had ever been an issue. Rather, as evidenced by her text message, Rilee-Kelley thought that the path to improvement of Martin's financial picture and its leadership going forward was "you and me, kid". Rilee-Kelley would not have hitched her wagon to Joe if there had been any complaints made about Joe.

26.     On September 22, 2017, Joe picked his favorite ads of all time for *Adweek*. [https://twitter.com/InterpublicIPG/status/911304184217075714].

27.     On September 27, 2017, Joe was honored by the 4A's Foundation[14] as one of the "100" who made advertising great. The award was a recognition of Joe's strong belief in and practice of diversity in the workplace. Joe took giant steps towards improving workplace diversity at Martin  He brought Karen Costello ("Costello") to the Agency. Costello was the first woman to serve as Executive Creative Director ("ECD"). [http://www.adweek.com/agencies/the-martin-agency-hires-karen-costello-to-lead-mondelez-account-as-executive-creative-director/ ("'Karen is one of the top creative leaders in the industry. But she is hardly one to brag. So I will for her. She's already

---

[14]     The 4A's is the national trade association representing the advertising agency business in the United States. Established in 1997, the 4A's Foundation was created to galvanize the industry around improving the level of diversity within advertising and media agencies. [http://foundation.aaaa.org/about].

making a huge difference in the place,' said Martin Agency chief creative officer Joe Alexander in a statement."].[15]

28.     On October 2, 2017, the *Richmond Times-Dispatch* published a lengthy piece in the Metro Business section, entitled "**An honor for Martin Agency's Alexander**".  [https://twitter.com/Advertising24x7/status/914696959381737479  ("**Joe Alexander of The Martin Agency - making advertising great**")].  Joe and many members of his creative team were on the cover:



All was well. Joe's team expressed nothing but positive enthusiasm and happiness about the creative work being performed and the present direction and momentum of the work-product.  No one informed Joe of any complaints about his behavior or issues of any kind.  Joe had the solid backing of the entire Martin Agency.

---

[15]     After Joe was terminated by Martin, the 4A's Foundation summarily rescinded    the    award.    https://www.thedrum.com/news/2017/12/08/4as-rescinds-joe-alexander-s-organizational-honor].    Coffee    was    the    first    to    report    the    award    being rescinded.       [https://www.adweek.com/agencyspy/a-martin-agency-account-director-offers-her-perspective-with-notmymartin-post/140968/].

29.     In October 2017, Joe and Rilee-Kelley traveled to New York for a forward planning meeting with McCann brass.  McCann Worldgroup North America President, Chris MacDonald ("Macdonald"), was very impressed with the financial and creative plan outlined by Martin for 2018.  He emailed Joe:

 **O Macdonald, Chris (NYC-MEW) <Chris.Macdonald@mccann.com>**
O Joe Alexander
Tuesday, October 17, 2017 at 10:09 PM
Show Details
↰ You replied to this message on 10/18/17, 7:51 AM.

Joe,

I was impressed - by the honesty and the discussion.

I think we will get to a great plan for 2018 and I liked Beth a lot and get the three of you are a very strong team.

The key for me is to ensure I help you any way I can and continue the great start I felt we had today.

Hope trip was good and talk soon.

C

On Oct 17, 2017, at 8:07 PM, Joe Alexander <joe.alexander@martinagency.com> wrote:

    Great seeing you. Hope it was good to connect. Positive from our end. Talk soon cheers. JA

    Sent from my iPad

  2017 CREATIVITY INNOVATOR - AD AGE
2016 ONE SHOW AGENCY OF THE YEAR
2016 EFFIE FOR SUSTAINED SUCCESS

During the meetings, Joe had the full and unfledging support of both Rilee-Kelley and McCann.  Joe's creative work and leadership were complimented.  No questions of any kind were raised by anyone about Joe or about the work conditions and environment at Martin.  While in New York, Joe went to a Yankee's game with the Global Creative Chairman of McCann Worldgroup, Rob Reilly ("Reilly"):



Again there was no mention from anybody, either inside Martin or at McCann, of any complaints about Joe or any issues of any kind.  In fact, Joe's creative campaigns were universally praised and commended.

30.     On November 7, 2017, just two weeks before his termination, Macdonald met with Joe and others at Martin in Richmond, Virginia, for follow-up planning sessions.  Once again, Joe's work was complimented.  After the meeting, Macdonald emailed Joe:

> **MC**   O Macdonald, Chris (NYC-MEW) <Chris.Macdonald@mccann.com>
> O Joe Alexander
> Tuesday, November 7, 2017 at 7:37 PM
> Show Details
>
> ---
>
> Joe,
>
> Always great to see you too - next time dinner !!
>
> I think it was a constructive meeting and don't want you to get in any way disheartened - the work is great.
>
> I am always there to support and hope the honesty and challenging comments are to push us to do the right things.
>
> Cell No is 646 630 0640
>
> C

As of November 7, 2017, there was not a single mention of any complaint or issue of any
kind involving Joe. No one who attended the planning meeting, including Rilee-Kelley
and Williams, mentioned anything.

A.   ___DIET MADISON AVENUE___

      31.    In or about October 2017, in the wake of the media frenzy surrounding
reported allegations of sexual misconduct by Harvey Weinstein, Cindy Gallop
("Gallop"), a former advertising executive turned "activist",[16] issued a public call to
action on Facebook for advertising professionals to speak up about "sexual harassers" in
the industry. Gallop claimed that her Facebook post came "in response to the outpouring
of sexual harassment stories" allegedly committed by Hollywood producer Weinstein.
[https://adage.com/article/agency-news/cindy-gallop-asks-advertising-expose-harvey-
weinsteins/310976]. Gallop urged woman to "name the names of their harrassers".
[https://www.campaignlive.co.uk/article/sexual-harassment-adland-cindy-gallop-wants-
names/1447809]. Gallop claimed to have been contacted by at least 160 women who
reported sexual harassment of some kind. Based on the unverified reports she received,

---

    [16]    Gallop claims that she likes to "blow shit up. I am the Michael Bay of
business". [https://twitter.com/cindygallop?lang=en].

the outspoken Gallop compiled "Cindy's List" of alleged "sexual harassers".
https://www.mumbrella.asia/2017/11/cindy-gallop-asia-treated-dumping-ground-sexual-predators ("What a load of absolute fucking bollocks. A man in the industry recently said to me that men are scared of appearing on 'Cindy's List' and that anyone could find themselves on it. I bit his head off because the sheer scale of human misery I'm looking at in my inbox from all around the world, and not a false accusation in them – quite the opposite. How dare these men pronounce on it; they have no idea what women have been going through for decades. This is why we need to break these stories: these men, these names and companies and client brands attached, so the men understand the problem is them").

32.      Upon information and belief, Gallop supplied "Cindy's List" to DMA or the DMA Partners, and instigated, aided, abetted, enticed and/or assisted DMA in its smear and intimidation campaign.

33.      On October 30, 2017, IPG's chairman, Michael Isor Roth ("Roth"), anticipating attacks by Gallop and #MeToo,[17] circulated an internal note/memo to all 50,000-plus IPG employees around the world, including everyone at Martin, under the subject line "A Workplace Free from Harassment" (the "Roth Memorandum"). The Roth Memorandum "outlined a 'zero-tolerance' policy for all types of harassment". [https://www.adweek.com/agencies/ipg-ceo-issues-memo-promising-zero-tolerance-for-sexual-harassment/; https://www.thedrum.com/news/2017/10/30/ipg-chief-michael-roth-details-firm-s-zero-tolerance-policy-sexual-harassment-memo].

---

[17]      It is unclear when Roth first became aware of Martin's direct involvement with DMA. It is possible that the Roth Memorandum was a pro-active response to the collusion between Martin and DMA.

34.     Roth shamelessly pandered to Gallop and **#McToo** in order to insulate IPG and its agencies from the devastating negative publicity and adverse financial effects incident to the witch hunts that started in the fall of 2017.

35.     Because of Roth's irresponsible Memorandum, Joe was at the mercy of every disgruntled employee or ex-employee of Martin with an axe to grind.

36.     The Roth Memorandum gave any IPG employee carte blanche to disclose confidential employee and human resource files to **#McToo** and DMA.   The Roth Memorandum empowered Martin to breach fiduciary duties, violate the IPG Code of Conduct, deprive male employees of due process, and take the law into its own hands.

