IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| JOE ALEXANDER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-688-JAG |
| | ) | |
| | ) | **TRIAL BY JURY** |
| DIET MADISON AVENUE | ) | **IS DEMANDED** |
| et al | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# <u>AMENDED COMPLAINT</u>

Plaintiff, Joe Alexander ("Alexander"), by counsel, pursuant to Rule 15(a)(1)(B) and the Court's Order entered November 8, 2019 [*ECF No. 20*], files the following Amended Complaint against Defendants, Diet Madison Avenue ("DMA"), Jean Batthany ("Batthany"), Dani Hurt ("Hurt"), Mara Buta ("Buta"), Adweek, LLC ("Adweek") and Patrick Coffee ("Coffee"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$25,350,000.00**, (b) plus prejudgment interest on the principal sum awarded by the Jury from November 21, 2017 to the date of Judgment, and (c) court costs and expenses – arising out of the Defendants' tortious interference with contract, tortious interference with prospective economic advantage, common law conspiracy, aiding and abetting, defamation, and intentional infliction of emotional distress.

## I.  **INTRODUCTION**

1.      This case is about a conspiracy and betrayal that rocked the advertising industry.

2.      Joe Alexander ("Joe") was the Chief Creative Officer ("CCO") at The Martin Agency in Richmond, Virginia.  He led the team of creatives responsible for the great success of the GEICO account and many others.  Under Joe's leadership, GEICO became the No. 2 car insurance brand; OREO's global sales rose 12%; Ping became the No. 1 driver in golf; and Donate Life's donor base increased 600%.  Joe's creative leadership produced acclaimed work for clients and brands in almost every category and medium. [https://joealexander.net/about-me-1].  In 2017, The Martin Agency won a Grand Clio[1] award for the powerful short film *Donate Life – The World's Biggest Asshole*.  [https://clios.com/awards/winner/film/donate-life/the-world-s-biggest-asshole-17052].  In 2015, GEICO's *Unskippable* pre-roll campaign[2] was Adweek's Campaign of the Year and took home 12 Cannes Lions,[3] including the Grand Prix in Film:

---

[1]      The Clios is an  esteemed international awards competition for the creative business.  Founded in 1959 to celebrate high achievement in advertising, the Clios annually and throughout the year recognize the work, the agencies and the talent that push boundaries and establish new precedent.  The "Grand Clio" is the highest honor bestowed by the Clios. [https://clios.com/awards].

[2]      https://www.youtube.com/watch?v=g0zJNjGM5Dw ("You can't skip this GEICO ad because its already over"); https://www.youtube.com/watch?v=4ELn-NTKo44 (Geico – Unskippable Elevator); https://www.youtube.com/watch?v=8JomU-0WHLk (Geico – Unskippable High Five); https://www.youtube.com/watch?v=cshPQ3ZbESs (Geico – Unskippable Hungry Dog).

[3]      The Cannes Lions are the most established and coveted awards for the creative and marketing communications industry.  Winning at the Cannes Lions International Festival of Creativity Festival puts you among the world's elite.  Cannes Lions trophies are recognized globally as the ultimate achievement in creativity. [https://www.canneslions.com/our-awards].



In 2013, *Clouds Over Cuba*, a striking interactive documentary produced for the JFK Presidential Library and Museum, won an Emmy Award.  It was the first time an advertising agency had ever won an Emmy in the News and Documentary category:



[https://martinagency.com/news/the_martin_agency_wins_emmy_for_clouds_over_cuba]

Well before Joe became CCO of The Martin Agency, he was the creative star of the Agency.  His writing for The JFK Presidential Library won international acclaim.  His writing for Healthtex captured the hearts of parents everywhere:



He helped win millions of dollars in new business for The Martin Agency, including Mercedes-Benz, Olympus, PING, Kindercare, Remy Martin, Careerbuilder, Pizza Hut, UPS, and more.  From 2010 to 2012, he led the Walmart account:



Under Joe, the Walmart account grew to be the largest in Agency history with over $45,000,000.00 in revenue.  When Joe was promoted to CCO in 2012, the late Mike

Hughes, former Martin Agency President, stated that "Joe's passion for the work, his unbridled drive to push hard for brilliant creative and his ability to mentor creative talent across all disciplines combine to make him the right guy for this critically important job." By May 2016, The Martin Agency was recognized at The One Show[4] as 2016 Agency of the Year.  The Agency and GEICO also received the inaugural Penta Pencil, an award given to an agency-brand team who, together, have created stellar work for five or more continuous    years. [https://martinagency.com/news/the-one-show-names-martin-agency-2016-agency-of-the-year].  Joe was named one of the fifty (50) Most Creative People in the World by *Ad Age* magazine and the 7th most Creative in the World by Adweek. [https://adage.com/article/special-report-creativity-50-2015/creativity-50-2015-joe-alexander/301720;  https://www.adweek.com/brand-marketing/10-chief-creative-officers-who-are-inspiring-breakthrough-work-us-agencies-165896/].  In 2017, just a few months before his termination, the One Club ranked Joe # 1 Chief Creative Officer in the world:



---

        4       The One Show is one of the most prestigious awards competitions in advertising, design, interactive and branded entertainment. Judged every year by top industry professionals, a Gold Pencil is the ultimate symbol of creative excellence. [https://www.oneclub.org/awards/theoneshow/].

Joe was near the top of his career in advertising.

3.     Beginning in 2017 and continuing thereafter, the Defendants, acting in concert and combination together, with other partner/members of DMA and with agents and former agents of The Martin Agency ("Martin"), robbed Joe of his entire life's work, destroyed his name and reputation, and permanently impaired his ability to find employment in the advertising industry.   The Defendants targeted Joe for termination, and worked with Martin to accomplish the task.   In furtherance of the conspiracy, Martin breached its fiduciary duties and secretly leaked to the Defendants the terms of a confidential settlement agreement that Martin and Joe had entered into in 2013 to resolve a disputed accusation.   Martin also disclosed the contents of confidential human resources (HR) files to DMA, knowing that DMA intended to use and republish the confidential information as part of a **#MeToo** crusade against white, male, chief creative officers at prominent advertising agencies.   Martin represented to DMA that Joe had sexually harassed Martin employees.   The allegations were completely false.   Martin concealed its involvement with DMA and its vicious, despicable, premeditated misconduct and betrayal from Joe.   In order to cover up Martin's involvement with DMA and Martin's flagrant breaches of trust and duty, gross negligence and wrongdoing, Martin and its parent company, The Interpublic Group of Companies, Inc. ("IPG"), concocted a "sexual harassment" claim and used the false claim as a pretext to terminate Joe.   After Martin terminated Joe, Adweek and Coffee hungrily published the false and defamatory statements received from DMA and Martin to millions in the advertising industry in multiple hit pieces.   In December 2017, DMA bragged publicly about what

they had done to Joe and what they threatened to do (and later did) to others.  Using an Instagram account, DMA posted the following insulting words:



4.     In this case, Joe seeks to recover presumed damages and actual damages caused by the Defendants' egregious misconduct.  The Defendants went out of their way to wreck the life of a hugely successful and incredibly popular Virginia creative, and, then, to compound their misconduct with more defamation.  They conspired with employees and former employees of Martin to intentionally betray and hurt a human being at the top of his career.  They jointly undertook to promote the misandry of DMA and **#MeToo**.  The Defendants should be punished for their unlawful actions and a very strong message needs to be sent to prevent others who choose to conspire and defame from ever acting in a similar way.

## II.  <u>PARTIES</u>

5.     Joe lives in Richmond, Virginia.  He is 59-years old.  Joe grew up in a huge family with three sisters and five brothers.  Joe's father "Ace" was a man of honor, always aware of right and wrong.  He had very defined moral guidelines.  He was respectful and open to differing points of view and new ideas.  He passed those same traits on to Joe. [http://consciencenow.blogspot.com/].  Joe is married.  He helped raise three (3) smart, confident, compassionate, successful daughters, with whom he is very close.  Joe often brought his daughters to work and on the road with him.  They loved seeing their father do work he loved.  During this time, Joe was a major part of Martin's success, including transforming UPS from the world's leading shipping company to the world's leading supply chain and logistics provider by asking, "What can Brown do for you?".  As a result of Joe's creative leadership, Martin won Effie Awards[5] between 2012

---

[5]     The Effie Awards recognize all forms of marketing that contribute to a brand's success.  For over 50 years, winning an Effie has become a global symbol of achievement. [https://www.effie.org/worldwide/about].

and 2017 for multiple campaigns on behalf of multiple different clients, including GEICO and Walmart. [https://effie.org/case_database/case/3051 (GEICO – Happier Than II – featuring Hump Day Camel) (https://www.youtube.com/watch?v=WMsXhG9S2LU); https://www.effie.org/case_database/case/NA_2012_6637 (Walmart)].   The Martin Agency was named to the *Ad Age* Creative Innovators List four (4) times. [https://adage.com/article/special-report-agency-alist-2016/creativity-innovators-martin-agency/302296; https://martinagency.com/news/ad-ages-first-ever-campaign-of-the-year-award].  The creative genius of The Martin Agency was a major reason parent company IPG was named the Most Effective Holding Company of the Year in 2017. [https://interpublicgroup.gcs-web.com/news-releases/news-release-details/ipg-named-most-effective-holding-company-2017-north-american].   Joe sat on the distinguished board of The One Club, was Cannes Lions Film Jury President in 2016, and was a regular guest speaker in the advertising industry and on campuses, including the renowned VCU Brandcenter.  It took a life-time for Joe to establish his name, goodwill and to build his personal and professional reputations.  Until he was betrayed, attacked and smeared by the Defendants beginning in 2017, Joe enjoyed an untarnished reputation in the advertising industry.

