**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

**JOE ALEXANDER,**

        **Plaintiff,**

    **v.**

**DIET MADISON AVENUE, JEAN
BATTHANY, DANI HURT, MARA BUTA,
ADWEEK, LLC, AND PATRICK COFFEE,**

        **Defendants.**

Case No. 3:19-cv-00688-JAG

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS ADWEEK, LLC AND PATRICK COFFEE'S MOTION TO DISMISS**

Matthew E. Kelley
Va. Bar No. 84045
BALLARD SPAHR LLP
1909 K St. NW, 12th Floor
Washington, DC 20006-1157
Phone: 202-661-2200
Fax: 202-661-2299
kelleym@ballardspahr.com

Michael Berry
(*pro hac vice*)
BALLARD SPAHR LLP
1735 Market St., 51st Floor
Philadelphia, PA 19103
Phone: 215-988-9773
Fax: 215-865-8999
berrym@ballardspahr.com

Thomas B. Sullivan
(*pro hac vice*)
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
Phone: 212-850-6139
Fax: 212-223-1942
sullivant@ballardspahr.com

*Counsel for Defendants Adweek, LLC and Patrick Coffee*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND.............................................................................................2

A.    Alexander's Forced Resignation Following Accusations of Sexual
      Harassment...........................................................................................................2

B.    Adweek's Reporting on the Sexual Harassment Allegations Against Alexander ..............4

C.    This Action...........................................................................................................5

ARGUMENT .....................................................................................................................6

I.    THIS COURT LACKS PERSONAL JURISDICTION OVER ADWEEK .......................6

II.   ALEXANDER CANNOT STATE ANY VIABLE CLAIM ............................................11

      A.    Alexander Cannot State a Defamation Claim ........................................................12

            1.    The Statute of Limitations Bars Any Claim Arising From
                  Most of the Adweek Publications ...............................................................12

            2.    The Other Three Publications Are Indisputably True...............................13

      B.    Adweek Did Not Tortiously Interfere with Alexander's Contract ........................15

      C.    Alexander Cannot State a Claim Against Adweek for Tortious
            Interference with Prospective Economic Advantage .............................................16

      D.    Alexander Cannot State a Conspiracy Claim Against Adweek.............................17

      E.    Alexander Cannot State a Claim for Intentional Infliction of
            Emotional Distress ...............................................................................................18

      F.    Alexander Cannot State a Claim for Aiding and Abetting ...................................21

      G.    The First Amendment Bars Alexander's Claims Because He Is a Public
            Figure in the Advertising Industry and Cannot Establish Actual Malice .............22

            1.    Alexander Is a Limited-Purpose Public Figure..........................................23

            2.    Alexander Cannot Meet His Burden of Pleading Actual
                  Malice ........................................................................................................26

CONCLUSION.................................................................................................................30

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*17th Street Associates, LLP v. Markel International Insurance Co.*,
373 F. Supp. 2d 584 (E.D. Va. 2005) ....................................................................17

*Advanfort Co. v. International Registries, Inc.*,
2015 U.S. Dist. LEXIS 62125 (E.D. Va. May 12, 2015) ......................................16

*AdvanFort Co. v. The Maritime Executive LLC*,
2015 U.S. Dist. LEXIS 99208 (E.D. Va. July 28, 2015) .......................................27

*Allen v. Beirich*,
2019 U.S. Dist. LEXIS 197183 (D. Md. Nov. 13, 2019) ......................................21

*ALS Scan, Inc. v. Digital Service Consultants, Inc.*,
293 F.3d 707 (4th Cir. 2002) ...................................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................20

*Bartnicki v. Vopper*,
532 U.S. 514 (2001).........................................................................................21, 30

*Beasley v. FV-I, Inc.*,
2013 U.S. Dist. LEXIS 39640 (E.D. Va. Mar. 21, 2013) ......................................18

*Besen v. Parents & Friends of Ex-Gays, Inc.*,
2012 U.S. Dist. LEXIS 58155 (E.D. Va. Apr. 25, 2012)........................................23

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) .................................................................................13

*Boyce v. Bennett*,
2014 U.S. Dist. LEXIS 190446 (E.D. Va. Oct. 30, 2014) .....................................20

*Carr v. Forbes, Inc.*,
259 F.3d 273 (4th Cir. 2001) .................................................................................23

*Cerick v. Central Fidelity Bank*,
19 Va. Cir. 1 (Va. Cir. Ct. 1989)............................................................................16

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ...............................................................................23

*Cominelli v. Rector & Visitors of the University of Va.*,
    589 F. Supp. 2d 706 (W.D. Va. 2008) ...................................................................17

*Commerce Funding Corp. v. Worldwide Security Services Corp.*,
    249 F.3d 204 (4th Cir. 2001) ............................................................................17

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
    2018 U.S. Dist. LEXIS 28902 (M.D. Ala. Feb. 21, 2018)......................................28

*Cox v. MAG Mutual Insurance Co.*,
    2015 U.S. Dist. LEXIS 46502 (E.D. Va. Apr. 9, 2015)....................................17, 18

*Crittendon v. Arai Americas, Inc.*
    2014 U.S. Dist. LEXIS 576 (E.D. Va. Jan. 2, 2014) ...........................................19

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).................................................................................................6

*Doe v. Roe*,
    295 F. Supp. 3d 664 (E.D. Va. 2018) ...................................................................13

*ESAB Group, Inc. v. Centricut, Inc.*,
    126 F.3d 617 (4th Cir. 1997) ....................................................................................7

*FireClean, LLC v. Tuohy*,
    2016 U.S. Dist. LEXIS 96294 (E.D. Va. July 21, 2016)....................................9, 10

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) ................................................................................23

*Garrison v. Louisiana*,
    379 U.S. 64 (1964)................................................................................................22

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)..............................................................................................23

*Goulmamine v. CVS Pharmacy, Inc.*,
    138 F. Supp. 3d 652 (E.D. Va. 2015) ...................................................................16

*Greenbelt Cooperative Publishing Association v. Bresler*,
    398 U.S. 6 (1970)..................................................................................................29

*Handy v. Johnson & Johnson*,
    2017 U.S. Dist. LEXIS 204533 (E.D. Va. Dec. 12, 2017) ......................................6

*Harte-Hanks Communications, Inc. v. Connaughton*,
    491 U.S. 657 (1989)........................................................................................26, 29

*Haskins v. Washington Adventist Hospital*,
   2012 U.S. Dist. LEXIS 3255 (E.D. Va. Jan. 11, 2012) ........................................................6

*Hatfill v. N.Y. Times Co.*,
   416 F.3d 320 (4th Cir. 2005) ........................................................................................19, 23

*Hodge v. E. Bay Express*,
   2013 Cal. App. Unpub. LEXIS 2892 (Cal. Ct. App. Apr. 25, 2013).....................................14

*Hustler Magazine v. Falwell*,
   485 U.S. 46 (1988)..............................................................................................................22

*Jeffrey J. Nelson & Associates v. LePore*,
   2012 U.S. Dist. LEXIS 93097 (E.D. Va. July 5, 2012) .......................................................12

*Jordan v. Donahoe*,
   2013 U.S. Dist. LEXIS 83471 (E.D. Va. June 13, 2013) ................................................18, 19

*Katz v. Odin, Feldman & Pittleman, P.C.*,
   332 F. Supp. 2d 909 (E.D. Va. 2004) ..................................................................................13

*Kensington Volunteer Fire Department v. Montgomery County*,
   684 F.3d 462 (4th Cir. 2012) ................................................................................................2

*KMLLC Media, LLC v. Telemetry, Inc.*,
   2015 U.S. Dist. LEXIS 145764 (E.D. Va. Oct. 27, 2015)....................................................10

*Lohrenz v. Donnelly*,
   223 F. Supp. 2d 25 (D.D.C. 2002) .......................................................................................27

*Marom v. Town of Greenburgh*,
   2018 U.S. Dist. LEXIS 117607 (E.D.N.C. July 16, 2018) ...................................................11

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991)........................................................................................................13, 14

*Mayfield v. NASCAR*,
   674 F.3d 369 (4th Cir. 2012) ..........................................................................................22, 26

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) .............................................................................................22

*Microstrategy Services Corp. v. OpenRisk, LLC*,
   2015 U.S. Dist. LEXIS 32719 (E.D. Va. Mar. 17, 2015) .....................................................21

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990)................................................................................................................29

*Mirafuentes v. Estevez,*
   2015 U.S. Dist. LEXIS 166157 (E.D. Va. Nov. 30, 2015) ....................................................16

*Myers v. Lee,*
   2010 U.S. Dist. LEXIS 69012 (E.D. Va. July 12, 2010) ........................................................21

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ................................................................................................................29

