IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOE ALEXANDER                              )
                                           )
        Plaintiff,                         )
                                           )
v.                                         )          Case No. 3:19-cv-688-JAG
                                           )
                                           )
DIET MADISON AVENUE                        )
        et al                              )
                                           )
        Defendants.                        )
_____)

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, Joe Alexander ("Plaintiff"), by counsel, pursuant to Local Civil Rule 7(F), respectfully submits this Memorandum in Opposition to the motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(6) filed by defendants, Adweek, LLC and Patrick Coffee ("Adweek") [*ECF No. 30*].

## I.  INTRODUCTION

This is a case about defamation and conspiracy.  Between 2017 and 2019, Adweek, acting in concert with Diet Madison Avenue ("DMA"), The Martin Agency ("Martin"), Sissy Estes ("Estes") and other bad actors in Virginia, systematically targeted Plaintiff, mercilessly publishing multiple false and defamatory statements that intentionally caused injury to Plaintiff in Virginia.  The conspiracy to defame Plaintiff and to interfere with his employment as Chief Creative Officer of Martin originated in Virginia; co-conspirators of Adweek were physically present in Virginia and committed

acts in furtherance of the conspiracy in Virginia; and Plaintiff suffered extreme and unconscionable injury to his reputation in Virginia, where he lives and where Adweek's scandalous accusations were published to its paying subscribers and legion of Twitter followers. [*ECF No. 29 ("Amended Complaint"). ¶¶ 3, 4, 6, 8, 9, 11, 12, 14, 98*].

As a result of Adweek's actions and conduct, Plaintiff filed a multi-count complaint against Adweek, asserting claims of tortious interference with contract, tortious interference with prospective economic advantage, aiding and abetting breaches of fiduciary duty, defamation, and intentional infliction of emotional distress.

The matter is before the Court on Adweek's motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.  The Court should deny the motion to dismiss for the reasons stated below.

## II.  <u>FACTUAL BACKGROUND</u>

Plaintiff was the hugely successful and incredibly popular Chief Creative Officer ("CCO") at The Martin Agency in Richmond, Virginia.  His creative leadership produced acclaimed work for clients and brands ranging from GEICO to Oreo to Donate Life to the JFK Presidential Library.  He helped win millions of dollars in new business for Martin. As a result of Plaintiff's work, Martin won every major industry award, including an Emmy.  Plaintiff sat on the distinguished board of The One Club, was Cannes Lions Film Jury President in 2016, and was a regular guest speaker in the advertising industry and on campuses, including the renowned VCU Brandcenter.  Plaintiff enjoyed an excellent working relationship with his colleagues at Martin.   His style was inclusive, collaborative, nurturing, encouraging, mentoring, advocating.  He treated all colleagues with respect.  He shared opportunity with all.  Plaintiff was a staunch advocate of

equality and diversity in and out of the workplace. He hired dozens of women, including the top 3 female creatives in the Agency's history: Karen Costello, Nancy Hannon and Deb Hagan. Plaintiff's last hire before his termination was Ashley Bozeman, the first African American female creative in the history of Martin. Plaintiff sent people to the 3% Conference[1] every year since it began. He was one of the very first supporters of Free the Bid, a non-profit initiative advocating on behalf of women directors for equal opportunities to bid on commercial jobs in the global advertising industry. [https://www.freethebid.com/]. Plaintiff mentored countless women throughout Martin. Being inclusive was a tenet of his leadership style. Throughout the many years they worked together, Jane Doe always expressed how much she respected Plaintiff and enjoyed working with him. In 2016, to celebrate Plaintiff's 25th anniversary with Martin, dozens of Plaintiff's co-workers gave him a book full of beautiful, heart-felt tributes. Jane Doe wrote these kind words about Plaintiff:

> You always say "great leaders have followers." I'd follow you anywhere. The Martin Agency is quite lucky to have had your thinking, passion, and love for 25 years. Cheers to the next!

In September 2017, Plaintiff was honored by the 4A's Foundation as one of the "100" who made advertising great. The award was a recognition of Plaintiff's strong belief in

---

[1] Founded by Kat Gordon in 2011, the 3% Conference is part of a movement to increase the number of female creatives in the advertising industry. [https://www.3percentmovement.com/movement ("Until we came along, only 3% of Creative Directors were women. And very few were people of color. We're changing the ratio because the more varied the people who come up with ideas, the better the ideas will be … Until women make up 50% of creative directors, we've got a crew who'll keep working their butts off, all led by founder Kat Gordon")]. Because of the hard work of the 3% movement, women now comprise up 29% of the total creatives in the industry. [https://www.3percentmovement.com/].

and practice of diversity in the workplace. All was well. Plaintiff's team expressed nothing but positive enthusiasm and happiness about the creative work being performed and the present direction and momentum of the work-product. No one informed Plaintiff of any complaints about his behavior or issues of any kind. He had the solid backing of the entire Martin Agency. It took a life-time for Plaintiff to establish his name, goodwill and to build his personal and professional reputations. [*Amended Complaint, ¶¶ 2, 5, 21, 22, 23, 46. 47, 55, 79*].

Beginning in December 2017, Adweek combined with Martin, DMA, Estes and others to breach fiduciary duties, to interfere with Plaintiff's employment, and to publish false and defamatory statements about Plaintiff. Martin, DMA and Estes leaked confidential information to Adweek. [*Amended Complaint, ¶ 72*]. Adweek and its confederates shared a common nefarious purpose: to "expose" Plaintiff as a sexual harasser and predator. [*Id., ¶¶ 9, 11*]. On December 6, 2017, in furtherance of the conspiracy, Adweek advised Plaintiff that it was "preparing to run a story indicating that you were fired from The Martin Agency after multiple female employees filed sexual harassment complaints against you. The story also notes that a case brought against you in 2012 was settled out of court for an undisclosed total. Please let me know if you would like to comment." On December 7, 2017, Adweek published that damning indictment of Plaintiff. Adweek's expose included confidential information about a 2013 settlement of a disputed claim brought against Martin and Joe by a former employee. The Adweek Hit Piece contained multiple false and defamatory statements of and concerning Plaintiff, including:

