**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |
|---|---|
| **JOE ALEXANDER,**<br><br>        **Plaintiff,**<br><br>      **v.**<br><br>**DIET MADISON AVENUE, JEAN BATTHANY, DANI HURT, MARA BUTA, ADWEEK, LLC, AND PATRICK COFFEE,**<br><br>        **Defendants.** | Case No. 3:19-cv-00688-JAG |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS ADWEEK, LLC AND PATRICK COFFEE'S
MOTION TO DISMISS**

Matthew E. Kelley
Va. Bar No. 84045
BALLARD SPAHR LLP
1909 K St. NW, 12th Floor
Washington, DC 20006-1157
Phone: 202-661-2200
Fax: 202-661-2299
kelleym@ballardspahr.com

Michael Berry
(*pro hac vice*)
BALLARD SPAHR LLP
1735 Market St., 51st Floor
Philadelphia, PA 19103
Phone: 215-988-9773
Fax: 215-865-8999
berrym@ballardspahr.com

Thomas B. Sullivan
(*pro hac vice*)
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
Phone: 212-850-6139
Fax: 212-223-1942
sullivant@ballardspahr.com

*Counsel for Defendants Adweek, LLC and Patrick Coffee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

ARGUMENT ...............................................................................................1

I.     THIS COURT LACKS PERSONAL JURISDICTION OVER ADWEEK ......................1

II.    ALEXANDER CANNOT STATE ANY VIABLE CLAIM ...............................4

       A.     The First Amendment Bars Alexander's Claims Because He Is a
              Public Figure in the Advertising Industry and Cannot Establish Actual
              Malice .........................................................................................4

       B.     Alexander Cannot State a Defamation Claim .........................................8

              1.     Any Claim for the December 7, 2017 Article Is Time-Barred ..................8

              2.     The Other Three Adweek Publications Are Indisputably True ................10

              3.     Adweek Cannot Be Liable For Another Party's Publication...................13

       C.     Adweek Did Not Tortiously Interfere with Any of Alexander's
              Contracts ....................................................................................13

       D.     Alexander Cannot State a Conspiracy Claim Against Adweek............................15

       E.     Alexander Cannot State a Claim for Intentional Infliction of
              Emotional Distress.........................................................................18

       F.     Alexander Cannot State a Claim for Aiding and Abetting ..................................19

CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*A Soc'y Without a Name, for People without a Home, Millennium Future-Present*
    *v. Virginia*,
    655 F.3d 342 (4th Cir. 2011) ...............................................................16

*AdvanFort Co. v. The Mar. Exec. LLC*,
    2015 U.S. Dist. LEXIS 99208 (E.D. Va. July 28, 2015) ........................8

*Armstrong v. Bank of Am.*,
    61 Va. Cir. 131 (Cir. Ct. 2003) .............................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................16

*B2Gold Corp. v. Christopher*,
    No. 1:18-cv-1202, Dkt. 29 (E.D. Va. July 10, 2019)...............................7

*Bartincki v. Vopper*,
    532 U.S. 514 (2001)........................................................................14, 15

*Beasley v. FV-I, Inc.*,
    2013 U.S. Dist. LEXIS 39640 (E.D. Va. Mar. 21, 2013) .....................16

*Blue Ridge Bank v. Veribanc, Inc.*,
    755 F.2d 371 (4th Cir. 1985) .................................................................2

*Bochan v. La Fontaine*,
    68 F. Supp. 2d 692 (E.D. Va. 1999) ......................................................3

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
    334 F.3d 390 (4th Cir. 2003) .................................................................3

*Chaves v. Johnson*,
    230 Va. 112 (1985) ..............................................................................14

*Daniczek v. Spencer*,
    156 F. Supp. 3d 739 (E.D. Va. 2016) ..................................................18

*Dickenson v. Wal-Mart Stores, Inc.*,
    1997 U.S. Dist. LEXIS 19459 (W.D. Va. Nov. 3, 1997).......................13

*Doctor's Data, Inc. v. Barrett*,
    170 F. Supp. 3d 1087 (N.D. Ill. 2016) .................................................10

*Doe v. Roe*,
    295 F. Supp. 3d 664 (E.D. Va. 2018) ....................................................9

*Dowd v. Calabrese*,
    589 F. Supp. 1206 (D.D.C. 1984) ........................................................................17

*Downey v. Coal. Against Rape & Abuse, Inc.*,
    2005 U.S. Dist. LEXIS 7340 (D.N.J. Apr. 27, 2005) ............................................17

*Dragulescu v. Va. Union Univ.*,
    223 F. Supp. 3d 499 (E.D. Va. 2016) .....................................................................9

*Duffy v. Leading Edge Products, Inc.*,
    44 F.3d 308 (5th Cir. 1995) ....................................................................................8

*Edwards v. Schwartz*,
    378 F. Supp. 3d 468 (W.D. Va. 2019) ...................................................................11

*Eldib v. Bass Pro Outdoor World, L.L.C.*,
    2015 U.S. Dist. LEXIS 99833 (E.D. Va. July 29, 2015) .......................................19

*Eramo v. Rolling Stone, LLC*,
    209 F. Supp. 3d 862 (W.D. Va. 2016) ...........................................................6, 7, 9

*Feeley v. Total Realty Mgmt.*,
    660 F. Supp. 2d 700 (E.D. Va. 2009) ....................................................................16

*Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*,
    109 F.3d 993 (4th Cir. 1997) ..................................................................................4

*FireClean, LLC v. Tuohy*,
    2016 U.S. Dist. LEXIS 96294 (E.D. Va. July 21, 2016) ...............................2, 3, 17

*Foretich v. Glamour*,
    741 F. Supp. 247 (D.D.C. 1990) ...........................................................................10

*Fuller v. Aliff*,
    990 F. Supp. 2d 576 (E.D. Va. 2013) ....................................................................19

*Gilmore v. Jones*,
    370 F. Supp. 3d 630 (W.D. Va. 2019) ...............................................................8, 10

*Gubarev v. BuzzFeed, Inc.*,
    253 F. Supp. 3d 1149 (S.D. Fla. 2017) ...................................................................2

*Hanks v. Wavy Broad., LLC*,
    2012 U.S. Dist. LEXIS 15729 (E.D. Va. Feb. 7, 2012) .........................................12

*Harte-Hanks Commc'ns v. Connaughton*,
    491 U.S. 657 (1989) ............................................................................................4, 6

