IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOE ALEXANDER,
        Plaintiff,

v.                                            Civil Action No. 3:19-cv-688

DIET MADISON AVENUE, et al.,
        Defendants.

## OPINION

Until his resignation in 2017, Joe Alexander served as Chief Creative Officer for The Martin Agency (the "Agency"), a prominent advertising agency based in Richmond, Virginia. Alexander resigned from the Agency after a colleague reported that Alexander had sexually harassed her. Adweek, LLC ("Adweek"), published online articles about the sexual harassment allegations and Alexander's subsequent resignation. Adweek's New York-based reporter, Patrick Coffee, wrote the Adweek articles and published tweets about Alexander's resignation.

Alexander has sued Adweek and Coffee,[1] alleging that they conspired with other entities and individuals to purposefully tarnish his reputation by publishing false information about the sexual harassment allegations. The defendants have moved to dismiss for lack of personal jurisdiction, or in the alternative, for failure to state a claim. Because Alexander cannot show that Adweek and Coffee specifically targeted a Virginia audience when they published and wrote the articles and tweets at issue, the Court lacks personal jurisdiction over the defendants and will grant the motion to dismiss.

---

[1] Alexander also sued Diet Madison Avenue ("DMA"), Jean Batthany, Dani Hurt, and Mara Buta. Alexander did not serve those defendants. (*See* Dk. No. 36.) After the Court ordered Alexander to explain his failure to serve those defendants, Alexander voluntarily dismissed them from this case. (Dk. No. 37.) Accordingly, the Court will dismiss this case without prejudice as to DMA, Batthany, Hurt, and Buta.

# I. BACKGROUND

## *A. The Parties*

Alexander, a resident of Richmond, Virginia, served as the Agency's Chief Creative Officer from 2012 to 2017. (Am. Compl. ¶¶ 2, 5.) Alexander says that his "creative leadership" enabled the Agency to win a number of awards for its advertising campaigns during his tenure. (*Id.*) He also says that he "enjoyed an untarnished reputation in the advertising industry" before Adweek and Coffee published the articles and tweets at issue. (*Id.*)

Adweek—a Delaware limited liability company headquartered in New York[2]—"publishes *Adweek*, a national trade publication covering the advertising industry throughout the United States." (Litvack Decl. ¶ 2.) Relevant here, Adweek publishes articles available online to readers throughout the United States. Adweek has no employees, offices, bank accounts, or assets in Virginia. (*Id.* ¶¶ 3-6, 8.) Virginia residents comprise approximately 2 percent of Adweek's subscribers and 1.2 percent of its paid subscribers. (*Id.* ¶ 9.) Similarly, Virginia-based advertisers account for approximately 2 percent of Adweek's total advertising revenue. (*Id.* ¶ 10.) Adweek contracts with Amazon Web Services ("AWS") for its cloud-based web services. (*Id.* ¶ 7.) AWS houses its servers in Virginia. (Dk. No. 32, at 15.)

Coffee, a New York resident,[3] "is a blogger, writer, and former senior editor employed by *Adweek*." (Am. Compl. ¶ 9.) Coffee does not own any real estate, hold any bank accounts, conduct any business, or derive any income in Virginia. (Coffee Decl. ¶ 4.) Coffee wrote the articles and published the tweets at issue in New York. (*Id.* ¶¶ 7-8.) During the writing and reporting process,

---

[2] Adweek's members include a Delaware holding company headquartered in New York and individual members domiciled in New York or New Jersey. (Litvack Decl. ¶ 4.)

[3] Aside from two years spent at a boarding school in Virginia in the 1990s, Coffee has been a New York resident "for more than 20 years." (Coffee Decl. ¶ 2.)