37.     Between approximately mid-October and November 21, 2017, Martin secretly disclosed to DMA and the DMA Partners the terms of the 2013 confidential settlement agreement with Bidwell and the contents of other confidential Martin HR files/reports.  Estes or another former employee of Martin falsely stated to DMA that in "Joe Alexander's case, there was a slush fund created just for him internally at Martin" to deal with Joe's "crap" – a "slush fund" that was hidden from "Michael Roth and IPG":

> Yeah EPLs for sure. But in Martin and Joe Alexander's case there was a slush fund created just for him internally at Martin. Money was drummed up just for his crap and Michael Roth and IPG were not even told about it.

The suggestion that Roth and IPG were unaware of the settlement with Bidwell is patently false. IPG and Martin's financial statements are consolidated and audited. There was no way for Martin to have concealed a $275,000 settlement check from IPG's crack team of accountants and auditors. In addition to the "slush fund" post, Martin and DMA exchanged numerous false and defamatory statements about Joe via Instagram direct messenger. They wrongly accused Joe of sexual harassment and labeled him a predator.[18]

**B.   _IPG/MARTIN TERMINATES JOE_**

38.     Upon information and belief, IPG did not know that Martin had breached the 2013 confidential settlement agreement or that Martin, Estes and others were disclosing confidential HR files/reports and information to DMA.

39.     Although IPG claims that it "first learned" of "alleged misconduct" by Joe in "mid-November" 2017 [https://www.wsj.com/articles/ousting-an-accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001], IPG has never revealed how or from whom it learned about the so-called "alleged misconduct" or what, indeed, it learned, if anything, in "mid-November" 2017.[19]

---

[18]     Upon information and belief, DMA and the DMA Partners engaged in both libel and slander of Joe between December 2017 and the present that Joe has not discovered because he does not have access to the DMA Instagram account or the DMA Gmail accounts or the emails and text messages of the individual DMA Partners. Joe believes that additional false and defamatory statements will be revealed through discovery.

[19]     A spokesman for IPG told the _Wall Street Journal_ that IPG first learned about the 2013 confidential settlement during the week of November 20, 2017, and received a copy of the document on December 6, 2017. This is a preposterous lie. IPG has never revealed _how_ or _from whom_ it learned about the 2013 confidential settlement or why it waited until December 6, 2017 to get a copy from Martin.

40.   As soon as IPG found out that Martin had breached fiduciary duties and disclosed confidential employee information to DMA and that that confidential information (and false accusations) about Joe was being published by DMA, IPG ordered Martin to terminate Joe.

41.   At the same time ("[a]round the second week of November" according to the *Wall Street Journal*), IPG and Martin began a pretextual "investigation" of Joe. Even DMA thought the "investigation" was "bogus":



42.     The IPG/Martin "investigation" was solely intended to cover-up Martin's massive betrayal, breaches of fiduciary duty, breaches of the 2013 confidential settlement agreement, and violations of the IPG human resources policies and Code of Conduct.

43.     In truth, IPG decided to terminate Joe in the hopes that DMA would not look further into the cover-up of sexual harassment by the "C-suite" or the handling of sexual harassment claims by IPG/Martin.

44.     IPG wanted to get the spotlight off itself and Martin before DMA negatively publicized the confidential information and salacious stories to clients:

> # Do the right thing.
>
> # Address it internally. If you don't, we know your clients will.
>
> # Like @martinagency are you willing to risk the livelihoods of hundreds to protect a small group of predators ?

45.   In order to appease DMA and cover-up Martin's breaches of fiduciary duty and gross negligence in disclosing confidential information to DMA, IPG and Martin manufactured a false narrative about a claim of "sexual harassment". Although IPG and Martin represented to trade magazines that Joe's termination followed an "internal investigation into **an** allegation of sexual harassment by the chief creative officer" [https://adage.com/article/agency-news/exit-martin-agency-cco-joe-alexander-internal-investigation/311550; https://twitter.com/adage/status/938523336858054656 (emphasis added)], in truth, there was no investigation and, even more to the point, there was no "allegation of sexual harassment" that prompted Joe's termination. IPG actually made it up.

46.   Martin complied with IPG's direction to concoct a sexual harassment complaint so as to conceal Martin's involvement with DMA and the fact that IPG had decided to give Joe up to toxic DMA and #MeToo.

### C.   *THE FAKE CLAIM OF "SEXUAL HARASSMENT"*

47.   On November 21, 2017, at 3:30 pm, Joe met with Rilee-Kelley and Williams. Joe thought it was a routine weekly meeting. Rilee-Kelley had a sheet of paper. She made an off-hand comment that "they" had been "watching this" for a "couple of weeks". Then, she fraudulently misrepresented to Joe that "someone"[20] had "filed" a sexual harassment complaint against Joe. Joe was floored. Rilee-Kelley refused to give any details. She misrepresented to Joe that it looked "bad". Rilee-Kelley said that Joe had two options: (1) resign and it "goes away", or (2) "you can fight it and

---

[20]   Joe would later find out on December 1, 2017 that the alleged "someone" was ████████████████, a woman who Joe had worked with for years – a woman who had never before complained to anyone about Joe. *See ¶ 60 infra.*

probably lose which would result in your termination.  As your friend, you should take

number 1".  Rilee-Kelley refused to disclose what the complaint was or who made it.

She told Joe, "we must protect the confidentiality of the accuser."  Rilee-Kelley and

Williams expressly represented to Joe that if he resigned, they would work with him on

an acceptable statement to be made to Martin Agency staff.

48.     The meeting lasted a total of seven (7) minutes.

49.     Joe left dumfounded, confused and deeply hurt.

50.     He retrieved his belongings.  Around 4:19 p.m., he quickly sent a text to

his team, including ████ and Costello, stating that something "personal" had happened

and that he would need to take the rest of the year off.

51.     At 5:44 p.m. on November 21, 2017, ████ responded to Joe's text:



35

When Joe explained that it was "bad", ■■ replied:



On November 23, 2017 (Thanksgiving), ■■ texted Joe again:

52.   ■■ was a colleague and friend. Prior to November 21, 2017, she never

expressed any complaints, concerns, or fears of any kind to Joe.[21]   She made no

---

[21]   ■■ text messages demonstrate that she did not level a complaint of
sexual harassment before Thanksgiving 2017, and that Rilee-Kelley was lying. If ■■
had made a complaint of sexual harassment against Joe, she would *not* have said, "[h]ope
you and your family are ok". She would *not* have said, "[w]hatever this is, you will get
through it". She would *not* have wished a sexual harasser "Happy Thanksgiving". 
■■ texts demonstrate that she did not even know about any claim of sexual
harassment on November 21, 2017 when Rilee-Kelley misrepresented that "someone"
had made such a complaint.

36

complaints of sexual harassment.   In fact, throughout the many years they worked together, ▀▀▀ always expressed how much she respected Joe and enjoyed working with him.   In 2016, for instance, to celebrate Joe's 25th anniversary with Martin, dozens of Joe's Martin Agency co-workers gave Joe a book full of beautiful, heart-felt tributes. ▀▀▀ wrote these kind words about Joe:

> You always say "great leaders have followers." I'd follow you anywhere. The Martin Agency is quite lucky to have had your thinking, passion, and love for 25 years. Cheers to the next!

On August 17, 2017, ▀▀▀ sent Joe the following text:

> Well heeeey.
> Hope today was ok.
>
> CB is out tomorrow, so you'll have a new assistant for the day.
> Me.
> Just like the good 'ol days! Except that I'm a lot nicer now.

"I'd follow you anywhere". "Just like the good 'ol days!" These are not the words of a woman who has **EVER** been sexually harassed by her boss.