6.      Defendant, DMA, is a partnership, joint venture, "collective". or unincorporated association of individuals, none of whom, upon information and belief, is a citizen of Virginia.  DMA was formed by advertising executives and others for the sole purpose of anonymously doxxing, smearing and shaming alleged sexual harassers in the advertising industry.  DMA confirmed in a post that:

**3) There are 12 of us in this collective. We all have day jobs. We work at various agencies (2 of us work at the same one). We are mainly in NY, SF, LA, and Chicago. We decided on those locations on purpose. Other members of the team are 2 lawyers, and 4 phd students + 2 professors who are working on some long term projects with us.**

DMA was started to "expose" Joe:



dietmadisonave   44m

**We started this page to expose one man. We have decided to stay because we believe that our work is not done. So many of you have shared your personal and painful stories with us, and because of it we have decided to stay.**

DMA proclaimed that it had a duty to expose "sexual harassment/abuse" "cuz HR won't".  DMA's mission was personal and premeditated:



On February 2, 2018, DMA confirmed that it had targeted seven (7) advertising agencies: "over the past few months we have held the following agencies accountable in a similar fashion:  @martinagency @grey @tbwa @cpbgroup [and @droga5] Next up: @mccann_ww & @180la."  DMA was aggressive, unabashed and publicly unapologetic:



Richmond, Virginia, and Martin was ground zero in DMA's campaign of intimidation and character assassination.  DMA began operations as a direct result of the stories it heard about Joe from Martin and how harassment complaints were supposedly handled at Martin.     [https://www.nytimes.com/2018/03/07/business/media/diet-madison-avenue-instagram.html (a lengthy document about DMA's mission shared with the *New York Times* "noted that the group [DMA] was formed after its members learned of how harassment complaints were handled at the Martin Agency")].   DMA operated an Instagram account, "**dietmadisonave**".  [https://www.instagram.com/dietmadisonave/].[6] DMA used Instagram and its direct messenger ("DM") service to target Joe and others for

---

[6]     Instagram is a free photo and video sharing app available on Apple iOS, Android and Windows Phone.  People can upload photos or videos to our service and share them with their followers or with a select group of friends.  They can also view, comment and like posts shared by their friends on Instagram. Anyone 13 and older can create an account by registering an email address and selecting a username.  [https://help.instagram.com/424737657584573].  Instagram is owned by Facebook, Inc. ("Facebook").  Facebook's is authorized to transact business in Virginia.  Its registered office and registered agent are located in the City of Richmond, Virginia.  According to Instagram's "Terms of Use," a user "**can't do anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose,**" and "**can't post private or confidential information or do anything that violates someone else's rights**".  Further, Instagram's "Community Guidelines" state that it is unacceptable to post "content that targets private individuals to degrade or shame them" or "personal information meant to blackmail or harass someone".  [https://help.instagram.com/581066165581870 ("terms of Service); https://help.instagram.com/477434105621119 (Community Guidelines)].

termination.  DMA communicated anonymously with Martin and former employees of Martin in Virginia for the express purpose of interfering with and ending Joe's employment.  In addition to its Instagram account. DMA set up three (3) email accounts:

dietmadisonavenue@gmail.com;

dietmadisonave@gmail.com; and

Madisonaveabuse@gmail.com.

DMA used these email accounts to communicate false and defamatory statements concerning its targets.  Martin was the first advertising agency to leak confidential information to DMA.  On multiple occasions DMA and its agents confirmed working directly with Martin in furtherance of the conspiracy to eliminate Joe.  DMA also confirmed that it had received copies of confidential Martin HR reports and NDAs:

> We ask for evidence of those reports. NDAs have also been turned over to us. We consider that to be corroborating evidence. We attach those items to a specific name in our database. Obviously that makes a particular case a bit more solid and provides us with info about who else is involved and complicit. That was/is the situation at Martin and we also suspect it to be the case at Crispin.

Between October 2017 and the present, DMA and its agents published unverified, scandalous, and salacious statements about Joe – statements that were received from Martin. DMA acted as judge, jury and executioner to "call out" Joe for termination. DMA represented everything that was wrong about the nascent **#MeToo** movement. It's statements and visual content graphically symbolized hatred, intolerance, and rabid misandry. DMA was determined to hold white, male, chief creative officers "accountable" no matter what the costs and consequences:[7]

---

[7]      An advocate of violent activism has taken credit for one visual image employed by DMA. [https://twitter.com/ShannonDowney/status/959581597128445959 ("@dietmadisonave hey. I'm in full support of outing the ad world perves. The boys will be boys piece is mine. Wanted you to know. My insta is @badasscrossstitch so you can credit it")].



7.      DMA is operated by identifiable partners, associates and/or individual members, who act in concert to destroy the careers of white, male, chief creative officers, including Joe.  At all times relevant to this action, Batthany, Hurt, and Butta acted as partner/members and agents of DMA in furtherance of DMA's primary mission to get rid of Joe.  The identity of DMA's remaining confederates remains unknown because DMA's partner/members have concealed their identities and have resisted every effort to unmask them.  Upon information and belief, the remaining DMA partner/members include current or former employees of three (3) advertising agencies:  Crispin-Porter-Bogusky [https://www.cpbgroup.com/], 180LA [https://www.180la.com/], and Droga5

[https://droga5.com/].   In 2017, DMA published a post stating that the group was comprised of people in the advertising industry, Ph.D students, professors, and 2 lawyers. Ralph M. Watson ("Watson"), another victim of DMA's smear and intimidation campaign, received private messages (Instagram DMs) between DMA and an individual at the Droga5 advertising agency ("Droga5").   These DMs confirmed that the DMA Instagram account was operated in part by people who worked in advertising, with at least two working at Droga5, one of whom was Buta.  Batthany, Hurt, Buta and one or more of the other DMA partner/members participated in a conspiracy with Martin and former employees of Martin, including Sissy Estes ("Estes"), to tortiously interfere with and to terminate Joe's employment with Martin.

8.    Defendant, Adweek is a Delaware limited liability company.  Adweek is owned by the Canadian private equity firm, Beringer Capital. [https://www.adweek.com/digital/adweek-acquired-private-equity-firm-beringer-capital-172542/;  https://twitter.com/tonyrobbins/status/756490412693479424?lang=en  ("My partners and I purchased @Adweek – one of the leading trade publications")].  None of Adweek's members is a citizen of Virginia.  Adweek launched in 1978 and now attracts more than 6.5 million monthly unique visitors online, counts 1.9 million social media followers, and has a weekly print circulation of around 40,000. [https://www.youtube.com/channel/UCKhCJRTHHLuW2iW7XQtcfyQ ("we reach more than 6,000,000 marketing wizards, ad innovators, tech titans, media mavens and brand geniuses … three times our nearest competitor")].  Adweek regularly transacts substantial business in Richmond, Virginia, where it has a large social media following, including many followers at Martin, and a huge subscriber base.  Since 1978, Adweek and its

employees have written hundreds, perhaps thousands, of articles on matters relating to Virginia's advertising industry.  At all times relevant to this action, Adweek acted as a partner, associate, or member of DMA or as an agent of DMA to publish and republish false and defamatory statements about Joe on the Internet and via social media, with the intended goal that Joe would never work again.

9.     Defendant, Coffee, is a blogger, writer, and former senior editor employed by *Adweek*.  [https://www.adweek.com/contributor/patrick-coffee/].  Adweek employed Coffee until August 16, 2019.  Coffee is now at *Business Insider*.  At all times relevant to this action, Coffee acted as an partner, associate or member of DMA or as an agent of DMA and its partners to publish and republish false and defamatory statements about Joe on the internet and via social media.  DMA and its partner/members called Coffee "Patrick", fed in him information and waited for "Patrick" to publish his exposes in Adweek.  In 2018 and 2019, Adweek published and republished the following defamatory articles written by Coffee about Joe to subscribers and advertising executives in Virginia:

> https://www.adweek.com/agencies/the-martin-agency-promotes-karen-costello-to-cco-in-the-wake-of-joe-alexanders-scandalous-departure/
> ("The Martin Agency Promotes Karen Costello to CCO in the Wake of Joe Alexander's Scandalous Departure");[8]

---

[8]     Coffee published his articles to multiple new target audiences, including his followers on Twitter, to Adweek's 600,000+ followers on Twitter, to the 81.500 Twitter followers of Adweek's "AgencySpy", and Adweek's 600,000+ followers on Facebook.  [*See, e.g.*,  https://twitter.com/AgencySpy/status/1039533742249992192; https://www.facebook.com/Adweek/posts/joe-alexander-departed-last-december-amid-an-investigation-into-claims-of-sexual/10155436232142075/].

https://www.adweek.com/agencies/when-metoo-came-to-madison-avenue/4/
("When #MeToo Came to Madison Avenue … staffers at The Martin Agency say
their complaints to HR about CCO Joe Alexander were repeatedly ignored or
dismissed for years before he was ousted last December over multiple sexual
harassment allegations");

https://www.adweek.com/agencyspy/the-martin-agency-turns-joe-alexanders-old-
office-into-a-meeting-room-and-dog-house/148911/
("It's been 10 months since The Martin Agency parted with CCO **Joe Alexander**
after 26 years amid an investigation into multiple claims of sexual harassment
made over nearly two decades") (emphasis in original);

https://twitter.com/PatrickCoffee/status/1075407319943524352
("The Martin Agency one year after the Joe Alexander sexual harassment scandal
blew up the ad industry");

https://www.adweek.com/agencies/the-5-most-important-ad-industry-stories-of-
2018/
("Misogyny and advertising have an unfortunate and well-documented history …
This year, the conversation unquestionably changed; whether that change was
dramatic enough to permanently impact the industry for the better remains a
matter for debate.  #MeToo officially hit the business in December 2017, when
The Martin Agency fired CCO Joe Alexander");

https://www.adweek.com/agencyspy/the-20-biggest-agencyspy-posts-of-
2018/152124/
("However you may now feel about Diet Madison Avenue, the group exerted a
huge influence over the calendar year.  After the departure of The Martin
Agency chief creative Joe Alexander last December, 2018 became the year
#MeToo finally arrived as the industry maybe, finally began to grapple
with endemic abuses of power").