*New Wellington Financial Corp. v. Flagship Resort Development Corp.,*
   416 F.3d 290 (4th Cir. 2005) ....................................................................................................6

*Ortiz v. Panera Bread Co.,*
   2011 U.S. Dist. LEXIS 85463 (E.D. Va. Aug. 2, 2011) ........................................................20

*Peterson v. Cooley,*
   142 F.3d 181 (4th Cir. 1998) ..................................................................................................15

*Phantom Touring, Inc. v. Affiliated Publications,*
   953 F.2d 724 (1st Cir. 1992) ..................................................................................................14

*In re Philadelphia Newspapers, LLC,*
   690 F.3d 161 (3d Cir. 2012) ...................................................................................................13

*Philadelphia Newspapers v. Hepps,*
   475 U.S. 767 (1986) ................................................................................................................13

*Phillips v. LCI International, Inc.,*
   190 F.3d 609 (4th Cir. 1999) ....................................................................................................2

*Quinn v. Knight,*
   2016 U.S. Dist. LEXIS 151346 (E.D. Va. Nov. 1, 2016) ......................................................21

*Reuber v. Food Chemical News, Inc.,*
   925 F.2d 703 (4th Cir. 1991) ......................................................................................23, 25, 28

*Russo v. White,*
   241 Va. 23 (1991) ...................................................................................................................18

*Ryan v. Brooks,*
   634 F.2d 726 (4th Cir. 1980) ..................................................................................................22

*Shirvinski v. United States Coast Guard,*
   673 F.3d 308 (4th Cir. 2012) ..................................................................................................23

*St. Amant v. Thompson,*
   390 U.S. 727 (1968) ................................................................................................................22

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) .................................................................................25

*Tucker v. Fischbein*,
   237 F.3d 275 (3d Cir. 2001)....................................................................................27

*Virginia Citizens Defense League v. Couric*,
   2017 U.S. Dist. LEXIS 83308 (E.D. Va. May 31, 2017) .......................................13

*Waldbaum v. Fairchild Publications, Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980) .............................................................................25

*Walden v. Firoe*,
   571 U.S. 277 (2014)..............................................................................................6, 7

*Warner v. Buck Creek Nursery, Inc.*,
   149 F. Supp. 2d 246 (W.D. Va. 2001) ...................................................................19

*Weidman v. Exxon Mobil Corp.*,
   776 F.3d 214 (4th Cir. 2015) .................................................................................19

*Wenzel v. Knight*,
   2015 U.S. Dist. LEXIS 4476 (E.D. Va. Jan. 14, 2015) .........................................21

*Wenzel v. Knight*,
   2015 U.S. Dist. LEXIS 70536 (E.D. Va. June 1, 2015) .........................................17

*Wolff v. City of N.Y. Financial Services Agency*,
   939 F. Supp. 258 (S.D.N.Y. 1996) ........................................................................19

*Wynn v. Wachovia Bank, N.A.*,
   2009 U.S. Dist. LEXIS 38250 (E.D. Va. May 6, 2009) .........................................21

*Young v. New Haven Advocate*,
   315 F.3d 256 (4th Cir. 2002) ......................................................................6, 8, 10, 11

*Zaklit v. Global Linguist Solutions, LLC*,
   2014 U.S. Dist. LEXIS 92623 (E.D. Va. July 8, 2014) .........................................20

**Statutes**

Va. Code § 8.01-223.2(A)...........................................................................................12

Va. Code § 8.01-247.1 ................................................................................................12

## PRELIMINARY STATEMENT

In the Fall of 2017, plaintiff Joe Alexander, one of the country's top advertising executives, was forced to resign after being accused of sexual harassment.  His sudden unexplained departure sparked widespread speculation, until a trade publication reported that he was forced out after an investigation into alleged sexual harassment.  Then, a second trade publication, defendant Adweek, LLC (the "LLC"), and its reporter Patrick Coffee (collectively, "Adweek") published an extensively sourced article documenting accusations of sexual harassment against Alexander going back more than two decades.

In this case, Alexander claims that Adweek's December 2017 article was a defamatory "hit piece."  It is the core of his action against Adweek.  But, that article and almost all of the other Adweek reports Alexander cites in his Amended Complaint cannot be the basis for a defamation claim because any such claim would be barred by the one-year statute of limitations.  Alexander has attempted to plead around that bar by crafting a fantastic tale of a wide-ranging conspiracy involving creatively pled torts.  That effort, however, is barred by well-established law, too.

Under Virginia law, Adweek is immune from Alexander's claims of tortious interference and defamation.  And, because he is a public figure in the ad industry, the First Amendment demands Alexander establish that any reporting was done with actual malice.  As the Supreme Court and Fourth Circuit have held, the actual malice standard applies to all claims arising from publications, including all of the claims asserted here.  As his pleading shows, Alexander cannot meet that standard.  Even if he could, he cannot establish the elements of any of his claims.

The merits of those claims, however, need not be reached, as this Court lacks jurisdiction over Adweek.  Neither the Company nor the reporter have sufficient connections to Virginia to trigger jurisdiction.  Although Alexander lives here, that fact alone is insufficient, as Adweek's

1

Internet-based reporting was targeted at the advertising industry nationwide.  Accordingly, as explained below, Alexander's claims should be dismissed for lack of jurisdiction or on the merits.

## FACTUAL BACKGROUND[1]

### A.    Alexander's Forced Resignation Following Accusations of Sexual Harassment

Plaintiff Joe Alexander is the "hugely successful and incredibly popular" former Chief Creative Officer ("CCO") at The Martin Agency ("Agency").  Am. Compl. ("FAC") ¶¶ 2, 4.  He became famous for his critically acclaimed advertisements for companies ranging from GEICO to Oreo and for civic endeavors ranging from Donate Life to the JFK Presidential Library.  *See id.* ¶ 2.  In 2017, Alexander was ranked the "#1 Chief Creative Officer in the world" by the One Club, "one of the most prestigious awards competitions in advertising."  *Id.* ¶ 2 & n.4.

On November 21, 2017, Alexander was called to a meeting with the Agency's CEO and President.  *Id.* ¶ 41.  They told Alexander that "'someone' had 'filed' a sexual harassment complaint against" him and "it looked 'bad.'"  *Id.*  This was not the first complaint against Alexander.  A few years earlier, an Agency employee "made a claim . . . that she had been sexually harassed" by him.  *Id.* ¶¶ 3, 68.  That claim resulted in a confidential settlement.  *Id.*  In the wake of the latest complaint, Alexander was told that he could either resign or fight the charge, which likely would result in his termination.  *Id.* ¶ 41.

Nine days later, Alexander again met with the Agency's CEO and President.  *Id.* ¶ 51.  At that meeting, they informed Alexander that he was the subject of ten separate sexual harassment

---

[1] For purposes of this motion, Alexander's allegations are accepted as true.  *See Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  In addition to those allegations, the publications cited to and linked in his Complaint are properly considered on a motion to dismiss because they are "integral to and explicitly relied on in the complaint." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  Copies of the publications cited in this Brief are attached as exhibits to the Declaration of Michael Berry ("Berry Decl.").

complaints.  *Id.*  Again, the President told him that "it 'doesn't look good,'" comparing

Alexander's situation to the terminations of disgraced celebrities, Matt Lauer and Garrison

Keillor.  *Id.*  The CEO gave Alexander one day to decide whether to resign.  *Id.*

The next day, December 1, Alexander met with human resources representatives from the

Agency and its parent company.  *Id.* ¶ 54.  They identified one of the women who filed a sexual

harassment claim against him and described other incidents of harassment.  *Id.* ¶¶ 54-56.

Although Alexander contested the claims, he submitted a "forced resignation letter."  *Id.* ¶ 59.

That afternoon, the Agency's CEO announced that "Alexander is no longer employed by

the agency."  *Id.* ¶ 60. At the same time, the Agency "scrubbed" Alexander's "entire history and

presence" from its "website and social media – articles, bios, awards, photos."  *Id.* ¶ 61.

An hour after that announcement, Adweek reported that the Agency "parted ways" with

Alexander.  *Id.* ¶ 62; Berry Decl. Ex. A at 2.  That report included a statement from the Agency

confirming that "Alexander is no longer with our company," but declining to provide any

additional information or explain his sudden departure.  *Id.*  Adweek noted that "Alexander did

not respond to emails or social media messages" seeking comment.  *Id.*

Over the following days, as "speculation about [Alexander]'s termination spread like a

wildfire," he responded by "post[ing] a statement on Facebook."  FAC ¶¶ 63, 66.  Yet, as

Alexander acknowledges, public accusations of his sexual harassment had been rampant for

many weeks before:  In October 2017, an anonymous group of people in the advertising industry

who called themselves Diet Madison Avenue ("DMA") launched a campaign against ad

executives it claimed had histories of sexual harassment.  *Id.* ¶ 6.  In fact, "DMA was started to

'expose'" Alexander.  *Id.*  For DMA, the Agency became "ground zero," as it began publishing

"salacious statements" about Alexander's misconduct on social media.  *Id.* ¶¶ 6, 38, 69.  During

this time, the Agency told DMA that Alexander "sexually harassed Martin employees," *id.* ¶ 3, and "disclosed" information about his record of harassment, including the "confidential settlement agreement and the contents of other confidential Martin HR/files reports." *Id.* ¶ 31; *see also id.* ¶¶ 3, 76.  After Alexander was forced to resign, DMA "took full credit." *Id.* ¶ 76.