- Plaintiff left The Martin Agency "after several sexual harassment claims[2] about him were made with the agency";

- Several women "reported concerns about his behavior to the agency, citing incidents as far back as the 1990s";

- Plaintiff's "nickname among some staff" in the 2000s was "HR Joe";

- In 2012, Estes told Mike Hughes that Plaintiff "could not continue hitting on women";

- Daniela Montanez ("Montanez") "approached human resources in 2012 to let them know that she was uncomfortable working with Alexander";

- "Alexander made improper sexual advances" towards two "additional women";

- Alexander passed "a former executive" "his hotel key and invited her to his room to have sex during a business trip.  They were both married at the time";

- This was "Alexander's way of 'testing the waters' with women he found attractive";

- A "former worker" said "Alexander joked about threesomes and at one point propositioned her";

- "Three other former employees said Alexander regularly belittled co-workers, telling multiple women that they needed to lose weight and commenting on the size of their breasts in front of male colleagues. They allege that he once described a black female employee as "chocolate thunder" and frequently told Mormon staff members that no one wanted to spend time with them because they wouldn't drink alcohol";

- Estes said, "[t]his has been happening for decades."

---

[2]     The only "sexual harassment claim" ever made prior to December 1, 2017 was the one reported to Plaintiff by Garner.  In truth, however, Jane Doe never made the claim prior to December 1, 2017.  IPG and Martin induced Jane Doe to make the claim, which IPG and Martin then supplied to trade magazines as the reason for Joe's termination.  IPG and Martin concealed the truth, which is that they terminated Joe in response to DMA's threat to publicly expose and shame IPG and Martin for how they handled sexual harassment claims and to cover-up Martin's egregious breaches of fiduciary duty, breaches of contract and violations of IPG HR policies and the Code of Conduct.

The Adweek Hit Piece was republished millions of times between 2017 and the present, including within the year preceding commencement of this action. [*See, e.g.,* https://www.refinery29.com/en-us/2018/12/217506/the-martin-agency-women-executives-times-up ("The piece included two former employees who spoke on the record, saying they went to managers about Alexander at various points to no avail.  Most damning though was a 2013 settlement between the agency and an unnamed woman"). [*Amended Complaint, ¶¶ 9, 68, 69, 70, 71, 72, 73*].

The conspiracy between Adweek and Martin to interfere with Plaintiff's employment and to defame Plaintiff did not abate.  It continued uninterrupted on December 7 and 8, 2017. [*Amended Complaint, ¶¶ 74-75*].  In 2018 and 2019, long after Plaintiff was terminated by Martin, Adweek continued to target Plaintiff.  Adweek published additional defamatory statements about Plaintiff to subscribers and advertising executives in Virginia:

> https://www.adweek.com/agencies/the-martin-agency-promotes-karen-costello-to-cco-in-the-wake-of-joe-alexanders-scandalous-departure/
> ("The Martin Agency Promotes Karen Costello to CCO in the Wake of Joe Alexander's Scandalous Departure");

> https://www.adweek.com/agencies/when-metoo-came-to-madison-avenue/4/
> ("When #MeToo Came to Madison Avenue … staffers at The Martin Agency say their complaints to HR about CCO Joe Alexander were repeatedly ignored or dismissed for years before he was ousted last December over multiple sexual harassment allegations");

> https://www.adweek.com/agencyspy/the-martin-agency-turns-joe-alexanders-old-office-into-a-meeting-room-and-dog-house/148911/
> ("It's been 10 months since The Martin Agency parted with CCO **Joe Alexander** after 26 years amid an investigation into multiple claims of sexual harassment made over nearly two decades") (emphasis in original);

> https://twitter.com/PatrickCoffee/status/1075407319943524352
> ("The Martin Agency one year after the Joe Alexander sexual harassment scandal blew up the ad industry");

https://www.adweek.com/agencies/the-5-most-important-ad-industry-stories-of-2018/
("Misogyny and advertising have an unfortunate and well-documented history … This year, the conversation unquestionably changed; whether that change was dramatic enough to permanently impact the industry for the better remains a matter for debate.  #MeToo officially hit the business in December 2017, when The Martin Agency fired CCO Joe Alexander");

https://www.adweek.com/agencyspy/the-20-biggest-agencyspy-posts-of-2018/152124/
("However you may now feel about Diet Madison Avenue, the group exerted a huge influence over the calendar year.  After the departure of The Martin Agency chief creative Joe Alexander last December, 2018 became the year #MeToo finally arrived as the industry maybe, finally began to grapple with endemic abuses of power").

Adweek's articles have been republished millions of times in the last year in Virginia, including by Martin. [*See, e.g.,* https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency]. [*Amended Complaint, ¶ 9*].

### III.  DISCUSSION

### A.    Defendants' Motion Under Rule 12(b)(2)

It is well-settled that when the Court addresses the personal jurisdiction question "by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016); *id. Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009) (citation omitted). Under such circumstances, the Court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction. *Sneha Media & Entm't, LLC v. Associated Broad. Co. P LTD*, 911 F.3d 192, 196 (4th Cir. 2018); *New Wellington Fin. Corp. v.*

*Flagship Resort Dev. Co.*, 416 F.3d 290, 294 (4th Cir. 2005) (citations and quotations omitted). "If a plaintiff makes the requisite showing, the defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to violate due process." *Reynolds Foil, Inc. v. Pai*, 2010 WL 1225620, at * 1 (E.D. Va. 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477-78 (1985)).

### 1. <u>Framework for Personal Jurisdiction Analysis</u>

In order for a Court to exercise personal jurisdiction over a defendant, the exercise of that jurisdiction must both be authorized by state law and comport with the Due Process Clause of the Fourteenth Amendment. The exercise of jurisdiction in Virginia is governed by the Commonwealth's long-arm statute (Va. Code § 8.01-328.1), which has been held to extend personal jurisdiction to the full extent permitted by Due Process. *Roche v. Worldwide Media, Inc.*, 90 F.Supp.2d 714, 716 (E.D. Va. 2000). Since Virginia's long-arm statute is co-extensive with the strictures of Due Process, Courts collapse the two-part analysis into one inquiry. *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) ("Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'") (quoting *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996)); *see Reynolds Metals Co. v. FMALI. Inc.*, 862 F. Supp. 1496, 1498 (E.D. Va. 1994) (citing *Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1981)).