*Holley v. CVS Caremark Corp.*,
  2016 U.S. Dist. LEXIS 101522 (W.D. Va. Aug. 3, 2016)....................................................18

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
  238 F. Supp. 2d 174 (D.D.C. 2002) ...................................................................................18

*Kramer v. Monogram Models, Inc.*,
  700 F. Supp. 1348 (D.N.J. 1988) .......................................................................................10

*Kroger Grocery & Baking Company, Inc. v. Rosenbaum*,
  171 Va. 158 (1938) ...............................................................................................................8

*Lolavar v. De Santibanes*,
  430 F.3d 221 (4th Cir. 2005) ................................................................................................3

*Lucido v. Maxwell*,
  93 Va. Cir. 415 (2016) ..........................................................................................................3

*LULAC v. Pub. Interest Legal Found.*,
  2018 U.S. Dist. LEXIS 136524 (E.D. Va. Aug. 13, 2018)....................................................10

*Mayfield v. NASCAR*,
  674 F.3d 369 (4th Cir. 2012) .............................................................................................4, 5

*McCleary-Evans v. Md. DOT*,
  780 F.3d 582 (4th Cir. 2015) ..............................................................................................13

*In re McMaken*,
  2018 Bankr. LEXIS 2798 (Bankr. E.D. Va. Sep. 13, 2018)..................................................19

*Meyers v. Levinson*,
  2005 U.S. Dist. LEXIS 42799 (E.D. Va. July 26, 2005) .........................................................9

*Milsap v. Journal/Sentinel, Inc.*,
  100 F.3d 1265 (7th Cir. 1996) ...............................................................................................5

*Mirafuentes v. Estevez*,
  2015 U.S. Dist. LEXIS 166157 (E.D. Va. Nov. 30, 2015)....................................................11

*Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*,
  326 F. Supp. 3d 26 (S.D.N.Y. 2018)....................................................................................10

*Moon v. CBS*,
  7 Va. Cir. 68 (Cir. Ct. 1981) .................................................................................................9

*Moore v. Allied Chemical Corp.*,
  480 F. Supp. 364 (E.D. Va. 1979) .......................................................................................10

*Myska v. RMS Techs.*,
   25 Va. Cir. 344 (Cir. Ct. 1991) ................................................................9

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964).................................................................................8

*Oliver v. Baity*,
   208 F. Supp. 3d 681 (M.D.N.C. 2016) .................................................18

*Perk v. Vector Res. Grp., Ltd.*,
   485 S.E.2d 140 (Va. 1997)....................................................................12

*Perrott v. Coffee*,
   2019 U.S. Dist. LEXIS 216211 (E.D. Va. Dec. 16, 2019) ................1, 3

*Perry v. Isle of Wight Cty.*,
   2016 U.S. Dist. LEXIS 53362 (E.D. Va. Apr. 20, 2016)......................11

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999) ..................................................................4

*Poulston v. Rock*,
   251 Va. 254 (1996) .................................................................................7

*Ramunno v. Cawley*,
   705 A.2d 1029 (Del. 1998) ...................................................................17

*Shirvinski v. U.S. Coast Guard*,
   673 F.3d 308 (4th Cir. 2012) ................................................................17

*Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*,
   191 F. Supp. 2d 652 (E.D. Va. 2002) ..................................................19

*Time, Inc. v. Johnston*,
   448 F.2d 378 (4th Cir. 1971) ..................................................................5

*Unspam Techs., Inc. v. Chernuk*,
   716 F.3d 322 (4th Cir. 2013) ...........................................................3, 16

*Va. Citizens Def. League v. Couric*,
   2017 U.S. Dist. LEXIS 83308 (E.D. Va. May 31, 2017) .....................12

*Walden v. Fiore*,
   571 U.S. 277 (2014).................................................................................2

*Weaver v. Beneficial Finance Co.*,
   199 Va. 196 (1957) .................................................................................9

*Whitaker v. Wells Fargo Advisors, LLC*,
    2011 U.S. Dist. LEXIS 111938 (E.D. Va. Sept. 29, 2011)....................................................11

*Witthohn v. Fed. Ins. Co.*,
    164 F. App'x 395 (4th Cir. 2006) ............................................................................................4

*WJLA-TV v. Levin*,
    264 Va. 140 (2002) ................................................................................................................10

*Young v. New Haven Advocate*,
    315 F.3d 256 (4th Cir. 2002) ..............................................................................................2, 3

**Statutes**

Va. Code § 8.01-223.2(A).................................................................................................................4

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ........................................................................................4

In his Opposition to the motion to dismiss filed by Adweek, LLC and Patrick Coffee (collectively, "Adweek"), plaintiff Joe Alexander doubles down on his see-what-sticks approach to this litigation, continuing to push a speculative conspiracy theory of liability, stretching that theory in an attempt to establish jurisdiction over Adweek, and offering up new theories of liability that appear nowhere in his Amended Complaint.[1]  All of these various theories are undercut by Alexander's factual allegations, and they each fall flat as a matter of law.

Under Fourth Circuit precedent, Adweek is not subject to jurisdiction because it has no meaningful contacts with Virginia and its publications were not targeted here.  Alexander does not address that precedent and cannot avoid it simply by calling Adweek and its supposed sources "co-conspirators."  Even if jurisdiction could be exercised, all of Alexander's claims against Adweek fail because he is a limited-purpose public figure who cannot plausibly plead actual malice, as his Opposition makes clear.  In addition, the core of his defamation claim is barred by Virginia's one-year statute of limitations and its stringent single publication rule, and the Adweek publications that fall within the statutory period are indisputably true.  While Alexander continues his attempt to shoehorn his time-barred defamation claim into other tort theories, he cannot avoid that bar or meet those torts' basic elements.  The case against Adweek should be dismissed.

## **ARGUMENT**

## I.    **THIS COURT LACKS PERSONAL JURISDICTION OVER ADWEEK.**

The Opposition concedes general jurisdiction is lacking,[2] but contends specific jurisdiction exists because (1) Adweek reported on Alexander and the Agency (both Virginia

---

[1] In this Reply, Adweek uses the same defined terms and abbreviations that it employed in its opening memorandum, Dkt. 31 ("Mem.").

[2] Judge Hudson recently determined Adweek and Coffee are not subject to general jurisdiction here.  *Perrott v. Coffee*, 2019 U.S. Dist. LEXIS 216211, at *4 n.5 (E.D. Va. Dec. 16, 2019).

residents), and those reports were read by Virginians; (2) Adweek has web servers here; and (3) alleged co-conspirators were present and acted in Virginia. *See* Pl.'s Memorandum in Opposition to Defendants' Motion to Dismiss, Dkt. 32 ("Opp.") at 15-17. None of these contentions suffice.