Coffee spoke with a few sources who were in Virginia, including Alexander. (*Id.* ¶ 9.) Coffee did not travel to Virginia to do any interviews and "most of [his] sources were not in Virginia." (*Id.*)

Alexander contends that Adweek and Coffee conspired with individuals in Virginia to "publish[ ] false and defamatory statements in Virginia for the sole purpose of injuring [Alexander] and interfering with his employment at [the Agency]." (Am. Compl. ¶ 14.) He contends that Adweek and Coffee have opened themselves up to suit in Virginia due to "[t]he primary focus and sheer number of articles written about [Alexander] and [the Agency]." (Dk. No. 32, at 14.)

### B. Facts Alleged in the Amended Complaint

The events giving rise to this case began at a meeting between Alexander and executives of the Agency on November 21, 2017. At the meeting, Alexander learned that a coworker had filed a sexual harassment claim against him. (Am. Compl. ¶ 41.) Faced with the choice to resign or contest the allegations, Alexander resigned on December 1, 2017. (*Id.* ¶ 59.)

That same day, Adweek published an article written by Coffee ("Coffee's first article"), reporting that the Agency and Alexander had "parted ways." (Dk. No. 31-4, at 3; *see also* Am. Compl. ¶ 62.) Coffee's first article describes Alexander as "an elder statesman in the ad industry." (Dk. No. 31-4, at 3.) The article does not mention the sexual harassment allegations or give any reason for Alexander's departure.

Six days later, on December 7, 2017, Adweek published a second article written by Coffee ("Coffee's second article"), this time reporting that Alexander had resigned from the Agency "after several sexual harassment allegations claims were made with the agency." (Dk. No. 31-5, at 3; *see also* Am. Compl. ¶ 69.) Coffee's second article mentions that "[e]leven individuals" spoke with Adweek "about their experiences working with Alexander." (Dk. No. 31-5, at 3.) The article further reports that Alexander "made improper sexual advances" toward female coworkers, made

inappropriate jokes and comments at work, and "regularly belittled coworkers." (*Id.* at 5.) The article also includes a quote from Alexander, who told Coffee that he denies the allegations. (*Id.* at 3.)

Alexander contends that Coffee's second article amounts to a "Hit Piece" against him. (Am. Compl. ¶ 69.) He says that it contains "multiple false and defamatory statements" and "has been republished millions of times between 2017 and the present." (*Id.* ¶¶ 70, 73.) Alexander's amended complaint cites various additional articles and tweets published by Adweek, Coffee, and other media organizations.[4] In his brief in opposition to the motion to dismiss, however, Alexander narrowed his defamation claim to the following five articles and tweets that he contends fall within the statute of limitations:

- Coffee's second article;[5]

- A tweet by Coffee published on December 19, 2018,[6] which includes a link to an article published by *Refinery29* on December 17, 2018 (the "Refinery29 article");[7]

---

[4] The amended complaint cites thirteen articles and tweets. (*See* Am. Compl. ¶¶ 9 & n. 8, 21 n. 13, 62, 69, 74, 75, 93.)

[5] Patrick Coffee, *The Martin Agency Chief Creative Officer Joe Alexander Exited After Multiple Sexual Harassment Complaints, Sources Say: He Denies the Allegations*, Adweek (Dec. 7, 2017), https://www.adweek.com/agencies/the-martin-agency-chief-creative-officer-joe-alexander-exits-after-multiple-sexual-harassment-complaints-sources-say/. (Am. Compl. ¶ 69; *see* Dk. No. 31-5.)

[6] Patrick Coffee (@PatrickCoffee), Twitter (Dec. 19, 2018, 3:07 P.M.), https://twitter.com/PatrickCoffee/status/1075407319943524352. (Am. Compl. ¶ 9; *see* Dk. No. 31-14.)

[7] Amelia Harnish, *The Morning After: After a #MeToo Shake-Up, One of the Country's Top Ad Agencies Replaced All Their Leading Men with Women. Now What?*, Refinery29 (Dec. 17, 2018), https://www.refinery29.com/en-us/2018/12/217506/the-martin-agency-women-executives-times-up. (Am. Compl. ¶ 73; *see* Dk. No. 31-20.) The Refinery29 article discusses Alexander and the Agency.