     53.    Joe's style was inclusive, collaborative, nurturing, encouraging, mentoring, advocating. He treated all colleagues with respect. He shared opportunity with all, as evidenced by the thanks he routinely received:

> *Cori Kaylor*        5/15/2017
>
> Joe—
> i can't thank you enough for the opportunities that you've shared with me... but here's a try.
> Thank you for embracing and encouring the Coleman story.
> Thank you for advocating for me to join the team to celebrate the campaign's success.
> Thank you for taking the time to build a friendship with me.
> i'm looking forward to more champagne-and-gold worthy moments in the future.
> Cori

     54.    In truth, Rilee-Kelley, acting upon direction from IPG, manufactured the false claim that Joe had sexually harassed ████. Rilee-Kelley betrayed Joe and acted out of mechanical loyalty to IPG and Roth. Rilee-Kelley was a good lieutenant who valued the security of her job more than loyalty to her close personal friend and partner of twenty-six (26) years. She backed IPG and terminated Joe's employment to avoid exposure of Martin's breaches of fiduciary duty, gross negligence and the purported HR shortcomings and complacency at Martin that had motivated DMA from the start.

**D.** *__THE HR INQUISITION__*

55.     The day after Thanksgiving, Riley-Kelley texted Joe.  She told Joe that he could not reach out, talk to, or "confront" anyone at Martin, McCann or IPG.  She warned Joe about trying to figure out who had lodged the complaint: "Pls don't try to figure out who lodged the complaint because it can be viewed as retaliation which would result in immediate dismissal."  In truth, Rilee-Kelley was afraid that Joe would discover that the complaint of sexual harassment was a lie.

56.     By Monday, November 27, 2017, Joe still had not heard anything from Rilee-Kelley about the next steps.  On Tuesday, November 28, 2017, Joe received a text from Rilee-Kelley at 6:19 pm: "Just tried to call you.  You are my partner and I get it.  I am trying to get you as much as I can so you can make the right decision so you can be thoughtful and make the right decision for you going forward.  And it's taken more time than I hoped.  Working hard to get you something tomorrow."  This was more lies.  In truth, Rilee-Kelley was desperately trying to solicit more complaints against Joe.

57.     On Thursday, November 30, 2017, Joe met with Rilee-Kelley and Williams at the Willow Oaks Country Club.  Rilee-Kelley slid a single sheet of paper across the table.  There were 10 lines on the paper, each describing in very general terms an alleged complaint.  No dates, times, places, or names.  Joe asked for the name of the woman – the "someone" – who had filed the complaint.  Rilee-Kelley refused to say.  Joe asked if any complaint was in writing.  Rilee-Kelley stated that "they" had one email, the rest were "verbal" complaints.  Rilee-Kelley did not identify when the so-called verbal complaints had been made.  Rilee-Kelley again said that it "doesn't look good and as your friend, I advise you to resign because if you investigate and the complaints are true,

you will be fired with cause and lose everything." This was Rilee-Kelley's third threat along these lines. Joe looked Rilee-Kelley in the eye and said, "after 26 years of partnership and all that I've done, you couldn't come to me and say this is bad. You have 6 months. Let's figure out an exit that's good for all of us." No response. Rilee-Kelley then looked at Joe and stated, "you should be grateful we are offering you the option to resign. You think Matt Lauer got that? You think Garrison Keiller got that? We are doing you a favor." Then, Williams dropped the final coercive bombshell. He told Joe "You have until 5 pm tomorrow, Friday December 1, to take option 1 or 2. Because people are already wondering where you are, what's going on, and we have to tell our clients. We can't have this speculation."

58.     Joe was so upset he left after 25 minutes.

59.     Shortly after the meeting on November 30, 2017, Williams texted Joe:

> I know you're upset. I'm sorry. But I need to be really clear: if you don't communicate your decision about option 1 vs option 2 by end of day Friday, option 1 will come off the table. I don't want that to happen.

60.     On December 1, 2017, Joe attended a pretextual Human Resource inquisition at the Richmond Marriott Downtown.   Meg Garner and Alice Albright (Martin Agency HR) were at the meeting in person.   Dana Mansfield (McCann HR) participated by phone.   Garner reminded Joe about the IPG Code of Conduct and then revealed to Joe that the sexual harassment claim had been filed by ████

61.     Joe could not believe it.   There was no one in Martin that Joe was professionally or personally closer to than ████.   ████ was close friends with Joe's wife, Sarah.   Joe's daughter babysat ████ first baby.   ████ had shared a photo of her new baby with Joe just months before.   Joe and ████ shared everything: work, home, kids, play, laughs, sadness, trust, life, even death.   Both Joe and ████ engaged in typical office banter: You look great.   Those jeans are awesome.   That's a great haircut.   Joe was ████ biggest champion.   In fact, Joe hand-selected her to be Martin's first creative recruiter.   ████ performance was outstanding, just as Joe had predicted.   She took time off and had a baby.   She came back into a new role – creative department manager.   ████ was not as confidant in the new role, but, again, Joe propped her up and made sure everyone knew she was doing an exceptional job.   Joe and ████ were as close as could be.   In fact, Joe would always discuss important and/or vital information and lean on ████ when he had to make important decisions.   ████ called it, "The Vault."   "Don't worry," she would say.   "It's in the vault."   Anything Joe said to ████ he knew was safe, as safe as it would be with anyone.

62.     Garner gave Joe a 4-year old email from 2013.   The subject matter was the Cobblestone Awards, an award ████ and Joe organized every year for the top creative contributors at Martin.   In a line buried in the email, Joe and ████ bantered back and

forth (as always) about a dream that Joe had had. Joe did not even remember the email. No one ever complained about the email. Rather, Garner and/or Rilee-Kelley searched the server for things to use against Joe, and found one old email. Joe was not even given a copy of the email. Garner went on to mention other verbal "incidents": a young woman wonders why Joe pays attention to her; another woman says Joe makes her feel "creepy"; another person says Joe called other women "hot"; Joe texts emojis to a women; another person asks why Joe wanted to meet her in his office.[22]

63.     It was a preposterous witch hunt. Joe asked, "how are any of these incidents sexual harassment?" Joe asked for times, places and dates. Garner admitted that she did not have *any* times, places or dates. Garner said that in her claim ████ said she changed her clothes and appearance to stop the "harassment". This was not true. Katie was not shy about her clothes, her body and making sure everyone knew she looked great. She often said in front of Joe and others that she was proud of her body by saying, "There's no shame in my game." She was completely comfortable around Joe and others no matter what she was wearing. In fact, one of the last times she and Joe worked together in his office, ████ wore a very short skirt and moved her chair right next to Joe's. And, that same week, she sat working on Joe's sofa wearing tight jeans, her legs spread-eagled.

64.     The meeting was pointless. Garner, Albright and Mansfield showed "zero tolerance" and showed a reckless disregard for due process. They had already made a decision on who/what to believe and who/what not to. It was a sham.

---

[22]     Joe's office was glass-walled, right in the middle of the busiest part of the Martin Agency, hardly a place where any "sexual harassment" would have ever occurred.

65.   About 25 minutes into the inquisition, Joe handed Garner a forced resignation letter. He stood up and said, "I would rather walk out with my dignity than go through this inquisition any longer." Joe left.

66.   After the HR inquisition on December 1, 2017, Joe prepared a draft statement to be released to Martin. He sent it to Rilee-Kelley and Williams because they had promised and represented that if Joe resigned they would release a joint statement together concerning Joe's departure from Martin. Rilee-Kelley and Williams broke their promise. At 5:00 p.m., much to Joe's astonishment and chagrin, Williams texted Joe the following message:

We kept it simple:

Hi, everyone. I want you to know that Joe Alexander is no longer employed by the agency. Karen Costello and Jerry Hoak have agreed to step in as creative leads for the time being and we are notifying clients of the change. Beth and I are available to you as we focus on moving forward.



67.     By 5:00 p.m. on December 1, 2017, Joe's entire history and presence on Martin's website and social media – articles, bio, awards, photos – had been scrubbed. It was planned and premeditated.

68.     At 6:00 p.m., *Adweek* and Coffee published the "breaking" news of Joe's termination to *Adweek's* millions of online subscribers and its 600,000 Twitter followers. [https://www.adweek.com/agencies/the-martin-agencys-chief-creative-officer-joe-alexander-is-out-after-26-years/; https://twitter.com/Adweek/status/956919170561691650].

E.      ***FRAUD IN THE INDUCEMENT***

69.     On or about December 2, 2017, IPG prepared and forwarded to Joe a "confidential separation agreement and general release" (the "IPG Release").

70.     After twenty-six (26) years of service, IPG and Martin terminated Joe without any severance or payout of his hard-earned bonus accounts. Instead, IPG offered Joe payment of the small amount in his Capital Accumulation Plan (CAP) pursuant to a Participation Agreement for 2015 and 2016. IPG saw this as an opportunity to coerce a limited "release of claims" from Joe for the torts committed by IPG and Martin prior to December 12, 2017.