Virtually every article published by Adweek between December 2017 and July 2019

contains provably false and defamatory statements about Joe.  Coffee's articles have been

republished millions of times in the last year in Virginia, including by Martin. [*See, e.g.*,

https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency].

10.    Martin is a Virginia corporation, headquartered in Richmond, Virginia.

Martin is a full-service agency with unified capabilities in advertising, strategic planning,

direct response, digital, media services, data analytics, design and branded content.

Martin owns and operates a website, https://martinagency.com/, and a Twitter account, https://twitter.com/martinagency.  The chief executive officer of Martin is Kriste Cavallo. [https://martinagency.com/about; https://www.linkedin.com/in/kristen-cavallo-1044633/]. Cavallo was appointed to the position of CEO by IPG on December 12, 2017.  Cavallo spent her formative years at Martin.  She knew how special a place it was.  She never experienced any misogyny while at Martin and never heard any complaints about Joe from anyone.

11.     Estes lives and works in Richmond. [http://www.sissyestes.com/].  Estes is a former employee of Martin. [https://www.linkedin.com/in/sissy-estes/].  She was an art director that Joe recruited and brought to the agency in the mid-2000s.  Estes worked primarily on the Walmart account.  In or about 2011, after Martin lost a big portion of the Walmart business, Estes was part of a layoff involving a large part of the staff.  Estes held a grudge against Joe and was very vocal about her layoff.  In 2017, Estes conspired with DMA, Martin and others to tortiously interfere with Joe's employment and to defame Joe.  Like DMA, Estes publicly bragged about taking Joe down.  Martin breached fiduciary duties and shared confidential, non-public information with Estes that Joe was going to be terminated.  Estes celebrated Joe's termination.   She posted the following message to Facebook:



Estes exhibited a true messianic desire to hurt Joe.  She intentionally violated a non-disclosure agreement and intentionally disclosed confidential settlement information to

DMA.  She published false and defamatory statements about Joe to DMA, to Martin and to "thousands of women" and other professionals in the advertising industry, to newspapers, including the *Wall Street Journal* and the *Richmond-Times Dispatch*, and to trade magazines, such as Adweek, all in furtherance of a conspiracy to tortiously interfere with Joe's employment as CCO of Martin and to ensure that Joe never works another day in his life.  Among the articles that contain Estes' false and defamatory statements are the following:

https://www.wsj.com/articles/ousting-an-accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001;[9]

https://www.richmond.com/business/local/amid-new-allegations-of-misconduct-former-employees-discuss-the-culture/article_b0930ee2-c672-55d6-8aca-ef14836999d9.html.[10]

As a veteran in the advertising industry, Estes knew that her false and defamatory statements to DMA and to the media would be republished over and over and over to

---

[9]    On December 13, 2017, the *Wall Street Journal* reported that "[s]everal other former employees and another person with knowledge of Mr. Alexander's alleged conduct told The Wall Street Journal about allegations of harassment and assault by the executive, including previously unreported details."  **Estes was one of the unnamed "former employees" who spoke with the *Journal*.**

[10]    On December 15, 2017, the *Richmond Times-Dispatch* reported that "Sissy Estes, who worked at The Martin Agency from 2007 to 2012, said that when she was first hired, a creative director gave her a warning about Alexander with no explanation: 'He said, 'Stay away from Joe.  Just try to avoid Joe.'  One day, Estes heard Alexander comment on another woman in his department: 'Why would we hire someone who looks like that? … Another time, Estes said she heard Alexander tell a woman she looked great and dared the woman to go to HR about it … He earned the moniker 'HR Joe,' Estes said … 'I know Joe loves his wife and his family, but he's saying things that could be construed as a sexual invite or a coming on or sexually inappropriate things that he should not be saying.  There were so many women coming to me crying,' Estes said.  'A lot of us tried to change things, and we were brushed off.'  About a month later, Estes was laid off, along with others at the company".  **Estes' statements to the *Richmond Times-Dispatch* were completely fabricated as part of the conspiracy to defame and tortiously interfere with Joe's employment.  None of these events ever occurred**.

Joe's detriment. [*E.g.*, https://twitter.com/patrickmwilson/status/942077220645982209]. In fact, Estes was counting on a massive republication in order to kill Joe's reputation.

12.     Estes is very good friends with Robin Bidwell ("Bidwell"), another former employee of Martin.  In 2011, Bidwell made a claim against Martin and Joe.  She alleged (falsely) that she had been sexually harassed.  Joe emphatically denied any wrongdoing. The matter was settled in 2013 with Bidwell, Martin and Joe executing a confidential settlement agreement.  In spite of the confidential settlement agreement, Bidwell leaked the terms of the confidential settlement to Estes who in turn leaked the terms to the Defendants between October 2017 and November 21, 2017.

## III.   JURISDICTION AND VENUE

13.     The United States District Court for the Eastern District of Virginia has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

14.     The Defendants are subject to personal jurisdiction in Virginia pursuant to Virginia's long-arm statute, § 8.01-328.1(A)(1), (A)(3) and (A)(4) and § 8.01-328.1(B) of the Code, as well as the Due Process Clause of the United States Constitution.  The Defendants and their agents and co-conspirators in Virginia at Martin divulged confidential information and transmitted and published false and defamatory statements in Virginia for the sole purpose of injuring Joe and interfering with his employment at Martin.  The Defendants are subject to specific personal jurisdiction.  They have minimum contacts with Virginia such that the exercise of personal jurisdiction over them

comports with traditional notions of fair play and substantial justice and is consistent with the Due Process Clause of the United States Constitution.

15.     Venue is proper in the Richmond Division of the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(2).   A substantial part of the events giving rise to the claims stated in this action occurred in Richmond, Virginia.

## IV.  STATEMENT OF MATERIAL FACTS

16.     Martin is a wholly-owned subsidiary of IPG.  It is part of IPG's "McCann Worldgroup" network, one of the world's largest advertising agency networks. [https://www.interpublic.com/our-companies/the-martin-agency/].

17.     Joe had a valid written contract with Martin that was not terminable at will.  In 2016, Joe earned gross wages of $1,071,856.83.  His performance in 2016 was nothing less than spectacular.  In March 2017, Joe received the maximum 2016-2017 Long Term Incentive (LTI) Award from McCann and the maximum Performance Bonus from Martin.  Joe's creative product in 2017 exceeded all expectations.

18.     Between 2013 and 2017, Martin underperformed financially.[11] The major cause was the CEO, Matt Williams ("Williams").  Williams' underperformance as CEO was well-known inside the Agency.  He faltered in all major areas:  financial – declining revenue, margin and profit; new business – no CMO recruited and put in place for years and a stunning lack of wins; strategy and communications – failure to appoint a new CSO and a lack of cohesive strategic vision for 4 years and a failure to update the Agency's company vision and communication strategy.  Most importantly, Williams failed to

---

[11]     Martin's creative product kept it from sinking.

inspire and connect with Martin staff.  He was often described by others as "not understanding how the agency actually works."  Concerns about Williams simmered into the fall of 2017.

19.    Williams' underperformance did not go unnoticed at McCann.  Concerns filtered down from McCann to Martin's former CEO and chairman emeritus, John Adams ("Adams").  Adams emailed both Joe and Martin President, Beth Rilee-Kelley ("Rilee-Kelley"), that the Agency had a real problem and needed to make an action plan. Adams laid out an elaborate plan pursuant to which Williams would step down as CEO and become chairman (retaining a new role as "head of strategy"), and Rilee-Kelley would take over as CEO.  Behind the scenes in September 2017, Rilee-Kelley made sure Williams did not know he was being pushed out as CEO and replaced.  Her stated goal was to get Williams to "take this escape hatch and continue to work closely with us. We've got too much riding on him in the hopper right now."  Rilee-Kelley also made sure that she and Joe were the leadership team moving forward.  When the action plan was complete, Rilee-Kelley texted Joe as follows:



Fri, Sep 15, 7:41 PM

It's you and me, kid.

Throughout the entire process of reorganizing management, Rilee-Kelley never once suggested to anyone that Joe's behavior had ever been an issue.  Rather, as evidenced by her text message, Rilee-Kelley thought that the path to improvement of Martin's financial

picture and its leadership going forward was "you and me, kid".  Rilee-Kelley would not have hitched her wagon to Joe if there had been any complaints made about Joe.

20.     On September 22, 2017, Joe picked his favorite ads of all time for Adweek. [https://twitter.com/InterpublicIPG/status/911304184217075714].

21.     On September 27, 2017, Joe was honored by the 4A's Foundation[12] as one of the "100" who made advertising great.  The award was a recognition of Joe's strong belief in and practice of diversity in the workplace.  Joe took giant steps towards improving workplace diversity at Martin.  He brought Karen Costello ("Costello") to the Agency.  Costello was the first woman to serve as Executive Creative Director ("ECD"). [http://www.adweek.com/agencies/the-martin-agency-hires-karen-costello-to-lead-mondelez-account-as-executive-creative-director/ ("'Karen is one of the top creative leaders in the industry.  But she is hardly one to brag.  So I will for her.  She's already making a huge difference in the place,' said Martin Agency chief creative officer Joe Alexander in a statement."].[13]

22.     On October 2, 2017, the *Richmond Times-Dispatch* published a lengthy piece in the Metro Business section, entitled "**An honor for Martin Agency's Alexander**".   [https://twitter.com/Advertising24x7/status/914696959381737479 ("**Joe**

---

[12]     The 4A's is the national trade association representing the advertising agency business in the United States.  Established in 1997, the 4A's Foundation was created to galvanize the industry around improving the level of diversity within advertising and media agencies. [http://foundation.aaaa.org/about].

[13]     After Joe was terminated by Martin, the 4A's Foundation summarily rescinded the award.  https://www.thedrum.com/news/2017/12/08/4as-rescinds-joe-alexander-s-organizational-honor]  Coffee was the first to report the award being rescinded.     [https://www.adweek.com/agencyspy/a-martin-agency-account-director-offers-her-perspective-with-notmymartin-post/140968/].