Then, on December 6, 2017, a national trade publication called AdAge broke the news that Alexander's "high-profile exit" "followed an internal investigation into an allegation of sexual harassment." *Id.* ¶ 39; Berry Decl. Ex. N at 1-2.  The AdAge article reported that the Agency declined to comment, except to explain that "[t]here are instances when we're unable to provide details in deference to the request of individuals who have come forward to report actions of others that are inconsistent with our values." *Id.* at 2.  For his part, Alexander was quoted as saying that he resigned to avoid "a drawn-out, hurtful investigation" and requesting to "[p]lease respect my privacy during this very, very sad time." *Id.*; FAC ¶ 67.

B.      **Adweek's Reporting on the Sexual Harassment Allegations Against Alexander**

On the same day that AdAge reported on the reason for Alexander's sudden departure, Patrick Coffee, then a senior editor and reporter for *Adweek*, contacted Alexander "to advise" him that Adweek was preparing its own report that Alexander was forced out of the Agency "after multiple female employees filed sexual harassment complaints against [him]." FAC ¶ 68. Alexander provided a statement denying the claims against him.  Berry Decl. Ex. B at 2-3.

On December 7, Adweek published its report titled *The Martin Agency Chief Creative Officer Joe Alexander Exited After Multiple Sexual Harassment Complaints, Sources Say:  He Denies the Allegations*.  FAC ¶ 69; Berry Decl. Ex. B.  The article reported that Adweek had spoken to eleven people who worked with Alexander, including two who went on the record. Berry Decl. Ex. B at 2-3.  Those former colleagues described his sexual harassment going back

to the 1990s.  *Id.* at 2.  The article also reported on the settlement Alexander entered after being

accused of sexual harassment just a few years before.  *Id.* at 3-4. The article noted the Agency

would not "provide details . . . of individuals who have come forward," but its spokesman

explained that "[i]n this case, as soon as [the Agency's parent company] was made aware of

these allegations, we made sure that the right action was taken."  *Id.* at 2.  Although Alexander

now calls the article a "hit piece," he admits Adweek sought his comment in advance, FAC ¶ 68,

and then published his response, "[t]he allegations you are reporting on are false.  All of them."

Berry Decl. Ex. B at 2.

That same day, the Agency released a memo to its employees and the press stating that

the "behavior" that Alexander was "accused of is inexcusable.  That's why the only alternative

was for him to leave The Martin Agency.  That decision was ours."  FAC ¶ 74; Berry Decl. Ex.

C.  The memo also explained that the Agency had sought to "protect the anonymity of the person

who came forward.  She deserves that."  *Id.* at 3.

Less than a week later, Alexander signed a separation agreement with the Agency,

releasing all claims relating to his sudden departure.  Dkt. 9-4.  That agreement made clear that

he had been "accused of inappropriate workplace conduct, such as sexual harassment."  *Id.* at 8;

*see* Dkt. 16 at 7 (acknowledging signing agreement after being "accused" by multiple "women").

Within days, other media – including *The Wall Street Journal* and *Richmond Times-*

*Dispatch* – published reports of additional allegations against Alexander.  *See* FAC ¶¶ 11, 33;

Berry Decl. Exs. O, P.  And, in the following weeks and months, media around the country

continued to publish reports about the #MeToo movement in the advertising industry, some of

which mentioned Alexander's departure.  FAC ¶¶ 9, 73; *see also, e.g.*, Berry Decl. Ex Q.

**C.**     **This Action**

Nearly two years after Alexander's resignation and Adweek's report about the long

history of sexual harassment allegations against him, Alexander filed this lawsuit seeking $25 million.  *See* Dkt. 1.  Alexander asserts claims against DMA, alleged members of DMA, and Adweek for tortious interference with contract and prospective business, common law conspiracy, aiding and abetting, defamation, and intentional infliction of emotional distress.  As detailed below, Adweek is not subject to jurisdiction here, and, even if it was, Alexander cannot state any claim against it as a matter of well-established constitutional and common law.

**ARGUMENT**

## I.   THIS COURT LACKS PERSONAL JURISDICTION OVER ADWEEK.

This action should be dismissed because the Court lacks personal jurisdiction over the LLC and Coffee.  Alexander does not contend the Court has general personal jurisdiction over either Defendant.  Nor could he.[2]  Thus, the sole possible basis for jurisdiction is specific jurisdiction, which only "exists in a forum when the suit arises out of a defendant's specific contacts with that forum."  *Handy v. Johnson & Johnson*, 2017 U.S. Dist. LEXIS 204533, at *5 (E.D. Va. Dec. 12, 2017).  Specific jurisdiction only can be exercised within the constitutional requirements of due process.  *E.g.*, *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005); *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002).  To satisfy those requirements, "the defendant's suit-related conduct must create a substantial connection with the forum State."  *Walden v. Firoe*, 571 U.S. 277, 284 (2014).

The Complaint's conclusory assertion that all of the defendants are subject to specific personal jurisdiction in this Court, *see* FAC ¶ 14, is insufficient to meet that burden.  *See Haskins*

---

[2] Coffee is domiciled in New York, and the LLC is neither headquartered nor organized in Virginia.  Decl. of P. Coffee ("Coffee Decl.") ¶ 2; Decl. of J. Litvack ("Litvack Decl.") ¶ 3.  Thus, the paradigm bases for general jurisdiction are not met, and Alexander does not allege any contacts with Virginia that would make either defendant "essentially at home" here.  *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

*v. Wash. Adventist Hosp.*, 2012 U.S. Dist. LEXIS 3255, at *4-5 (E.D. Va. Jan. 11, 2012).  In essence, Alexander argues that because he lives in Virginia and was allegedly injured here, that is enough.  But that is simply not the law:  "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [it] to the forum in a meaningful way."  *Walden*, 571 U.S. at 290.  As the Fourth Circuit has explained, "[a]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the [jurisdictional] inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld."  *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997).  Indeed, the Supreme Court has instructed this "analysis looks to the defendant's contacts with the forum State itself," and "the plaintiff cannot be the only link between the defendant and the forum."  *Walden*, 571 U.S. at 284-86.

Neither the LLC's nor Coffee's contacts with Virginia is sufficient to trigger jurisdiction.  The LLC publishes the eponymous trade publication *Adweek*, which covers the ad industry nationally and has a substantial readership around the country.  FAC ¶ 8; Litvack Decl. ¶¶ 2, 9.  The LLC is a Delaware company based in New York, has never had an office in Virginia, does not employ anyone in Virginia, and has no assets in the Commonwealth.  *See* Litvack Decl. ¶¶ 3,4, 5, 7, 8.  Although the LLC has a small number of paid subscribers in Virginia (1.2% of total paid subscribers), derives some minor advertising revenue from customers with Virginia addresses (2% of revenue), *id.* ¶¶ 9-10, and at times covers advertising companies based here, none of those limited contacts satisfy due process requirements, which focus on "the defendant's suit-related conduct."  *Walden*, 571 U.S. at 284.

Coffee does not have any current connection to Virginia.  He lives and works in New York.  Coffee Decl. ¶¶ 2, 5, 6, 8-9.  He lived in Virginia between 1994 and 1996, when in high

school.  *Id.*  ¶ 3.  Since then, he has never lived, worked, or visited here.  *Id*.  He does not own or

rent real estate or hold personal property, do business, or derive income from here.  *Id.* ¶ 4.

Alexander apparently seeks to overcome these tenuous connections to Virginia by

alleging that jurisdiction is proper because Adweek "published false and defamatory statements

in Virginia," FAC ¶ 14, but the various Adweek articles and tweets referenced in the Complaint

were not written in or reported from Virginia.  Coffee Decl. ¶¶ 7-9.[3]

Moreover, "a person who simply places information on the Internet does not subject

himself to jurisdiction in each State into which the electronic signal is transmitted and received,"

even if the plaintiff is injured in the State.  *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293

F.3d 707, 714 (4th Cir. 2002) (holding that Maryland had no jurisdiction for claim by Maryland

company alleging copyright infringement).  Rather, when a case centers on online news reports,

the defendant "must, through the Internet postings, manifest an intent to target and focus on

Virginia readers."  *Young*, 315 F.3d at 263.