The federal constitutional predicate for the exercise of personal jurisdiction is the familiar requirement that "a defendant must have sufficient 'minimum contacts' with the forum state such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

## 2. <u>Due Process Standard</u>

The requirements of the Due Process clause can be met through establishing either specific or general jurisdiction. Specific jurisdiction exists where the controversy at issue arises out of sufficient contacts with the state to make the exercise of jurisdiction reasonable. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-415 (1984). Alternatively, general jurisdiction can exist, even where a claim does not arise from a defendant's interactions with the state, where the defendant has sufficient continuous and systematic contacts with the state to satisfy Due Process. *International Shoe Company v. Washington*, 326 U.S. 310, 318 (1945) (general jurisdiction exists where a foreign corporation's "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.")); *id. Bay Tobacco, LLC v. Bell Quality Tobacco Products, LLC*, 261 F.Supp.2d 483, 497 (E.D. Va. 2003) ("this Court must determine whether it may exercise general jurisdiction over Bell and Continental, meaning Bay must prove that each defendant has fairly extensive, continuous, and systematic contacts with Virginia").

### 3.   <u>Specific Jurisdiction</u>

In determining whether specific jurisdiction exists, a Court looks to: (1) the extent to which the defendant has purposely availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be Constitutionally "reasonable." *New Wellington*, 328 F.2d at 618; *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (citing *Helicopteros Nacionales de Columbia, S.A.*, 466 U .S. at 414 & fn. 8-9 (1984)).  With respect to the first factor, "no clear formula [exists] for determining what constitutes 'purposeful availment.'" *Reynolds Foil, Inc.*, 2010 WL 1225620, at * 2.  The Court, however, may consider whether the defendant maintains offices or agents in the forum state; whether the defendant reached into the forum state to solicit or initiate business; whether the defendant deliberately engaged in significant or long-term business activities in the forum state; whether the defendant made in-person contact with a resident of the forum in the forum state regarding the business relationship; the nature, quality, and extent of the parties' communications about the relevant transactions. *See Consulting Eng'rs Corp.*, 561 F.3d at 278 (internal citations omitted).  The second prong of the test for specific jurisdiction "requires that the defendant's contacts with the forum state form the basis of the suit. *Burger King*, 471 U.S. at 472; *Helicopteros Nacionales de Columbia, S.A.*, 466 U.S. at 414.  The third prong of the specific jurisdiction test permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there.  Specifically, the court may consider: (1) the burden on the defendant of litigating in the

forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and, (5) the interests of the states in furthering substantive social policies. *Burger King*, 471 U.S. at 477.

      **4.**      **<u>Personal Jurisdiction In Conspiracy Cases</u>**

"There is no question that physical presence is not necessarily required to satisfy the constitutionally mandated requirement of minimum contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.").

Virginia recognizes that the in-state acts of co-conspirators – in this case Martin and Estes – are sufficient to confer personal jurisdiction over an out-of-state confederates, Adweek. *See, e.g., B2Gold Corp. v. Christopher*, 2019 WL 4934969, at * 3 (E.D. Va. 2019) ("A co-conspirator is subject to jurisdiction in a forum where substantial acts in furtherance of the conspiracy were performed by any member of the conspiracy, if the co-conspirator knew or should have known that the acts would be performed in the forum state"); *St. Paul Fire and Marine Ins. Co. v. Hoskins*, 2011 WL 1897683, * 3 (W.D. Va. 2011) ("Under a conspiracy theory of personal jurisdiction, a conspirator not present in the forum state will, nevertheless, be adjudged to have had a personal presence in the forum State by means of adequate minimum contacts of the other conspirators") (quotation and citation omitted); *Verizon Online Services, Inc. v. Ralsky*, 203 F.Supp.2d 601, 622 (E.D. Va. 2002) (citing *Ethanol Partners Accredited v. Wiener, Zuckerbrot,*

*Weiss & Brecher*, 635 F. Supp. 15, 18 (E.D. Pa. 1995) ("When co-conspirators have sufficient contacts with the forum, so that due process would not be violated, it is imputed against the 'foreign' co-conspirators who allege there is [sic] not sufficient contacts; co-conspirators are agents for each other.")); *Krantz v. Air Line Pilots*, 245 Va. 202, 427 S.E.2d 326 (1993) (entry of message on computer in New York with the knowledge that persons in Virginia would transmit negative comments about the plaintiff and thereby interfere with plaintiffs prospective employment, subject New York resident to personal jurisdiction in Virginia); *Nathan v. Takeda Pharmaceuticals America, Inc.*, 2011 WL 8947650, at * 13 (Fairfax Cir. 2011) ("In the instant case, Plaintiff has alleged a conspiracy between Flood, Smith, Venanzi, Savant, and Fouchie.  Accordingly, under the conspiracy theory of jurisdiction, Flood and Smith could be subject to jurisdiction based on the acts of Venanzi, Savant or Fouchie that occurred in Virginia in furtherance of the conspiracy.  The underlying torts of Plaintiff's conspiracy claim are defamation and tortious interference.  Thus, if Savant, Venanzi, or Fouchie committed acts in furtherance of these torts in Virginia, jurisdiction could lie against Flood or Smith as co-conspirators"); *Massey Energy Co.*, 2005 WL 3476771 at * 4-5 ("At this stage, plaintiff need not prove the entire case but only make a 'prima facie' showing of the conspiracy. Once this prima facie showing of conspiracy is adequately alleged, and where co-conspirators have sufficient contacts with the forum, so that due process would not be violated, these contacts are imputed against the foreign co-conspirator.") (quotations and citations omitted); *North Fork Shenandoah, Inc. v. Bunning*, 7 Va. Cir. 327 (1986) (Warren Cir. 1986) (Whiting, J.) (California resident was subject to personal jurisdiction in Virginia, where plaintiff alleged a conspiracy between the defendants to breach an

employment contract by acts of disloyalty in Virginia – non-resident, who had never set foot in state, was subject to personal jurisdiction because he "has acted in Virginia through [his] agent … a co-conspirator.").