Alexander's first argument falls short because "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [it] to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277, 290 (2014). For jurisdiction to lie in cases involving Internet publications, the publication must "manifest an intent to target and focus on Virginia readers." *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002). Thus, as district courts have held in *FireClean, LLC v. Tuohy*, 2016 U.S. Dist. LEXIS 96294 (E.D. Va. July 21, 2016), and the other cases discussed in Adweek's opening brief, the fact that a defendant wrote about a Virginia resident and conducted some reporting from sources here does not establish personal jurisdiction. Mem. at 9-11. Other than baldly claiming the focus of Adweek's reporting "was clearly always on Virginia," Opp. at 14, the Opposition does not address this precedent or line of cases. It forecloses Alexander's claim of jurisdiction. The reporting about Alexander, an internationally renowned figure in advertising, was targeted to the entire ad industry, as the Amended Complaint acknowledges. *See* Mem. at 8-11; *see also, e.g.*, FAC ¶ 1 (reporting "rocked the advertising industry").[3] Although Alexander lives here, the publications at issue were

---

[3] Plaintiff's citation of an out-of-Circuit case and a 35-year-old decision by the Fourth Circuit do not alter this analysis. In *Gubarev v. BuzzFeed, Inc.*, 253 F. Supp. 3d 1149 (S.D. Fla. 2017), the court noted that the defendant's connections to the Florida forum were "extensive," including its "regularly send[ing] reporters to Florida to cover Florida-based stories" and "regularly author[ing] and publish[ing] articles that are aimed at a Florida audience," *id.* at 1157-58 (citations omitted). No such contacts between Adweek and Virginia are asserted here, and *Young* was not binding on the Florida court. *Blue Ridge Bank v. Veribanc, Inc.*, 755 F.2d 371 (4th Cir. 1985), was issued before *Walden* and *Young*, did not address an Internet publication, and involved a "local bank" in Virginia and article in the *Richmond Times-Disptach*, *id.* at 374.

not focused on Virginia readers.  Thus, as in *Young* and *Tuohy*, jurisdiction does not lie in Virginia.

Alexander cannot avoid this conclusion by suggesting the possibility that Adweek's web servers might be located in Virginia.  *See* Opp. at 15.  Although Adweek contracts with Amazon Web Services ("AWS") to provide cloud-based web services, *see* Litvack Decl. ¶ 7, there is no evidence that its data is on servers here.[4]  Nor would that matter for jurisdictional purposes.  *See, e.g.*, *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003) (describing "as 'de minimis' the level of contact created by the connection between an out-of-state defendant and a web server located within a forum"); *Perrott*, 2019 U.S. Dist. LEXIS 216211, at *8 n.7 (rejecting argument Adweek is subject to jurisdiction because of AWS servers).[5]

Alexander's conspiracy theory of jurisdiction fares no better.  The Fourth Circuit has held that to succeed on a conspiracy theory of jurisdiction, a plaintiff must "'make a plausible claim' that (1) a conspiracy existed" and (2) that the defendant "participated in the conspiracy" with a co-conspirator who has "sufficient contacts with Virginia."  *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) (quoting *Lolavar v. De Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005)).  As the appeals court has made clear, this requirement is not met through "[b]are allegations."  *Lolavar*, 430 F.3d at 229.  Yet, as discussed below, that is all that Alexander has offered.  *See infra* at 15-18.  He cannot skirt this Circuit's well-established law governing Internet jurisdiction merely by slapping the label "conspiracy" on his claims and reciting the elements of the conspiracy tort.  His factual allegations about Adweek's supposed involvement with the other defendants simply

---

[4] AWS has servers throughout the world. *See* Amazon Web Services, Global Infrastructure Regions and AZs, https://aws.amazon.com/about-aws/global-infrastructure/regions_az/.

[5] The cases cited by Alexander on this point do not aid his argument.  In *Lucido v. Maxwell*, 93 Va. Cir. 415, 418-19 (2016), the court dismissed the case "for lack of personal jurisdiction."  *Id.* at 418-19.  And, *Bochan v. La Fontaine*, 68 F. Supp. 2d 692 (E.D. Va. 1999), was decided both before the existence of cloud-computing and, more importantly, before the Fourth Circuit and other courts characterized cloud-based contacts as *de minimis* for jurisdictional purposes.

reflect typical interactions of reporters and sources, not a tortious conspiracy.

Accordingly, Adweek respectfully requests that the Court dismiss all of Alexander's claims for lack of personal jurisdiction.  Mem. at 6-11.

## II.   ALEXANDER CANNOT STATE ANY VIABLE CLAIM.

Even if Alexander could establish jurisdiction over Adweek, his suit should be dismissed. Adweek is immune from civil liability under Va. Code § 8.01-223.2(A), and Alexander's Amended Complaint fails to state any claim.[6]  *See* Mem. at 11-30.

### A.   The First Amendment Bars Alexander's Claims Because He Is a Public Figure in the Advertising Industry and Cannot Establish Actual Malice.

A public figure attempting to bring any tort claim based on allegedly false statements must plausibly plead actual malice.  *Mayfield v. NASCAR*, 674 F.3d 369, 377-78 (4th Cir. 2012); *see* Mem. at 22-30.  Alexander does not contest this constitutional requirement,[7] but argues it

---

[6] Alexander argues Adweek's motion must be converted to a summary judgment motion because its brief "repeatedly refers to matters outside [his] complaint."  Opp. at 18 n.6.  But, documents "integral to and explicitly relied on in the complaint" are properly considered on a motion to dismiss.  *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  The only documents Adweek cites that are not referenced in the Amended Complaint are documents filed in this case – the contract he signed with the Agency upon his termination and a brief he filed in response to a motion for protective order.  *See* Mem. at 5 (citing Dkt. 9-4 and Dkt. 16).  Those documents can be considered on this Rule 12(b)(6) motion.  *E.g.*, *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006) ("court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed").  The opposition to the motion to seal was filed by Alexander, and he does not dispute that the separation agreement filed by IPG in this action is a true and accurate copy.  *See* Dkt. 16 at 7.  Nevertheless, to the extent the Court determines that those two documents are not integral to the Amended Complaint, it may disregard them.  *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997).