4

- Two Adweek articles published on December 27, 2018, both of which include links to Coffee's second article;[8] and

- An article published on the Agency's website on January 6, 2019, which includes a link to the Refinery29 article.[9]

(Dk. No. 32, at 19.)[10]

Alexander's amended complaint asserts the following claims: tortious interference with contract (Count One); tortious interference with prospective economic advantage (Count Two);[11] common law conspiracy (Count Three); aiding and abetting (Count Four); defamation per se (Count Five); and intentional infliction of emotional distress (Count Six).

The defendants have moved to dismiss the amended complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), or in the alternative, for failure to state a claim under Rule 12(b)(6).[12]

---

[8] Patrick Coffee, *The 5 Most Important Ad Industry Stories of 2018: From #MeToo to M&A, the Agency Community Picks the Top Trends*, Adweek (Dec. 27, 2018), https://www.adweek.com/agencies/the-5-most-important-ad-industry-stories-of-2018/ (Am. Compl. ¶ 9; *see* Dk. No. 31-15); Admin, *The 20 Biggest AgencySpy Posts of 2018*, AgencySpy (Dec. 27, 2018), https://www.adweek.com/agencyspy/the-20-biggest-agencyspy-posts-of-2018/152124/ (Am. Compl. ¶ 9; *see* Dk. No. 31-16).

[9] *Then and Now: Refinery29 Profiles The Martin Agency*, The Martin Agency (Jan. 6, 2019), https://martinagency.com/news/then-and-now-refinery29-profiles-the-martin-agency.

[10] Although Alexander did not attach copies of the articles and tweets at issue to his amended complaint, the defendants submitted them as exhibits to their brief in support of their motion to dismiss. *See Consulting Eng'rs Corp. v. Geometric, Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009) (noting that courts "address[ ] the question of personal jurisdiction on the basis of motion papers, supporting legal memoranda, and the allegations in the complaint"). Thus, the Court may consider the articles and tweets in deciding whether it has personal jurisdiction over the defendants.

[11] Alexander concedes that he does not state an actionable claim in Count Two. (Dk. No. 32, at 24.)

[12] Because the Court concludes that it lacks personal jurisdiction over Adweek and Coffee, the Court will not reach the defendants' arguments for dismissal under Rule 12(b)(6). *See Intera*

5

## II. DISCUSSION[13]

### *A. Personal Jurisdiction*

A court may exercise personal jurisdiction over a nonresident defendant if the defendant has certain minimum contacts with the forum and the suit does not offend "traditional notions of fair play and substantial justice." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In this case, the Court must determine whether it can exercise specific personal jurisdiction[14] by examining three factors: (1) whether the defendants "purposefully availed [themselves] of the privilege of conducting activities" in Virginia; (2) "whether the plaintiff's claim [arose] out of those activities directed at" Virginia; and (3) "whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016).

When a case involves Internet contacts, a sliding scale test determines whether a "defendant purposefully availed itself of the privilege of conducting activities in the State." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712-13 (4th Cir. 2002). Using the sliding scale, a court may exercise jurisdiction over an out-of-state defendant only when that entity "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business

---

*Corp. v. Henderson*, 428 F.3d 605, 621 (6th Cir. 2005) ("[U]pon a determination that personal jurisdiction is lacking, a court should not dismiss a case on the merits.").

[13] Adweek and Coffee have moved to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). *See* Fed. R. Civ. P. 12(b)(2). Alexander bears the burden "to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Alexander "need only make a prima facie showing of personal jurisdiction." *Id.* The Court views "all disputed facts and reasonable inferences" in Alexander's favor. *Id.*

[14] In a recent case involving Adweek and Coffee, the Court held that Adweek and Coffee are not subject to general personal jurisdiction in Virginia. *See Perrott v. Coffee*, No. 3:19-cv-511-HEH, 2019 WL 6842536, at *2 n.5 (E.D. Va. Dec. 16, 2019).