71.     Joe signed the IPG Release on December 12, 2017. Joe had no choice – sign it or IPG threatened to put him and his family through ignominy.

72.     IPG and Martin fraudulently induced Joe to sign the IPG Release. IPG and Martin concealed the fact that Martin had leaked the 2013 confidential settlement agreement and other confidential HR files/information to DMA. But for IPG and Martin's fraudulent concealment, Joe NEVER would have signed the IPG Release.

73.   Joe learned about IPG and Martin's deception in late December 2017, when DMA disclosed that it was involved in Joe's termination.  The first post read:



93 likes

**dietmadisonave** Two CCO's down. Who is next?
#cleanhouse #joealexander

74. DMA and the DMA Partners marked Joe off their "master" hit list. They crossed out Joe's name in red to signify that he had been terminated:



| dietmadisonave 8h | |
|---|---|
| REPORTED | Repo |
| Ted Royer | 21 times see do |
| Eric Silver | 12 times see do |
| Mark Fitzloff | 5 times doc 3 |
| Rick Condos | 8 times doc 3 an |
| Ralph Watson | 12 times doc 1, |
| Jason Levine | 12 times see do |
| Rick Dodds | 9 times see doc |
| John Norman | 6 times see doc |
| Darren Moran | 8 times see doc |
| Tony Weisman | 6 times see doc |
| Joe Alexander | 32 times see do |
| Erik Vervroegen | 10 times see do |
| Curt Detweiler | 16 times see do |
| Andrew Chirstou | 21 times see do |
| Travis Robertson | 8 times see doc |
| Peter McGuinness | 7 times see doc |

Beside Joe's name on the hit list was an entry: "32 times see doc". Upon information and belief, this is a reference to the 2013 confidential settlement agreement and other HR

Reports and documents unlawfully leaked and disclosed to DMA by Martin.  DMA and

the DMA Partners reminded readers that:



> **Just remember folks, it took 9 months to expose Joe Alexander, & the @martinagency still hasn't fully come clean.**

75.     In addition to publishing the "master" hit list, and as further evidence of

their actual malice, spite and ill-will towards Joe, DMA and the DMA Partners published

a picture of Joe wearing a pig nose with emojis vomiting out of Joe's eyes:

> Or this... btw to date neither IPG or Martin has still explained why he was let go, what their role was, & why they allowed this garbage to continue

REX SHUTTERSTOCK

F.   ___DEFENDANTS' CONTINUING MISCONDUCT___

76.   Because of Joe's sudden departure and the vagueness of Williams' internal announcement to Martin, speculation about Joe's termination spread like a wildfire in Southern California.  Former co-workers and peers texted and emailed Joe relentlessly. They expressed bewilderment, sadness and thanks for Joe's leadership.  Some prejudged Joe immediately.[23]  ▓▓▓ – the woman who allegedly complained about "sexual harassment" – texted the following message to Joe:



We're here for you. Focus where you need to focus.

Joe could not believe what was happening.  The woman who Martin and IPG represented Joe had "sexually harassed" was "here for" him.  Obviously preposterous lies from IPG and Martin.

---

[23]   On December 3, 2017, Joe engaged in the following text conversation with Danny Robinson ("Robinson"), a senior creative at the Agency:

| | |
|---|---|
| Joe: | I'm going to miss you guys.  Hope when it settles down we can grab coffee. |
| Danny: | I'll have to think about that. |
| Joe: | What?  Really? |
| Danny: | Gotta think about myself.  Don't think it's a good idea to be seen with you. |
| Joe: | Oh wow.  That's really sad. |

Joe never heard from Mr. Robinson again.

48

77.     Joe tried to maintain his dignity and self-respect.  He posted a statement
on Facebook:

> "What a great run.  But it's time for a new challenge.  I couldn't be prouder of the
> work we accomplished together.  More important, it has been a blessing of a
> lifetime to do work I love with people I love.  The Martin creative bar will
> continue to be high because of the deepest bench in the business.  I wish them
> nothing but the best.  And I look forward to the next adventure.  Shedding a tear
> tonight through an eye toward the future.  Cheers."

78.     On December 5, 2017, oblivious to Martin's betrayal, Joe gave an official
statement to Lindsay Stein ("Stein") at *Ad Age*:

> "The Martin Agency is my family.  Rather than a drawn-out, hurtful investigation,
> resigning was the proper thing to do to protect my family and all the people I've
> worked so closely together with in my 26 wonderful years.  I will always love that
> place and the people who make it so special.  Please respect my privacy during
> this very, very sad time."

79.     On December 6, 2017, Coffee texted Joe to advise that *Adweek* was
"preparing to run a story indicating that you were fired from The Martin Agency after
multiple female employees filed sexual harassment complaints against you.  The story
also notes that a case brought against you in 2012 was settled out of court for an
undisclosed total.  Please let me know if you would like to comment."

80.     On December 7, 2017, *Adweek* published a damning indictment of Joe
written by Coffee, citing unnamed "sources", anonymous "women", an unidentified
"former executive", and unidentified "former employees" and "former co-workers".  As
planned, *Adweek* and Coffee gave a national public voice to and amplified the tortious
conduct of DMA and the DMA Partners.  [https://www.adweek.com/agencies/the-martin-
agency-chief-creative-officer-joe-alexander-exits-after-multiple-sexual-harassment-
complaints-sources-say/ ("**The Martin Agency Chief Creative Officer Joe Alexander**

Exited After Multiple Sexual Harassment Complaints, Sources Say") (the "Adweek

Hit Piece")].[24]

81.    The Adweek Hit Piece contained multiple false and defamatory statements

of and concerning Joe, including:

- Joe left The Martin Agency "after several sexual harassment claims[25] about him were made with the agency";

- Several women "reported concerns about his behavior to the agency, citing incidents as far back as the 1990s";

- Joe's "nickname among some staff" in the 2000s was "HR Joe";

- In 2012, Estes told Mike Hughes that Joe "could not continue hitting on women";[26]

- Daniela Montanez ("Montanez") "approached human resources in 2012 to let them know that she was uncomfortable working with Alexander";

- "Alexander made improper sexual advances" towards two "additional women";

---

[24]    The coordinated effort between DMA and *Adweek*/Coffee is evidenced by the timing of publication of Coffee's various stories. Coffee was always first to report the terminations. He clearly had inside information from DMA that no one else had. For instance, on the same day Watson was fired by CBP, Adweek/Coffee simultaneously published an article titled "**CP+B Fires Chief Creative Officer Ralph Watson**". [https://www.adweek.com/agencies/cpb-fires-chief-creative-officer-ralph-watson/]. That article, and the "hit list" published by DMA shortly thereafter, linked Watson to other high-profile advertising executives' terminations that were allegedly because of sexual harassment.

[25]    The only "sexual harassment claim" ever made prior to December 1, 2017 was the one reported to Joe by Garner. In truth, however, ■■■ never made the claim prior to December 1, 2017. IPG and Martin induced ■■ to make the claim, which IPG and Martin then supplied to trade magazines as the reason for Joe's termination. IPG and Martin concealed the truth, which is that they terminated Joe in response to DMA's threat to publicly expose and shame IPG and Martin for how they handled sexual harassment claims and to cover-up Martin's egregious breaches of fiduciary duty, breaches of contract and violations of IPG HR policies and the Code of Conduct.

[26]    Estes' false statements about Joe were immediately retweeted by Gallop. [https://twitter.com/cindygallop/status/938816561502093312].

- Alexander passed "a former executive" "his hotel key and invited her to his room to have sex during a business trip. They were both married at the time";

- This was "Alexander's way of 'testing the waters' with women he found attractive";

- A "former worker" said "Alexander joked about threesomes and at one point propositioned her";

- "Three other former employees said Alexander regularly belittled co-workers, telling multiple women that they needed to lose weight and commenting on the size of their breasts in front of male colleagues. They allege that he once described a black female employee as "chocolate thunder" and frequently told Mormon staff members that no one wanted to spend time with them because they wouldn't drink alcohol";

- Estes said, "[t]his has been happening for decades."