**Alexander of The Martin Agency - making advertising great**”)].   Joe and many members of his creative team were on the cover:



All was well.  Joe's team expressed nothing but positive enthusiasm and happiness about the creative work being performed and the present direction and momentum of the work-product.  No one informed Joe of any complaints about his behavior or issues of any kind.  Joe had the solid backing of the entire Martin Agency.

23.     In October 2017, Joe and Rilee-Kelley traveled to New York for a forward planning meeting with McCann brass.  McCann Worldgroup North America President, Chris MacDonald (“Macdonald”), was very impressed with the financial and creative plan outlined by Martin for 2018.  During the meetings, Joe had the full and unfledging support of both Rilee-Kelley and McCann.  Joe's creative work and leadership were complimented.  No questions of any kind were raised by anyone about Joe or about the work conditions and environment at Martin.  While in New York, Joe went to a Yankee's game with the Global Creative Chairman of McCann Worldgroup, Rob Reilly (“Reilly”):



Again there was no mention from anybody, either inside Martin or at McCann, of any complaints about Joe or any issues of any kind.  In fact, Joe's creative campaigns were universally praised and commended.

24.     On November 7, 2017, just two weeks before his termination, Macdonald met with Joe and others at Martin in Richmond, Virginia, for follow-up planning sessions.  Once again, Joe's work was complimented.  After the meeting, Macdonald emailed Joe:



As of November 7, 2017, there was not a single mention of any complaint or issue of any kind involving Joe.  No one who attended the planning meeting, including Rilee-Kelley and Williams, mentioned anything.

**A.** ***DIET MADISON AVENUE***

25.     In or about October 2017, in the wake of the media frenzy surrounding reported allegations of sexual misconduct by Harvey Weinstein, Cindy Gallop ("Gallop"), a former advertising executive turned "activist",[14] issued a public call to action on Facebook for advertising professionals to speak up about "sexual harassers" in the industry.  Gallop claimed that her Facebook post came "in response to the outpouring of sexual harassment stories" allegedly committed by Hollywood producer Weinstein. [https://adage.com/article/agency-news/cindy-gallop-asks-advertising-expose-harvey-weinsteins/310976].   Gallop urged woman to "name the names of their harrassers". [https://www.campaignlive.co.uk/article/sexual-harassment-adland-cindy-gallop-wants-names/1447809].  Gallop claimed to have been contacted by at least 160 women who reported sexual harassment of some kind.  Based on the unverified reports she received,

---

[14]     Gallop claims that she likes to "blow shit up.  I am the Michael Bay of business". [https://twitter.com/cindygallop?lang=en].

the outspoken Gallop compiled "Cindy's List" of alleged "sexual harassers". https://www.mumbrella.asia/2017/11/cindy-gallop-asia-treated-dumping-ground-sexual-predators ("What a load of absolute fucking bollocks.  A man in the industry recently said to me that men are scared of appearing on 'Cindy's List' and that anyone could find themselves on it.  I bit his head off because the sheer scale of human misery I'm looking at in my inbox from all around the world, and not a false accusation in them – quite the opposite.  How dare these men pronounce on it; they have no idea what women have been going through for decades.  This is why we need to break these stories: these men, these names and companies and client brands attached, so the men understand the problem is them").

26.     Upon information and belief, Gallop supplied "Cindy's List" to DMA, and instigated, aided, abetted, enticed and/or assisted DMA in its smear and intimidation campaign.

27.     On October 30, 2017, IPG's chairman, Michael Isor Roth ("Roth"), anticipating attacks by Gallop and **#MeToo**,[15] circulated an internal note/memo to all 50,000-plus IPG employees around the world, including everyone at Martin, under the subject line "A Workplace Free from Harassment" (the "Roth Memorandum").  The Roth Memorandum "outlined a 'zero-tolerance' policy for all types of harassment". [https://www.adweek.com/agencies/ipg-ceo-issues-memo-promising-zero-tolerance-for-sexual-harassment/; https://www.thedrum.com/news/2017/10/30/ipg-chief-michael-roth-details-firm-s-zero-tolerance-policy-sexual-harassment-memo].

---

[15]     It is unclear when Roth first became aware of Martin's direct involvement with DMA.  It is possible that the Roth Memorandum was a pro-active response to the collusion between Martin and DMA.

28.    Roth shamelessly pandered to Gallop and **#MeToo** in order to insulate IPG and its agencies from the devastating negative publicity and adverse financial effects incident to the witch hunts that started in the fall of 2017.

29.    Because of Roth's irresponsible Memorandum, Joe was at the mercy of DMA and every disgruntled employee or ex-employee of Martin with an axe to grind.

30.    The Roth Memorandum gave any IPG employee carte blanche to disclose confidential employee and human resource files to **#MeToo** and DMA.   The Roth Memorandum empowered Martin to breach fiduciary duties, violate the IPG Code of Conduct, deprive male employees of due process, and take the law into its own hands.

31.    Between approximately mid-October and November 21, 2017, Martin secretly disclosed to DMA and the DMA Partners the terms of the 2013 confidential settlement agreement with Bidwell and the contents of other confidential Martin HR files/reports.   Estes or Martin falsely stated to DMA that in "Joe Alexander's case, there was a slush fund created just for him internally at Martin" to deal with Joe's "crap" – a "slush fund" that was hidden from "Michael Roth and IPG":

> Yeah EPLs for sure. But in Martin and Joe Alexander's case there was a slush fund created just for him internally at Martin. Money was drummed up just for his crap and Michael Roth and IPG were not even told about it.

In addition to the "slush fund" post, Martin and DMA exchanged numerous false and defamatory statements about Joe via Instagram direct messenger. They wrongly accused Joe of sexual harassment and labeled him a predator.[16]

**B.    *IPG/MARTIN TERMINATES JOE***

32.    Upon information and belief, IPG did not know that Martin had breached the 2013 confidential settlement agreement or that Martin, Estes and others were disclosing confidential HR files/reports and information to DMA.

33.    Although IPG claims that it "first learned" of "alleged misconduct" by Joe in "mid-November" 2017 [https://www.wsj.com/articles/ousting-an-accused-harasser-wasnt-enough-ad-agency-staff-wanted-to-know-why-1513161001], IPG has never revealed how or from whom it learned about the so-called "alleged misconduct" or what, indeed, it learned, if anything, in "mid-November" 2017.[17]

34.    As soon as IPG found out that Martin had breached fiduciary duties and disclosed confidential employee information to DMA and that that confidential information (and false accusations) about Joe was being published by DMA, IPG ordered Martin to terminate Joe and cover it up.

---

[16]    Upon information and belief, DMA and its partners engaged in both libel and slander of Joe between December 2017 and the present that Joe has not discovered because he does not yet have access to the DMA Instagram account or the DMA Gmail accounts or the emails and text messages of the individual DMA partners, including Batthany, Hurt and Buta. Joe believes that additional false and defamatory statements will be revealed through discovery.

[17]    A spokesman for IPG told the *Wall Street Journal* that IPG first learned about the 2013 confidential settlement during the week of November 20, 2017, and received a copy of the document on December 6, 2017. This is a preposterous lie. IPG has never revealed *how* or *from whom* it learned about the 2013 confidential settlement or why it waited until December 6, 2017 to get a copy from Martin.

35.     At the same time ("[a]round the second week of November" according to the *Wall Street Journal*), IPG and Martin began a pretextual "investigation" of Joe.  Even DMA thought the "investigation" was "bogus":



36.     The IPG/Martin "investigation" was solely intended to cover-up Martin's massive betrayal, breaches of fiduciary duty, breaches of the 2013 confidential settlement agreement, and violations of the IPG human resources policies and Code of Conduct.

37.   In truth, IPG decided to terminate Joe in the hopes that DMA would not look further into the cover-up of sexual harassment by the "C-suite" or the handling of sexual harassment claims by IPG/Martin.

38   IPG wanted to get the spotlight off itself and Martin before DMA negatively publicized the confidential information and salacious stories to clients, which it threatened to do:



Do the right thing.

Address it internally. If you don't, we know your clients will.

Like @martinagency are you willing to risk the livelihoods of hundreds to protect a small group of predators ?

39.   In order to appease DMA and cover-up Martin's breaches of fiduciary duty and gross negligence in disclosing confidential information to DMA, IPG and

Martin manufactured a false narrative about a claim of "sexual harassment".  Although IPG and Martin represented to trade magazines that Joe's termination followed an "internal investigation into **an** allegation of sexual harassment by the chief creative officer"   [https://adage.com/article/agency-news/exit-martin-agency-cco-joe-alexander-internal-investigation/311550;   https://twitter.com/adage/status/938523336858054656 (emphasis added)], in truth, there was no investigation and, even more to the point, there was no "allegation of sexual harassment" that prompted Joe's termination.  IPG and Martin actually made it up.

40.    Martin complied with IPG's direction to concoct a sexual harassment complaint so as to conceal Martin's involvement with DMA and the fact that IPG had decided to give Joe up to toxic DMA and **#MeToo**.

C.    ***THE FAKE CLAIM OF "SEXUAL HARASSMENT"***

41.    On November 21, 2017, at 3:30 pm, Joe met with Rilee-Kelley and Williams.  Joe thought it was a routine weekly meeting.  Rilee-Kelley had a sheet of paper.  She made an off-hand comment that "they" had been "watching this" for a "couple of weeks".  Then, she fraudulently misrepresented to Joe that "someone"[18] had "filed" a sexual harassment complaint against Joe.  Joe was floored.  Rilee-Kelley refused to give any details.  She misrepresented to Joe that it looked "bad".  Rilee-Kelley said that Joe had two options: (1) resign and it "goes away", or (2) "you can fight it and probably lose which would result in your termination.  As your friend, you should take number 1".  Rilee-Kelley refused to disclose what the complaint was or who made it.