Here, Alexander concedes that news of his termination "rocked the advertising industry"

and Adweek's reporting about him was "a national public voice."  FAC ¶¶ 1, 69; *see also id.* ¶ 8

(recognizing that LLC publishes information of interest to the advertising industry worldwide).

Indeed, several of the Adweek reports referenced in the Complaint mention that Alexander's

departure amid sexual harassment allegations was one of the advertising industry's biggest news

stories of the year.  *Id.* ¶ 9 (referencing articles titled *5 Most Important Ad Industry Stories of

2018* and *20 Biggest AgencySpy Posts of 2018*); Berry Decl. Exs. L-M.  And, as the Complaint

makes clear, the issue of sexual harassment in advertising agencies was a national issue that

_____

[3] Coffee was not physically present here for any of his reporting.  Coffee Decl. ¶¶ 7-9.  And,
although Coffee communicated with a few sources in Virginia, including Alexander, he also
communicated with many people in different places.  *Id.* ¶ 9.

captured the attention of people from coast to coast.  *See, e.g.*, FAC ¶¶ 6-12, 25, 27, 48.  The reporting about Alexander's departure was of interest nationally and internationally because it demonstrated how "#MeToo Came to Madison Avenue."  *Id.* ¶ 9.

Courts in this Circuit repeatedly have ruled that jurisdiction is lacking in cases involving similar circumstances.  For example, in *FireClean, LLC v. Tuohy*, 2016 U.S. Dist. LEXIS 96294 (E.D. Va. July 21, 2016), FireClean, a manufacturer of gun oil headquartered and organized in Virginia, sued Tuohy for allegedly defamatory posts on his firearms blog.  *Id.* at *1-2.  Although Touhy was domiciled in Arizona, FireClean claimed jurisdiction in Virginia was proper because (1) Touhy had exchanged numerous emails, text messages, and phone calls with FireClean's Virginia-based owner while conducting his reporting, (2) samples of FireClean's oil had been sent to Touhy from Virginia, (3) about 1% of the blog's readers were in Virginia, and (4) the statements were "aimed . . . . at a Virginia company with full awareness that FireClean would feel the harmful effects of those statements in Virginia."  *Id.* at *16-17.

The court found those contacts insufficient and granted a motion to dismiss for lack of jurisdiction.  It noted that Touhy's non-Internet contacts were "minimal":

> Tuohy has no home, office, or property in Virginia.  He did not write any of the allegedly defamatory statements in Virginia.  Nor did he travel to Virginia to investigate the allegedly defamatory articles and comments.  He has no on-going business in Virginia and has visited the Commonwealth only twice for reasons unrelated to this lawsuit.  His only communications into Virginia when preparing these articles were "several" phone calls, texts, or emails [to FireClean's owner].

*Id.* at *18.  The court rejected FireClean's argument that its Virginia incorporation, headquarters, and injury were sufficient to trigger jurisdiction.  As the court explained, "[a]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld."  *Id.* at *25 (citation omitted).

The blog posts at issue did not "demonstrate an attempt to attract a Virginia audience." *Id.* at \*21.  Rather, they addressed a topic of interest "to a nationwide audience of firearms enthusiasts and had no special appeal for Virginia readers."  *Id.*[4]  Touhy's blog itself also did not focus on Virginia – it "aim[ed] to distribute Tuohy's opinions to the nationwide marketplace of consumers of firearms and associated equipment."  *Id.* at \*20.  Although about 1% of the blog's readers lived in Virginia, that fact did not confer jurisdiction as the readership's location was "random, fortuitous, or attenuated."  *Id.* at \*20-21 ("Contacts of that kind do not indicate purposeful targeting of a Virginia audience.").

 Similarly, in *KMLLC Media, LLC v. Telemetry, Inc.*,  2015 U.S. Dist. LEXIS 145764, (E.D. Va. Oct. 27, 2015), the court held that it did not have jurisdiction over a foreign defendant that had prepared a report about a Virginia-based company's fraudulent internet advertising scheme.  The defendant shared the report with AdAge, which then published an article about the report online.  *Id.* at \*3.  Although the report noted the plaintiff's location in Virginia, its focus was on the plaintiff's fraudulent scheme and had "no focus on Virginia."  *Id.* at \*25-26.  As the court explained, the report "targeted the entire online advertising industry; an industry that spans the Internet, not just Northern Virginia (or wherever Plaintiff was domiciled)," and "[p]laintiff would have experienced [the same harm] wherever else they might have [been headquartered] and found themselves [answering to clients] who read the article."  *Id.*

Likewise, in *Young v. New Haven Advocate*, 315 F.3d 256, the Fourth Circuit ruled that a Virginia court could not exercise jurisdiction over two Connecticut newspapers in an action filed by a Virginia prison warden.  The case arose from Internet articles about Connecticut's decision

---

[4] Although the posts never referenced Virginia and did not mention FireClean's connection to Virginia, that fact made no difference, as "even overt references to a State may be jurisdictionally insufficient if the focus of the article is elsewhere."  *Id.*

to incarcerate prisoners in Virginia and that discussed a lawsuit filed against the Virginia warden. *Id.* at 259, 264.  Although the warden claimed the online articles defamed him in Virginia, and although the reporting included a discussion of the conditions at a Virginia prison and mentioned the warden by name, the Fourth Circuit ruled there was no jurisdiction because the articles were not posted "with the manifest intent of targeting Virginia readers."  *Id.* at 263-64; *see also Marom v. Town of Greenburgh*, 2018 U.S. Dist. LEXIS 117607, at *3-6 (E.D.N.C. July 16, 2018) (no personal jurisdiction based on Internet publication).

As in *FireClean*, *KMLLC Media*, and *Young*, Adweek's reporting was not aimed at Virginia.  It addressed a topic of national interest involving accusations against a well-known ad executive with clients around the country.  *See supra* at 2, 4-5; *infra* at 24-25.  Under Fourth Circuit precedent, the claims against Adweek should be dismissed for lack of jurisdiction.

## II.    ALEXANDER CANNOT STATE ANY VIABLE CLAIM.

To the extent that Adweek is subject to jurisdiction here, Alexander cannot state a viable claim against it.  Anticipating that he cannot pursue a defamation claim for the so-called Adweek "hit piece" reporting on the many sexual harassment allegations against him because it is facially barred by the one-year statute of limitations, Alexander seeks to hold Adweek liable for that and other time-barred publications by giving his claims other names, like "tortious interference" and "intentional infliction."  He cannot pursue those claims, however, because he cannot satisfy their basic elements.  In addition, long-standing Supreme Court precedent blocks Alexander from attempting this kind of constitutional end-run by requiring public figures like him to establish actual malice to pursue any publication-based tort claim.  He cannot meet that burden.  And, to the extent Virginia law applies, Adweek is "immune from civil liability" for Alexander's tortious interference and defamation claims:  Those claims indisputably arise from Adweek's "statements

. . . regarding matters of public concern," those statements are "protected under the First Amendment," and, as detailed below, they were not made with "actual or constructive knowledge that they are false or with reckless disregard for whether they are false."  Va. Code § 8.01-223.2(A).[5]  The bottom line, as detailed below, is that despite Alexander's artful pleading, he cannot state any viable claim for multiple reasons.

### A.   Alexander Cannot State a Defamation Claim.

#### 1.   The Statute of Limitations Bars Any Claim Arising From Most of the Adweek Publications.

The statute of limitations for defamation is one year, running from the time of initial publication.  *See* Va. Code § 8.01-247.1.  Alexander's Complaint cites thirteen different Adweek articles and tweets, *see* FAC ¶¶ 9 & n.8, 21 n.13, 62, 69, 74, 75, 93, but does not specify which of those publications Alexander claims are defamatory, *see id.* ¶¶ 109-15.  This ambiguity does not matter:  Ten, including the "hit piece," were published more than a year before Alexander filed suit on September 19, 2019, and thus cannot be the basis of any defamation claim.[6]

---

[5] For purposes of this Motion, Adweek assumes Virginia law applies, even though the various publications at issue were published in New York, as the two states' laws are consistent on the issues raised for dismissal.  *But see Jeffrey J. Nelson & Assocs. v. LePore*, 2012 U.S. Dist. LEXIS 93097, at *26 (E.D. Va. July 5, 2012) (Virginia follows the principle of *lex loci delicti* for tort claims and "looks to where the statement was published" for publication-related claims).