> **5.      Adweek Is Subject To Specific Jurisdiction**

Applying the foregoing principles, and construing Plaintiff's allegations in the light most favorable to him, there is no question that Plaintiff has made a *prima facie* showing as to specific personal jurisdiction.

Adweek reaches an engaged audience in the advertising industry in Virginia and elsewhere of "more than 6 million professionals across platforms including print, digital, events, podcasts, newsletters, social media and mobile apps".  It has over 620,000 followers on Twitter, including followers and users in Richmond, Virginia, at the storied Martin Agency.  607,000 people around the world follow Adweek on Facebook.  Adweek launched in 1978 and now attracts more than 6.5 million monthly unique visitors online, counts 1.9 million social media followers, and has a weekly print circulation of around 40,000.  [https://www.youtube.com/channel/UCKhCJRTHHLuW2iW7XQtcfyQ    ("we reach more than 6,000,000 marketing wizards, ad innovators, tech titans, media mavens and brand geniuses … three times our nearest competitor")]. [*Amended Complaint, ¶ 8*]. Adweek has 1,167 subscribers in Virginia.  It also generates income from advertising in Virginia.  Although Adweek does not reveal its total advertising revenue, Adweek admits that since 2017, two percent (2%) of that advertising revenue comes from advertisers in Virginia. *Compare Bay Tobacco*, 261 F.Supp.2d at 496 ("Continental's contacts with Virginia are similar to Bell's.  Continental is a Florida limited liability company, that also has no physical presence in Virginia.  Unlike Bell, however, in 2002 Continental sold and

shipped approximately two percent (2%) of its cigarettes into and within the Commonwealth. Although it is unclear as to how much revenue Continental's Virginia sales generated, the Court finds that this sales percentage, taken with the fact that such sales and shipments likely qualify as the regular transaction of business in the Commonwealth, satisfies the jurisdictional requirements of subdivision (A)(4) of the long-arm statute."). In addition to its Virginia subscriber base and its significant Virginia advertising revenue, Adweek does not dispute, and therefore concedes, that it has a large social media following in Virginia that includes advertising professionals at the Martin Agency.

Adweek purposefully availed itself of the privilege of conducting business in Virginia. It operates an active website on which it advertises and solicits business from Virginians. It has engaged in significant long-term business activities in Virginia. The primary focus and sheer number of articles written about the Plaintiff and Martin manifests an intent to target and focus on Virginia readers. Unlike *KMLLC Media, LLC v. Telemetry*, the focus of Adweek's articles was clearly always on Virginia. As evidenced by the defamatory articles at issue in this action, Adweek made multiple personal contacts with multiple different Virginia residents[3] regarding the preconceived narrative that Plaintiff engaged in sexual harassment and other wrongdoing. Adweek's contacts with Virginia, specifically its intentional disclosure of the terms of a confidential settlement agreement and its publication of false statements about a Virginia citizen, form

---

[3]     Adweek admits that Coffee communicated with "a few sources in Virginia" to prepare the defamatory articles. This is a grave understatement, as the Adweek Hit Piece itself refers to "nine sources" who supposedly provided information regarding the disputed incident with Bidwell that was the subject of the confidential settlement agreement.

the basis of the claims of tortious interference, conspiracy, defamation and intentional infliction of emotional distress.   Adweek also knew that its false and defamatory statements would be published in Virginia and read by Virginians, including advertising professionals at Martin.   Adweek contracts with Amazon Web Services ("AWS") for its cloud-based services.   AWS's servers are located in Virginia.   Because Adweek's web servers are located in Virginia and defamatory material was posted on those web servers, Adweek is subject to long-arm jurisdiction under § 8.01-328.1(A)(3) of the Virginia Code. *Lucido v. Maxwell*, 2016 WL 9076182, at * 2 (Fairfax Cir. 2016) ("in the present case, because the servers and Internet bandwidth provided by Amazon Web Services and used to operate the Wrestler Unstoppable game site are located in Northern Virginia, "[a]ll posts submitted by users over the Wrestler Unstoppable online game site are sent through ... servers located in Northern Virginia." Affidavit of Carla Emmons, ¶ 9.  As a result, a post to the Wrestler Unstoppable online game site arguably would constitute an 'act' in Virginia under § 8.01-328.1(A)(3)"); *see also Bochan v. La Fontaine*, 68 F.Supp,2d 692, 699 (E.D. Va. 1999) ("a *prima facie* showing of a sufficient act by the La Fontaines in Virginia follows from their use of the AOL account, a Virginia-based service, to publish the allegedly defamatory statements").   Adweek also extensively republished the defamatory statements to its Virginia followers on Twitter and Facebook. Under these circumstances, Adweek reasonably should have expected to be haled into court in Virginia. *See Gubarev v. BuzzFeed*, 253 F.Supp.3d 1149, 1159 (S.D. Fla. 2017)[4]

---

[4]    In *Gubarev*, the Court found that the defendant was subject to the court's long-arm jurisdiction.   "Because there is no dispute that the Buzzfeed website and the Buzzfeed mobile application are accessible in Florida, the Article was accessible in Florida, and the Article was, in fact, accessed in Florida, it follows that Defendants have committed a tort in Florida for purposes of the jurisdictional analysis." 253 F.Supp.3d 1149, 1156-1157.

("When Defendants published their unverified Dossier via their website and mobile application, Defendants knew it would be viewed around the world, and given the international scope of its contents, should have anticipated that the effects of the publication might be felt in different fora, including the fora where Plaintiffs are located. Accordingly, Defendants cannot claim surprise at being haled into court in the Southern District of Florida."); *compare id. Blue Ridge Bank, Inc. v. Veribanc*, 755 F.2d 371, 374 (4th Cir. 1985) (the defendant "obviously knew that Dorfman was going to write an article that included the allegedly libelous information about Blue Ridge and that the article could find its way into the Commonwealth of Virginia.  By requiring Dorfman to reveal his source of financial information Veribanc obviously expected to receive additional orders from customers who read the information in the article.  Because of this expectation Veribanc could reasonably expect to be hailed into court, on an allegation of false information supplied to Dorfman by Veribanc, in any forum in which Dorfman's article appeared … Veribanc's fifty-seven contacts with its subscribers in Virginia add strength to the exercise of personal jurisdiction over Veribanc").