[7] Alexander asserts in a footnote that actual malice is a "question of fact for the Jury.  It is a fact-intensive inquiry that cannot be resolved on a motion to dismiss . . . ."  Opp. at 30 n.8.  This is not the law in the Fourth Circuit or any federal court.  *See* Mem. at 22 n.11.  Indeed, the Supreme Court case he cites in that same footnote plainly instructs that whether the record "is sufficient to support a finding of actual malice is a question of law."  *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 685 (1989).

does not apply because he was no longer a public figure when Adweek reported on him.  Opp. at 28.  Yet, he cites no factual support for that contention, and it is directly contradicted by his Opposition, which devotes its first two pages of facts to discussing how "incredibly popular" Alexander was at the time of his termination and how well known he was for supporting women and promoting "diversity in the workplace."  Opp. at 2-5.  It also is contradicted by his Amended Complaint.  *See* Mem. at 23-25; FAC ¶¶ 2, 4, 5, 20-22.  In any event, the law is clear that "an individual who was once a public figure with respect to a controversy remains a public figure for latter commentary on that controversy."  *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1269-70 (7th Cir. 1996) (collecting cases).  Indeed, long-standing Fourth Circuit precedent provides that "[n]o rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attach to events in such a public career."  *Time, Inc. v. Johnston*, 448 F.2d 378, 380-82 (4th Cir. 1971) (holding that the plaintiff's public figure status did not expire in twelve years between events in question and challenged publication).

To adequately plead actual malice, a plaintiff must make specific allegations of fact; a "conclusory allegation" or "mere recitation of the legal standard" does not suffice.  *Mayfield*, 674 F.3d at 378.  In arguing that he has met that burden, Alexander points to a single paragraph of his Amended Complaint that contains a series of conclusory allegations.  *See* Opp. at 28-30.  As Adweek previously detailed, these bare conclusions are directly contradicted by other specific facts alleged elsewhere in his pleading – allegations the Opposition ignores.  Mem. at 27-18.

For example, while Alexander claims that Adweek "pursued a preconceived story – that Plaintiff was guilty of sexual harassment – and published half-truths to conform to the preconceived story," Opp. at 28, his Amended Complaint admits that before Adweek reported on the accusations against Alexander, (1) the Agency disclosed confidential HR files about him and

information that he "had sexually harassed Martin employees," FAC ¶ 3; (2) another trade

publication, *Adage*, reported he was terminated due to an accusation of sexual harassment, FAC

¶ 39; *see* Berry Decl., Ex. N; (3) Alexander publicly acknowledged the Agency had opened a

sexual harassment investigation against him, FAC ¶ 67; and (4) Coffee sought his response about

the accusations and included that response in his reporting, FAC ¶ 68; Berry Decl., Ex. B at 2-3.

Alexander seeks to bolster his "preconceived story" theory by relying heavily on *Eramo*

*v. Rolling Stone, LLC*, 209 F. Supp. 3d 862 (W.D. Va. 2016).  The *Eramo* court did hold that the

plaintiff had adequately demonstrated actual malice by showing a preconceived story line, but it

did so based on additional facts, including that the reporter (1) "consciously disregarded

contradictory evidence," (2) "did not seek to contact" people she knew were first-hand witnesses

of events, (3) knew her source's "account of her alleged rape had changed," and (4) was advised

by "three individuals . . . that her portrayal of [the plaintiff] was inaccurate," *id.* at 872-73.  Here,

in contrast, Adweek was not given any contradictory evidence, it spoke to numerous people

about Alexander's conduct (including first-hand witnesses), no sources changed their stories, and

no one but Alexander denied the accusations.  *See* Mem. at 26-28; *Harte-Hanks*, 491 U.S. at 691

n.37 ("the press need not accept 'denials, however vehement; such denials are so commonplace

in the world of polemical charge and countercharge that, in themselves, they hardly alert the

conscientious reporter to the likelihood of error'" (citation omitted)).

The Opposition tries to save Alexander's claims by raising two new theories of actual

malice that appear nowhere in the Amended Complaint:  Adweek's reporting on the confidential

settlement agreement somehow disregarded journalistic ethics, and Adweek knew its sources

were biased, Opp. at 29-30.  The Opposition offers no factual support for these belated theories.

They do not support his case.  The settlement agreement *disproves* Alexander's theory of actual

malice because it bolstered the *truth* of what Adweek reported (that Alexander had a history of being accused of sexual harassment).  And, the bare assertion that some unidentified sources were biased does not evidence Adweek itself knew its reporting was false or doubted its veracity, particularly in light of Alexander's vast admissions detailed above, his concession the Agency told him about the many accusations he faced and compared his situation to Matt Lauer and Garrison Keillor when forcing him out, *and* his own public statements acknowledging that he left rather than face a "hurtful investigation."  *See* Mem. at 2-4.  Moreover, Alexander's claim that Adweek had some "ulterior motive" to "hurt" him, Opp at 29, is undercut by his own admission that Adweek regularly honored him, including just weeks before his termination when it highlighted him in a report about the Agency and published a feature of him picking his favorite ads of all time.  *See* FAC ¶¶ 2, 20, 21; Berry Supp. Decl., Exs. R-U.  At bottom, Alexander's theories of actual malice are utterly implausible, much less supported by factual allegations that would make a clear and convincing showing of actual malice.  *See* Mem. at 22-23, 26-30.

In its opening brief, Adweek explained why, under well-established law, Alexander's allegations individually and collectively do not establish actual malice as a matter of law.  Mem. at 26-30.  The Opposition does not address those arguments at all or any of the cases cited in that brief.  Instead, it cites to *Eramo* and similarly inapposite cases:

- In *Poulston v. Rock*, 251 Va. 254, 263 (1996), it was "uncontroverted" that the defendant was "out to 'get'" the plaintiff following litigation between them.  To avenge this personal vendetta, he made up a story that the plaintiff was a thief and then told that fabricated story to the plaintiff's employer in an effort to get him fired.  *Id.*  This case involves nothing remotely similar.

- *B2Gold Corp. v. Christopher*, No. 1:18-cv-1202, Dkt. 29, (E.D. Va. July 10, 2019), is a default judgment case where, according to the complaint, the defendants had explicitly threatened a "war" and a "vicious social media campaign designed to lower [Plaintiff's stock] price" if it did not purchase a mine from them, *id.* at 14, 29.  No allegations of extortion or threats are present here.

- *Kroger Grocery & Baking Company, Inc. v. Rosenbaum*, 171 Va. 158, 165 (1938), was issued almost thirty years before *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), established the actual malice requirement in defamation cases.