6

or other interactions within the State, and (3) that the activity creates, in a person within the State, a potential cause of action." *ALS Scan, Inc.*, 293 F.3d at 714.

"When the Internet activity is . . . the posting of news articles on a website, the *ALS Scan* test works more smoothly when parts one and two of the test are considered together." *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002). Thus, the Court must consider "whether (1) each defendant 'manifested an intent to direct their website content' to a 'Virginia audience,' . . . such that the defendant 'should reasonably anticipate being haled into court' in Virginia[;] . . . and (2) whether each defendant's activity 'creates, in a person within the State, a potential cause of action' under Virginia law." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 653-54 (W.D. Va. 2019) (internal citations omitted).

### B. Application to Adweek and Coffee

Upon review of the websites, articles, and tweets at issue in this case, the Court has little difficulty concluding that the defendants did not intend to target a Virginia audience. *See Young*, 315 F.3d at 263 (noting that courts should "examine the[ ] general thrust and content" of the websites and the "specific articles" at issue to determine whether a defendant "manifest[ed] an intent to target and focus on Virginia readers"). Instead, the relevant websites, articles, and tweets reveal that the defendants intended to target the entire advertising industry nationwide.[15] *Cf. Burleson v. Toback*, 391 F. Supp. 2d 401, 413 (M.D.N.C. 2005) (finding that the defendant's

---

[15] For example, the Adweek webpage on which Coffee's Second Article is published features advertisements directed at the advertising industry, postings for jobs in New York, and links to other *Adweek* articles, none of which have any connection to Virginia. (*See* Dk. No. 31-5, at 2-8.) The webpage features advertisements for a company that provides "[a]dvertising [s]olutions for [p]erformance [m]arketers," an event featuring Ashton Kutcher as a keynote speaker, a company that bills itself as "the trusted authority in CTV & OTT advertising," and a company that apparently helps advertisers "reach millions of students." (*Id.*); *cf. Young*, 315 F.3d at 263 ("[N]either newspaper's website contains advertisements aimed at a Virginia audience.").

website intended to target people "all over the world" and thus that the defendant did not intend to target a North Carolina audience).

For his part, Alexander's amended complaint acknowledges Adweek's national reach and focus. He asserts that Adweek "attracts more than 6.5 million monthly unique visitors online, counts 1.9 million social media followers, and has a weekly print circulation of around 40,000." (Am. Compl. ¶ 8.) To support his argument that the defendants intended to target a Virginia audience, Alexander points out that the articles and tweets at issue feature two Virginia citizens: Alexander and the Agency. The Fourth Circuit, however, has rejected the argument that nonresident news organizations open themselves up to suit in a state simply by publishing online articles about that state's residents. *See Young*, 315 F.3d 263-64; *see also ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997) ("Although the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state.").

For example, in *Young*, the warden of a Virginia prison sued two Connecticut-based newspapers for libel in federal court in Virginia. 315 F.3d at 259. The warden's allegations involved the newspapers' coverage of prison conditions in Virginia, which housed prisoners from Connecticut. *Id.* Both newspapers printed and distributed the publications in Connecticut. *Id.* at 259-60. Although one newspaper had eight mail subscribers in Virginia, neither solicited subscriptions from Virginia residents. *Id.* at 260. Nobody traveled to Virginia to work on the articles. *Id.* Reasoning that "[t]he newspapers did not post materials on the Internet with the manifest intent of targeting Virginia readers," the Fourth Circuit in *Young* held that the district court lacked specific jurisdiction over the newspapers. *Id.* at 264. That two reporters called Virginia residents as part of the reporting process did not alter the court's conclusion. *Id.* at 260.