82.     *Adweek* and Coffee concealed the fact that none of the so-called "complaints" were ever reported to Martin Agency Human Resources or to any manager of Martin or IPG.  *Adweek* and Coffee confirmed that "one former employee ... and several of her colleagues" did not file complaints until "Thursday", December 7, 2017, the same day *Adweek* and Coffee published the Adweek Hit Piece.

83.     *Adweek* and Coffee also published confidential information that they obtained from Martin, Estes, Bidwell and/or Hanley regarding the 2013 confidential settlement of the disputed claim that had been levelled by Bidwell against Martin and Joe.[27]  *Adweek* and Coffee stated that "nine sources with knowledge of the story" stated that "a woman in the creative department [Bidwell] accused Alexander of sexually harassing her and then firing her after she repeatedly rejected his advances."  Martin, Estes, Bidwell and/or Hanley also disclosed to *Adweek* and Coffee that "the settlement

---

[27]     Estes, Bidwell and Hanley are not parties to or third-party beneficiaries of the IPG Release.

51

forbid the woman [Bidwell] from working for the larger Interpublic Group again in any capacity."

84.     The Adweek Hit Piece was republished millions of times between 2017 and the present. [*See, e.g.*, https://www.refinery29.com/en-us/2018/12/217506/the-martin-agency-women-executives-times-up ("The piece included two former employees who spoke on the record, saying they went to managers about Alexander at various points to no avail. Most damning though was a 2013 settlement between the agency and an unnamed woman"); https://qz.com/1201495/metoo-and-diet-madison-avenue-sexual-harassment-allegations-at-publicis-wieden-kennedy-martin-agency/ ("According to a lengthy report published by Adweek in December, Alexander was the subject of several harassment complaints about repeated incidents through his career, dating as early as the 1990s"); https://twitter.com/cindygallop/status/938821321181618176 ("I'm disgusted @martinagency fired @joealex12 without publicizing the (many, years-long) reasons why")].

85.     On December 7, 2017, Joe received a text from Stein stating that Martin had released an "internal memo" to the press. Prior to release, Martin did not provide a copy of the "internal" memo to Joe or even advise Joe that it intended to release the memo. The "internal" memo materially breached the terms of Joe's verbal agreement with Rilee-Kelley and Williams and the IPG Release, including the covenant of good faith and fair dealing. Joe resigned on December 1, 2017. Martin promised Joe that if he resigned, it would not comment on the matter further and the parties would work together on a joint statement to Martin staff. The "internal" memo expressly violated Martin and IPG's commitments. The "internal" memo, published at the direction of IPG, was

egregiously defamatory. Among other things, the memo falsely stated that the "behavior that Martin's former CCO, Joe Alexander, is accused of is inexcusable. That's why the only alternative was for him to leave The Martin Agency. That decision was ours." Martin further misrepresented that "people in our company felt unsafe and unheard". Martin further falsely stated that it was "deeply sorry that any of you ever felt unsafe or unheard." [https://www.adweek.com/agencies/the-martin-agency-releases-internal-memo-promising-to-get-better-in-wake-of-harassment-scandal/].

86.    On December 8, 2017, *Adweek* and Coffee republished false statements about Joe by Kelsey Johnson ("Johnson"), an account supervisor with Martin. Johnson piled on with numerous unsolicited false and defamatory statements solely designed to defame Joe, interfere with his ability to find prospective employment and violate the spirit and letter of the IPG Release. Johnson, *inter alia*, stated as follows: *"we do not condone the behavior of Joe Alexander, or any of his enablers,*[28] *or those who sexually harass, speak down to and demean women ... we do not condone the environment and the culture that allowed him to feel safe and comfortable in his behavior. The environment that allowed him to stay here and prey on women for over twenty years ... The only way to change this culture is if men and women refuse to accept a system that allows for predatory behavior"*.    [https://www.adweek.com/agencyspy/a-martin-agency-account-director-offers-her-perspective-with-notmymartin-post/140968/; https://medium.com/@kelseyann.johnson1/notmymartin-e00bbdc55c4b].

---

[28]    In truth, Joe was the only one targeted. Not one other person was accused of sexual harassment or "inexcusable" conduct. No "enablers" were ever identified. No "enablers" were terminated by IPG and Martin on or after December 1, 2017 because, in truth, there was nothing to "enable". The defamatory statements about Joe were all invented out of whole cloth.

87.     On December 13, 2017 – the day after Joe signed the fraudulent IPG

Release – the terms of the confidential settlement were again leaked to the *Wall Street

Journal* by Martin, Estes and/or Hanley. [https://www.wsj.com/articles/ousting-an-

accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001   ("In

2011, Mr. Alexander made several unwanted advances toward a female copywriter at the

agency, harassing her on multiple occasions, according to people familiar with the

woman's account.  That year, on assignment in Los Angeles to shoot a commercial for

Wal-Mart, Mr. Alexander touched her inappropriately and tried to kiss her, but she

rejected his advances, according to the people familiar with her account.  Days later, he

invited her to his hotel room to discuss business. After a short conversation, he got naked,

got into bed and said, 'You decide what you want to do,' according to the people familiar

with her account.  The two had a sexual encounter.  The people familiar with her account

say that after enduring his alleged harassment and criticism, she felt she had no choice.

The alleged harassment continued for months afterward, the people said.  The woman

involved in the 2011 incident was let go by the Martin Agency in 2013 and received a

settlement of $275,000, including a provision barring her from working for Interpublic

Group agencies, the people familiar with the matter say.  A spokesman for Interpublic

said the parent company first learned about the 2013 settlement in the week of Nov. 20,

2017,   and   received   a   copy   of   the   document   on   Dec.   6")];   *see   also*

https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency   (on

January 6, 2019, Martin and Cavallo again breached the 2013 confidential settlement

agreement by posting the terms of the settlement on Martin's website)].  Bidwell told

*Digiday* that she spent the net proceeds of the settlement after payment of taxes and

lawyers on "Diamond earrings … They were quarter carats, if that tells you anything". [https://digiday.com/marketing/agencies-use-ndas-hide-sexual-harassment-claims/].

88.     On December 15, 2017, the *Richmond Times-Dispatch* published an article about Joe that included "new" and "exclusive" false and defamatory statements from Cavallo. https://www.richmond.com/business/local/amid-new-allegations-of-misconduct-former-employees-discuss-the-culture/article_b0930ee2-c672-55d6-8aca-ef14836999d9.html]. Consistent with her pledge to IPG to "re-write" the history of Martin, Cavallo told the *Times-Dispatch* that "I know some of the people that have come forth and I know them to be good and honest people. So I have no reason to doubt anything that happened". Cavallo confirmed that she was "seizing the opportunity", created by the allegations of "harassment and hostile working conditions" that were "ignored for years", to "rebuild the reputation of the storied agency". Cavallo falsely stated that the "complaint" that "prompted Alexander's departure" "came from the inside, someone whose aim was not to burn the house down.[29] Do you know how hard it must be to break something you love in order to make it better". Cavallo stated that "she would never send a victim back to someone they were accusing of misconduct to work it out".

89.     On December 18, 2017, Coffee published an article with the defamatory headline: "**Incoming Martin Agency CEO Kristen Cavallo: 'I Have No Reason to Doubt' Joe Alexander's Accusers**". https://www.adweek.com/agencyspy/incoming-martin-agency-ceo-kristen-cavallo-i-have-no-reason-to-doubt-joe-alexanders-accusers/141358/; https://twitter.com/AgencySpy/status/942803805812547584]. The

---

[29]     Significantly, Cavallo's words, "burn the house down", mirrored language used by DMA.

article featured a picture of Cavallo and republished one of Cavallo's false and defamatory statements about Joe: "I know some of the people that have come forth and I know them to be good and honest people. So I have no reason to doubt anything that happened".

90.     On April 11, 2018, Martin told *Adweek* that it was "a bit of grassroots for the #MeToo movement in advertising". [https://www.adweek.com/agencies/the-martin-agencys-new-cco-and-other-female-leaders-on-why-they-signed-times-up-advertising/].