---

[18]    Joe would later find out on December 1, 2017 that the alleged "someone" was _____ ("Jane Doe"), a woman who Joe had worked with for years – a woman who had never before complained to anyone about Joe. *See ¶ 60 infra.*

She told Joe, "we must protect the confidentiality of the accuser." Rilee-Kelley and Williams expressly represented to Joe that if he resigned, they would work with him on an acceptable statement to be made to Martin Agency staff.

42.    The meeting lasted a total of seven (7) minutes.

43.    Joe left dumfounded, confused and deeply hurt.

44.    He retrieved his belongings. Around 4:19 p.m., he quickly sent a text to his team, including Jane Doe and Costello, stating that something "personal" had happened and that he would need to take the rest of the year off.

45.    At 5:44 p.m. on November 21, 2017, Jane Doe responded to Joe's text:



When Joe explained that it was "bad", Jane Doe replied:



On November 23, 2017 (Thanksgiving), Jane Doe texted Joe again:



46.     Jane Doe was a colleague and friend.  Prior to November 21, 2017, she never expressed any complaints, concerns, or fears of any kind to Joe.[19]  She made no complaints of sexual harassment.  In fact, throughout the many years they worked

---

[19]     Jane Doe's text messages demonstrate that she did not level a complaint of sexual harassment before Thanksgiving 2017, and that Rilee-Kelley was lying.  If Jane Doe had made a complaint of sexual harassment against Joe, she would ***not*** have said, "[h]ope you and your family are ok".  She would ***not*** have said, "[w]hatever this is, you will get through it".  She would ***not*** have wished a sexual harasser "Happy Thanksgiving".  Jane Doe's texts demonstrate that she did not even know about any claim of sexual harassment on November 21, 2017 when Rilee-Kelley misrepresented that "someone" had made such a complaint.

together, Jane Doe always expressed how much she respected Joe and enjoyed working with him.  In 2016, for instance, to celebrate Joe's 25th anniversary with Martin, dozens of Joe's Martin Agency co-workers gave Joe a book full of beautiful, heart-felt tributes. Jane Doe wrote these kind words about Joe:

> You always say "great leaders have followers." I'd follow you anywhere. The Martin Agency is quite lucky to have had your thinking, passion, and love for 25 years. Cheers to the next!

On August 17, 2017, Jane Doe sent Joe the following text:

> Well heeeey.
> Hope today was ok.
>
> CB is out tomorrow, so you'll have a new assistant for the day.
> Me.
> Just like the good 'ol days! Except that I'm a lot nicer now.

"**I'd follow you anywhere**".  "**Just like the good 'ol days!**"  These are not the words of

a woman who has **<u>EVER</u>** been sexually harassed by her boss.

47.    Joe's style was inclusive, collaborative, nurturing, encouraging,

mentoring, advocating.  He treated all colleagues with respect.  He shared opportunity

with all, as evidenced by the thanks he routinely received:



48.    In truth, Rilee-Kelley, acting upon direction from IPG, manufactured the

false claim that Joe had sexually harassed Jane Doe.  Rilee-Kelley betrayed Joe and acted

out of mechanical loyalty to IPG and Roth.  Rilee-Kelley was a good lieutenant who

valued the security of her job more than loyalty to her close personal friend and partner of

twenty-six (26) years.  She backed IPG and terminated Joe's employment to avoid

exposure of Martin's breaches of fiduciary duty, gross negligence and the purported HR

shortcomings and complacency at Martin that had motivated DMA from the start.

D.     *THE HR INQUISITION*

49.     The day after Thanksgiving, Riley-Kelley texted Joe.  She told Joe that he could not reach out, talk to, or "confront" anyone at Martin, McCann or IPG.  She warned Joe about trying to figure out who had lodged the complaint: "Pls don't try to figure out who lodged the complaint because it can be viewed as retaliation which would result in immediate dismissal."  In truth, Rilee-Kelley was afraid that Joe would discover that the complaint of sexual harassment was a lie.

50.     By Monday, November 27, 2017, Joe still had not heard anything from Rilee-Kelley about the next steps.  On Tuesday, November 28, 2017, Joe received a text from Rilee-Kelley at 6:19 pm: "Just tried to call you.  You are my partner and I get it.  I am trying to get you as much as I can so you can make the right decision so you can be thoughtful and make the right decision for you going forward.  And it's taken more time than I hoped.  Working hard to get you something tomorrow."  This was more lies.  In truth, Rilee-Kelley was desperately trying to solicit more complaints against Joe.

51.     On Thursday, November 30, 2017, Joe met with Rilee-Kelley and Williams at the Willow Oaks Country Club.  Rilee-Kelley slid a single sheet of paper across the table.  There were 10 lines on the paper, each describing in very general terms an alleged complaint.  No dates, times, places, or names.  Joe asked for the name of the woman – the "someone" – who had filed the complaint.  Rilee-Kelley refused to say.  Joe asked if any complaint was in writing.  Rilee-Kelley stated that "they" had one email, the rest were "verbal" complaints.  Rilee-Kelley did not identify when the so-called verbal complaints had been made.  Rilee-Kelley again said that it "doesn't look good and as your friend, I advise you to resign because if you investigate and the complaints are true,

you will be fired with cause and lose everything."  This was Rilee-Kelley's third threat along these lines.  Joe looked Rilee-Kelley in the eye and said, "after 26 years of partnership and all that I've done, you couldn't come to me and say this is bad.  You have 6 months.  Let's figure out an exit that's good for all of us."  No response.  Rilee-Kelley then looked at Joe and stated, "you should be grateful we are offering you the option to resign.  You think Matt Lauer got that?  You think Garrison Keiller got that?  We are doing you a favor."  Then, Williams dropped the final coercive bombshell.  He told Joe "You have until 5 pm tomorrow, Friday December 1, to take option 1 or 2.  Because people are already wondering where you are, what's going on, and we have to tell our clients.  We can't have this speculation."

52.     Joe was so upset he left after 25 minutes.

53.     Shortly after the meeting on November 30, 2017, Williams texted Joe:

> I know you're upset. I'm sorry. But I need to be really clear: if you don't communicate your decision about option 1 vs option 2 by end of day Friday, option 1 will come off the table. I don't want that to happen.

54.     On December 1, 2017, Joe attended a pretextual Human Resource inquisition at the Richmond Marriott Downtown.   Meg Garner and Alice Albright (Martin Agency HR) were at the meeting in person.   Dana Mansfield (McCann HR) participated by phone.   Garner reminded Joe about the IPG Code of Conduct and then revealed to Joe that the sexual harassment claim had been filed by Jane Doe.

55.     Joe could not believe it.   There was no one in Martin that Joe was professionally or personally closer to than Jane Doe.   Jane Doe was close friends with Joe's wife, Sarah.   Joe's daughter babysat Jane Doe's first baby.   Jane Doe had shared a photo of her new baby with Joe just months before.   Joe and Jane Doe shared everything: work, home, kids, play, laughs, sadness, trust, life, even death.   Both Joe and Jane Doe engaged in typical office banter: You look great.   Those jeans are awesome.   That's a great haircut.   Joe was Jane Doe's biggest champion.   In fact, Joe hand-selected her to be Martin's first creative recruiter.   Jane Doe performance was outstanding, just as Joe had predicted.   She took time off and had a baby.   She came back into a new role – creative department manager.   Jane Doe was not as confidant in the new role, but, again, Joe propped her up and made sure everyone knew she was doing an exceptional job.   Joe and Jane Doe were as close as could be.   In fact, Joe would always discuss important and/or vital information and lean on Jane Doe when he had to make important decisions.   Jane Doe called it, "The Vault."   "Don't worry," she would say.   "It's in the vault."   Anything Joe said to Jane Doe he knew was safe, as safe as it would be with anyone.

56.     Garner gave Joe a 4-year old email from 2013.   The subject matter was the Cobblestone Awards, an award Jane Doe and Joe organized every year for the top creative contributors at Martin.   In a line buried in the email, Joe and Jane Doe bantered

back and forth (as always) about a dream that Joe had had.  Joe did not even remember the email.  No one ever complained about the email.  Rather, Garner and/or Rilee-Kelley searched the server for things to use against Joe, and found one old email.  Joe was not even given a copy of the email.  Garner went on to mention other verbal "incidents": a young woman wonders why Joe pays attention to her; another woman says Joe makes her feel "creepy"; another person says Joe called other women "hot"; Joe texts emojis to a women; another person asks why Joe wanted to meet her in his office.[20]

57.     It was a preposterous witch hunt.  Joe asked, "how are any of these incidents sexual harassment?"  Joe asked for times, places and dates.  Garner admitted that she did not have _**any**_ times, places or dates.  Garner said that in her claim Jane Doe said she changed her clothes and appearance to stop the "harassment".  This was not true.  Jane Doe was not shy about her clothes, her body and making sure everyone knew she looked great.  She often said in front of Joe and others that she was proud of her body by saying, "There's no shame in my game."  She was completely comfortable around Joe and others no matter what she was wearing.  In fact, one of the last times she and Joe worked together in his office, Jane Doe wore a very short skirt and moved her chair right next to Joe's.  And, that same week, she sat working on Joe's sofa wearing tight jeans, her legs spread-eagled.

58.     The meeting was pointless.  Garner, Albright and Mansfield showed "zero tolerance" and showed a reckless disregard for due process.  They had already made a decision on who/what to believe and who/what not to.  It was a sham.

---

[20]     Joe's office was glass-walled, right in the middle of the busiest part of the Martin Agency, hardly a place where any "sexual harassment" would have ever occurred.

59.     About 25 minutes into the inquisition, Joe handed Garner a forced resignation letter.  He stood up and said, "I would rather walk out with my dignity than go through this inquisition any longer."  Joe left.