[6] *See* FAC ¶ 62 (December 1, 2017 article titled *The Martin Agency's Chief Creative Officer Joe Alexander Is Out After 26 Years*); *id.* ¶ 69 (December 7, 2017 article titled *The Martin Agency Chief Creative Officer Joe Alexander Exited After Multiple Sexual Harassment Complaints, Sources Say*); *id.* ¶ 74 (December 7, 2017 article titled *The Martin Agency Releases Internal Memo Promising to 'Get Better' in Wake of Harassment Scandal*); *id.* ¶ 75 (December 8, 2017 article titled *A Martin Agency Account Supervisor Offers Her Perspective With #NotMyMartin Post*); *id.* ¶ 9 (January 26, 2018 article titled *The Martin Agency Promotes Karen Costello to CCO in the Wake of Joe Alexander's Scandalous Departure*); *id.* ¶ 9 n.8 (January 26, 2018 Facebook post linking to the article published that day); *id.* ¶ 62 (January 26, 2018 tweet linking to the same article); *id.* ¶ 9 (April 8, 2018 article titled *When #MeToo Came to Madison Avenue*); *id.* (September 11, 2018 article titled *The Martin Agency Turns Joe Alexander's Old Office Into a Meeting Room and Doghouse*); *id.* ¶ 9 n.8 (September 11, 2018 tweet linking to the article published that day); *see also* Berry Decl. Exs. A-J (copies of articles and tweets).

Alexander appears to contend that claims based on these publications are nevertheless

timely because they were republished by *others* within one year of his filing of this action.  *See*

*id.* ¶¶ 73, 110.  This contention flouts black-letter law:  "Although subsequent distribution of a

defamatory statement may continue to increase plaintiff's compensable damages, it does not

create independent actions or start the statute of limitations running anew."  *Katz v. Odin,*

*Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 918 (E.D. Va. 2004); *see also, e.g.*, *Doe v.*

*Roe*, 295 F. Supp. 3d 664, 673 (E.D. Va. 2018) (recognizing that verbatim recitation and

distribution would not constitute separate and distinct publication).  This "single publication"

rule is designed "to protect publishers from repeated liability based on old publications that

might be reprinted."  *Doe*, 295 F. Supp. 3d at 673 n.10 (citation omitted).  The rule bars

Alexander from resuscitating his stale claims for these dated publications.[7]

### 2.    The Other Three Publications Are Indisputably True.

Under the First Amendment and common law, Alexander bears the burden of pleading

that Adweek's publications include false statements of fact.  *E.g.*, *Phila. Newspapers v. Hepps*,

475 U.S. 767, 776 (1986); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183 (4th Cir. 1998);

*Va. Citizens Def. League v. Couric*, 2017 U.S. Dist. LEXIS 83308, at *8 (E.D. Va. May 31,

2017) (Virginia law), *aff'd on other grounds*, 910 F.3d 780 (4th Cir. 2018).  Alexander can meet

this burden only by establishing that any alleged falsity is material.  *Masson v. New Yorker*

*Magazine, Inc.*, 501 U.S. 496, 517 (1991).  As the Supreme Court has explained, in assessing

whether a statement is materially false, the statement's gist and sting are considered, and the

statement is considered materially false only if it would "have a different effect on the mind of

---

[7] In addition, the posting of a hyperlink to Adweek's articles or tweets does not constitute
republication and cannot trigger any new claims based on those articles and tweets.  *See, e.g.*, *In*
*re Phila. Newspapers, LLC*, 690 F.3d 161, 174-75 (3d Cir. 2012) (collecting cases).

13

the reader from that which the pleaded truth would have produced." *Id.*

In a single paragraph of his Complaint, Alexander references three articles and tweets that were published less than a year before he filed suit, FAC ¶ 9, but does not attempt to describe how they (or any of the other publications cited in that paragraph) are materially false. They are not; none of the three contains a false statement of fact:

First, the Complaint quotes a tweet from Coffee, which provided a link to an article published by *Refinery 29* and stated "The Martin Agency one year after the Joe Alexander sexual harassment scandal blew up the ad industry." *Id.* The description of an event as a "scandal" is a statement of opinion, incapable of bring proven true or false. *See, e.g.*, *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) (description of production as a "a rip-off, a fraud, a scandal, a snake-oil job" is opinion that cannot be "disprove[n]"); *Hodge v. E. Bay Express*, 2013 Cal. App. Unpub. LEXIS 2892, at *32 (Cal. Ct. App. Apr. 25, 2013) (statement that appellant's tenure on a community college board had been "plagued with scandal" was opinion). And, to the extent that describing Alexander's departure as a "scandal" could be deemed a statement of fact, it is indisputably true – Alexander was admittedly forced to resign by the Agency amidst accusations of sexual harassment and an effort by Alexander to avoid a "hurtful investigation." FAC ¶¶ 11, 12, 63, 67, 74, 84. And, Alexander's termination was (1) preceded by the Agency disclosing a confidential agreement and "HR files/reports," and DMA launching a social media campaign to "expose" him; and (2) followed by public accusations by former co-workers, "widespread speculation," and a memo from the Agency apologizing to employees who "felt unsafe and unheard." *See supra* at 4-5; FAC ¶¶ 11, 12, 63, 67, 74, 84.

Second, the Complaint quotes an article titled *The 5 Most Important Ad Industry Stories of 2018* as saying, "Misogyny and advertising have an unfortunate and well-documented history

14

. . . . This year, the conversation unquestionably changed; whether that change was dramatic

enough to permanently impact the industry for the better remains a matter for debate.  #MeToo

officially hit the business in December 2017, when The Martin Agency fired CCO Joe

Alexander." FAC ¶ 9.  This statement is true.  Alexander concedes that misogyny exists in the

advertising industry, he was fired because of #MeToo-related allegations, and his termination

"rocked the advertising industry."  *E.g.*, *id.* ¶¶ 1, 2, 6, 27-30, 39-40, 79 & n.26.

Third, the Complaint quotes an article titled *The 20 Biggest AgencySpy Posts of 2018* as

saying, "However you may now feel about Diet Madison Avenue, the group exerted a huge

influence over the calendar year.  After the departure of The Martin Agency chief creative Joe

Alexander last December, 2018 became the year #MeToo finally arrived as the industry maybe,

finally began to grapple with endemic abuses of power."  *Id.* ¶ 9.  This article again merely

reports the undisputed fact of Alexander's sudden departure following allegations of sexual

harassment.  *Id.* ¶¶ 41, 51, 54, 56, 59, 61, 63.  And, his Complaint highlights the central role

DMA and the #MeToo movement purportedly played in his departure.[8]

In sum, Alexander's defamation claim is barred because of the one-year statute of

limitations and the indisputable truth of Adweek's reporting.

### B.    Adweek Did Not Tortiously Interfere with Alexander's Contract.

Tortious interference with contract requires a plaintiff to allege, among other things, that

a valid contract existed at the time of the defendant's actions and that those actions caused the

termination of that contract.  *See Peterson v. Cooley*, 142 F.3d 181, 186 (4th Cir. 1998).  The

---

[8] By only discussing the truth of these three publications, Adweek does not mean to suggest that its other articles reported anything false about Alexander.  All of its reporting was accurate.  Adweek has addressed only those three publications to ensure compliance with the Court's 30-page limit on briefs and because any defamation claim based on the other articles is plainly time-barred and prohibited by the First Amendment's actual malice requirement, *see infra* at 22-30.

plaintiff "must plead facts that show that [defendant's] conduct was the cause of the loss alleged in the Complaint." *Goulmamine v. CVS Pharm., Inc.*, 138 F. Supp. 3d 652, 672 (E.D. Va. 2015).

Here, Alexander's allegations demonstrate conclusively that Adweek did not have anything to do with the termination of his contract with the Agency. His Complaint makes clear that by the time Adweek did anything, there was no contract left to breach. Adweek's first action was reporting on Alexander's departure from the Agency, and that report was published after he resigned and his presence was "scrubbed" from the Agency's website. FAC ¶¶ 54-62; *see also id.* ¶ 3 ("*After Martin terminated Joe*, Adweek and Coffee hungrily published the false and defamatory statements received from DMA and Martin . . . .") (emphasis added).

### C.   Alexander Cannot State a Claim Against Adweek for Tortious Interference with Prospective Economic Advantage.

Alexander's other tortious interference claim fails for four separate reasons:

First, Alexander fails to allege a "*specific* . . . business expectancy with which [Adweek] allegedly interfered." *Mirafuentes v. Estevez*, 2015 U.S. Dist. LEXIS 166157, at \*15-17 (E.D. Va. Nov. 30, 2015) (citation omitted). The Complaint alleges only that "[a]fter December 1, 2017, [Alexander] had a handful of opportunities to work on freelance campaigns." FAC ¶ 92. The law is clear, however, that a "general inability to obtain employment" is not sufficient. *Cerick v. Central Fid. Bank*, 19 Va. Cir. 1, 2 (Va. Cir. Ct. 1989). Indeed, a plaintiff's failure to identify a specific business expectancy is "fatal to [his] claim." *Mirafuentes*, 2015 U.S. Dist. LEXIS at \*17 (dismissing complaint that did "not actually state by name the individuals or businesses with which [plaintiff] had business relationships").