Plaintiff is a Virginia citizen.  Martin, Estes and Bidwell are also citizens of Virginia.  Virginia has a substantial interest in adjudicating this dispute. *Compare, e.g., Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776 (1984) ("it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the State.").  Plaintiff has an interest in obtaining convenient and effective relief in his home state, where his injury occurred.  Here, as in *Keaton*, false statements caused harm in Virginia, where the false statements were circulated by the Defendants to the Martin Agency and other subscribers and followers. *Id.* at 777 ("The tort of libel is generally

held to occur wherever the offending material is circulated. Restatement (Second) of Torts § 577A, Comment a (1977).  The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous.  The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished.").  Litigating the case in Virginia will help prevent delay for Plaintiff and ensure that the dispute is resolved in an efficient way.  Under the circumstances, the exercise of specific personal jurisdiction over Adweek is constitutionally reasonable.

Adweek is also subject to personal jurisdiction under the conspiracy theory of jurisdiction.  Plaintiff has made a plausible claim that a conspiracy existed; that Adweek participated in the conspiracy by unlawfully disclosing the terms and conditions of a confidential settlement agreement, and by publishing false statements about Plaintiff to further the interests to DMA and Martin who were out to get Plaintiff; and that Adweek knew that its co-conspirators were physically in Virginia and that their activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject Adweek to jurisdiction in Virginia.  Here, by reason of its conspiracy with Martin and Estes to breach fiduciary duties, to interfere with a Virginia employment contract and to defame a citizen of Virginia – Adweek is subject to personal jurisdiction in Virginia.[5]

---

[5]     Plaintiff alleges that venue is proper pursuant to Title 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to his claims occurred in Richmond, Virginia. [*Amended Complaint, ¶ 15*].  Adweek concedes that venue is proper in this Court.

**B.**     **Defendants' Motion Under Rule 12(b)(6)**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted).   The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).   A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555 (citations omitted).   Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.*   In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater,* 385 F.3d 835, 841 (4th Cir. 2004) (citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).[6]

**1.**     ***Statute of Limitations***

As Adweek observes, Plaintiff's complaint identifies thirteen different articles that contain false and defamatory statements.   Certain of these articles are not actionable.

---

[6]     Adweek's memorandum in support repeatedly refers to matters outside Plaintiff's complaint.   [*See, e.g., ECF No. 31, p. 34 ("upon his termination, Alexander signed a separation agreement that gave him no severance and acknowledged he had been accused of "inappropriate workplace conduct, such as sexual harassment.")*].   In accordance with Rule 12, the Court should convert Adweek's motion to a motion for summary judgment and deny the motion without prejudice.

The following articles **were** published or republished within one year of the commencement of this action:

- The Adweek Hit Piece
  [*See Amended Complaint, ¶ 73*]

- https://twitter.com/PatrickCoffee/status/1075407319943524352
  (Published on December 19, 2018)

- https://www.adweek.com/agencies/the-5-most-important-ad-industry-stories-of-2018/
  (Published on December 27, 2018)

- https://www.adweek.com/agencyspy/the-20-biggest-agencyspy-posts-of-2018/152124/
  (Published on December 27, 2018)

- https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency
  (Published January 6, 2019)

Virginia follows the "republication rule". "[E]ach successive publication of an old or preexisting defamatory statement gives rise to a new cause of action under Virginia law." *Dragulescu v. Va. Union Univ.*, 223 F.Supp.3d 499, 509 (E.D. Va. 2016); *id. WJLA-TV v. Levin*, 264 Va. 140, 153, 564 S.E.2d 383 (2002) ("each publication of a defamatory statement is a separate tort and, indeed, generally subsequent republications of such a statement are separate torts"). Republication occurs when the original defamatory statement is "affirmatively reiterated" or redistributed to a new audience. *Eramo v. Rolling Stone, LLC*, 2016 WL 5234688, at * 11 (W.D. Va. 2016) (citing *Clark v. Viacom Int'l, Inc.*, 617 Fed.Appx. 495, 505 (6th Cir. 2015) and *In re Davis*, 347 B.R. 607, 611 (W.D. Ky. 2006)); *id. Gilmore v. Jones*, 370 F.Supp.3d 630, 658 fn. 30 (W.D. Va. 2019) (article and video published on the website www.infowars.com was republished by Alex Jones on his YouTube channel); *League of United Latin American*

*Citizens – Richmond Region Council 4614 v. Public Interest Legal Foundation*, 2018 WL 3848404, at * 7 (E.D. Va. 2018) ("Defendants fail to rebut Plaintiffs' assertion that *Alien Invasion II* is effectively a successive publication of an old or preexisting defamatory statement (i.e., *Alien Invasion I*).   Given the textual, thematic, and formalistic parallels between the two publications, the Court finds that *Alien Invasion II* qualifies as a 'republication' for purposes of Plaintiffs' defamation claim.   Accordingly, the limitations period does not bar Plaintiffs' action with respect to either report."); *Doe v. Roe*, 295 F.Supp.3d 664, 671 (E.D. Va. 2018) ("where there are separate publications of the same defamatory statement, a new cause of action, and thus a new statute of limitations, accrues with each republication").

The leading case in Virginia on republication is *Weaver v. Beneficial Finance Co.*, 199 Va. 196, 98 S.E.2d 687 (1957).   In *Weaver*, the defendants wrote a libelous letter about the plaintiff, and published the letter to plaintiff's employer.   The letter was later republished to the company's promotion board.   In his complaint, the plaintiff alleged

> "that the libelous letter in question was republished on or about March 21, 1956 before a promotion board convened to consider appellant's record, at which time the contents of the letter were first made known to appellant; that the letter suggested that appellant was and is dishonest, insolvent and one to whom credit should not be extended; that it attacked his reputation for integrity; that appellees knew the libelous letter would be a permanent part of his record and would be republished in the future; that the republication of the letter was the natural and probable consequence of the appellees' act … Appellant's cause of action is grounded upon the republication of the letter, on March 21, 1956."