- In *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 316 (5th Cir. 1995), the court found the allegations of actual malice *inadequate*.

- In *AdvanFort Co. v. The Mar. Exec. LLC*, 2015 U.S. Dist. LEXIS 99208, at *21 (E.D. Va. July 28, 2015), the plaintiffs claimed that the author of the article, not a source, had ill-will toward him, that the publisher of the article knew of this "bad blood" between the parties, and that this knowledge, combined with the "blatantly hostile and sarcastic tone" of the article at issue, could adequately allege actual malice. Here, there is no suggestion of "bad blood" between Coffee and Alexander, and Adweek's reporting on the accusations against Alexander had neither a hostile nor sarcastic tone.

- Finally, the purported breach of ethical standards in *Gilmore v. Jones*, 370 F. Supp. 3d 630, 673 (W.D. Va. 2019), was a failure to contact the plaintiff prior to publication, while Alexander acknowledges he was contacted here, FAC ¶ 68.

Because Alexander has failed to plausibly plead actual malice, each of his claims fails as a matter of constitutional law, and this action should be dismissed with prejudice.

## B.   <u>Alexander Cannot State a Defamation Claim.</u>

In response to Adweek's motion to dismiss, Alexander has narrowed his defamation claim to its December 7, 2017 article (the supposed "hit piece"), a tweet from Coffee, two other Adweek publications, and a new claim arising from the Agency's posting of an article written by a different media company, Refinery29. *See* Opp. at 19. Alexander concedes that the other nine articles on which he initially based his claim are untimely. *See* Mem. at 12-13.

### 1.   <u>Any Claim for the December 7, 2017 Article Is Time-Barred.</u>

The Opposition contends the December 2017 "hit piece," which indisputably was published more than a year before Alexander filed suit, is actionable because it was "republished" within the limitations period. Virginia, however, follows the single publication rule. That rule bars this claim. *See* Mem. at 13.

Under the single publication rule, "with respect to a single publication, the statute of limitations begins to run when the first publication is made and subsequent distribution of that statement does not 'start the statute of limitations running anew.'" *Doe v. Roe*, 295 F. Supp. 3d 664, 671 (E.D. Va. 2018) (citation omitted).  This rule prevents the "insurmountable burdens" the mass media would face in the absence of such a strict limitation.  *Moon v. CBS*, 7 Va. Cir. 68, 69 (Cir. Ct. 1981) (explaining that a "'multiple publication' rule would be unworkable and would in effect destroy any protections afforded by a one-year statute of limitations").

The Opposition seeks to avoid the one-year statute by pointing to *Weaver v. Beneficial Finance Co.*, 199 Va. 196, 199-200 (1957).  *See* Opp. at 20-21.  But, it is well established that the single publication rule is "an exception to the *Weaver* rule."  *Armstrong v. Bank of Am.*, 61 Va. Cir. 131, 132 (Cir. Ct. 2003); *see Meyers v. Levinson*, 2005 U.S. Dist. LEXIS 42799, at *51 (E.D. Va. July 26, 2005) (discussing the single publication rule's history and noting that *Weaver* did not discuss the rule, which was "a fairly recent development at the time *Weaver* was decided").  Indeed, the purpose of the single publication rule is to avoid precisely what Alexander attempts here.  *See Myska v. RMS Techs.*, 25 Va. Cir. 344, 346 (Cir. Ct. 1991) ("[T]his rule was adopted in recognition of the vast multiplicity of suits which could arise from mass publications which transcend a variety of medias and state lines, and the attendant problems of choice of law, indefinite liability, and endless tolling of the statute of limitation.").

The cases cited by Alexander are not to the contrary.  In both *Doe*, 295 F. Supp. at 671, and *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 512 (E.D. Va. 2016), the court applied the single publication rule and found any claim was time-barred.  In several other cases, unlike here, the defendant itself was alleged to have republished the statement at issue.  *See Eramo*, 209 F. Supp. 3d at 879-80 (magazine appended original article to editor's note acknowledging

discrepancies); *Gilmore*, 370 F. Supp. 3d at 658 & n.30 (defendant accused of republishing article and video on his YouTube channel); *LULAC v. Pub. Interest Legal Found.*, 2018 U.S. Dist. LEXIS 136524, at *3 (E.D. Va. Aug. 13, 2018) (defendant published a second report reiterating pre-existing, allegedly defamatory material).  And, in another case, the court simply stated the general rule that "subsequent republications of . . . a statement are separate torts" when holding that the plaintiff could bring a single defamation claim for multiple publications by the same defendant.  *See WJLA-TV v. Levin*, 264 Va. 140, 153 (2002).[8]

Even if Alexander's novel suggestion to disregard the single publication rule were accepted, he still could not state a claim based on the so-called "hit piece" because he has not cited any republications of that article.  The only publications he cites are tweets and articles that link to the article, and, as the Opposition concedes, the law uniformly holds that a hyperlink to an article does not constitute a republication.  *See* Mem. at 13 n.7; *see also, e.g.*, *Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018) (linking to a story in a tweet did not constitute republication); *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016) ("A hyperlink . . . does not duplicate the content of a prior publication").

## 2.    The Other Three Adweek Publications Are Indisputably True.

The tweet by Coffee on December 19, 2018 and the two articles published by Adweek in

---

[8] The sole remaining case cited by Alexander, *Moore v. Allied Chemical Corp.*, 480 F. Supp. 364 (E.D. Va. 1979), is inapposite.  *Moore* held that "if an action against the wrongdoer for the initial publication of the defamatory material is time-barred, he still may be liable *for those republications which occurred within the one-year period of limitation.*"  *Id.* at 376 (emphasis added); *see Foretich v. Glamour*, 741 F. Supp. 247, 253 n.9 (D.D.C. 1990) (noting the *Moore* rule applies only "so long as republication occurred during the limitations period with respect to the original publication").  Alexander has not pointed to any publication that meets this requirement and was published less than one year before suit.  Also, *Moore*, which did not even mention the single publication rule, appears to have been wrongly decided in light of the great weight of case law both before and since then.  *Kramer v. Monogram Models, Inc.*, 700 F. Supp. 1348, 1353 (D.N.J. 1988) ("*Moore* is far from the majority rule.").