Similarly, in this case, Coffee wrote the articles and tweets at issue in New York. Although he made a few phone calls to Virginia residents as a part of the reporting process, he never traveled to Virginia to work on the articles and tweets. Adweek does not have employees or offices in Virginia. Adweek's Virginia subscribership—1.2 percent of its paid subscribers—"is 'random, fortuitous, and attenuated' given that . . . Adweek caters to a 'nationwide marketplace of consumers.'" *Perrott*, 2019 WL 6842536, at *4 (quoting *FireClean, LLC v. Tuohy*, No. 1:16-cv-294, 2016 WL 3952093, at *6 (E.D. Va. July 21, 2016)). Thus, while Alexander may have felt "the effects of any [defamation] in Virginia, where he lives and works," the relevant question remains "whether the defendant has expressly aimed or directed its conduct toward the forum state." *Young*, 315 F.3d at 262.

Alexander does not offer any persuasive argument on that score. He notes that Virginia residents accessed Adweek's website and Coffee's tweets. But "'a person's act of placing information on the Internet' is not sufficient to 'subject[ ] that person to personal jurisdiction in each State in which the information is accessed.'" *Id.* at 263 (quoting *ALS Scan*, 293 F.3d at 714). "Otherwise, 'a person placing information on the Internet would be subject to personal jurisdiction in every State,' and the traditional due process principles governing a State's jurisdiction over persons outside of its borders would be subverted." *Id.* (quoting *ALS Scan*, 293 F.3d at 712).

Next, Alexander points out that Adweek maintains its web servers in Virginia. (*See* Dk. No. 31, at 15.) But the Fourth Circuit has "described as 'de minimis' the level of contact created by the connection between an out-of-state defendant and a web server located within a forum." *Carefirst of Md., Inc.*, 334 F.3d at 393.

Finally, Alexander invokes the conspiracy theory of jurisdiction, arguing that Adweek and Coffee worked with other individuals or entities who carried out an alleged conspiracy in Virginia.

To proceed on a conspiracy theory of jurisdiction, a plaintiff must "make a plausible claim (1) that a conspiracy existed; (2) that the [ ] defendants participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013). A plaintiff cannot meet this requirement with "bare allegations." *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997) ("[T]he plaintiff must plead with particularity the conspiracy as well as the overt acts within the forum in furtherance of the conspiracy.").

Here, Alexander has failed to make a plausible claim that a conspiracy existed. He contends that all of the defendants in this case "agreed or acted in concert together . . . for the express purpose of injuring [Alexander] in his business and reputation through the publication and republication of false and defamatory statements and tortiously interfering with [Alexander's] employment as CCO of [the Agency]." (Am. Compl. ¶ 98.) But Alexander does not plead any facts to suggest that the defendants ever engaged in a conspiracy with anyone. Instead, his allegations indicate that the defendants' behavior amounts to conduct typical of news organizations and their reporters: news-gathering, fact-checking, and publication. Alexander's speculation that the defendants coordinated their activities to injure him "does not suffice to allege a plausible claim of the existence of a conspiracy." *Unspam*, 716 F.3d at 330. Alexander, therefore, cannot proceed on a conspiracy theory of specific jurisdiction. *Id.* at 229.

* * *

Because the defendants intended to target the advertising industry nationwide, Alexander cannot show that they intended to direct their articles and tweets specifically to a Virginia audience. Moreover, the defendants' interactions with Virginia-based sources amount to conduct typical of

national news organizations and reporters—not a conspiracy. Accordingly, the defendants "could not have reasonably anticipate[d] being haled into [a Virginia Court]." *Carefirst of Md., Inc.*, 334 F.3d at 400 (alterations in original).

### III. CONCLUSION

Because the Court lacks personal jurisdiction over Adweek and Coffee, the Court will dismiss this case without prejudice.[16]

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 17 Jul 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[16] *See Pandit v. Pandit*, 808 F. App'x 179, 183 n.3 (4th Cir. 2020) (per curiam) (noting that a dismissal for lack of personal jurisdiction is without prejudice because "such a dismissal does not dismiss the case on the merits").

11