91.     On April 12, 2018, *Adweek* published an article written by Coffee that again referred to Joe's termination. The article published portions of a letter written by IPG chairman, Roth. Roth's letter directly defamed and disparaged Joe. It stated that in 2017 "sexual harassment became impossible to ignore. We have worked hard to create a culture where all our employees – regardless of gender, race, ethnicity, and other dimensions of diversity – can feel safe and that they can be their authentic selves at the office. However, with 50,000 employees, we are not immune to behavior by some individuals that runs counter to our values ... When employees bring forward credible allegations about sexual misconduct or unethical behavior, we investigate. And as we showed in 2017, we take swift disciplinary action when required." [https://www.adweek.com/agencyspy/ipg-ceo-michael-roth-cites-swift-disciplinary-action-on-metoo-in-new-letter-to-shareholders/145809/].

92.     On April 13, 2018, *Adweek* published another article that contained statements published by IPG about Joe. The article refers to an email sent out by IPG to its 50,000 employees. The article states: "The email comes amid ongoing discussions around the agency world's response to the #MeToo movement. IPG had to reevaluate its

own workplace procedures and policies late last year after The Martin Agency chief creative officer Joe Alexander was accused of sexual harassment and fired". [https://www.adweek.com/agencies/ipg-issues-a-memo-reminding-staff-to-act-responsibly-at-cannes/].

93. On September 11, 2018, *Adweek* published another article about Alexander written by Coffee. The headline reads "**The Martin Agency Turns Joe Alexander's Old Office Into a Meeting Room and Doghouse**". The article begins with following false statements: "It's been 10 months since The Martin Agency parted with CCO **Joe Alexander** after 26 years amid an investigation into multiple claims of sexual harassment made over nearly two decades". (Emphasis in original).

94. On January 6, 2019, Martin and Cavallo republished an article by *Refinery29* on Martin's website. The article was entitled "**The Morning After**", implying that something bad had happened the night before. The article featured a picture of Cavallo and a laughing group of Martin officers. The article falsely stated that Martin was "rocked by a public sexual harassment scandal last December"; that Cavallo "came to power under unfortunate circumstances" and that she operates "under a shadow"; that Joe "behaved badly"; that there was a "scandal"; "Here this company has now sent a really strong message that this is not a riskless frolic. Sexual harassment at this agency can destroy your ability to support your family and practice your profession". The article republished the substance of the December 7, 2017 *Adweek* article, the "internal" memo published by Martin the next day, and it again discloses the terms of the 2013 confidential settlement: "Most damning though was a 2013 settlement between the agency and an unnamed woman." The article reported that the confidential Bidwell

settlement was brought to IPG's attention by a "reporter", further confirming that the settlement had been leaked by Martin, Estes and/or Hanley to the reporter, probably Coffee.[30]   [https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency].

95.     On April 16, 2019, Martin and Cavallo published a statement on Martin's website that contains numerous false and defamatory statements of and concerning Joe. The statements falsely asserts that two weeks before Cavallo's appointment as CEO of Martin, "a #MeToo scandal had toppled longtime Chief Creative Officer Joe Alexander, and would later force the resignations of [Williams and Rilee-Kelley]". The statement further falsely asserts that "Cavallo was brought over from Interpublic Group of Cos. sibling MullenLowe to put the pieces back together". Following IPG's edict to "re-write" Martin's history, Cavallo also commented, "[d]on't waste a good crisis", reiterating the false narrative that Joe had embroiled Martin in crisis and scandal. [https://martinagency.com/news/ad-age-2019-executive-of-the-year-kristen-cavallo-martin-agency].

96.     On May 9, 2019 – one-and-one-half *years* after Joe's termination – Martin and Cavallo shamelessly revisited Joe's lynching. Martin and Cavallo republished an *Adweek* article on Martin's website. The headline of the article stated that Martin had gone through a "**METOO SCANDAL**". Cavallo falsely stated that she "hopes every company experiences 'a bone-crushing crisis,'" because "you won't show the courage to change" without it, referring to the crisis allegedly caused by Joe. Cavallo stated that she

---

[30]     The *Refinery29* article reports that "IPG says it was also not aware of any alleged misconduct [by Joe] until a formal complaint was made in November 2017."

took over "branding crisis". [https://martinagency.com/news/the-martin-agency-ceo-and-nike-vp-discuss-the-benefits-of-undergoing-a-metoo-scandal].

97.    In June 2019, Martin, Cavallo and IPG again brought up the events of December 2017. *Adweek* published a statement by Martin and Cavallo. Cavallo told *Adweek* that she had "her work cut out for her [when she became CEO of Martin]. A #MeToo scandal had rocked The Martin Agency, and Cavallo's first order of business was to build a safe, diverse, equitable and welcoming environment. To help her, she brought on Costello".[31] [https://www.adweek.com/brand-marketing/these-41-women-trailblazers-are-breaking-down-barriers-and-opening-up-opportunities-for-others/#/Kristen-Cavallo,-CEO--Karen-Costello,-CCO].

98.    Significantly, the *Refinery29* article confirmed that Costello, who was ECD at Martin at the time Joe was terminated, had "had no knowledge of any allegation against Alexander, or any inkling things were awry."

99.    Over ten years ago, Joe wrote a small book about Martin's culture. He called it "Good and Tough": good to each other, tough on the work; good place to work, tough place to leave. Martin embraced this motto. It was a large part of the Agency's identity. Joe was never the person described by the Defendants as "preying on females", a man who it was "unsafe" to be around. Joe was not "guilty" of actions "that are inexcusable." The fact is, Joe had been, was then, and will always be a staunch advocate of equality and diversity in and out of the workplace. At Martin, Joe hired dozens of women, including the top three (3) female creatives in the Agency's history: Karen

---

[31]    The truth, omitted by Cavallo in her hurry to please IPG, is that Joe personally recruited and hired Costello six months before Cavallo was appointed CEO of Martin.

Costello, Nancy Hannon and Deb Hagan.  Joe's last hire before his termination was Ashley Bozeman, the first African American female creative in the history of Martin.  Joe sent people to the 3% Conference[32] every year since it began.  He sent ▉▉ to the Conference in ▉▉.  Joe was one of the very first supporters of Free the Bid, a non-profit initiative advocating on behalf of women directors for equal opportunities to bid on commercial jobs in the global advertising industry.  [https://www.freethebid.com/].  Joe discovered female talent in other departments and brought them into creative, including copywriters Lassiter Stone, Miranda Morgan and Katie Lynn Moncure.  He mentored countless women throughout The Martin Agency.  Being inclusive was a tenet of his leadership style.

100.    Joe has been surrounded his whole life by smart, confident, strong, courageous, compassionate women.  He was raised by the strongest most beautiful person in his life: his Mother Jan.  He grew up with three sisters who blazed trails and always had Joe's undying support and admiration.  He raised three incredible daughters.  He has an amazing wife.   It would have been impossible to have women in his life like this if Joe was the person described by the Defendants in this case.   It is physically and emotionally unattainable.  The most telling proof of Joe's character *is* the women in his life [http://consciencenow.blogspot.com/]:

---

[32]    Founded by Kat Gordon in 2011, the 3% Conference is part of a movement to increase the number of female creatives in the advertising industry. [https://www.3percentmovement.com/movement ("Until we came along, only 3% of Creative Directors were women. And very few were people of color. We're changing the ratio because the more varied the people who come up with ideas, the better the ideas will be ... Until women make up 50% of creative directors, we've got a crew who'll keep working their butts off, all led by founder Kat Gordon")].  Because of the hard work of the 3% movement, women now comprise up 29% of the total creatives in the industry. [https://www.3percentmovement.com/].



101.    For their part, DMA and the DMA Partners never stopped defaming Joe.

Long after Joe was terminated, they continued to stalk him and post false and defamatory

statements, including the following malicious, insulting and hateful words:

 dietmadisonave   6h                    ✕

## And just because it's too hard to NOT "go there...

## Hitler was a VEGETARIAN, and he LOVED dogs -

## and he was one of the biggest assholes in history.

## we're pretty sure Joseph Goebbels thought he was "a good dude."

## Joe Alexander started volunteering at a crisis hotline last week & is proclaiming to be a counselor. All good dudes.

DMA and the DMA Partners posted these insulting words after they learned that Joe had volunteered to be a national suicide crisis counselor. Like Martin, Estes, Hanley, and IPG, DMA and the DMA Partners were well aware of Joe's prospective business opportunities. The defamation and tortious interference never stopped. They intended to permanently injure Joe.