60.     After the HR inquisition on December 1, 2017, Joe prepared a draft statement to be released to Martin.  He sent it to Rilee-Kelley and Williams because they had promised and represented that if Joe resigned they would release a joint statement together concerning Joe's departure from Martin.  Rilee-Kelley and Williams broke their promise.  At 5:00 p.m., much to Joe's astonishment and chagrin, Williams texted Joe the following message:



61.     By 5:00 p.m. on December 1, 2017, Joe's entire history and presence on Martin's website and social media – articles, bio, awards, photos – had been scrubbed.  It was planned and premeditated.

62.     At 6:00 p.m., Adweek and Coffee published the "breaking" news of Joe's termination to Adweek's millions of online subscribers and its 600,000 Twitter followers. [https://www.adweek.com/agencies/the-martin-agencys-chief-creative-officer-joe-alexander-is-out-after-26-years/;

https://twitter.com/Adweek/status/956919170561691650].

**E.     *THE ADWEEK/COFFEE MEDIA SLAUGHTER***

63.     Because of Joe's sudden departure and the vagueness of Williams' internal announcement to Martin, speculation about Joe's termination spread like a wildfire in Southern California.  Former co-workers and peers texted and emailed Joe relentlessly. They expressed bewilderment, sadness and thanks for Joe's leadership.

64.     Some prejudged Joe immediately.[21]

---

[21]     On December 3, 2017, Joe engaged in the following text conversation with Danny Robinson ("Robinson"), a senior creative at the Agency:

| | |
|---|---|
| Joe: | I'm going to miss you guys.  Hope when it settles down we can grab coffee. |
| Danny: | I'll have to think about that. |
| Joe: | What?  Really? |
| Danny: | Gotta think about myself.  Don't think it's a good idea to be seen with you. |
| Joe: | Oh wow.  That's really sad. |

Joe never heard from Mr. Robinson again.

65.    Jane Doe – the woman who allegedly complained about "sexual harassment" – texted the following message to Joe:



We're here for you. Focus where you need to focus.

Joe could not believe what was happening.  The woman who Martin and IPG represented Joe had "sexually harassed" was "here for" him.  Obviously preposterous lies from Martin and IPG.

66.    Joe tried to maintain his dignity and self-respect.  He posted a statement on Facebook:

> "What a great run.  But it's time for a new challenge.  I couldn't be prouder of the work we accomplished together.  More important, it has been a blessing of a lifetime to do work I love with people I love.  The Martin creative bar will continue to be high because of the deepest bench in the business.  I wish them nothing but the best.  And I look forward to the next adventure.  Shedding a tear tonight through an eye toward the future.  Cheers."

67.    On December 5, 2017, oblivious to Martin's betrayal, Joe gave an official statement to Lindsay Stein ("Stein") at *Ad Age*:

> "The Martin Agency is my family.  Rather than a drawn-out, hurtful investigation, resigning was the proper thing to do to protect my family and all the people I've worked so closely together with in my 26 wonderful years.  I will always love that place and the people who make it so special.  Please respect my privacy during this very, very sad time."

68.    On December 6, 2017, Coffee texted Joe to advise that *Adweek* was "preparing to run a story indicating that you were fired from The Martin Agency after multiple female employees filed sexual harassment complaints against you.  The story

also notes that a case brought against you in 2012 was settled out of court for an undisclosed total.  Please let me know if you would like to comment."

69.     On December 7, 2017, Adweek published a damning indictment of Joe written by Coffee, citing unnamed "sources", anonymous "women", an unidentified "former executive", and unidentified "former employees" and "former co-workers".  As planned, Adweek and Coffee gave a national public voice to and amplified the tortious conduct of DMA.  [https://www.adweek.com/agencies/the-martin-agency-chief-creative-officer-joe-alexander-exits-after-multiple-sexual-harassment-complaints-sources-say/

("**The Martin Agency Chief Creative Officer Joe Alexander Exited After Multiple Sexual Harassment Complaints, Sources Say**") (the "Adweek Hit Piece")].[22]

70.     The Adweek Hit Piece contained multiple false and defamatory statements of and concerning Joe, including:

- Joe left The Martin Agency "after several sexual harassment claims[23] about him were made with the agency";

---

[22]     The coordinated effort between DMA and Adweek/Coffee is evidenced by the timing of publication of Coffee's various stories.  Coffee was always first to report the terminations.  He clearly had inside information from DMA that no one else had.  For instance, on the same day Watson was fired by CBP, Adweek/Coffee simultaneously published an article titled "**CP+B Fires Chief Creative Officer Ralph Watson**".  [https://www.adweek.com/agencies/cpb-fires-chief-creative-officer-ralph-watson/].  That article, and the "hit list" published by DMA shortly thereafter, linked Watson to other high-profile advertising executives' terminations that were allegedly because of sexual harassment.

[23]     The only "sexual harassment claim" ever made prior to December 1, 2017 was the one reported to Joe by Garner.  In truth, however, Jane Doe never made the claim prior to December 1, 2017.  IPG and Martin induced Jane Doe to make the claim, which IPG and Martin then supplied to trade magazines as the reason for Joe's termination.  IPG and Martin concealed the truth, which is that they terminated Joe in response to DMA's threat to publicly expose and shame IPG and Martin for how they handled sexual harassment claims and to cover-up Martin's egregious breaches of fiduciary duty, breaches of contract and violations of IPG HR policies and the Code of Conduct.

- Several women "reported concerns about his behavior to the agency, citing incidents as far back as the 1990s";

- Joe's "nickname among some staff" in the 2000s was "HR Joe";

- In 2012, Estes told Mike Hughes that Joe "could not continue hitting on women";[24]

- Daniela Montanez ("Montanez") "approached human resources in 2012 to let them know that she was uncomfortable working with Alexander";

- "Alexander made improper sexual advances" towards two "additional women";

- Alexander passed "a former executive" "his hotel key and invited her to his room to have sex during a business trip.  They were both married at the time";

- This was "Alexander's way of 'testing the waters' with women he found attractive";

- A "former worker" said "Alexander joked about threesomes and at one point propositioned her";

- "Three other former employees said Alexander regularly belittled co-workers, telling multiple women that they needed to lose weight and commenting on the size of their breasts in front of male colleagues. They allege that he once described a black female employee as "chocolate thunder" and frequently told Mormon staff members that no one wanted to spend time with them because they wouldn't drink alcohol";

- Estes said, "[t]his has been happening for decades."

71.    Adweek and Coffee concealed the fact that none of the so-called "complaints" were ever reported to Martin Agency Human Resources or to any manager of Martin or IPG, as required by the IPG Code of Conduct.   Adweek and Coffee confirmed that "one former employee … and several of her colleagues" did not file

---

[24]    Estes' false statements about Joe were immediately retweeted by Gallop. [https://twitter.com/cindygallop/status/938816561502093312].

complaints until "Thursday", December 7, 2017, the same day Adweek and Coffee published the Adweek Hit Piece.

72.    Adweek and Coffee also published confidential information that they obtained from Martin, Estes, Bidwell and/or Hanley regarding the 2013 confidential settlement of the disputed claim that had been levelled by Bidwell against Martin and Joe.  Adweek and Coffee stated that "nine sources with knowledge of the story" stated that "a woman in the creative department [Bidwell] accused Alexander of sexually harassing her and then firing her after she repeatedly rejected his advances."  Martin, Estes, Bidwell and/or Hanley also disclosed to Adweek and Coffee that "the settlement forbid the woman [Bidwell] from working for the larger Interpublic Group again in any capacity."

73.    The Adweek Hit Piece was republished millions of times between 2017 and the present. [*See, e.g.*, https://www.refinery29.com/en-us/2018/12/217506/the-martin-agency-women-executives-times-up ("The piece included two former employees who spoke on the record, saying they went to managers about Alexander at various points to no avail. Most damning though was a 2013 settlement between the agency and an unnamed woman"); https://qz.com/1201495/metoo-and-diet-madison-avenue-sexual-harassment-allegations-at-publicis-wieden-kennedy-martin-agency/ ("According to a lengthy report published by Adweek in December, Alexander was the subject of several harassment complaints about repeated incidents through his career, dating as early as the 1990s"); https://twitter.com/cindygallop/status/938821321181618176 ("I'm disgusted @martinagency fired @joealex12 without publicizing the (many, years-long) reasons why")].

74.     On December 7, 2017, Joe received a text from Stein stating that Martin had released an "internal memo" to the press.  Prior to release, Martin did not provide a copy of the "internal" memo to Joe or even advise Joe that it intended to release the memo.  The "internal" memo materially breached the terms of Joe's verbal agreement with Rilee-Kelley and Williams and the IPG Release, including the covenant of good faith and fair dealing.  Joe resigned on December 1, 2017.  Martin promised Joe that if he resigned, it would not comment on the matter further and the parties would work together on a joint statement to Martin staff.  The "internal" memo, published at the direction of IPG, was egregiously defamatory.  Among other things, the memo falsely stated that the "behavior that Martin's former CCO, Joe Alexander, is accused of is inexcusable.  That's why the only alternative was for him to leave The Martin Agency.  That decision was ours."  Martin further misrepresented that "people in our company felt unsafe and unheard".  Martin further falsely stated that it was "deeply sorry that any of you ever felt unsafe or unheard."  [https://www.adweek.com/agencies/the-martin-agency-releases-internal-memo-promising-to-get-better-in-wake-of-harassment-scandal/].

75.     On December 8, 2017, Adweek and Coffee republished false statements about Joe by Kelsey Johnson ("Johnson"), an account supervisor with Martin.  Johnson, *inter alia*, stated as follows: "*we do not condone the behavior of Joe Alexander, or any of his enablers,*[25] *or those who sexually harass, speak down to and demean women ... we do not condone the environment and the culture that allowed him to feel safe and*

---

[25]     In truth, Joe was the only one targeted.  Not one other person was accused of sexual harassment or "inexcusable" conduct.  No "enablers" were ever identified.  No "enablers" were terminated by IPG and Martin on or after December 1, 2017 because, in truth, there was nothing to "enable".  The defamatory statements about Joe were all invented out of whole cloth.