Second, even if a specific business expectation was alleged, Alexander would need to show, in a non-conclusory way, that Adweek knew of that expectation. *See Advanfort Co. v. Int'l Registries, Inc.*, 2015 U.S. Dist. LEXIS 62125, at \*12-13 (E.D. Va. May 12, 2015);

*Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001). Alexander, however, merely alleges that the "Defendants" generally were aware that he was attempting to find work, FAC ¶ 91, not that Adweek specifically knew of any particular business opportunity.

Third, Virginia law "requires a competitive relationship between the party interfered with and the interferor." *Cox v. MAG Mut. Ins. Co.,* 2015 U.S. Dist. LEXIS 46502, at *20 (E.D. Va. Apr. 9, 2015) (internal quotation marks omitted); *accord Wenzel v. Knight*, 2015 U.S. Dist. LEXIS 70536, at *23 (E.D. Va. June 1, 2015). Adweek and Alexander are not competitors. Alexander is a creative who works as an advertising executive, while Adweek conducts journalism about the advertising industry. FAC ¶¶ 2, 8-9.

Fourth, a plaintiff must allege "contact by the defendant with the source of the plaintiff's business expectancy, direct or indirect." *17th Street Assocs., LLP v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 600-01 (E.D. Va. 2005). Here, Adweek's alleged conduct, publishing news reports to the public, does not satisfy this element. *See Cominelli v. Rector & Visitors of the Univ. of Va.*, 589 F. Supp. 2d 706, 716-17 (W.D. Va. 2008) (publication of email "with knowledge that its contents might be shared . . . is not the form of indirect contact required to state a prima facie case of intentional interference").

**D.**     **Alexander Cannot State a Conspiracy Claim Against Adweek.**

Alexander alleges that "[t]he Defendants," including Adweek, engaged in a "conspiracy to tortiously interfere with contract and reasonable business expectations." FAC ¶ 102. Because he cannot state a tortious interference claim, however, Alexander cannot pursue a conspiracy claim: "Where there is no actionable claim for the underlying alleged wrong, there can be no

action for civil conspiracy based on that wrong." *Beasley v. FV-I, Inc.*, 2013 U.S. Dist. LEXIS 39640, at *13 (E.D. Va. Mar. 21, 2013) (internal quotation marks omitted).

In addition, a complaint that "neither identifies nor details any sort of agreement between the defendants" and does not "describe the manner in which the defendants colluded" fails to state a conspiracy claim. *Cox*, 2015 U.S. Dist. LEXIS 46502, at *23. Alexander offers only conclusory allegations about the existence of a conspiracy, *see* FAC ¶ 98-101, providing no details about the alleged agreement or how Adweek supposedly colluded with DMA. Thus, even if the tortious interference claims survive, Alexander's conspiracy claim should be dismissed.

### E.  Alexander Cannot State a Claim for Intentional Infliction of Emotional Distress.

As this Court has recognized, "[t]he law does 'not favor[ ]'" claims for intentional infliction of emotional distress ("IIED"). *Jordan v. Donahoe*, 2013 U.S. Dist. LEXIS 83471, at *18 (E.D. Va. June 13, 2013) (quoting *Supervalu, Inc. v. Johnson*, 276 Va. 356, 370 (2008)). Alexander has failed to adequately allege at least three elements of an IIED claim:

First, the conduct attributed to Adweek, publishing articles reporting on Alexander's termination and the allegations against him, *see* FAC ¶ 117, is not "outrageous," *Russo v. White*, 241 Va. 23, 27 (1991) (holding that liability attaches only "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"). By the time Adweek published its report detailing allegations of sexual harassment, AdAge already reported that Alexander resigned amid an "allegation of sexual harassment," Alexander acknowledged that was true, and the Agency had told Adweek that when it "was made aware of these allegations, we made sure that the right action was taken." *Supra* at 4-5. Adweek spoke to many sources, including Alexander himself, and included his denial in its report. *See* Berry

18

Decl. Ex. B at 2-3.  Adweek's conduct was not outrageous; it was journalism.[9]

Analogously, courts in this Circuit repeatedly have dismissed IIED claims based on claims that the plaintiff was subjected to false allegations of workplace misconduct.  *See, e.g.*, *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 217 (4th Cir. 2015) (no claim for "malicious campaign of retaliation," including "making statements that clearly implied that [he] was a pedophile"); *Crittendon v. Arai Ams., Inc.*  2014 U.S. Dist. LEXIS 576, at *17-18 (E.D. Va. Jan. 2, 2014) (no claim based on filing "false reports and inform[ing] others that Plaintiff had stolen money or committed financial improprieties" and "ask[ing] other employees to file false reports to injure Plaintiff's reputation and have her employment terminated"); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 265 (W.D. Va. 2001) (no claim based on "allegedly false statements that [plaintiff] was fired for theft" even though statements "were made with the intent to destroy his reputation").  As one court put it, "a false charge of sexual harassment, although reprehensible, does not rise to the level of outrage required to recover under a cause of action that is limited to only the most egregious of acts."  *Wolff v. City of N.Y. Fin. Servs. Agency*, 939 F. Supp. 258, 264 (S.D.N.Y. 1996).

Second, Alexander has failed to plead facts showing that he actually experienced severe emotional distress.  Under Virginia law, "liability arises only with emotional distress so extreme and severe that no reasonable person could be expected to endure it."  *Jordan*, 2013 U.S. Dist. LEXIS 83471, at *18.  To survive a motion to dismiss, a plaintiff "must provide facts to support

---

[9] In one case, the Fourth Circuit held that allegations about the publication of a defamatory article were sufficiently outrageous to survive a motion to dismiss.  *See Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005).  In allowing that IIED claim to proceed, however, the court stressed the defendant allegedly engaged in misconduct not present here – specifically, it "intentionally published false charges accusing [the plaintiff] of being responsible for anthrax mailings that resulted in five deaths, without regard for the truth of those charges and without giving [him] an opportunity to respond" and "refus[ing] to permit comment by" his counsel.  *Id.*

th[e] conclusion" that he experienced such "severe emotional distress"; pleading distress "in a conclusory fashion" requires dismissal. *Boyce v. Bennett*, 2014 U.S. Dist. LEXIS 190446, at *20 (E.D. Va. Oct. 30, 2014) (dismissing IIED claim); *accord Zaklit v. Glob. Linguist Sols., LLC*, 2014 U.S. Dist. LEXIS 92623, at *48-49 (E.D. Va. July 8, 2014) ("bare and conclusory assertions are insufficient"). Here, Alexander alleges that he "suffer[ed] severe emotional distress," and "extreme fear and panic" and then provides a laundry list of supposed distress. FAC ¶¶ 119, 121. These vague and conclusory allegations are identical to allegations other courts in this District have ruled are insufficient. *See, e.g.*, *Zaklit*, 2014 U.S. Dist. LEXIS 92623, at *48-49 (granting motion to dismiss); *Ortiz v. Panera Bread Co.*, 2011 U.S. Dist. LEXIS 85463, at *19 (E.D. Va. Aug. 2, 2011) (same).

Finally, Alexander cannot plausibly allege that Adweek caused whatever emotional distress he allegedly "suffered." Here, the Complaint provides an "obvious alternative explanation" for Alexander's supposed distress. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). Before Adweek published a word, he was confronted with allegations of sexual harassment and forced to resign. *See, e.g.*, FAC ¶¶ 56, 59. In the aftermath of that resignation, Alexander's legacy was "scrubbed" from the Agency, "speculation about Joe's termination spread like a wildfire," and AdAge published a report that he was forced out following a complaint of sexual harassment. FAC ¶¶ 61, 63, 67. At that point, Alexander admittedly was "deeply hurt" and "upset," and was dealing with a "very, very sad time." *Id.* ¶¶ 43, 52, 64, 67. Then, the Agency publicly released its memo about Alexander's "inexcusable" conduct, and, within days of Adweek publishing its supposed "hit piece," investigative reports detailing more about his long history of sexual misconduct were published by *The Wall Street Journal*, the *Richmond Times-Dispatch*, and others. *Id.* ¶¶ 11 & n. 9-10, 12, 74, 76-77. Given these allegations and the

20

widespread publicity of the reasons for his termination, it is implausible that Adweek caused Alexander's distress.