199 Va. at 198, 98 S.E.2d at 690.   The trial court sustained a plea of the statute of limitations and dismissed plaintiff's complaint.   The Supreme Court reversed:

"It is well settled that the author or originator of a defamation is liable for a republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication.  This is based upon the principle that such republication constitutes a new cause of action against the original author.  However, the original author is not responsible if the republication or repetition is not the natural and probable consequence of his act, but is the independent and unauthorized act of a third party.
…

"'Under the weight of authority the author of a libel or slander is not liable for its voluntary and unjustifiable repetition, without his authority or request, by others over whom he has no control, either as on a direct cause of action or by way of aggravation of damages, and such repetition cannot be considered in law a necessary, natural and probable consequence of the original slander or libel.  But the rule has one important qualification.  It is a general principle that every one is responsible for the necessary consequences of his act, and it may be that the repetition of a slander or libel may be the natural consequence of the original publication, in which case the author of the original defamatory matter would be liable.  __And where the words declared on are slanderous per se their repetition by others is the natural and probable result of the original slander__.'"

199 Va. at 199-200, 98 S.E.2d at 690 (emphasis added); *Moore v. Allied Chemical Corp.*, 480 F.Supp. 364, 376 (E.D. Va. 1979) ("Count V is not time-barred insofar as plaintiff seeks to hold Allied liable for republications of the allegedly defamatory statement occurring on or after July 1, 1976.  If he can show that the statement was defamatory, he may be able to show that the republications of the statement were the natural and probable result of the original publication.").

Here, Adweek's defamatory statements were published and republished by others within the statute of limitations.

### 2.      *Substantial Truth Is An Affirmative Defense*

"To prevail on a claim for defamation, a party must prove by a preponderance of the evidence that the allegedly defamatory statements are both false and defamatory, so 'harm[ing] the reputation of another as to lower [her or] him in the estimation of the

community or to deter third persons from associating or dealing with [her or] him.'"

*Steele v. Goodman*, 382 F.Supp.3d 403, 418-419 (E.D. Va. 2019) (quoting *Cook,*

*Heyward, Lee, Hopper, & Feehan, P.C. v. Trump Virginia Acquisitions, LLC*, 2012 WL

1898616, at * 3 (E.D. Va. 2012)).

Plaintiff clearly and emphatically alleges in his complaint that Adweek's

statements were false. [*See, e.g., Amended Complaint, ¶¶ 3, 8, 9, 14, 70*].  Each of the

statements published in the Adweek Hit Piece, in the Coffee tweet, and the Adweek

articles are statements of fact capable of being proven false.  For instance, in his tweet,

Coffee states that Refinery 29 visits "The Martin Agency one year after the Joe

Alexander sexual harassment scandal blew up the ad industry".  This statement charges

Plaintiff with the very conduct alleged in the defamatory statement, *e.g., "sexual*

*harassment"*.  Coffee's statement is clearly referring to Plaintiff because Plaintiff is

named. *Compare Cheney v. Daily News, L.P.*, 654 Fed Appx. 578, 581 (3rd Cir. 2016)

(the Daily News, a New York newspaper, published an article on its website with the

headline, "Heated Sex Scandal Surrounds Philadelphia Fire Department: 'It's Bad Stuff.'"

– held that a reasonable reader could have concluded that inclusion of city firefighter's

picture and name in article about sex scandal at city fire department meant to suggest that

text of the article concerned him, as required to support firefighter's defamation claim

under Pennsylvania law against internet news publisher); *see id. Butowsky v. Folkenflik*,

2019 WL 2518833, at * 38 (E.D. Tex. 2019) ("At this stage of the proceedings, accepting

the allegations in Plaintiff's Complaint as true, the Court is not convinced Plaintiff fails

to plausibly allege he is a 'readily identifiable member' of the 'journalistic scandal' and

alleged 'concoction' of Fox News' Seth Rich story.  The Court recommends this part of

Defendants' motion be denied.").  Similarly, in "*The 5 Most Important Ad Industry Stories of 2018*", Adweek either directly states or certainly implies that Plaintiff's "[m]isogyny" is "well-documented" and "MeToo" officially hit the advertising business with the "firing" of Plaintiff.  These statements imply wrongdoing by Plaintiff, cause for his termination, and are very prejudicial to him in his business as a creative.  Finally, in "*The 20 Biggest AgencySpy Posts of 2018*", Adweek identifies Plaintiff by name and states or implies that he engaged in an "abuse of power" as Chief Creative Officer at Martin.

Whether Adweek's statements are true, substantially true, half true, or just plain deceptive and false cannot be resolved at this stage of the case without evidence.  *Pendleton*, 290 Va. at 173, 772 S.E.2d at 764 ("The defendants argue that their statements were true and the truth is a defense to a defamation claim.  The defendants' statements here, however, may be true if taken out of context, but in the context of the alleged publicity attending the case when the statements were published, it cannot be said at the demurrer stage that they were not capable of conveying the defamatory innuendo that the plaintiff bore responsibility for her child's death.  The defendants also argue that their statements were protected by the First Amendment.  Again, that position may be sound if the statements were read out of context, but a defamatory innuendo is no more protected by the First Amendment than is defamatory speech expressed by any other means.").  The "truth" defense is particularly ill-suited for resolution at the 12(b)(6) stage.  As the Virginia Supreme Court noted in *Pendleton*, a defendant's motive, intent, scheme, plan or design, which bear on the "truth" of its statements, are issues of fact that

may be proved by circumstantial evidence as well as by direct evidence. 290 Va. at 174,

772 S.E.2d at 765.

### 3. *Adweek Tortiously Interfered With Plaintiff's Contracts*

Adweek tortiously interfered with *two* contracts:

First, when he texted Plaintiff on December 6, 2017, Coffee had already written

the story.  Plaintiff alleges that Adweek's actions "caused Martin and IPG to terminate

Joe's contract." [*Amended Complaint, ¶ 84*].  These allegations are sufficient at this stage

of the proceeding.  Given the length of the Adweek Hit Piece, it is reasonable to infer that

Coffee had been working with Martin and its agents for a considerable period of time

prior to December 1, 2017 and that it was Coffee who instigated the "verbal" incidents

reported to Plaintiff on December 1, 2019. [*See id., ¶ 56*].