2018 are not actionable because they are not false.  *See* Mem. at 13-15.  Alexander cannot satisfy

his burden at the pleading stage by merely, yet "emphatically, alleg[ing] in his complaint that

Adweek's statements were false."  Opp. at 22.  Federal courts in Virginia have repeatedly

granted motions to dismiss where, just as in this case, the pleadings establish that the statements

at issue are substantially true.  *See, e.g.*, *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 523-24

(W.D. Va. 2019) (dismissing claim where transcript referenced in complaint showed plaintiff

made the statement attributed to him); *Perry v. Isle of Wight Cty.*, 2016 U.S. Dist. LEXIS 53362,

at *6-7 (E.D. Va. Apr. 20, 2016) (dismissing claim when plaintiff's allegations showed statement

was not false); *Mirafuentes v. Estevez*, 2015 U.S. Dist. LEXIS 166157, at *12-13 (E.D. Va. Nov.

30, 2015) (dismissing complaint after finding statement was accurate); *Whitaker v. Wells Fargo

Advisors, LLC*, 2011 U.S. Dist. LEXIS 111938, at *8-12 (E.D. Va. Sept. 29, 2011) (granting

motion to dismiss following comparison of admitted facts and claimed defamatory statement).

Alexander fails to identify anything false in any of the three publications:

*First*, the Opposition cites a series of cases for the proposition that Coffee's tweet is

"referring to Plaintiff."  Opp. at 22.  That, however, is not in dispute.  The Opposition does not

address to either of the grounds for dismissal:  (1) the numerous cases cited by Adweek holding

that the description of an event as a "scandal" is a statement of opinion, and (2) to the extent that

describing Alexander's departure as a "scandal" could be deemed a statement of fact, it is

indisputably true.  *See* Mem. at 14.  Those uncontested arguments doom any claim for the tweet.

*Second*, with respect to the article titled *The 5 Most Important Ad Industry Stories of

2018*, the Opposition contends the sentence stating generally that "[m]isogyny and advertising

have an unfortunate and well-documented history" somehow accuses Alexander of misogyny

personally.  Opp. at 23.  But, under Virginia law, a plaintiff cannot "extend the meaning of the

11

words used beyond their ordinary and common acceptance," *Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 144 (Va. 1997), and a court must view "allegedly defamatory statements in context," *Hanks v. Wavy Broad., LLC*, 2012 U.S. Dist. LEXIS 15729, at *21 (E.D. Va. Feb. 7, 2012) (citation omitted). *Accord Va. Citizens Def. League v. Couric*, 2017 U.S. Dist. LEXIS 83308, at *14 (E.D. Va. May 31, 2017) (Gibney, J.) (rejecting attempt to "take the film [at issue] beyond its plain meaning"), *aff'd*, 910 F.3d 780 (4th Cir. 2018). Here, the sentence cited by the Opposition appears two paragraphs before any reference to Alexander and, in context, clearly refers to the history of sexism in the advertising industry as a whole. Berry Decl., Ex. L at 2; *Hanks*, 2012 U.S. Dist. LEXIS 15729, at *20-21 (reference to "unscrupulous tax preparers" in report also mentioning error made by plaintiff was discussing tax preparers as a class, not plaintiff). The sentence says nothing about Alexander, and the sole sentence mentioning him is indisputably true, as the "#MeToo movement officially hit the [advertising] business in December 2017, when The Martin Agency fired CCO Joe Alexander." FAC ¶ 9; Mem. at 15.

**Third**, with respect to the article *The 20 Biggest AgencySpy Posts of 2018*, the Opposition argues that a single sentence implies Alexander "engaged in an 'abuse of power' as Chief Creative Officer at Martin." Opp. at 23. That sentence states, "After the departure of The Martin Agency chief creative Joe Alexander last December, 2018 became the year #MeToo finally arrived as the industry maybe, finally began to grapple with endemic abuses of power." FAC ¶ 9. Again, in context, the Opposition's alleged meaning is not reasonable. The sentence simply noted that in the wake of Alexander's departure at the end of 2017, advertising companies began to deal with #MeToo issues in 2018, which Alexander admits is true. *See, e.g.*, *id.* ¶¶ 3, 45 n.22. And, in any event, it is undisputed that Alexander was forced out amid accusations that he sexually harassed employees, which is fairly characterized as an abuse of power. Mem. at 15.

### 3.   Adweek Cannot Be Liable For Another Party's Publication.

The Opposition seeks to assert a claim based on a fifth publication:  a January 6, 2019 posting on the Agency's website.  *See* Opp. at 19.  That article was written and published by Refinery29, not Adweek, and reposted by the Agency.  *See* Berry Decl., Ex. Q; Berry Supp. Decl., Ex. V.  It is fundamental that a plaintiff can state a defamation only based on a "publication by the defendant."  *Dickenson v. Wal-Mart Stores, Inc.*, 1997 U.S. Dist. LEXIS 19459, at *17 (W.D. Va. Nov. 3, 1997).  Alexander does not even attempt to explain how Adweek could be held liable for an article it did not write, publish, or post.  It cannot.

### C.   Adweek Did Not Tortiously Interfere with Any of Alexander's Contracts.

The only contract on which Alexander's Complaint bases his tortious interference claim is his employment contract.  FAC ¶¶ 82, 84.  Because that contract was terminated before Adweek published a word, Adweek could not have interfered with it.  *See* Mem. at 15-16.

The Opposition cannot save this claim by speculating that Coffee might have been working on an article before December 1, 2017, and might have "instigated the 'verbal' incidents reported to Plaintiff on December 1, 2017."  Opp. at 24.  Neither allegation appears in Alexander's Amended Complaint, and this conjecture is contradicted elsewhere in the Opposition, which contends Adweek "combined" with the other defendants "[b]eginning in December 2017."  *Id.* at 4.  Yet, even if Coffee began working on his article "prior to December 1," *id.* at 24, the Amended Complaint makes clear the Agency began leaking confidential information about Alexander to DMA in "mid-October," Alexander's firing was ordered by IPG in "mid-November," and he was first told to resign on November 21.  FAC ¶¶ 31, 33, 34, 41.  None of these actions had anything to do with Coffee or his reporting.  And, even if Coffee somehow "instigated" the incidents reported to Alexander "on December 1" (he did not), Opp. at 24, the decision to end Alexander's employment occurred long before.  *E.g.*, *McCleary-Evans v.*

*Md. DOT*, 780 F.3d 582, 587 (4th Cir. 2015) (Supreme Court has "rejected the sufficiency of complaints that merely allege the possibility of entitlement to relief, requiring plausibility for obtaining such relief and thus rejecting a complaint in which the plaintiff relies on speculation").