102.    The Defendants each engaged in actions and published statements that destroyed Joe's reputation and ended his stellar career in advertising. It is now virtually impossible for Joe to obtain work. As an example: Joe was hired to do freelance, but when a vendor was told Joe was working on the job, they said he couldn't be seen in their office or be on phone calls. Joe lost the freelance job. Joe has lost much more than money, however. His family suffered untold pain. His marriage is forever changed. He constantly fears what his former colleagues, clients and others in the industry may think of him.    The personal injuries Joe suffered – the disgrace, insult, humiliation, embarrassment, pain and mental anguish and suffering – are permanent.

## COUNT I – **DEFAMATION**

### (Martin, Cavallo and IPG)

103.    Joe restates paragraphs 1 through 102 of this Complaint, and incorporates them herein by reference.

104.    In 2018 and 2019, within the year preceding the filing of this action, Martin and Cavallo each made and published to third-parties, including *Adweek* and *Coffee*, numerous false factual statements, which are detailed verbatim above, of or concerning Joe. The false and defamatory statements were published without privilege or excuse of any kind.

105.   At the time Cavallo defamed Joe, Martin and Cavallo reported directly to IPG and were subject to its control. At all times relevant to this case, Martin and Cavallo acted at the direction of IPG and with its knowledge, and within the scope of their duties and authority. IPG is liable for Martin and Cavallo's actions and conduct under the doctrine of *respondeat superior*.

106.   By intentionally publishing statements on the Internet, to trade magazines and via social media, Martin, Cavallo and IPG knew or should have known that their false and defamatory statements would be published and republished over and over by third-parties, including other industry publications, subscribers and social media followers of those publications, and others, millions of times to Joe's detriment and injury. Republication was the natural and probable consequence of these Defendants' actions and was actually and/or presumptively authorized by the Defendants. These Defendants are liable for the republication of the false and defamatory statements within the year prior to the filing of this action under the doctrine announced by the Supreme Court of Virginia in *Weaver v. Home Beneficial Co.*, 199 Va. 196, 200, 98 S.E.2d 687 (1957) ("where the words declared on are slanderous per se their repetition by others is the natural and probable result of the original slander.").

107.   The Defendants' false statements constitute defamation *per se*. The statements accuse and impute to Joe (1) the commission of felonies and crimes involving moral turpitude and for which Joe may be punished and imprisoned in a state or federal institution, (b) an unfitness to perform the duties of an office or employment for profit, including the job of a CCO, or the want of integrity in the discharge of the duties of such

office or employment. The Defendants' statements also severely prejudice Joe in his profession or trade.

108. Martin, Cavallo and IPG's false statements caused Joe substantial harm, presumed damages and actual damages.

109. Martin, Cavallo and IPG made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false. These Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

　　a. These Defendants pursued a predetermined agenda and reiterated a false narrative that perpetuated the lie that Joe had engaged in sexual harassment and other scandalous behavior and misconduct;

　　b. These Defendants knew their statements were false and acted out of a desire to hurt Joe and to permanently stigmatize him. The words and images that they used were vile, contemptuous, any disproportionate to any occasion. These Defendants made up the false statements out of whole cloth.

　　c. Martin, Cavallo and IPG revealed confidential information with the intent to hurt Joe.

　　d. These Defendants initiated defamation. They knew that the false and defamatory statements would be republished and repeated over and over, destroying Joe's reputation globally and rendering him unemployable.

110. Joe is a private individual. The Defendants lacked reasonable grounds for any belief in the truth of their statements, and, at the very least, acted negligently in failing to determine the true facts.

111.    As a direct and proximate result of Martin, Cavallo and IPG's defamation, Joe suffered presumed damages and actual damages, including, but not limited to, loss of business and income, insult, humiliation, embarrassment, mental suffering, pain and mental suffering, injury to his reputation, costs, and other out-of-pocket expenses in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT II – <u>INSULTING WORDS</u>

### (Martin, Cavallo and IPG)

112.    Joe restates paragraphs 1 through 111 of this Complaint, and incorporates them herein by reference.

113.    Martin, Cavallo and IPG's insulting words, in the context and under the circumstances in which they were published, written and used, tend to violence and breach of the peace.  Like any reasonable person, Joe was humiliated, disgusted, angered and provoked to violence by the insulting words.

114.    Martin, Cavallo and IPG's false, libelous and slanderous words are fighting words, which are actionable under § 8.01-45 of the Code.

115.    As a direct result of Martin, Cavallo and IPG's insulting words, Joe suffered actual damages, including, but not limited to, loss of business and income, insult, humiliation, embarrassment, mental suffering, pain and mental suffering, injury to his reputation, costs, and other out-of-pocket expenses in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

66

## COUNT III – <u>BREACH OF FIDUCIARY DUTY/BREACH OF CONTRACT</u>

### (Martin, Estes, Hanley and IPG)

116.    Joe restates paragraphs 1 through 115 of this Complaint, and incorporates them herein by reference.

117.    The 2013 confidential settlement agreement by and between Bidwell, Martin and Joe is a valid and enforceable agreement.  As a result of the execution of the 2013 confidential settlement agreement, the Defendants owed common law fiduciary duties and contractual duties to Joe, *inter alia*, to keep the terms of the settlement agreement strictly confidential.

118.    Martin promised Joe that if he resigned, Martin would work with Joe on an acceptable statement to be made to Martin Agency staff.

119.    Martin, Estes, Hanley and IPG breached their fiduciary and contractual duties by, *inter alia*, providing a copy of the 2013 confidential settlement agreement and/or disclosing its terms to DMA, to newspapers, to *Adweek* and Coffee, and by publishing and republishing the terms of the settlement with Bidwell on Martin's website. Martin further breached fiduciary and contractual duties owed to Joe when it disclosed confidential HR files/information to DMA.

120.    Martin breached its oral contract with Joe when it published the "internal" memo and leaked it to *Adweek* and Coffee.

121.    As a direct result of these Defendants' breaches of fiduciary duty and breaches of contract, Joe suffered presumed and actual damages, including, but not limited to, presumed damages and actual damages, including, but not limited to, loss of business and income, insult, humiliation, embarrassment, mental suffering, pain and

mental suffering, injury to his reputation, costs, and other out-of-pocket expenses in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT IV – <u>GROSS NEGLIGENCE</u>

### (Martin, Estes, Hanley and IPG)

122.   Joe restates paragraphs 1 through 121 of this Complaint, and incorporates them herein by reference.

123.   Martin, Estes, and Hanley's disclosure of the 2013 confidential settlement agreement and confidential employment/HR files and information to DMA, to newspapers, to *Adweek* and Coffee, and on Martin's website, constitutes a degree of negligence that shows an utter disregard of prudence amounting to a complete neglect of the rights, interests, welfare and safety of Joe.

124.   These Defendants' deliberate actions constitute a heedless and palpable violation of legal duty respecting the rights of Joe.

125.   These Defendants' actions constitute gross negligence.

126.   As a direct result Martin, Estes, Hanley and IPG's gross negligence, Joe suffered damage and incurred loss, including, but not limited to, pain and suffering, severe emotional trauma, anguish, stress and anxiety, financial loss, injury to his reputation, special damages, costs and out-of-pocket expenses in the amount of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT V – <u>TORTIOUS INTERFERENCE WITH CONTRACT</u>

### (Estes and Hanley)

127.   Joe restates paragraphs 1 through 126 of this Complaint, and incorporates them herein by reference.

128.     Joe had a valid contract with Martin and reasonable business expectancies in his employment and property rights.

129.     Estes and Hanley both knew that Joe was employed as CCO of Martin.

130.     Estes and Hanley intentionally interfered with Joe's contract, property rights and business expectancies by, *inter alia*, disclosing the terms of the 2013 confidential settlement agreement to third parties, including DMA, *Adweek*, the *Richmond Times-Dispatch*, the *New York Times* and the *Wall Street Journal*, and by publishing false and defamatory statements about Joe.  Estes and Hanley's improper methods, actions and practices were, *inter alia*, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.