*comfortable in his behavior. The environment that allowed him to stay here and prey on women for over twenty years*". [https://www.adweek.com/agencyspy/a-martin-agency-account-director-offers-her-perspective-with-notmymartin-post/140968/; https://medium.com/@kelseyann.johnson1/notmymartin-e00bbdc55c4b].

### F.   *DIET MADISON AVENUE TAKES FULL CREDIT*

76.    DMA took full credit for getting Joe fired.  Afterwards, they crossed Joe off their "master" hit list:



Beside Joe's name on the "master" hit list was an entry: "32 times see doc".   Upon information and belief, this is a reference to the 2013 confidential settlement agreement and other HR Reports and documents unlawfully leaked and disclosed to DMA by Martin.

77.    In addition to publishing the "master" hit list, and as further evidence of their actual malice, spite and ill-will towards Joe, DMA and its partner/members published a picture of Joe wearing a pig nose with emojis vomiting out of Joe's eyes:



78.    DMA and its partner/members never stopped defaming Joe.   Long after Joe was terminated, they continued to stalk him and post false and defamatory statements, including the following malicious, insulting and hateful words:

 **dietmadisonave**  6h   

## And just because it's too hard to NOT "go there...

## Hitler was a VEGETARIAN, and he LOVED dogs -

## and he was one of the biggest assholes in history.

## we're pretty sure Joseph Goebbels thought he was "a good dude."

## Joe Alexander started volunteering at a crisis hotline last week & is proclaiming to be a counselor. All good dudes.

DMA posted these insulting words after they learned that Joe had volunteered to be a national suicide crisis counselor. Like Martin, IPG, and Estes, DMA and its partner/members were well aware of Joe's prospective business opportunities. The defamation and tortious interference never stopped. They intended to permanently injure Joe. DMA and its partner/members, including Batthany, Hurt and Buta, reminded readers that:

> Just remember folks, it took 9 months to expose Joe Alexander, & the @martinagency still hasn't fully come clean.

79.     Over ten years ago, Joe wrote a small book about Martin's culture. He called it "Good and Tough": good to each other, tough on the work; good place to work, tough place to leave. Martin embraced this motto. It was a large part of the Agency's identity. Joe was never the person described by the Defendants as "preying on females", a man who it was "unsafe" to be around. Joe was not "guilty" of actions "that are inexcusable." The fact is, Joe had been, was then, and will always be a staunch advocate of equality and diversity in and out of the workplace. At Martin, Joe hired dozens of women, including the top three (3) female creatives in the Agency's history: Karen Costello, Nancy Hannon and Deb Hagan. Joe's last hire before his termination was Ashley Bozeman, the first African American female creative in the history of Martin. Joe

sent people to the 3% Conference[26] every year since it began.  He sent Jane Doe to the Conference in 2017.  Joe was one of the very first supporters of Free the Bid, a non-profit initiative advocating on behalf of women directors for equal opportunities to bid on commercial jobs in the global advertising industry. [https://www.freethebid.com/].  Joe discovered female talent in other departments and brought them into creative, including copywriters Lassiter Stone, Miranda Morgan and Katie Lynn Moncure.  He mentored countless women throughout Martin.  Being inclusive was a tenet of his leadership style.

80.    Joe has been surrounded his whole life by smart, confident, strong, courageous, compassionate women.  He was raised by the strongest most beautiful person in his life: his Mother Jan.  He grew up with three sisters who blazed trails and always had Joe's undying support and admiration.  He raised three incredible daughters.  He has an amazing wife.   It would have been impossible to have women in his life like this if Joe was the person described by the Defendants in this case.   It is physically and emotionally unattainable.  The most telling proof of Joe's character ***is*** the women in his life. [http://consciencenow.blogspot.com/].

### COUNT I – <u>TORTIOUS INTERFERENCE WITH CONTRACT</u>

81.    Joe restates paragraphs 1 through 80 of this Amended Complaint, and incorporates them herein by reference.

---

[26]    Founded by Kat Gordon in 2011, the 3% Conference is part of a movement to increase the number of female creatives in the advertising industry. [https://www.3percentmovement.com/movement ("Until we came along, only 3% of Creative Directors were women. And very few were people of color. We're changing the ratio because the more varied the people who come up with ideas, the better the ideas will be … Until women make up 50% of creative directors, we've got a crew who'll keep working their butts off, all led by founder Kat Gordon")].  Because of the hard work of the 3% movement, women now comprise up 29% of the total creatives in the industry. [https://www.3percentmovement.com/].

82.     Joe had a valid contract with Martin and reasonable business expectancies in his employment and property rights.

83.     DMA, Batthany, Hurt, Buta, Adweek and Coffee each knew that Joe was employed as CCO of the Martin Agency from their review of public records and information, and/or from their discussions with DMA partner/members, employees and/or ex-employees of Martin with whom the Defendants were in private communications.

84.     The Defendants intentionally interfered with Joe's employment, property rights and business expectancies by, *inter alia*, (a) conspiring with employees and ex-employees of Martin to get Joe fired, (b) instigating, aiding and abetting in breaches of fiduciary duty, (c) engaging in repeated acts of defamation and insulting words, and (d) threatening to expose Martin and IPG's human resources practices and failures. Defendant's actions caused Martin and IPG to terminate Joe's contract.

85.     The Defendants' actions and practices were and are illegal, independently actionable, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, immoral and sharp.

86.     DMA, Batthany, Hurt, Buta, Adweek and Coffee engaged in actions and published statements that destroyed Joe's reputation and ended his stellar career in advertising.  It is now virtually impossible for Joe to obtain work.  As an example:  Joe was hired to do freelance, but when a vendor was told Joe was working on the job, they said he couldn't be seen in their office or be on phone calls.  Joe lost the freelance job.  Joe has lost much more than money, however.  His family suffered untold pain.  His marriage is forever changed.  He constantly fears what his former colleagues, clients and

others in the industry may think of him.  The personal injuries Joe suffered – the disgrace, insult, humiliation, embarrassment, pain and mental anguish and suffering – are permanent.

87.     As a direct and proximate cause of the Defendants' tortious interference with contract and Joe's reasonable business expectations, Joe suffered damage and incurred loss, including, but not limited to, actual damages, loss of business and income, diminished earning capacity, injury to his reputation, court costs, and other out-of-pocket expenses and damages in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

## COUNT II – <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS</u>

88.     Joe restates paragraphs 1 through 87 of this Amended Complaint, and incorporates them herein by reference.

89.     After he was terminated by Martin, Joe attempted to pursue work as a freelancer. [https://www.linkedin.com/in/joealex12/].

90.     Based upon his long career in advertising, Joe had a reasonable expectation of obtaining future employment and business.

91.     From a review of publicly available information including Joe's *LinkedIn* page, website and blogspot, the Defendants each knew about Joe's business expectations and attempts to find work.

92.     After December 1, 2017, Joe had a handful of opportunities to work on freelance campaigns.

93.     As alleged above, after Joe's termination from Martin, DMA, Batthany, Hurt, Buta, Adweek and Coffee intentionally interfered with Joe's prospective business

relationships and opportunities by continuing to publish and by enticing others to publish and republish false and defamatory statements and images (visual content) about Joe. [*See, e.g.*, https://www.adweek.com/agencyspy/the-martin-agency-turns-joe-alexanders-old-office-into-a-meeting-room-and-dog-house/148911/ ("Meanwhile, the former CCO is reportedly testing a return to the ad business. Several parties tell us that he has reached out specifically seeking work or looking to re-establish connections with industry influencers. On his personal blog, he recently congratulated Costello, wrote a post in which he discussed volunteer work and indirectly addressed the events preceding his exit, and shared a spec ad for the National Suicide Prevention Hotline following the death of Kate Spade. (The organization said it had no knowledge of that effort.)")]. The Defendants intended that their continuing false statements would interfere with Joe's ability to obtain future employment in the advertising industry. They knew that the false statements were substantially likely to deprive Joe of any ability to find work.

94.     As a proximate result of the Defendants' statements and improper actions, Joe has largely been unable to secure any substantial work in the advertising industry since his termination. Prospective employers who google his name fear retaliation by the Defendants and their supporters and/or the reputational risk of being "seen" with Joe. Absent the Defendants' misconduct, it was reasonably certain that Joe would have obtained work, including the freelance business he sought, and/or kept the freelance work he did obtain.

95.     The Defendants' actions constitute tortious interference with prospective economic advantage.

96.     As a direct result of the Defendants' tortious interference with prospective economic advantage, Joe suffered damage and loss, including, but not limited to, Joe suffered damage and incurred loss, including, but not limited to, actual damages, loss of business and income, diminished earning capacity, injury to his reputation, court costs, and other out-of-pocket expenses and damages in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

### COUNT III – **COMMON LAW CONSPIRACY**

97.     Joe restates paragraphs 1 through 96 of this Amended Complaint, and incorporates them herein by reference.

98.     Beginning in October 2017, DMA, Batthany, Hurt, Buta, Adweek and Coffee combined, associated, agreed or acted in concert together and with other partner/members of DMA, with Estes and with others (whose identities are unknown to Joe at this time), for the express purpose of injuring Joe in his business and reputation through the publication and republication of false and defamatory statements and tortiously interfering with Joe's employment as CCO of Martin.  In furtherance of the conspiracy and preconceived joint plan, the Defendants and their confederates orchestrated a scheme the unlawful purpose of which was to cause Joe's termination. Acting in concert, with specific knowledge of IPG's "zero-tolerance" policy, the Defendants published, republished and spread false and defamatory statements about Joe with knowledge that IPG would order Joe's termination without due process.

99.     DMA's sources were embedded in leadership and HR positions at Martin:



In fact, some of the original DMA partner/members actually worked at Martin:

 **marabeanzz** You guys are so off base. How long have you followed them? Some of the original DMA work at Martin, and they started out by calling out Joe Alexander before it was ever in the papers or known in public. Did you know that ? They did that for months. No agency is protected, they speak truth to power. they have even exposed someone that's good friends with a person in their collective and even posted the text messages of her directly confronting the man and telling him that he would be reported.