### F. Alexander Cannot State a Claim for Aiding and Abetting.

In the FAC, Alexander claims Adweek "aided and abetted Martin's breaches of fiduciary duty and breaches of trust" by "receiving" and "publishing confidential information," including "HR reports and files" about Alexander.  FAC ¶ 106.  If Virginia law recognizes a civil claim for "aiding and abetting," Alexander would be required to show Adweek "had 'actual knowledge' of the other's breach of fiduciary duty" and "knowingly participated in the breach."  *Quinn v. Knight*, 2016 U.S. Dist. LEXIS 151346, at *13 (E.D. Va. Nov. 1, 2016) (quoting *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 659-60 (2004)).[10]  To the extent this receipt of information even occurred, Alexander cannot meet this requirement because there was no breach:  Under Virginia law, an employer owes no fiduciary duty to its employee.  *See Myers v. Lee*, 2010 U.S. Dist. LEXIS 69012, at *25 & n.6 (E.D. Va. July 12, 2010); *Wynn v. Wachovia Bank, N.A.*, 2009 U.S. Dist. LEXIS 38250, at *12 (E.D. Va. May 6, 2009).  As a matter of law, "there can be no claim for aiding and abetting of a breach of fiduciary duty without an underlying breach by a fiduciary." *Wenzel v. Knight*, 2015 U.S. Dist. LEXIS 4476, at *10-11 (E.D. Va. Jan. 14, 2015).

Moreover, any "aiding and abetting" claim against Adweek would be barred by the First Amendment.  The Supreme Court has made clear that a third party's "illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern," so long as the press's "access to the information . . . was obtained lawfully."  *Bartnicki v. Vopper*, 532 U.S. 514, 525 (2001); *see Allen v. Beirich*, 2019 U.S. Dist. LEXIS 197183, at *17-18 (D.

---

[10] Although this Court permitted an "aiding and abetting" claim to proceed in *Quinn*, other courts have held such a claim is not recognized in Virginia.  *E.g.*, *Microstrategy Servs. Corp. v. OpenRisk, LLC*, 2015 U.S. Dist. LEXIS 32719, at *8 (E.D. Va. Mar. 17, 2015).

Md. Nov. 13, 2019) ("the fact that the defendants knew the information was confidential and paid for the information does not remove the *Bartnicki* First Amendment protection for publishing that information").  Here, even if the Agency breached some duty to Alexander, Adweek did nothing unlawful in allegedly receiving the HR files and settlement agreement. Thus, the First Amendment protects its right to publish reports based on such documents, given that Alexander's termination following his history of sexual harassment complaints was a matter of immense public concern in the advertising industry.

> **G.    The First Amendment Bars Alexander's Claims Because He Is a Public Figure in the Advertising Industry and Cannot Establish Actual Malice.**

When a public figure like Alexander seeks to bring a defamation claim, the First Amendment mandates that he plead and prove, by clear and convincing evidence, that each allegedly false statement was made with actual malice – that is, the defendant knew the statement was false, "entertained serious doubts as to [its] truth," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or published it with a "high degree of awareness of . . . probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  This "standard is a difficult one for libel plaintiffs to meet." *Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980).[11]

A public figure cannot avoid this constitutional requirement through creative pleading. As the Supreme Court has held, for any tort claim based on allegedly false statements, public figures must establish actual malice.  *See Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (rejecting IIED claim because plaintiff failed to prove actual malice).  A public figure simply cannot "recover defamation-type damages under non-reputational tort claims, without satisfying

---

[11] The Fourth Circuit and "every [other] circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice."  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *accord, e.g.*, *Mayfield v. NASCAR*, 674 F.3d 369, 377-78 (4th Cir. 2012).

the stricter (First Amendment) standards of a defamation claim." *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999). This constitutional principle extends to each of the claims Alexander attempts to make here. *Cf. Shirvinski v. United States Coast Guard*, 673 F.3d 308, 322 (4th Cir. 2012) ("if [a] letter is privileged against suit for defamation, it must also be protected in an action for interference with business.").

### 1.    Alexander Is a Limited-Purpose Public Figure.

A "limited-purpose public figure" is a plaintiff who has injected himself into the "public controversy" that is the subject matter of the challenged publication. *Hatfill*, 532 F.3d at 318. Whether a plaintiff is a limited-purpose public figure hinges on "the nature and extent of [the] individual's participation in the particular controversy giving rise to the defamation." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). Four principal factors are considered in making this determination:  (1) whether the plaintiff "had access to channels of effective communication"; (2) whether he "voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy"; (3) "whether the controversy existed prior to the publication of the defamatory statements"; and (4) whether he "retained public figure status at the time of the alleged defamation." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708-10 (4th Cir. 1991). "Whether a person has achieved the status of a limited-purpose public figure is a question of law," *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001), and can be decided on a motion to dismiss, *see, e.g.*, *Besen v. Parents & Friends of Ex-Gays, Inc.*, 2012 U.S. Dist. LEXIS 58155, at *8 (E.D. Va. Apr. 25, 2012).

Alexander is plainly a public figure for the limited purpose of reporting on his work in the advertising industry generally and the circumstances surrounding his sudden departure from the Agency specifically. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 n.4 (4th Cir.

1993) (plaintiffs were public figures due to  allegations about "nationwide charitable activities

and their long (twenty-years) duration").  As his Complaint explains, Alexander led the team that

developed some of the most beloved advertising campaigns in American culture and was himself

"hugely successful" and "incredibly popular."  FAC ¶¶ 2, 4.  At the time of his termination,

Alexander was "at the top of his career."  *Id.*  In 2017, immediately before the sexual harassment

allegations became public, Alexander was recognized as the "#1 Chief Creative Officer in the

world."  *Id* ¶ 2.[12]  In September 2017, Alexander was featured in an Adweek profile in which he

picked his favorite ads of all time.  *Id.* ¶ 20.  And, in October 20117, the *Richmond Times-*

*Dispatch* "published a lengthy piece" about him, with his photo on the cover of the newspaper's

business section.  *Id.* ¶ 22.  He also had won many national and international honors.  *See id.* ¶¶

2, 5 (recounting numerous honors, including an Emmy Award).  And, he sat on "distinguished

board[s]" and regularly spoke "in the advertising industry and on campuses."  *Id.* ¶ 5.

Alexander was particularly well known for his "strong belief in and practice of diversity

in the workplace."  *Id.* ¶¶ 21, 79.  He was "one of the very first supporters of Free the Bid, a non-

profit initiative advocating on behalf of women directors for equal opportunities to bid on

commercial jobs in the global advertising industry."  *Id.* ¶ 79.  He also regularly sent delegates

"to the 3% Conference," which was started "to increase the number of female creatives in the

advertising industry."  *Id.* ¶ 79 & n.26.  And, he hired "the top three (3) female creatives in the

Agency's history."  *Id.* ¶ 79.  Based on this history, in September 2017, just two months before

his termination, he was honored by an organization "created to galvanize the industry around

improving the level of diversity within advertising and media agencies."  *Id.* ¶ 21 & n.12.

---

[12] Alexander previously was named "the 7th most Creative in the World by Adweek" and "one of the fifty (50) Most Creative People in the World by Ad Age magazine."  FAC ¶ 2.

Alexander also was widely associated with the Agency and its success. *E.g.*, *id.* ¶¶ 2, 5. He had been featured prominently in its website, social media, and marketing, and even wrote a book about The Agency's culture. *E.g.*, *id.* ¶¶ 61, 79. Thus, when he suddenly left the Agency, it was no surprise that "speculation about [his] termination spread like a wildfire." *Id.* ¶ 63. Alexander attempted to influence the growing controversy by posting a statement on Facebook and then releasing a statement to the press. *Id.* ¶¶ 66-67. And, in light of his notoriety, news of Alexander's departure was reported in trade publications and local and national publications like the *Richmond Times-Dispatch* and *The Wall Street Journal*, and continued to be noted by publications in the months and years that followed. *See id.* ¶¶ 11 & n.9-10, 39, 67.

Courts consistently hold that well-known industry executives like Alexander are limited-purpose public figures. As the Fourth Circuit has explained, "[s]omeone who has not attracted general notoriety may nonetheless be a public figure in the context of a particular controversy covered by publications of specialized interest." *Reuber*, 925 F.2d at 709. Thus, for example, in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980), the former president of a consumer cooperative sued a trade publication that covered the supermarket industry after it published an article about his firing, *id.* at 1290. The cooperative was an "innovative company often the subject of news reports." *Id.* at 1299. The plaintiff "played an active role not only in the management of the cooperative but also in setting policies and standards within the supermarket industry," including "battl[ing] traditional practices in the industry." *Id.* at 1290. The court thus held he was a "public figure for the limited purpose of comment on the [cooperative]'s and his own innovation polices" and reporting on his termination. *Id.* at 1300; *see also, e.g.*, *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987) (finding that activist executive at company who "project[ed] his own image and that of [his company]" had "invite[d]

attention and comment with respect to public issues affecting his business dealings").