Second, Adweek tortiously interfered with the settlement agreement when it

disclosed the confidential terms and conditions in the Adweek Hit Piece.

### 4. *Interference With Prospective Economic Advantage*

Upon review of the argument and authority cited by Adweek, Plaintiff does not

intend to proceed with Count II of his amended complaint.

### 5. *Plaintiff States A Claim of Common Law Conspiracy*

In Virginia, a common law conspiracy consists of an agreement between two or

more persons to accomplish, by some concerted action, an unlawful purpose or a lawful

purpose by unlawful means. *Harrell v. Colonial Holdings, Inc.*, 2013 WL 550424, at * 7

(E.D. Va. 2013) ("The 'unlawful act' element requires that at least one member of the

conspiracy commit an 'underlying tort.' … This can include the inducement of a breach

of contract or defamation, as alleged in this case.") (citations omitted); *Ransome v.*

*O'Bier*, 2017 WL 1437100, at * 4 (E.D. Va. 2017) ("In addition to alleging facts supporting a claim for defamation, Ransome also alleges that O'Bier, Sterrett, and Berman conspired to defame him, and that they used personal email accounts to coordinate and communicate their defamatory publications.  The Court therefore denies the motion to dismiss Ransome's Count II common-law conspiracy claim as it relates to defamation."); *Massey Energy Co. v. United Mine Workers*, 2005 WL 3476771, at * 1 (Fairfax Cir. 2005) ("Plaintiffs allege that Defendants conspired to defame and defamed Plaintiffs with the purpose of injuring them in their trade, business, and profession. Plaintiffs allege that this was done via a defamatory television advertisement broadcast into West Virginia and Virginia, a defamatory press release, and subsequently published articles containing that press release.").

In his complaint, Plaintiff alleges that Adweek conspired with Martin, Estes and others to (a) breach fiduciary duties and disclose the terms of a confidential settlement agreement, (b) interfere with contracts to which Plaintiff was a party, including the confidential settlement agreement, and (c) to defame plaintiff. [*Amended Complaint,* ¶¶ *3, 11, 98*].  Plaintiff alleges who participated in the conspiracy, the role of Adweek as the vehicle and megaphone to amplify Martin and Estes' defamation, the acts and means employed to injure Plaintiff and impair his property rights and personal interests (*i.e. disclosure of confidential information and publications of defamatory statements*), when the scheme was hatched, why it was hatched, and how the injury was inflicted. Accepting these allegations are true, Plaintiff plausibly states a claim of common law conspiracy. *See, e.g., T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan, LLC*, 385 F.2d 836, 845-846 (4th Cir. 2004) (plaintiff properly pleaded conspiracy claims,

25

where complaint alleged that defendants "combined to terminate and interfere with the contractual relationship", and alleged that the parties to the conspiracy acted "together to complete the sale of the farm without paying Slater & Son a commission for the work it performed" and that this conduct was "intentional, purposeful and without lawful justification" resulting in "substantial monetary damages"); *Luckett v. Jennings*, 246 Va. 303, 307-308, 435 S.E.2d 400 (1993) (demurrer to conspiracy claim overruled, where motion for judgment alleged numerous facts describing actions that defendant took to injure plaintiff in his business and where plaintiff "impliedly alleges that there was an injury").

6.      ***Intentional Infliction of Emotional Distress***

Adweek argues that Plaintiff has failed to state facts in support of his claim of intentional infliction of emotional distress.  Adweek is wrong.  Plaintiff alleges that at the height of the "MeToo" movement in late 2017, when careers were destroyed by the mere mention of "sexual harassment", Adweek, acting in concert with others, intentionally publicized the terms of a confidential settlement agreement.  Adweek knew that mere publication of the disputed claim would condemn Plaintiff in the court of popular opinion and subject him to scorn.  Adweek engaged in a deliberate and malicious campaign of harassment.  It's conduct is outrageous. *See, e.g., Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005)[7] (citing *Baird v. Rose*, 192 F.3d 462, 473 (4th Cir. 1999); *Holley v. CVS Caremark Corporation*, 2016 WL 4132316, at * 4 (W.D. Va. 2016) ("Each of CVS's alleged missteps alone may not satisfy the element of outrageousness, but the totality of the circumstances shows a pattern of misconduct that plausibly went beyond

---

[7]      The Court of Appeals in *Hatfill* clearly ruled that plaintiff was not required to plead his emotional distress in specific terms. 416 F.3d at 337.

the bounds of decency and rose to a degree of outrageousness" – overruling motion to dismiss) (citing *Daniczek v. Spencer*, 156 F.Supp.3d 739, 760 (E.D. Va. 2016) (plaintiff stated claim of intentional infliction of emotional distress where, *inter alia*, the defendant released documents to trade publications that damaged plaintiff's reputation).

### 7.   *Aiding And Abetting*

Adweek argues that Plaintiff cannot state a claim of aiding and abetting because "there was no breach" of fiduciary duty. [*ECF No. 31, p. 28*].   Contrary to Adweek's argument, Plaintiff alleges that the settlement agreement, to which Martin and Bidwell were parties, was "confidential" and that Adweek knowingly and substantially assisted Martin and Estes breaches by publishing the disputed allegations.   Viewed in the light most favorable to Plaintiff, these allegations suffice to state a clam of aiding and abetting breach of fiduciary duty under Virginia law. *See, e.g., Quinn v. Knight*, 2016 WL 6471462, at * 4 (E.D. Va. 2016).

The First Amendment does not excuse unlawful conduct.  Nor does it shield and protect those who participate or assist in wrongdoing.  The First Amendment is not a license to engage in unlawful conduct. *Williams Printing Co. v. Saunders*, 113 Va. 156, 73 S.E. 473, 477 (1912) ("Liberty of the press is not license, and newspapers have no privilege to publish falsehoods or to defame under the guise of giving the news.  It is held that the press occupies no better position than private persons publishing the same matter; that it is subject to the law, and if it defames it must answer for it.") (quoting Cooley on Torts (3rd Ed.) 443)).