In his Opposition, Alexander claims for the first time that his tortious interference claim is also grounded in a second contract, the 2013 settlement agreement. *See* Opp. at 24. This claim, which appears nowhere in his Amended Complaint, *cf.* FAC ¶¶ 82-87, is not viable.

***First***, to plead a tortious interference claim, a plaintiff must allege "intentional interference inducing or causing a breach." *Chaves v. Johnson*, 230 Va. 112, 120 (1985). The Amended Complaint, however, alleges only that Adweek published information that was "fed" to it by others. *See* FAC ¶ 9; *id.* ¶ 3 ("Adweek and Coffee hungrily published the false and defamatory statements received from DMA and Martin . . . ."). There is no allegation that Adweek asked for the settlement agreement, let alone induced any party to breach it.

***Second***, the Amended Complaint's two theories for how Adweek received information about the settlement agreement contradict each other, and neither support a claim. In one version of the story, Robin Bidwell, one of the parties to the agreement, "leaked the terms of the confidential settlement" to Sissy Estes, "who in turn leaked the terms to the Defendants." FAC ¶ 12. Adweek cannot be plausibly said to have induced Bidwell's breach when it did not even receive the information from her. The Amended Complaint also alleges that the Agency itself supplied the agreement to "DMA and the DMA Partners." *Id.* ¶ 31. This version of the story also merely shows Adweek received the agreement from someone, with the Amended Complaint acknowledging the Agency took proactive steps to give it to DMA on its own.

***Finally***, regardless of the theory or contract on which Alexander seeks to base his claim, the First Amendment bars it. *Bartincki v. Vopper*, 532 U.S. 514 (2001), discussed in Adweek's

14

opening brief, involved an attempt to hold a radio commentator and others liable for disclosure of an illegally intercepted cellphone conversation between union leaders discussing a contentious collective-bargaining session, *id.* at 517-19.  The commentator did not intercept the calls himself – he was supplied the recordings by a local activist – but he had reason to know that the interception of the calls was illegal.  *Id.* at 517-18.  When one of the speakers on the call sued the commentator for reporting on the conversation, the Supreme Court rejected that claim on First Amendment grounds.  It held that when a publisher "has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully," the government may not "punish the ensuing publication of that information based on the defect in a chain."  *Id.* at 528.  Under this precedent, Adweek cannot be held liable for receiving and publishing information from the settlement agreement, even if Bidwell or the Agency breached that agreement's confidentiality provision by disclosing it and even if Adweek knew they breached the contract by disclosing it.  *Id.* (explaining that "if a newspaper lawfully obtains truthful information about a matter of public significance," it cannot be held liable for its publication "absent a need . . . of the highest order").

### D. Alexander Cannot State a Conspiracy Claim Against Adweek.

The Amended Complaint's effort to state a claim for conspiracy to tortiously interfere with Alexander's employment contract fails because the alleged underlying tort is not actionable and the conspiracy is pleaded in only conclusory terms.  *See* Mem. at 17-18.  The Opposition again pivots to assert new theories of liability, now claiming that Alexander is alleging not just a conspiracy to tortiously interfere with that contract, but also a conspiracy to interfere with the settlement agreement, to "breach fiduciary duties," and to defame him.  *See* Opp. at 25-26.  These new versions of his claim also must be dismissed.

*First*, Alexander cannot maintain a claim for breach of fiduciary duty, tortious interference with the settlement agreement, or defamation. *See supra* at 8-15; *infra* at 19-20; Mem. at 12-15, 26-30. Therefore, no actionable claim underlies the supposed conspiracy. *See Beasley v. FV-I, Inc.*, 2013 U.S. Dist. LEXIS 39640, at *13 (E.D. Va. Mar. 21, 2013).

*Second*, even if there were some underlying tort, Alexander cannot state a claim for conspiracy. A plaintiff attempting to plead a civil conspiracy must allege *facts* showing "a meeting of minds on the object or course of action." *Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 711 (E.D. Va. 2009). "Where a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy . . . . Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *A Soc'y Without a Name, for People without a Home, Millennium Future-Present v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556-57). Here, the Amended Complaint seeks to establish a conspiracy merely by using terms like "agreed" and "combined." *E.g.*, FAC ¶ 98. But, there are no *factual* allegations showing an actual meeting of the minds.[9] *See Soc'y Without a Name*, 655 F.3d at 346 ("The factual allegations must plausibly suggest agreement, rather than being merely consistent with agreement.").

*Third*, the existence of any conspiracy is not plausible based on the facts alleged. Those facts provide an "obvious alternative explanation." *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009); *see, e.g.*, *Unspam*, 715 F.3d at 330 (affirming dismissal where allegations of conspiracy were

---

[9] Instead, the Amended Complaint explicitly pleads that Adweek's supposed co-conspirators acted for different reasons. The Agency sought to cover up its own breaches of fiduciary duty and avoid coverage of how it handled sexual harassment claims more broadly, FAC ¶ 70 n.23; DMA's purpose was "anonymously doxxing, smearing and shaming alleged sexual harassers in the advertising industry, *id.* ¶ 6; and Estes "held a grudge against" Alexander, *id.* ¶ 11.

"conclusory and speculative" and could equally describe transactions done in the ordinary course of business); *Shirvinski v. U.S.  Coast Guard*, 673 F.3d 308, 320-21 (4th Cir. 2012) (dismissing conspiracy claim based on the "sort of thing happens all the time in any team venture" because "to hold that the communication here formed an actionable civil conspiracy would be to strain Virginia law to the breaking point"); *Tuohy*, 2016 U.S. Dist. LEXIS 96294, at *28 (dismissing claim where "the record is replete with facts providing non-conspiratorial explanations").

Specifically, the facts alleged describe traditional journalistic practices and a routine relationship between a reporter and his sources.  According to the Amended Complaint's allegations, Adweek reported on Alexander's termination and published information supplied by the Agency, Estes, and others.  Courts have repeatedly rejected claims of conspiracy based on similar allegations about journalists and their sources:

> [P]roof of cooperation between two individuals who have a common purpose to produce a news story does not represent a sufficient basis for an actionable conspiracy . . . .  What is required in this sensitive First Amendment area is proof not merely of separate and distinct improper purposes by each [individual], proof not merely of a joint purpose to publish, but specific evidence of a joint purpose to defame.