131.     As a direct result of Estes and Hanley's tortious interference with contract and valid business expectations, Joe suffered damage and incurred loss, including, but not limited to, actual damages, loss of business and income, diminished earning capacity, injury to his reputation, court costs, and other out-of-pocket expenses and damages in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT VI – <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS</u>

### (Martin, Cavallo and IPG)

132.     Joe restates paragraphs 1 through 131 of this Complaint, and incorporates them herein by reference.

133.     After he was terminated by Martin, Joe attempted to pursue work as a freelancer. [https://www.linkedin.com/in/joealex12/].

134.     Based upon his long career in advertising, Joe had a reasonable expectation of obtaining future employment and business.

135.    From a review of publicly available information, including Joe's *LinkedIn* page, website and blogspot and articles published in *Adweek*, Martin, Cavallo and IPG each knew about Joe's business expectations and attempts to find work.

136.    After December 1, 2017, Joe had a handful of opportunities to work on freelance campaigns.

137.    After Joe's termination, Martin, Cavallo and IPG (including Roth) intentionally interfered with Joe's prospective business relationships and opportunities by continuing to publish false and defamatory statements about Joe.  Martin, Cavallo and IPG (Roth) intended that their continuing false statements would interfere with Joe's ability to obtain future employment in the advertising industry.  They knew that the false statements – amplified in article after article written by Coffee for *Adweek* – were substantially likely to deprive Joe of any ability to find work.

138.    As a proximate result of Martin, Cavallo and IPG's statements and improper actions, Joe has largely been unable to secure any substantial work in the advertising industry since his termination.  Prospective employers who google his name fear retaliation by the Defendants and their supporters and/or the reputational risk of being "seen" with Joe.  One recruiter recently told Joe "unfortunately, you are radioactive."  Absent the Defendants' misconduct, it was reasonably certain that Joe would have obtained work, including the freelance business he sought, and/or kept the freelance work he did obtain.

139.    Martin and IPG's actions constitute tortious interference with prospective economic advantage.

140.   As a direct result of Martin and IPG's tortious interference with prospective economic advantage, Joe suffered damage and loss, including, but not limited to, Joe suffered damage and incurred loss, including, but not limited to, actual damages, loss of business and income, diminished earning capacity, injury to his reputation, court costs, and other out-of-pocket expenses and damages in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

### COUNT VII – <u>COMMON LAW CONSPIRACY</u>

### (Martin, Estes, Hanley and IPG)

141.   Joe restates paragraphs 1 through 140 of this Complaint, and incorporates them herein by reference.

142.   Beginning in November 2017, Martin, Estes, Hanley and IPG combined, associated, agreed or acted in concert together and with others, including DMA and Coffee, for the express purpose of injuring Joe in his business and reputation and tortiously interfering with Joe's employment as CCO of Martin through the disclosure of confidential employment information and the publication and republication of false and defamatory statements. DMA admitted and confirmed that it's actions were "one spoke" on the "wheel":



In furtherance of the conspiracy and preconceived joint plan, these Defendants and their confederates orchestrated a scheme, the unlawful purpose of which was to cause Joe's termination. Acting in concert, with specific knowledge of IPG's "zero-tolerance" policy and DMA's vicious purpose, these Defendants published, republished and spread false and defamatory statements about Joe with knowledge that IPG would order Joe's termination without due process.

143.    Martin, Estes, Hanley and IPG acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were injuring Joe.

144.    These Defendants' actions constitute a common law conspiracy to tortiously interfere with contract and reasonable business expectations.

145.    As a direct result of Martin, Estes and Hanley's conspiracy, Joe suffered damage and loss, including, but not limited to, presumed damages, actual damages, including, loss of employment, business and income, diminished future earnings capacity, insult, pain and mental suffering, humiliation, embarrassment, injury to reputation, court costs, and other damages in the amount of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

146.    Joe restates paragraphs 1 through 145 of this Complaint, and incorporates them herein by reference.

147.    The Defendants' conduct, detailed above, was intentional and reckless. The Defendants engaged in a series of acts that, taken together, constitute extreme and outrageous behavior. The Defendants deliberately disclosed confidential and "damning"

(disputed and unverified) employment information to DMA, an anonymous group of persons who the Defendants knew were on a crusade to smear top white, male, creatives in the advertising industry and to get them fired. The Defendants doxxed Joe without any due process. They engaged in a malicious scheme with knowledge that Joe's reputation would be destroyed. They knew that their incendiary allegations would cause swift, immediate and severe emotional injury and financial loss. They knew that top creatives at any IPG company were peculiarly susceptible to summary termination. They knew that IPG would afford Joe no due process. In spite of their knowledge, the Defendants proceeded with their plan to cause Joe's termination. Their conduct was vulgar, flagrant, insulting and heartless.

148.   The Defendants' actions offend against generally accepted standards of decency and morality and are atrocious and utterly intolerable.

149.   Their outrageous conduct caused Joe to suffer severe emotional distress, extreme fear and panic.

150.   The Defendants' misconduct constitutes intentional infliction of emotional distress.

151.   As a direct result of the Defendants' misconduct, Joe suffered damage and incurred loss, including, without limitation, pain and suffering, physical injury, severe emotional trauma, insult, embarrassment, humiliation, public ridicule, anguish, stress and anxiety, injury to reputation, special damages, medical expenses, attorney's fees, costs and out-of-pocket expenses in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

## COUNT IX – <u>FRAUD IN THE INDUCEMENT</u>

### (Martin and IPG)

152.   Joe restates paragraphs 1 through 151 of this Complaint, and incorporates them herein by reference.

153.   DMA's sources were embedded in leadership and HR positions at Martin:



154.   Some of the original DMA Partners actually worked at Martin:

 **marabeanzz** You guys are so off base. How long have you followed them? Some of the original DMA work at Martin, and they started out by calling out Joe Alexander before it was ever in the papers or known in public. Did you know that ? They did that for months. No agency is protected, they speak truth to power. they have even exposed someone that's good friends with a person in their collective and even posted the text messages of her directly confronting the man and telling him that he would be reported.

DMA protected the identities of its Martin confederates:

We also have individuals working for HR who have turned documents over to us. We can't get into the specifics of that because what they are doing is the most risky and we have been advised to not discuss our process when it comes to that particular matter.

155.   When it investigated the matter in mid-November 2017, IPG learned the truth about Martin's involvement with DMA and its conspiracy and treachery.

156.   Rather than reveal the truth, IPG decided to conceal Martin's wrongdoing and sacrifice Joe. IPG's motives and actions were wholly corrupt.

75

157.   Martin and IPG concealed material facts, including Martin's despicable involvement with DMA and disclosures to DMA, for the purpose of procuring the IPG Release.

158.   Joe reasonably and justifiably relied upon Martin and IPG's representations and concealment by signing the IPG Release and agreeing to the limited release of claims.  Joe was induced by Martin and IPG's concealment to release IPG and Martin from liability.  But for Martin and IPG's concealment, Joe would not have signed the IPG Release.

159.   Martin and IPG's representations were false at the time they were made. Martin and IPG misrepresented and concealed their true ulterior motive and intention, which was to trick Joe into releasing his valuable claims, knowing that DMA was going to publicly defame Joe on social media.

160.   Martin and IPG's statements, actions, omissions and nondisclosure, and concealment constitute fraud in the inducement of contract and fraud in the performance of contract.

161.   As a direct and proximate result of Martin and IPG's fraud in the inducement, Joe suffered damage and incurred loss, including, without limitation, damage and injury to Joe's business, property and reputation, financial loss, attorney's fees, court costs, and other damages in the sum of $50,000,000.00 or such greater amount as is determined by the Jury.

Joe alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.  He believes that substantial additional evidentiary support, which is in the exclusive possession of the Defendants, their clients, agents, surrogates, alter egos, and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Joe reserves the right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Joe Alexander respectfully request the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A. Compensatory damages in the sum of $50,000,000.00 or such greater amount as is determined by the Jury;

B. Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C. Prejudgment interest at the rate of 6% per year on the Principal Sum awarded by the Jury from November 21, 2017 to the date of Judgment;

D. Postjudgment interest at the rate of six percent (6%) per annum until paid;

E. Such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:      October 22, 2019

JOE ALEXANDER

By: _____
     Steven S. Biss (VSB # 32972)
     300 West Main Street, Suite 102
     Charlottesville, Virginia 22903
     Telephone:   (804) 501-8272
     Facsimile:   (202) 318-4098
     Email:       **stevenbiss@earthlink.net**

*Counsel for the Plaintiff*