Buta is "marabeanzz".  DMA protected the identities of its Martin confederates:

> We also have individuals working for HR who have turned documents over to us. We can't get into the specifics of that because what they are doing is the most risky and we have been advised to not discuss our process when it comes to that particular matter.

100.    DMA admitted and confirmed that it's actions were "one spoke" on the

"wheel":



101.    The Defendants acted intentionally, purposefully, without lawful justification, and with the express knowledge that they were injuring Joe.

102.    The Defendants' actions constitute a common law conspiracy to tortiously interfere with contract and reasonable business expectations.

103.    As a direct result of Defendants' conspiracy, Joe suffered damage and loss, including, but not limited to, presumed damages, actual damages, including, loss of employment, business and income, diminished future earnings capacity, insult, pain and mental suffering, humiliation, embarrassment, injury to reputation, court costs, and other damages in the amount of $25,000,000.00 or such greater amount as is determined by the Jury.

## COUNT IV – <u>AIDING AND ABETTING</u>

104.    Joe restates paragraphs 1 through 103 of his Amended Complaint, and incorporates them herein by reference.

105.    The law recognizes a cause of action for aiding and abetting an intentional tort. *See, e.g., Tysons Toyota, Inc. v. Globe Life Ins. Co.*, 45 F.3d 428 (4th Cir. 1994) ("Under Virginia law, one who aids and abets a third party's breach of fiduciary duty may be held liable for providing such assistance") (citing *Patteson v. Horsley*, 70 Va. (29

Gratt.) 263, 270-271, 273, 276 (1877)); *Priester v. Small*, 2003 WL 21729900, at * 5

(Loudoun Cir. 2003) (recognizing a cause of action for aiding and abetting) (citing

*Daingerfield v. Thompson*, 74 Va. (33 Gratt.) 136, 149-150 (1880) ("He who commands

or procures another to do an unlawful act, is as responsible as a trespasser as he who

commits the trespass.")); *Sherry Wilson and Co., Inc. v. Generals Court, L.C.*, 2002 WL

32136374, at * 1 (Loudoun Cir. 2002) ("On two occasions the Supreme Court of Virginia

has recognized the right of an injured plaintiff to recover damages against person who

aids and abets the principal actor.  More recently, Judge Kathleen H. Mackay has found

claim founded upon the aiding and abetting of a fraud was sufficient to withstand

demurrer. *Kieft v. Becker,* 2002 Va. Cir. LEXIS 33 (Fairfax County 2002).  Thus, unlike

some jurisdictions, it may be said that the common law of the Commonwealth has looked

with favor upon recovery in tort against those who aid and abet others in the commission

of the civil wrong for which damages may be maintained."); *see Quinn v. Knight*, 2016

WL 6471462, at * 4 (E.D. Va. 2016) (even if the claim of aiding and abetting is not to be

treated as a separate tort, "it appears to be a viable alternative theory to secure joint

liability.") (citing *All. Tech. Group v. Achieve 1, LLC*, 2013 WL 143500, at * 5 (E.D. Va.

2013)).

106.    DMA, Batthany, Hurt, Buta, Adweek and Coffee aided and abetted

Martin's breaches of fiduciary duty and breaches of trust by, *inter alia*, (a) divulging and

publishing confidential information about Joe, (b) receiving and utilizing HR reports and

files with the full knowledge that they had no right in or to the materials.

107.    As a direct result of the Defendants' actions, Joe suffered presumed

damages and actual damages, including, but not limited to, loss or injury to business,

insult, pain and suffering, humiliation, embarrassment, mental suffering, permanent damage and injury to his personal and professional reputations, attorney's fees, costs, and other out-of-pocket expenses in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

### COUNT V – <u>DEFAMATION *PER SE*</u>

108.    Joe restates paragraphs 1 through 107 of his Amended Complaint, and incorporates them herein by reference.

109.    The Defendants made and published to third-parties, including Martin and IPG, numerous false factual statements, which are detailed verbatim above, of or concerning Joe. The Defendants' false and defamatory statements at issue in this action were published and republished within the past year.

110.    By intentionally publishing statements on the Internet, to newspapers, to trade magazines and via social media, the Defendants knew or should have known that their false and defamatory statements would be published and republished over and over by third-parties, including other industry publications, subscribers and social media followers of those publications, and others, millions of times to Joe's detriment and injury. Republication was the natural and probable consequence of the Defendants' actions and was actually and/or presumptively authorized by the Defendants. The Defendants are liable for the republication of the false and defamatory statements within the year prior to the filing of this action under the doctrine announced by the Supreme Court of Virginia in *Weaver v. Home Beneficial Co.*, 199 Va. 196, 200, 98 S.E.2d 687 (1957) ("where the words declared on are slanderous per se their repetition by others is the natural and probable result of the original slander.").

111. The Defendants' false statements constitute defamation *per se*. The statements accuse and impute to Joe (1) the commission of felonies and crimes involving moral turpitude and for which Joe may be punished and imprisoned in a state or federal institution, (b) an unfitness to perform the duties of an office or employment for profit, including the job of a CCO, or the want of integrity in the discharge of the duties of such office or employment. The Defendants' statements also severely prejudice Joe in his profession or trade.

112. The Defendants' false statements caused Joe substantial harm, presumed damages and actual damages.

113. The Defendants made the false statements with actual or constructive knowledge that they were false or with reckless disregard for whether they were false. The Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

      a. The Defendants pursued a predetermined agenda, which was to interfere with Joe's employment and get him fired.

      b. The Defendants knew about IPG's "zero-tolerance" **#MeToo** policy and intentionally published false and scandalous statements about Joe, knowing that IPG would immediately terminate Joe without any investigation or Due Process.

      c. The Defendants knew their statements were false and acted out of a desire to hurt Joe and to permanently stigmatize him. The words and images that they used were vile, contemptuous, any disproportionate to any occasion.

There were no sources for any of the defamation because they made up the statements out of whole cloth.

        d.     They revealed confidential information with the intent to hurt Joe.

        e.     The Defendants knew that the false and defamatory statements would be republished and repeated over and over, destroying Joe's reputation globally and rendering him unemployable.

114.    The Defendants lacked reasonable grounds for any belief in the truth of their statements, and, at the very least, acted negligently in failing to determine the true facts.

115.    As a direct and proximate result of the Defendants' defamation, Joe suffered substantial damage and loss, including, but not limited to, presumed damages, actual damages, loss of business and income, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, damage and injury to his reputation, costs, and other out-of-pocket expenses in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

116.    Joe restates paragraphs 1 through 115 of his Amended Complaint, and incorporates them herein by reference.

117.    The Defendants' conduct, detailed above, was intentional and reckless. The Defendants engaged in a series acts that, taken together, constitute extreme and outrageous behavior.   The Defendants deliberately created an anonymous Instagram account and Gmail account.   They acted on unverified complaints of wrongdoing from sources they did not know.   They purposefully initiated a campaign to smear top male

creatives in the advertising industry and to get them fired.  They doxxed and defamed top creatives like Joe without any due process.  They engaged in a malicious scheme of harassment, intimidation and mental torture.  The Defendants knew about the Roth Memorandum.  They knew that their incendiary allegations would cause swift, immediate and severe emotional injury and financial loss.  They knew that top creatives at any IPG company were peculiarly susceptible to summary termination.  They knew that IPG would afford Joe no due process.  In spite of their knowledge, the Defendants proceeded with their plan to cause Joe's termination (and the terminations of many others on the "master" hit list).  Defendants' conduct was vulgar, flagrant, insulting and heartless. After Joe's termination, DMA and the DMA Doe Defendants callously scratched Joe's name off the list, as if Joe had been assassinated, published a picture of Joe wearing a pig nose, and Adweek and Coffee then published the Adweek Hit Piece to cap off the calumny.

118.    The Defendants' actions offend against generally accepted standards of decency and morality and are atrocious and utterly intolerable.

119.    Their outrageous conduct caused Joe to suffer severe emotional distress, extreme fear and panic.

120.    The Defendants' misconduct constitutes intentional infliction of emotional distress.

121.    As a direct result of the Defendants' misconduct, Joe suffered damage and incurred loss, including, without limitation, pain and suffering, physical injury, severe emotional trauma, insult, embarrassment, humiliation, public ridicule, anguish, stress and anxiety, injury to reputation, special damages, medical expenses, attorney's fees, costs

and out-of-pocket expenses in the sum of $25,000,000.00 or such greater amount as is determined by the Jury.

Joe alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.  He believes that substantial additional evidentiary support, which is in the exclusive possession of DMA, Batthany, Hurt, Buta, other DMA partner/members, Adweek, Coffee, their agents, surrogates, alter egos, employees and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Joe reserves the right to amend this Complaint upon discovery of additional instances of Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Joe Alexander respectfully request the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A.     Compensatory damages in the sum of $25,000,000.00 or such greater amount as is determined by the Jury;

B.     Punitive damages in the amount of $350,000.00 or the maximum amount allowed by law;

C.     Prejudgment interest at the rate of 6% per year on the Principal Sum awarded by the Jury from November 21, 2017 to the date of Judgment;

D.     Postjudgment interest at the rate of six percent (6%) per annum until paid;

E.     Such other relief as is just and proper.

**TRIAL BY JURY IS DEMANDED**

DATED:        December 10, 2019

JOE ALEXANDER

By:    */s/ Steven S. Biss*
        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:    (804) 501-8272
        Facsimile:     (202) 318-4098
        Email:         **stevenbiss@earthlink.net**

        *Counsel for the Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2019 a copy of the foregoing was filed electronically using the Court's CM/ECF System, which will send notice to counsel of record and all interesting parties.

By:    */s/Steven S. Biss*
        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:    (804) 501-8272
        Facsimile:     (202) 318-4098
        Email:         **stevenbiss@earthlink.net**

        *Counsel for the Plaintiff*