Under this precedent and his own high-profile track record, Alexander is plainly a public figure for purposes of his role in the advertising industry and his sudden exit from the Agency.

**2.      Alexander Cannot Meet His Burden of Pleading Actual Malice.**

Because Alexander is a limited-purpose public figure, he must plead sufficient facts that, if proven, would plausibly support a clear and convincing showing that each of Adweek's publications was made with actual malice. *See supra* at 22-23 & n.11. Whether a plaintiff can meet his burden of establishing actual malice presents a "question of law." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989). Thus, when a public figure fails to plead plausible facts establishing actual malice, his claim must be dismissed. *E.g.*, *Mayfield*, 674 F.3d at 377-78. Alexander has not – and cannot – plausibly establish actual malice here.

As detailed above, before Adweek published anything about the sexual harassment allegations against Alexander, he had been publicly accused by DMA of sexual harassment based on the Agency's disclosure of confidential HR files and reports, had settled a sexual harassment claim against him, had forcibly resigned after being confronted with 10 more complaints of sexual harassment, was compared to Matt Lauer and Garrison Keillor by the Agency's President, had his employment "scrubbed" from the Agency's website and social media, was the subject of an AdAge report stating that his termination followed an internal investigation into an allegation of sexual harassment against him, and responded to that report by acknowledging that he sought to thwart a "hurtful investigation." *See supra* at 2-4.

Then, prior to Adweek publishing its report on those allegations, Coffee spoke to eleven former co-workers, including two who spoke on the record, all of whom described Alexander's history of sexual harassment. *Supra* at 4. He also purportedly received confidential HR files and

reports about Alexander.  FAC ¶ 106.  Coffee sought Alexander for his response and was told by the Agency's parent company that it took "swift action" after "individuals" accused Alexander of "behavior" that ran "counter to [its] values and guidelines."  Berry Decl. Ex. B; *supra* at 5. Immediately after Adweek's report, the Agency circulated a damning memo to its staff and the press, labeling Alexander's "behavior" as "inexcusable" and confirming it made the "decision" to terminate him, and then multiple news outlets reported even more allegations against Alexander.  *See, e.g.*, Berry Decl. Exs. C, O, P.  And, upon his termination, Alexander signed a separation agreement that gave him no severance and acknowledged he had been accused of "inappropriate workplace conduct, such as sexual harassment."  *Supra* at 5.  This record – all of which is admitted in Alexander's pleading – renders any claim Adweek knew the accusations against him were false or entertained serious doubts about their truth utterly implausible.

Alexander nevertheless tries to plead a claim by alleging six conclusory "reasons" the defendants generally, both those associated with Adweek and those connected to Diet Madison Avenue, spoke with actual malice.  FAC ¶ 113 .  *But see AdvanFort Co. v. The Mar. Exec. LLC*, 2015 U.S. Dist. LEXIS 99208, at *16-17 (E.D. Va. July 28, 2015) ("actual malice must be proved with respect to *each* defendant").  All fall short as a matter of law.

*First*, Alexander alleges the defendants "pursued a predetermined agenda, which was to interfere with [his] employment and get him fired."  FAC ¶ 113(a).  But, he had been forced out already by the time Adweek published anything.  In any case, having an agenda does not reflect actual malice.  *E.g.*, *Tucker v. Fischbein*, 237 F.3d 275, 286-87 (3d Cir. 2001) (no actual malice where defendants had "preconceived story-line"); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 48 (D.D.C. 2002) ("Any 'pre-existing agenda,' even one which may be noxious to some minds, is not indicative of actual malice, and this argument may therefore be summarily rejected.'").

*Second*, Alexander claims the defendants "knew about IPG's 'zero-tolerance' #MeToo policy" and published "false and scandalous" statements "knowing that IPG would immediately terminate [him] without any investigation or Due Process." FAC ¶ 113(b). By the time Adweek published anything, Alexander already had been terminated. Moreover, Adweek's knowledge of the zero-tolerance policy does not disprove that Alexander committed sexual harassment. And, even if it were true that Adweek knew its reporting would have negative consequences for Alexander, that knowledge has no bearing on whether it had serious doubts about the truth of its reporting. As the Fourth Circuit has instructed, "the falsity of charges cannot be equated with their seriousness," and "the [actual malice] rule is not to be suddenly suspended for a news organization whenever the stakes run high. If that were the case, the vitality of debate would suffer at the point when the need for information and illumination was uppermost." *Reuber*, 925 F.2d at 715. In other words, an alleged "failure to protect reputation cannot alone constitute actual malice, for indeed it is inescapable to public controversy that reputations are at risk." *Id.*

In addition, evidence that a publication "set out to portray a particular viewpoint or even to advance a partisan cause" does not demonstrate actual malice. *Id.* at 716 ("Defamation judgments do not exist to police their objectivity."). Adweek's stance opposing harassment in the advertising industry, "to the extent [that is] pleaded, tend[s] to demonstrate [its] sincerity and good faith." *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 2018 U.S. Dist. LEXIS 28902, at *13 (M.D. Ala. Feb. 21, 2018) (rejecting claim that "'agenda' of opposing hate groups and the extent of its messaging somehow speak to its ill will").

*Third*, Alexander claims the defendants "acted of a desire to hurt [him] and to permanently stigmatize him." FAC ¶ 113(c); *see also id.* ¶ 113(d) (contending defendants had "the intent to hurt Joe"). But, actual malice cannot be established through "a showing of ill will

or 'malice' in the ordinary sense." *Harte-Hanks*, 491 U.S. at 666-67.

**Fourth**, Alexander alleges the defendants used "words and images" which were "vile, contemptuous, an[d] disproportionate." FAC ¶ 113(c). Alexander points to no such images or words used by Adweek, as his allegations on this point are limited to DMA, *see, e.g.*, *id.* ¶ 77. In any event, strong language in no way demonstrates actual malice. *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 10 & n.3 (1970) (finding it was "error of constitutional magnitude" to allow jury to find malice from the "excessive, intemperate, unreasonable and abusive" language of the publication). Indeed, the First Amendment protects "hyperbolic language," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990), and recognizes a "profound national commitment to the principle" that public discourse "may well include vehement, caustic, and sometimes unpleasantly sharp attacks," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

**Fifth,** Alexander claims the defendants "made up the statements out of whole cloth" and "[t]here were no sources for any of the defamation." FAC ¶ 113(c). Yet, the Complaint contradicts this claim, suggesting specific sources from whom it claims Adweek received information, including HR files and reports from the Agency, which said it forced him to resign over accusations of sexual harassment. *E.g.*, FAC ¶¶ 3, 72; *supra* at 4-5. And, Adweek's supposed "hit piece" identifies two sources by name (and nine other co-workers as confidential sources) and discusses a settlement agreement Alexander admittedly signed. Berry Decl. Ex. B.

**Sixth**, Alexander says Adweek "revealed confidential information with the intent to hurt" him. FAC ¶ 113(d). But, the revelation of "confidential information," which often is the basis for news reports, in no way demonstrates Adweek believed its reporting was not true. *Cf. Bartnicki*, 532 U.S. at 535. If anything, the confidential documents referenced in the Complaint – human resources files and reports provided by the Agency and an agreement executed by

29

Alexander settling a claim for sexual harassment – support the veracity of Adweek's reporting.

**_Finally_**, Alexander contends the defendants knew the statements "would be republished and repeated."  FAC ¶ 113(e).  It is not clear how this possibly shows Adweek had reason to know its reporting was false, nor could it.

Because the Complaint shows Alexander cannot meet his constitutional burden of establishing actual malice, his claims against Adweek should be dismissed with prejudice.

## **CONCLUSION**

For the foregoing reasons, Adweek respectfully requests that its motion be granted and that this case be dismissed.

Dated:  December 20, 2019

Respectfully submitted,

BALLARD SPAHR LLP

By  _/s/ Matthew E. Kelley_
    Matthew E. Kelley, Va. Bar No. 84045
1909 K Street NW, 12th Floor
Washington, DC  20006-1157
Phone: 202-661-2200
Fax: 202-661-2299
kelleym@ballardspahr.com

Michael Berry (_pro hac vice_)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Phone: 215-988-9773
Fax: 215-865-8999
berrym@ballardspahr.com

Thomas B. Sullivan (_pro hac vice_)
1675 Broadway, 19th Floor
New York, NY 10019
Phone: 212-850-6139
Fax: 212-223-1942
sullivant@ballardspahr.com

_Counsel for Defendants_
_Adweek, LLC and Patrick Coffee_