**8.**      ___Plaintiff Is Not A Public Figure – Actual Malice___

The level of intent required to prove a claim of defamation depends on the plaintiff's status as a private individual or a public figure.   The presumption is that Plaintiff is a private individual, subject to Adweek's burden of proving that he is a public figure. *See, e.g., Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1533 (4th Cir. 1994). Adweek has not and cannot satisfy its burden because it cannot prove that Plaintiff retained public-figure status **at the time of the alleged defamation**. *See, e.g., Gilmore v. Jones*, 370 F.Supp.3d 630, 667-669 (W.D. Va. 2019) ("Gilmore 'retained public-figure status at the time of the alleged defamation,' since his media appearances on the subject of the rally spanned from August 12, 2017 (the day before Creighton's article was published) through, at least, August 24, 2017 (three days after the publication of Jones's video, the last of Defendants' publications)).

However, even assuming that Plaintiff is a "limited purpose public figure", Plaintiff identifies six (6) inter-related bases in support of his contention that Adweek acted with actual malice. [*Amended Complaint, ¶ 113*]:

1.      Adweek pursued a preconceived story – that Plaintiff was guilty of sexual harassment – and published half-truths to conform to the preconceived story. *Eramo v. Rolling Stone, LLC*, 2016 WL 5234688, at * 5 (W.D. Va. 2016) ("evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.") (quoting *Harris v. City of Seattle*, 152 Fed.Appx. 565, 568 (9th Cir. 2005)).

Case 3:19-cv-00688-JAG   Document 32   Filed 01/03/20   Page 29 of 32 PageID# 652


2.      Adweek knew that publication of the scandalous falsehoods would cause immediate and irreparable injury to Plaintiff.  Adweek had an ulterior motive and engaged in a campaign of defamation against chief creative officers in which they reiterated and republished defamatory statements online and via Twitter and Facebook. *See, e.g., Poulston v Rock*, 251 Va. 254, 263, 476 S.E.2d 479 (1996) ("It is uncontroverted that Rock was out to 'get' Poulston and sought to accomplish this end by interfering with Poulston's employment and reputation.  Rock reiterated the defamatory statements in the workplace and in public places, further injuring Poulston's reputation. Such actions unquestionably fall within the category of malice and support the jury award of punitive damages.").

3.      Adweek revealed confidential information knowing that it would hurt Plaintiff. *B2Gold Corp. v. Christopher*, 2019 WL 4934969, at * 13 (E.D. Va. 2019) ("Defendants made the statements with reckless disregard of whether or not they were false because they were trying to extort Plaintiffs, harm their reputations, and attempt to defraud them"); *Kroger Grocery and Baking Company, Inc. v. Rosenbaum*, 171 Va. 158, 165, 198 S.E. 461 (1938) (the defendants undertook, without reason or apology, to "wreck the character of the plaintiff by painting [her] as a criminal").

4.      Adweek knew that its sources exhibited extreme bias and ill-will for Plaintiff, and, therefore, had a motive to lie about Plaintiff. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 315 fn 19 (5th Cir. 1995) ("[E]vidence of ill will can often bolster an inference of actual malice."); *id. AdvanFort Co. v. Maritime Executive, LLC*, 2015 WL 4603090, at * 8 (E.D. Va. 2015) ("If, in fact, TME knew of the bad blood between Plaintiffs and Defendant Cartner, it would have indeed had obvious reason to

doubt Cartner's veracity and the accuracy of his statements given the blatantly hostile and sarcastic tone of the Article.").

5.      Adweek reiterated, repeated and continued to publish the false defamatory statements to the broadest possible audience, online and on social media out of a desire to hurt Plaintiff with reckless disregard for the consequences. *Eramo*, 2016 WL 5234688, at * 5 ("Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted.") (quoting *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2nd Cir. 1969), *cert. denied*, 396 U.S. 1049 (1970) (stating that repetition is one factor that may be probative of actual malice)).

6.      In publishing the terms of a confidential settlement agreement, Adweek blatantly disregarded journalistic ethics and standards, ignored the law and invaded Plaintiff's rights. *Gilmore v. Jones*, 37 F.Supp.3d 630, 671 (W.D. Va. 2019) (a defendant's failure to observe journalistic standards, although not determinative, is relevant to the actual malice inquiry) (citing *Eramo*, 209 F.Supp.3d at 871-872.[8]

---

[8]      Actual malice is a question of fact for the Jury.  It is a fact-intensive inquiry that cannot be resolved on a motion to dismiss under Rule 12(b)(6).  In order to determine whether actual malice exists, the Court must review the totality of the circumstances.  The issue cannot be resolved by looking at any one factor alone.  In *Harte-Hanks Communications, Inc. v. Connaughton*, for example, the United States Supreme Court held that the "failure to investigate will not **alone** support a finding of actual malice." 491 U.S. 657, 692 (1989) (emphasis added). *Eramo*, 2016 WL 5234688, at * 5 ("Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact.  Plaintiff, however, goes further.  Pointing to Erdely's own reporting notes, plaintiff also forecasts evidence that could lead a reasonable jury to find that Erdely had 'obvious reasons to doubt [Jackie's] veracity' or 'entertained serious doubts as to the truth of [her] publication.'").

## <u>CONCLUSION AND REQUEST FOR RELIEF</u>

For the reasons stated above, Plaintiff respectfully requests the Court to deny Adweek's motion to dismiss.


DATED:        January 3, 2020


JOE ALEXANDER


By:   */s/Steven S. Biss*
        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:      (804) 501-8272
        Facsimile:      (202) 318-4098
        Email:          **stevenbiss@earthlink.net**

        *Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2020 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendants and all interested parties receiving notices via CM/ECF.

By: _/s/Steven S. Biss_
      Steven S. Biss (VSB # 32972)
      300 West Main Street, Suite 102
      Charlottesville, Virginia 22903
      Telephone:    (804) 501-8272
      Facsimile:    (202) 318-4098
      Email:        **stevenbiss@earthlink.net**

      *Counsel for the Plaintiff*