*Dowd v. Calabrese*, 589 F. Supp. 1206, 1213-14 (D.D.C. 1984).  Indeed, "[c]ollaboration between individuals with an axe to grind and reporters eager for a story is not uncommon; rather, it is the way the news media frequently operate" and is not "a sufficient basis for an actionable conspiracy."  *Id.* at 1213; *accord Downey v. Coal. Against Rape & Abuse, Inc.*, 2005 U.S. Dist. LEXIS 7340, at *25-26 (D.N.J. Apr. 27, 2005) (finding plaintiff's "theory of conspiracy" to be "frivolous" because "contacts" between "a news reporter [and] official sources alone could not state a conspiracy claim"); *Ramunno v. Cawley*, 705 A.2d 1029, 1040 (Del. 1998) (dismissing conspiracy claim between source and journalists).

17

Here, Alexander's conspiracy theory is particularly implausible.  His Amended

Complaint expressly alleges that Adweek's alleged co-conspirators also supplied information to

Adweek's competitors.  *See* FAC ¶¶ 11 & n.9-10 (Estes was source for *The Wall Street Journal*

and *Richmond Times-Dispatch*).  Indeed, one of those competitors, *Adage*, was the first to report

Alexander was accused of sexual harassment and did so based on information from the Agency,

one of the alleged conspirators.  *Id.* ¶ 39; *see* Berry Decl., Ex. N.  These allegations underscore

Adweek was merely doing its job of reporting the news, not conspiring to commit torts.

### E.    Alexander Cannot State a Claim for Intentional Infliction of Emotional Distress.

Alexander's claim for intentional infliction of emotional distress fails for three reasons:

(1) Adweek's actions were not outrageous, (2) Alexander has not adequately alleged that he

experienced severe emotional distress, and (3) he cannot plausibly allege that Adweek caused

any distress he suffered.  *See* Mem. at 18-21.  Alexander does not address the third reason and

thus concedes it.  *See, e.g.*, *Oliver v. Baity*, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016); *Hopkins*

*v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002).  And,

the arguments he does make in response to the other grounds for dismissal fall short.

The two cases Alexander cites to try to meet his burden of showing outrageous conduct

instead show just how far Adweek's alleged conduct falls below this standard:

- In *Holley v. CVS Caremark Corp.*, 2016 U.S. Dist. LEXIS 101522, at *9-10 (W.D. Va. Aug. 3, 2016), CVS allegedly failed to follow its own guidelines for dispensing opiates to children in at least three different ways, causing the plaintiff, a five-year-old child, to receive a life-threatening overdose.

- The Opposition describes *Daniczek v. Spencer*, 156 F. Supp. 3d 739 (E.D. Va. 2016), as allowing an IIED claim because "the defendant released documents to trade publications that damaged plaintiff's reputation," Opp. at 27.  But, the conduct in *Daniczek* was far worse than that.  The defendant, a Commonwealth attorney, misused his office as part of a "prolonged, vindictive, and multifaceted campaign of misconduct" against the plaintiff, including assaulting her and swearing out a false warrant for her arrest.  156 F. Supp. 3d at 760-761.

18

The Opposition attempts to show that Alexander adequately pled facts about his emotional distress by citing the Fourth Circuit's discussion of this issue in *Hatfill*. *See* Opp. at 26 n.7. But, that case was decided prior to the Supreme Court's *Iqbal/Twombly* decisions and relied on the more generous pleading standard then in place. *See Fuller v. Aliff*, 990 F. Supp. 2d 576, 581 (E.D. Va. 2013). As this Court has subsequently recognized, a plaintiff's factual allegations about distress must "meet [a] high threshold of severity that 'no reasonable person could be expected to endure.'" *Eldib v. Bass Pro Outdoor World, L.L.C.*, 2015 U.S. Dist. LEXIS 99833, at *6 (E.D. Va. July 29, 2015) (Gibney, J.). Alexander has not met that threshold.

### F.   Alexander Cannot State a Claim for Aiding and Abetting.

To the extent a claim for aiding and abetting a breach of fiduciary duty exists at all under Virginia law, Alexander's claim fails because there was no breach of fiduciary duty here and, regardless, the First Amendment would bar this claim. *See* Mem. at 21-22. The Opposition argues that Alexander can state a claim because Adweek allegedly assisted the Agency and Estes in publicizing information from the confidential settlement agreement. *See* Opp. at 27. But, the breach of a contract's confidentiality provision "give[s] rise to a breach of contract claim, not a breach of fiduciary duty claim." *In re McMaken*, 2018 Bankr. LEXIS 2798, at *6 (Bankr. E.D. Va. Sep. 13, 2018) (collecting cases); *accord Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 661 (E.D. Va. 2002) (fiduciary duty claim only lies if the duty breached is "a common law duty, not one existing between the parties solely by virtue of the contract."). Moreover, it is absurd to suggest that Estes, a complete stranger to the contract, can be said to have taken on any fiduciary duty under it, and, as discussed in Adweek's opening brief, the Agency did not owe Alexander any fiduciary duty. Mem. at 21.

The Opposition also argues "the First Amendment does not excuse unlawful conduct," but the state court case it cites for this truism predates modern First Amendment jurisprudence

(including the First Amendment's application to states).  The Opposition ignores the Supreme

Court's decision in *Bartnicki*, which forecloses this claim.  *See supra* at 14-15; Mem. at 21-22.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those outlined in its opening memorandum of law,

Adweek respectfully requests that this motion be granted and that this case be dismissed for lack

of jurisdiction or, in the alternative, for failure to state a claim.

Dated:  January 9, 2020          Respectfully submitted,

         BALLARD SPAHR LLP

         By  */s/ Matthew E. Kelley*
           Matthew E. Kelley, Va. Bar No. 84045
         1909 K Street NW, 12th Floor
         Washington, DC  20006-1157
         Phone: 202-661-2200
         Fax: 202-661-2299
         kelleym@ballardspahr.com

         Michael Berry (*pro hac vice*)
         1735 Market Street, 51st Floor
         Philadelphia, PA 19103
         Phone: 215-988-9773
         Fax: 215-865-8999
         berrym@ballardspahr.com

         Thomas B. Sullivan (*pro hac vice*)
         1675 Broadway, 19th Floor
         New York, NY 10019
         Phone: 212-850-6139
         Fax: 212-223-1942
         sullivant@ballardspahr.com

         *Counsel for Defendants*
         *Adweek, LLC and Patrick Coffee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of January, 2020, I caused a true and correct copy of the

foregoing **REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ADWEEK,**

**LLC AND PATRICK COFFEE'S MOTION TO DISMISS** to be filed with the Court through the

ECF system, which generates an electronic notice of service by email to all counsel of record.


   */s/ Matthew E. Kelley*
   Matthew E. Kelley